# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED THERAPEUTICS CORPORATION,
1000 Spring Street,
Silver Spring, MD 20910,

*Plaintiff,*

v.

FOOD AND DRUG ADMINISTRATION,
10903 New Hampshire Avenue,
Silver Spring, MD 20993,

ROBERT M. CALIFF, M.D., in his official
capacity as Commissioner of Food and Drugs,
10903 New Hampshire Avenue,
Silver Spring, MD 20993,

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
200 Independence Avenue SW,
Washington, DC 20201,

XAVIER BECERRA, in his official capacity as
Secretary of Health and Human Services,
200 Independence Avenue SW,
Washington, DC 20201,

*Defendants.*

No. 24-cv-484

## **COMPLAINT**

Plaintiff United Therapeutics Corporation ("UTC") brings this Complaint against
Defendants the Food and Drug Administration ("FDA"); Robert M. Califf, M.D., in his official
capacity as Commissioner of FDA; the United States Department of Health and Human Services
("HHS"); and Xavier Becerra, in his official capacity as Secretary of HHS, and alleges as follows:

## **NATURE OF THE ACTION**

1.      This is an action for injunctive and declaratory relief challenging a legally
erroneous final decision made by FDA. For at least three decades, FDA's rules, precedents, and

procedures have barred applicants from amending a pending drug application to seek approval for a newly proposed drug use (called an "indication") that was not requested in the applicant's original application, instead requiring a new application. In that new application, the applicant must demonstrate that the drug is safe and effective for the newly proposed indication and must pay a separate FDA "user fee" to fund the additional review that a new indication requires. Of particular relevance here, the new application must also go through the procedures that Congress specifically designed to ensure that any potential patent disputes could be adjudicated *before* FDA approves a potentially infringing drug product or use.

2.      In this case, FDA disregarded its own rules, precedents, and procedures by accepting an amendment from Liquidia Technologies, Inc. ("Liquidia") that would do precisely what FDA has always prohibited: add a new indication to its pending application. That unexplained departure from FDA's established rules, precedents, and policies would be improper on its own. However, FDA's decision also subverts the intricate statutory framework Congress designed to ensure that—for the protection of *both* innovators like UTC *and* imitators like Liquidia—the federal courts have enough time to resolve drug-related patent disputes before FDA can approve a new drug. FDA's decision to accept Liquidia's amendment threatens to upset the carefully crafted legislative bargain at the heart of the Hatch-Waxman Act. That decision is unlawful, arbitrary and capricious, and must be vacated.

3.      UTC is a biotechnology company focused on the development and commercialization of products that address the needs of patients with chronic and life-threatening conditions, including cardiovascular and pulmonary diseases and pediatric cancers.

4.      UTC developed TYVASO (treprostinil), an inhaled form of the drug treprostinil that FDA has approved for two clinically distinct indications: (1) the treatment of pulmonary

arterial hypertension ("PAH"), and (2) pulmonary hypertension associated with interstitial lung disease ("PH-ILD").

5.      In January 2020, Liquidia submitted a New Drug Application ("NDA") seeking FDA marketing approval for an inhaled treprostinil product that, as originally submitted to FDA, would be indicated exclusively for the treatment of PAH (but not PH-ILD). Liquidia sought approval for this product and indication under section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 355(b)(2), which allows an applicant to shortcut the normal FDA review process by relying on FDA's prior approval of an existing drug and its associated clinical data—in Liquidia's case, by piggybacking on FDA's prior approval of UTC's TYVASO as safe and effective in the treatment of PAH.

6.      In exchange for taking that shortcut, 505(b)(2) applicants like Liquidia must follow the requirements Congress established to protect the patent rights of the innovator on whose prior approval and data the 505(b)(2) applicant relies. As relevant here, the 505(b)(2) applicant must provide a "certification" to patents listed by the innovator in FDA's *Approved Drug Products with Therapeutic Equivalents* publication ("Orange Book"). If the innovator has timely listed a patent for the previously approved product, and the applicant certifies that it intends to begin marketing its own product before that patent expires (a so-called "paragraph IV" certification), then the innovator may bring suit for patent infringement without waiting for the 505(b)(2) applicant to commit a traditional act of patent infringement (such as selling its infringing product). 35 U.S.C. § 271(e)(2)(A); *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990).

7.      To ensure adjudication of patent disputes *before* the approval and resulting launch of a product that would irrevocably change the market, Congress created the "30-month stay" that is central to this case. If the innovator files suit promptly after receiving notice of an applicant's

paragraph IV certification, FDA's ability to approve the pending application is stayed for 30 months—typically enough time for the district court to decide the patent litigation. *See* 21 U.S.C. § 355(c)(3)(C). If the patent litigation ends sooner, so does the stay. *See id.* § 355(c)(3)(C)(i)-(ii). This process facilitates the efficient resolution of patent disputes before approval and launch.

8.       There is an exception to the 30-month stay for legally permissible amendments to 505(b)(2) applications that are already pending. To prevent garden-variety changes (such as a change in color) from triggering a new stay, the statute provides that a 30-month stay applies to listed patents for which information was submitted "before the date on which the application (*excluding an amendment or supplement to the application*) was submitted." 21 U.S.C. § 355(c)(3)(C) (emphasis added). Thus, when an applicant submits a lawful amendment to a pending 505(b)(2) application, its submission of a paragraph IV certification on patents listed after the original application was filed will not trigger a stay of final approval.

9.       To avoid disrupting the statutory process for pre-approval patent adjudication and to properly allocate its own resources, FDA regulations and guidance have always limited the types of changes allowed by amendment. Indeed, since at least 1993, FDA's "Bundling Rule" has provided that an applicant may not add a new *indication* to a pending application—which includes a "tentatively approved" application—via an amendment; rather, the applicant must submit a new application. This longstanding rule, which FDA has reiterated repeatedly and as recently as January 2024, ensures that when a 505(b)(2) applicant seeks approval for a new indication that provokes a patent dispute, a 30-month stay will apply to allow orderly resolution of the suit before approval. *See* SOPP 8401 Administrative Processing of Original Biologics License Applications (BLA) and New Drug Applications (NDA), at 12 (Jan, 8, 2024), https://www.fda.gov/media/ 85659/download. Since new indications are often protected by different patents than those

addressed by the applicant's initial certification, this established procedure is essential for the patent-litigation process to work as Congress intended.

10.     In July 2023, Liquidia submitted an amendment to its pending 505(b)(2) NDA to add PH-ILD as a proposed new indication. Under the FDA's Bundling Rule and as the Agency's precedents repeatedly have made clear, this amendment was improper. FDA should have rejected the application and required Liquidia to submit a new NDA for this indication. Nevertheless, FDA accepted Liquidia's amendment for substantive review. PR92523 (Press Release, FDA Accepts Submission to Add PH-ILD to YUTREPIA™ Label (Sept. 25, 2023), https://www.liquidia.com/ node/10646/pdf).

11.     FDA's decision to disregard binding rules, precedents, and procedures has deprived UTC of an important statutory protection. Liquidia's amended NDA implicates multiple UTC patents listed in the Orange Book, including those specific to the PH-ILD indication. Liquidia has submitted paragraph IV certifications as to those patents, and UTC has timely sued Liquidia for patent infringement. If Liquidia made these paragraph IV certifications as part of the new 505(b)(2) NDA required by the Agency's rules, precedents, and procedures, FDA would be barred from approving that NDA for up to 30 months to allow time for UTC's infringement claims to be adjudicated. That is what should have happened. Instead, by accepting Liquidia's request to pursue its new indication as an amendment, rather than a new application, FDA allowed Liquidia to sidestep the 30-month stay, deprived UTC of a valuable statutory right, and undermined the statutory process for resolving patent disputes.

12.     UTC brings this action under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*. UTC seeks an order declaring that FDA's decision to accept Liquidia's amendment for substantive review was arbitrary and capricious, in excess of its statutory authority, without

observation of procedure, or otherwise unlawful and vacating FDA's acceptance of Liquidia's amendment. Liquidia of course remains free to seek marketing approval for its follow-on product in PH-ILD if it wants—but it needs to follow FDA rules and submit a new application.

13.     Prompt judicial relief is urgently needed to restore UTC's statutory right and prevent UTC from suffering imminent, irreparable harm. If FDA had followed its established regulations, precedents and policies requiring Liquidia to submit a new NDA for the PH-ILD indication, then FDA could not approve Liquidia's application, with its paragraph IV certifications, until the earlier of 30 months from its submission or resolution of infringement claims in Liquidia's favor. If approval of Liquidia's PH-ILD indication is allowed to occur in the absence of requiring a new NDA for PH-ILD, UTC's statutory right will be lost irrevocably.

## **<u>PARTIES</u>**

14.     UTC is a corporation organized and existing under the laws of the State of Delaware and having a place of business at 1000 Spring Street, Silver Spring, Maryland 20910.

15.     Defendant FDA is an agency of the United States government within the United States Department of Health and Human Services ("HHS"). The Secretary of Health and Human Services has delegated to FDA the authority to administer relevant provisions of the FDCA. FDA is headquartered in Silver Spring, Maryland.

16.     Defendant Robert M. Califf, M.D., is the Commissioner of Food and Drugs. The Commissioner of Food and Drugs has the delegated authority to administer the FDCA. He is sued in his official capacity only.

17.     Defendant HHS is a cabinet-level executive department charged with enhancing the health and well-being of all Americans. HHS is headquartered in Washington, D.C.

18.     Defendant Xavier Becerra is Secretary of Health and Human Services. The Secretary of Health and Human Services is the official charged by law with administering the FDCA. He is sued in his official capacity only.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this case arises under the laws of the United States.

20.     UTC brings this lawsuit under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

21.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because at least one defendant resides in this district.

## LEGAL BACKGROUND

### A.     FDA Approval of New Drug Products

22.     The FDCA mandates that before FDA approves a new drug product, the sponsor must prove that the drug product is effective and safe for use in each of its proposed indications. *See* 21 U.S.C. § 355(d)(2); *see generally* § 355(a). To do so, the FDCA and its implementing regulations require those seeking to market a new drug to obtain approval of an application submitted pursuant to section 505(b) or (j) of the FDCA.

23.     To market a new brand-name drug, an applicant typically submits an NDA under section 505(b)(1) of the FDCA, 21 U.S.C. § 355(b)(1). Obtaining approval of an NDA under section 505(b)(1) requires that the drug's sponsor provide FDA with "full reports of investigations" that the applicant has "made to show whether or not such drug is safe for use and whether such drug is effective in use." *Id.* § 355(b)(1)(A). To that end, the NDA must include a clinical data section providing "[a] description and analysis of each controlled clinical study pertinent to a

proposed use of the drug" and a "summary of the data demonstrating substantial evidence of effectiveness for the claimed indications." 21 C.F.R. § 314.50(d)(5)(ii), (v).

**B.**     **The Hatch-Waxman Act**

24.     The Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act" or "Hatch-Waxman"), Pub. L. No. 98-417, 98 Stat. 1585, amended the FDCA to remove barriers to entry, increase availability of drugs, and reduce prescription costs. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). In so doing, the Hatch-Waxman Act established two abbreviated pathways allowing drug products to come to market more quickly than if full studies for safety and effectiveness were required: the ANDA pathway for generic drugs (duplicates), and the 505(b)(2) pathway for follow-on products. This case involves the latter.

25.     An applicant can secure approval for a generic drug by submitting an abbreviated new drug application ("ANDA") that establishes that the generic drug is bioequivalent and pharmaceutically equivalent to a previously approved reference listed drug ("RLD") that FDA has already found to be safe and effective. 21 U.S.C. § 355(j)(2)(A). In other words, the ANDA relies on the safety and effectiveness data for the RLD. The 505(b)(2) pathway is used when the new drug is not just a bioequivalent copy of the RLD but shares some relevant characteristics with a previously approved drug. "Like the full NDA, a 505(b)(2) NDA must directly demonstrate that the proposed drug product is safe and effective" for each of the indications for which it seeks FDA approval. *Veloxis Pharm., Inc. v. FDA*, 109 F. Supp. 3d 104, 108 (D.D.C. 2015); *see also* 21 C.F.R. § 314.54(a)(ii); 21 C.F.R. § 314.50(d)(5)(ii), (v). But to the extent that the drug shares characteristics with the proposed new product, the 505(b)(2) NDA can rely, at least in part, "on clinical studies that were previously submitted to the FDA in support of another drug and that were not conducted or licensed by the 505(b)(2) sponsor." *Veloxis*, 109 F. Supp. 3d at 109 (brackets

omitted); FDA, Determining Whether to Submit an ANDA or a 505(b)(2) Application (May 2019),

at 4, https://www.fda.gov/media/124848/download.

26.     In creating these abbreviated processes, Congress addressed two challenges. *First*,

Congress recognized that many listed drugs are protected by valuable patents (e.g., for active

ingredients, methods of delivery, and/or methods of use), and it needed to preserve and reinforce

the Patent Act's crucial incentives and protections for pharmaceutical innovation. *Second*,

Congress recognized that uncertainty over the validity, enforceability, and applicability of those

patents might discourage a follow-on product's sponsor from marketing its drug *even after FDA*

*approval*. That is so because the Patent Act had always prevented parties from resolving patent-

related disputes until after an alleged infringer actually "makes, uses, offers to sell, or sells any

patented invention, within the United States or imports [it] into the United States." 35 U.S.C.

§ 271(a). The utility of Hatch-Waxman's abbreviated pathways would have been substantially

diminished if follow-on applicants could not obtain patent certainty without risking the entry of an

infringement judgment and potential damages or injunctive relief.

27.     To "strike[] a balance between the sometimes-competing policy interests of

inducing pioneering research and development of new drugs and enabling production of low-cost,

generic copies of those drugs," *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 557 F.3d 1346, 1347

(Fed. Cir. 2009), the Hatch-Waxman Act established a multi-part process designed with one

objective in mind: to ensure that potential patent disputes between innovators and imitators can be

resolved *before* the approval and launch of a potentially infringing follow-on product.

28.     First, to help prospective follow-on product sponsors identify potential patent

barriers to entry, the Hatch-Waxman Act requires the sponsor of an FDA-approved NDA to file

with FDA "the patent number and the expiration date of any patent which claims the drug . . . and

with respect to which a claim of patent infringement could reasonably be asserted [against a competitor]." 21 U.S.C. § 355(b)(1); *see also* 21 C.F.R. § 314.50(h). FDA is then required to "make available to the public" a list of the patents NDA holders have submitted to the agency, which it publishes in the Orange Book. 21 U.S.C. § 355(j)(7)(A)(i); *see also* § 355(c)(2).

29.    Next, the Hatch-Waxman Act requires each 505(b)(2) NDA or ANDA to include "a certification . . . with respect to each [Orange Book-listed] patent which claims the listed drug … or … a use for such listed drug." § 355(c)(2)(A) (505(b)(2) applications), (j)(2)(A)(vii) (ANDAs); *see also* 21 C.F.R. § 314.53(f). If a 505(b)(2) or ANDA applicant wants to market a follow-on drug before the expiration of any patent listed in the Orange Book for a given brand-name drug, it must certify that the patent is invalid or unenforceable or will not be infringed by the generic drug (which, as noted above, is referred to as a "paragraph IV" certification). 21 U.S.C. § 355(c)(2)(A)(iv), (j)(2)(A)(vii)(IV); 21 C.F.R. § 314.94(a)(12)(i)(A). Whenever a follow-on applicant makes such a certification, it must then timely notify both the brand-name drug's sponsor and the relevant patentees and explain the basis for its paragraph IV certification. *Id.* § 355(b)(3)(B). To ensure that both innovators and follow-on sponsors can obtain patent certainty at the earliest possible opportunity, the statute deems an applicant's submission of a paragraph IV certification to FDA as a technical act of patent infringement that can immediately be litigated before the product is marketed. 35 U.S.C. § 271(e)(2)(A); *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990) ("Quite obviously, the purpose of [35 U.S.C. § 271]e)(2) and (e)(4) is to enable the judicial adjudication upon which the ANDA and paper NDA schemes depend."); *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1305 (D.C. Cir. 2010).

30.    The statute is further designed to ensure that orderly patent litigation promptly follows from the submission of a paragraph IV certification. Where the brand manufacturer files

suit within 45 days of receiving the legally required notice of a paragraph IV certification, it earns the right to an automatic stay that bars FDA from approving the 505(b)(2) NDA or ANDA until the earlier of the expiration of the patent, resolution of the suit, or thirty months after the patentee's receipt of notice. 21 U.S.C. § 355(c)(3)(C); 21 C.F.R. § 314.107(b)(3)(viii); 21 U.S.C. § 355(c)(3)(C). Taken as a whole, the purpose of the Hatch-Waxman Act is to ensure that patent disputes are resolved in an orderly fashion before an FDA approval irretrievably alters the composition of the marketplace.

### C.    The Bundling Rule and Incentivizing Major Modifications

31.    Before Congress amended the Hatch-Waxman Act in 2003, brands were able to secure additional 30-month stays for insignificant patents listed after the submission of a 505(b)(2) application or ANDA. For example, a brand manufacturer might secure a patent covering minor secondary changes to a drug product (*e.g.*, related to color or packaging) and trigger a new stay, even though the change "really did not indicate a different or improved use for the product[.]":

> We heard in committee examples of the brand name manufacturer making extremely minor changes, such as in the color or the design of the packaging or the scoring of the pill that really did not indicate a different or improved use for the product but, rather, were devices intended to keep the generic off the market for a while longer.

*See* 148 Cong. Rec. S6844 (2002). Congress sought to curb this practice in the Medicare Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 (2003), by amending the statute to specify that patents first listed after the application was filed do not result in a stay. 21 U.S.C. § 355(c)(3)(C) (patents must have been submitted before "the date on which the application (excluding an amendment or supplement to the application) was submitted"). But Congress did not intend for the MMA's limitation on the 30-month stay to address follow-on patents for significant changes reflecting "different or improved use[s] for [a] product," which are the kinds of "innovations that Congress sought in the [Hatch-Waxman] Bill." 48 Cong. Rec. S6844

(2002); Examining Issues Related to Competition in the Pharmaceutical Marketplace: A Review of the FTC Report, Generic Drug Entry Prior to Patent Expiration: Hearing Before the SubComm. on Health of the Comm. on Energy and Com., 107 Cong. 21 (2002). To the contrary, Congress understood that a major modification to a pending 505(b)(2) application could not be made in an amendment, and instead required a separate application. Such a major modification could thus give rise to a new 30-month stay, if covered by a patent listed before the new application.

32.     The MMA was enacted against the backdrop of FDA's Bundling Rule from 1993, which governed the kinds of modifications that could be added to a pending NDA in an amendment. The Bundling Rule as issued in 1993 provided that "a pending original or supplemental application should not be amended to add a new indication" and explained that, "[i]f the original application is not yet approved, a request for approval of other indications or claims" should "be submitted in a separate, original, application." FDA, Interim Guidance: Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees Under the Prescription Drug User Fee Act of 1992 at 6 (1993) ("1993 Bundling Rule"). When Congress adopted the MMA 10 years later, it acknowledged the import and continuing force of the Bundling Rule, stating that it "d[id] *not* intend [the MMA] to alter current [FDA] practice regarding acceptance of … amendments and supplements to pending and approved [applications].... Instead, Congress intends [the MMA] to reflect the FDA's current practice regarding those changes and variations to both innovator and generic drugs that may be approved under amendments and supplements to previously filed NDAs and ANDAs." H.R. Rep. No. 108-391, at 835 (2003). The text of the MMA further confirms that Congress acted to avoid disturbing the Bundling Rule and understood the distinction between substantial alterations that should be the subject of a new application (and should trigger a new 30-month stay) and largely immaterial modifications where

an additional 30-month stay might not be appropriate. *Compare* 21 U.S.C. § 355(b)(4)(A) (applicants may not seek approval of a different drug in an amendment), *and* 149 Cong. Rec. S8197 (2003) (statement of Sen. Frist) (discussing prudence of clarifying FDA's "policy that an amendment or supplement...cannot cover a drug other than the original drug" because it is an "obvious loophole."), *with* 21 U.S.C. § 355(b)(4)(B) (permitting amendments to seek approval for a different strength), *and* 1993 Bundling Rule at 4-5 (permitting different strengths in a single application).

33.     Following adoption of the 2003 MMA, FDA has reaffirmed its Bundling Rule in relevant and substantial part, including as applied to new indications. The current version of the Bundling Rule, set forth in 2004, states:

> If submitted simultaneously in one application, requests for approval of different indications and uses for the same dosage form to be administered by the same route of administration . . . can be regarded, for the purposes of assessing user fees, as one application. . . . *After initial submission, a pending original or supplemental application should not be amended to add a new indication or claim. . . . If the original application is not yet approved, a request for approval of other new indications or claims should be submitted in a separate, original application*. If the initial application is approved, the application can be subsequently supplemented to add a new indication.

2004 Bundling Rule, at 4-5 (emphasis added).

34.     In regulations implementing the MMA, FDA has characterized the Bundling Rule as imposing requirements on NDA applicants. *See, e.g.*, FDA, Proposed Rule, Abbreviated New Drug Applications and 505(b)(2) Applications, 80 Fed. Reg. 6802, 6851 (Feb. 6, 2015) ("[A]n applicant *may not* seek approval for these types of changes to a drug through an ... the applicant *is required* to submit a new 505(b)(2) application) (emphasis added); FDA, Final Rule, Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg. 69,580, 69,616, 69,635 (Oct. 6, 2016) ("These changes must be requested in a new 505(b)(2) application. This final requirement

conforms with FDA's current policy regarding the types of proposed changes to a drug product that should be submitted as a separate application."). FDA has also interpreted its regulations in accordance with the Bundling Rule, such that "[m]ost requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to the 505(b)(2) application," because new indications represent the type of significant innovation that the Hatch-Waxman Act sought to incentivize and protect. 81 Fed. Reg. at 69616. Similarly, FDA has promulgated regulations recognizing that a pending drug application cannot be amended to incorporate major changes, which would undermine the statutory design. For example, FDA regulations preclude amendments that would require the review of data to support an indication or claim that was not submitted with the original drug application, while amendments for minor modifications are permissible. *See* 21 C.F.R. § 314.60(b)(6).

## FACTUAL BACKGROUND

### A.   UTC Obtains NDA for TYVASO for the Treatment of PAH and PH-ILD

35.    PAH is a rare disease affecting the pulmonary vasculature. PAH is characterized by high pressure in the pulmonary arteries, which increases strain on the right ventricle of the heart, often leading to heart failure and death.

36.    On or around June 27, 2008, UTC sought approval of NDA No. 022387 for TYVASO (treprostinil) Inhalation Solution for the treatment of PAH. NDA 022387 Approval Letter, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2009/022387s000ltr.pdf.

37.    UTC relied on the TRIUMPH I phase 3 clinical study in support of NDA No. 022387, which evaluated the efficacy of TYVASO in 235 clinically stable subjects with PAH during a 12-week, randomized, double-blind, placebo-controlled, multicenter investigation. *See* Prescribing Information for TYVASO at 4, 9, https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/022387s020lbl.pdf.

38.     On or around July 30, 2009, FDA approved UTC's NDA for TYVASO for the treatment of PAH.

39.     Unlike PAH, PH-ILD encompasses a group of parenchymal lung diseases that are characterized by significant scarring and increased fibrotic tissue within the bronchioles and alveolar sacs of the lungs, which prevents oxygenation and free gas exchange between the alveolar sacs and pulmonary capillaries.

40.     On or around June 1, 2020, UTC sought approval for supplemental NDA No. 22387/S-017 for TYVASO for the treatment of a new indication, PH-ILD. UTC's Supplement Approval Letter, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2021/022387Orig1s017ltr.pdf.

41.     In order to submit supplemental NDA No. 22387/S-017, UTC conducted a clinical trial, the INCREASE phase 3 clinical study, which evaluated the efficacy of TYVASO in 326 patients with PH-ILD during a 16-week, randomized, double-blind, placebo-controlled, multicenter investigation. *See* Prescribing Information for TYVASO at 5, 11, https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/022387s020lbl.pdf.

42.     FDA approved UTC's supplemental NDA for PH-ILD in 2021. As a result, UTC was granted a three-year period of new-clinical-study exclusivity until March 31, 2024. That means that FDA cannot approve any 505(b)(2) application to market a treprostinil product for the PH-ILD indication until after that date. *See* 21 U.S.C. § 355(c)(3)(E)(iii).

43.     TYVASO is currently listed in the Orange Book with the following patent and exclusivity information:

**Patent Data**

| Patent No. | Patent Expiration | Drug Substance | Drug Product | Patent Use Code | Delist Requested | Submission Date |
|---|---|---|---|---|---|---|
| 9339507 | 03/10/2028 | | DP | | | 05/17/2016 |
| 9358240 | 05/05/2028 | | | U-1849 | | 06/06/2016 |
| 9593066 | 12/15/2028 | DS | | | | 03/14/2017 |
| 9604901 | 12/15/2028 | DS | | | | 03/28/2017 |
| 10376525 | 05/14/2027 | | | U-1849 | | 04/29/2020 |
| 10716793 | 05/14/2027 | | | U-1849 | | 07/21/2020 |
| 11723887 | 12/15/2028 | DS | | | | 08/15/2023 |
| 11826327 | 01/04/2042 | | | U-3749 | | 11/28/2023 |

**Exclusivity Data**

| Exclusivity Code | Exclusivity Expiration |
|---|---|
| I-856 (Indication for the Treatment of Pulmonary Hypertension Associated with Interstitial Lung Disease to Improve Exercise Ability) | 03/31/2024 |

### B. Liquidia Relied on TYVASO as the Listed Drug to Submit an Original 505(b)(2) NDA to Market a Version of Treprostinil for the Treatment of PAH

44. On or around January 24, 2020, Liquidia sought approval for NDA No. 213005 for treprostinil inhalation powder ("Liquidia's Proposed 505(b)(2) Product") under section 505(b)(2) of the FDCA ("Original 505(b)(2) NDA"). Liquidia's Tentative Approval Letter, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2021/213005Orig1s000TAltr.pdf. Liquidia's Original 505(b)(2) NDA sought approval to market Liquidia's Proposed 505(b)(2) Product for the treatment of PAH. PR112520, Press Release, Liquidia Receives Complete Response Letter from FDA for LIQ861 (treprostinil) Inhalation Powder for the Treatment of Pulmonary Arterial Hypertension (Nov. 25, 2020), https://www.liquidia.com/node/8351/pdf.

45. Liquidia's Original 505(b)(2) NDA contained paragraph IV certifications to the then-listed Orange Book patents for TYVASO—specifically, U.S. Patent Nos. 9,339,507 ("the

'507 patent"), 9,358,240 ("the '240 patent"), 8,497,393 ("the '393 patent"), 9,593,066 ("the '066 patent"), and 9,604,901 ("the '901 patent").

46.     Thereafter, Liquidia submitted an additional paragraph IV certification to FDA regarding U.S. Patent No. 10,716,793 ("the '793 patent"). The '793 patent was timely submitted for listing in the Orange Book for TYVASO on or around July 21, 2020, which was after Liquidia's Original 505(b)(2) NDA was initially submitted to FDA.

47.     Liquidia submitted paragraph IV certifications to FDA on each of these patents, thus representing that, in Liquidia's view, the '507, '240, '393, '066, '901, and '793 patents are invalid, unenforceable, and/or would not be infringed by Liquidia's Proposed 505(b)(2) Product that is the subject of Liquidia's Original 505(b)(2) NDA. Liquidia's certifications represent its intention to engage in the commercial manufacture, use, and/or sale of Liquidia's Proposed 505(b)(2) Product that is the subject of Liquidia's Original 505(b)(2) NDA prior to the expiration of the '507, '240, '393, '066, '901, and '793 patents.

48.     On or around November 4, 2021, FDA tentatively approved Liquidia's Original 505(b)(2) NDA. Liquidia's Tentative Approval Letter, https://www.accessdata.fda.gov/ drugsatfda_docs/appletter/2021/213005Orig1s000TAltr.pdf. Tentative approval means that the application cannot yet be finally approved until after a period of exclusivity has run.

49.     Meanwhile, UTC filed an infringement action against Liquidia based on its paragraph IV certifications. The case went to trial, and UTC prevailed on the '793 patent. Under an order from the U.S. District Court for the District of Delaware, the effective date of final approval for Liquidia's NDA may not be before expiration of the '793 patent in 2027, by virtue of that court's judgment of infringement. *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-cv-755, ECF No. 436 (D. Del. Sept. 9, 2022), *aff'd*, 74 F.4th 1360 (Fed. Cir. 2023), *cert. denied*,

No. 23-804 (U.S. Feb. 20, 2024); 35 U.S.C. § 271(e)(4). On December 26, 2023, Liquidia filed a motion under Rule 60(b) seeking to modify that judgment and allow immediate approval based on a decision of the U.S. Patent Trial and Appeal Board ("PTAB") finding the '793 patent unpatentable. The PTAB decision has been affirmed by a panel of the Federal Circuit, and a petition for panel rehearing or rehearing en banc is pending. If the U.S. District Court for the District of Delaware grants the relief requested by Liquidia, then FDA could immediately approve the Original 505(b)(2) NDA.

**C.     Liquidia Submitted an Amendment to Its Pending Original 505(b)(2) NDA to Add a New Indication for PH-ILD**

50.     On or around July 24, 2023, Liquidia submitted an amendment to its tentatively approved 505(b)(2) NDA, seeking to add a new indication: treatment of PH-ILD ("Amended 505(b)(2) NDA"). Press Release, Liquidia Submits Amendment to Add PH-ILD Indication to Tentatively Approved NDA for YUTREPIA™ (treprostinil) Inhalation Powder (July 27, 2023), https://www.liquidia.com/node/10556/pdf.

51.     Liquidia's Amended 505(b)(2) NDA contained paragraph IV certifications to the then-listed Orange Book patent information for TYVASO—specifically, to the '507 patent, the '240 patent, the '066 patent, the '901 patent, the '793 patent, and U.S. Patent No. 10,376,525 ("the '525 patent"). *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, C.A. No. 20-cv-00755 (D. Del. Nov. 15, 2023), D.I. 458-5 (E-mail from Brian Cooney, U.S. Food & Drug Admin., to Jennifer Weidman, Liquidia Techs., Inc. (Sept. 14, 2023)).

52.     On or around July 2023, Liquidia certified to FDA that the '507, '240,'066, '901, '793, and '525 patents are invalid, unenforceable, and/or would not be infringed by Liquidia's Proposed 505(b)(2) Product that is the subject of Liquidia's Amended 505(b)(2) NDA. Liquidia's certifications represent its intention to engage in the commercial manufacture, use, and/or sale of

Liquidia's Proposed 505(b)(2) Product that is the subject of Liquidia's Amended 505(b)(2) NDA prior to the expiration of the '507, '240,'066, '901, '793, and '525 patents.

53.     Within 45 days of receipt of notice of Liquidia's paragraph IV certifications, on or around September 5, 2023, UTC asserted the '793 patent in a suit for patent infringement under, *inter alia*, 35 U.S.C. § 271(e) due to Liquidia's intention to engage in the commercial manufacture, use, and/or sale of Liquidia's Proposed 505(b)(2) Product for the treatment of PH-ILD prior to the expiration of the '793 patent (the "PH-ILD Delaware Litigation"). *See* Complaint, *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 23-cv-975 (D. Del. Sept. 5, 2023), D.I. 1.

54.     On or around September 25, 2023, FDA accepted for review Liquidia's amendment to add the new PH-ILD indication to Liquidia's Original 505(b)(2) NDA and set a PDUFA goal date of January 24, 2024. *See* Press Release, FDA Accepts Submission to Add PH-ILD to YUTREPIA Label (Sept. 25, 2023) at 1, https://www.liquidia.com/node/10646/pdf. Liquidia has told the public that FDA informed it that the submission of Liquidia's Amended 505(b)(2) NDA would not require any new clinical information. *Id.*

55.     FDA has determined that a new 30-month stay period will not be triggered by litigation arising from the paragraph IV certifications to patents listed after the submission date for Liquidia's Original 505(b)(2) NDA, notwithstanding Liquidia's obligation to file a new 505(b)(2) NDA for PH-ILD. *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, C.A. No. 20-cv-00755 (D. Del. Nov. 15, 2023), D.I. 458-5 (E-mail from Brian Cooney, U.S. Food & Drug Admin., to Jennifer Weidman, Liquidia Techs., Inc. (Sept. 14, 2023)) ("Sept. 2023 FDA Correspondence"). FDA's Sept. 14, 2023 e-mail to Liquidia states, *inter alia*, "[w]e note that the 45-day period

provided for in section 505(c)(3)(C) of the FD&C Act does not apply with respect to a paragraph IV certification for the '887 patent." *Id.*[1]

56.     FDA thus determined that patents submitted for listing in the Orange Book for TYVASO after the Original 505(b)(2) NDA filing date, including the '887 patent submitted on August 15, 2023, cannot give rise to a 30-month stay of final approval . On or around November 28, 2023, U.S. Patent No. 11,826,327 ("the '327 patent") was issued by the U.S. Patent and Trademark Office. The '327 patent, duly and legally owned by UTC, was timely submitted for listing in the Orange Book for TYVASO on or around November 28, 2023. The Orange Book lists the use code for the '327 patent as "Method of treating [PH-ILD] by administering treprostinil or a salt thereof by inhalation using a device." The claims of the '327 patent all relate to administering treprostinil to a patient with PH-ILD. On or around November 30, 2023, UTC amended its Complaint in the PH-ILD Delaware Litigation and asserted the '327 patent against Liquidia for patent infringement under, *inter alia*, 35 U.S.C. § 271(e). *See* First Amended Complaint, *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 23-cv-975 (D. Del. Nov. 30, 2023), D.I. 8.

57.     Thereafter, on or around December 2023, Liquidia further amended its Amended 505(b)(2) Application to include a paragraph IV certification for the '327 patent. Liquidia certified to FDA that the '327 patent is invalid, unenforceable, and/or would not be infringed by Liquidia's Proposed 505(b)(2) Product that is the subject of Liquidia's Amended 505(b)(2) NDA. Liquidia's certification represents its intention to engage in the commercial manufacture, use, and/or sale of Liquidia's Proposed 505(b)(2) Product that is the subject of Liquidia's Amended 505(b)(2) NDA prior to the expiration of the '327 patent.

---

[1] UTC duly and legally owns U.S. Patent No. 11,723,887 ("the '887 patent"), which was issued by the U.S. Patent and Trademark Office on August 15, 2023. The '887 patent was timely submitted for listing in the Orange Book for TYVASO on August 15, 2023.

58.     As mentioned above, FDA has determined that patents listed in the Orange Book after the date on which Liquidia submitted its 505(b)(2) NDA cannot give rise to a 30-month stay of final approval. *See supra* ¶¶ 55–56. Thus, FDA has also determined that the '327 patent, which was also timely listed in the Orange Book after the date on which Liquidia submitted its 505(b)(2) NDA, cannot give rise to a 30-month stay of final approval. If Liquidia were now required to submit a new application for approval of the PH-ILD indication, a paragraph IV certification to the '327 patent would result in a 30-month stay.

### D.     FDA's Final Decision Allowing Liquidia to Add the New PH-ILD Indication to Its Original 505(b)(2) NDA by Amendment Was Unlawful

59.     FDA's final decision to accept Liquidia's Amended 505(b)(2) NDA rather than requiring Liquidia to file a new NDA to seek approval of the PH-ILD indication violated FDA rules, precedents and practices in at least two respects: (1) it violates the FDA's longstanding Bundling Rule requiring an applicant to submit a new 505(b) NDA if it wants to seek approval for a new indication rather than amending a pending NDA; and (2) it violates FDA regulations prohibiting amendments that include data to support an indication that was not included in an original NDA, *see* 21 C.F.R. § 314.60(b)(6). It also is inconsistent with the Hatch-Waxman Act's text, structure, and purposes.

#### 1.     Liquidia's Amendment Violated the Bundling Rule and FDA Violated the Bundling Rule by Accepting the Amendment for Review

60.     FDA's final decision to accept Liquidia's Amended 505(b)(2) NDA for substantive review violates its longstanding Bundling Rule, which both establishes FDA's requirements for "what will be considered a separate marketing application" and faithfully implements the text, structure, and purposes of the Hatch-Waxman Act. Bundling Rule at 1.

61.     The Bundling Rule states that, "[a]fter initial submission, a pending original or supplemental application should not be amended to add a new indication." *Id.* at 5. Instead, "a

request for approval of other new indications...should be submitted in a separate, original application." *Id.* Such a "separate, original application" for a new indication is identified by the Agency as a "Type 9 NDA." *See* FDA, MAPP 5028.3: NDA Classification Codes, at 6 (Dec. 8, 2022), https://www.fda.gov/media/94381/download ("A Type 9 NDA is for a new indication or claim for a drug product that is currently being reviewed under a different NDA (the 'parent NDA'), and the applicant does not intend to market this drug product under the Type 9 NDA after approval. Generally, a Type 9 NDA is submitted as a separate NDA so as to be in compliance with the guidance for industry on *Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees*.").

62.    FDA has also bound itself by the Bundling Rule. Before the Agency accepts an application (including an amendment) for substantive review, FDA staff have long been required to complete the Agency's "RPM Filing Review" checklist to ensure that the submission is lawful and consistent with the statute. As relevant here, that checklist permits the Agency to accept only those applications that comply with the Bundling Rule: "Has the user fee bundling policy been appropriately applied? *If no, or you are not sure, consult the User Fee Staff.*" *See* FDA, Approval Package, Other Review(s), NDA 108603 at PDF page 4 (May 21, 2021), https://www.accessdata. fda.gov/drugsatfda_docs/nda/2017/208603Orig1s000OtherR.pdf

63.    FDA failed to follow the Bundling Rule when it allowed Liquidia to amend its pending Original 505(b)(2) NDA to add a new indication, instead of requiring the company to submit a new original 505(b)(2) application. Bundling Rule at 5.

### 2.    FDA Treated Liquidia Differently than Similarly Situated Applicants

64.    For decades, FDA has consistently and repeatedly enforced the Bundling Rule against companies seeking to add new indications to pending applications. For example, FDA enforced the Bundling Rule in the following applications. *See, e.g.*, FDA, Approval Package,

Administrative Document(s) & Correspondence, NDA 021822 (Aptivus), PDF pages 5-6 (May 2006), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2008/021822s000admincorres.pdf (emphasis added); FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 206682 (Dexmedetomidine Hydrochloride Injection), PDF page 45 (Jan. 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/206628Orig1s000Admincorres.pdf; FDA, Approval Package, Proprietary Name Review(s), BLA 761223 (JEMPERLI), at PDF page 3 (May 24, 2021), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2021/761223Orig1s000NameR.pdf.

65.     Indeed, FDA has routinely and extensively enforced the Bundling Rule in various additional contexts, including, but not limited to, attempts to amend pending applications to change the dosage form or route of administration. Such extensive and routine application demonstrates FDA's widespread enforcement of the Bundling Rule for an array of major changes that are likely to implicate patent rights. For example, FDA has enforced the Bundling Rule in the following drug applications. *See, e.g.*, FDA, Approval Package, Administrative and Correspondence Documents, NDA 210709 (TEKTURNA), PDF page 60 (Unacceptable For Filing Review Letter) (May 2017), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/210709Orig1s000AdminCorres.pdf (emphasis added); FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 209400 (Omeprazole Delayed-release Orally Disintegrating Tablets), PDF pages 63-64 (Nov. 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/209400Orig1s000AdminCorres.pdf (emphasis added); FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 208780 (Esbriet), PDF page 76 (May 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/208780Orig1s000AdminCorres.pdf (emphasis added).

66.     FDA's unexplained refusal to apply the Bundling Rule to Liquidia's amendment violates a central precept of administrative law—that federal agencies must "treat like cases alike"—and violates the APA. *Westar Energy, Inc. v. Fed. Energy Regul. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007); *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27 (D.D.C. 1997) ("Government is at its most arbitrary when it treats similarly situated people differently.").

### 3.     FDA's Acceptance of Liquidia's PH-ILD Amendment Is Also Improper Because It Relied on a Study That Was Not Referenced in Its Original NDA

67.     FDA's decision to accept Liquidia's Amended 505(b)(2) NDA also violates 21 C.F.R. § 314.60(b)(6) because it must be either (a) a major amendment submitted with data to support an indication that was not included in the original NDA, or (b) a major amendment that *requires* data under 21 C.F.R. §§ 314.54 and  314.50(d)(5)(v) to support an indication that was not included in the original NDA.

68.     FDA typically divides amendments into two categories: "major" amendments and "minor" ones. For instance, when an applicant amends its application after receiving an action letter from the Agency, the Agency categorizes the applicant's resubmission as either a Class I (minor) resubmission or a Class II (major) resubmission. A Class I resubmission merely contains "minor clarifying information," such as "final printed labeling," "safety updates submitted in the same format. . . as the original safety submissions," or "a minor analysis of data previously submitted to the application." SOPP 8402: Designation of Amendments as Major at 2-3 (Sept. 22, 2023), https://www.fda.gov/media/84431/download. By contrast, a Class II (major) resubmission is one that includes "items that would require presentation to an advisory committee or a re-inspection of facilities"—for example, *data* "*other than minor assay validation data*." *Id.* at 2–3 (emphasis added).

69.     On information and belief, Liquidia's Amended 505(b)(2) NDA was not submitted in response to an action letter from FDA, and adding the new PH-ILD indication was not required by FDA in any action letter that FDA might have sent to Liquidia prior to the submission of the amendment at issue here. But applying its usual Class I (minor)/Class II (major) taxonomy for characterizing a given amendment, FDA characterized the amendment as a Class II major resubmission. *See* PR92523 at 1 (Press Release, FDA Accepts Submission to Add PH-ILD to YUTREPIA™ Label (Sept. 25, 2023), https://www.liquidia.com/node/10646/pdf). *Id.*

70.     That means that FDA necessarily determined that Liquidia's Amended 505(b)(2) NDA was a "major amendment." *See* SOPP 8402: Designation of Amendments as Major at 3 (Sept. 22, 2023), https://www.fda.gov/media/84431/download_(Because Class I resubmissions concern "minor clarifying information," they cannot be classified as major amendments.). Liquidia's Amended 505(b)(2) NDA adds a *completely new indication* for an entirely different disease (PH-ILD) than the one it sought in its Original 505(b)(2) NDA (PAH), and every NDA must include a clinical data section "describing the clinical investigations of the drug, including....[a]n integrated summary of the data demonstrating substantial evidence of effectiveness *for the claimed indications*." 21 C.F.R. § 314.50(d)(5)(v) (emphasis added); *see also* 21 U.S.C. § 355(b)(1)(A)(i) (An NDA must include "full reports of investigations which have been made to show whether such drug is safe for use and . . . effective in use."); 21 C.F.R. § 314.54(a), (a)(1)(ii) (an application for a change in a listed drug must contain "information needed to support the modification(s) of the listed drug" and clinical data "as needed to support the safety and effectiveness of the drug."); FDA, Determining Whether to Submit an ANDA or a 505(b)(2) Application (May 2019), at 4, https://www.fda.gov/media/124848/download (a 505(b)(2) applicant may rely on FDA's findings of safety and effectiveness for a previously approved

product only to the extent that the proposed product shares characteristics with the approved product). Liquidia was thus required to provide data demonstrating safety and effectiveness of its modified dosage form for each claimed indication, including the new PH-ILD indication, and there is nothing "minor" about that.

71.      Liquidia represents that its amendment contains no data. PR92523 (Press Release, FDA Accepts Submission to Add PH-ILD to YUTREPIA™ Label (Sept. 25, 2023), https://www.liquidia.com/node/10646/pdf). However, Liquidia's amendment necessarily contains "a substantial amount of new data not previously submitted to . . . the Agency" to support Liquidia's *completely new* PH-ILD indication because it relies on the INCREASE phase 3 clinical study that UTC conducted to secure approval of UTC's PH-ILD supplement (*see supra* ¶ 21). SOPP 8402: Designation of Amendments as Major at 2, 4 (Sept. 22, 2023), https://www.fda.gov/media/84431/download. The amendment thus violates longstanding Agency regulations providing that "[a] major amendment may not include data to support an indication or claim that was not included in the original NDA." 21 C.F.R. § 314.60(b)(6). Indeed, FDA has

> agree[d] with the comment that it is appropriate to allow a major amendment to include data to support a *slightly modified* indication (e.g., increasing or decreasing the age range, increasing the severity of the disease) but not a *completely new* indication, *regardless of whether the data supporting the new indication were submitted at the applicant's initiative or at our request*."

FDA, Final Rule, Applications for Approval to Market a New Drug; Complete Response Letter; Amendments to Unapproved Applications, 73 Fed. Reg. 39588, 39604 (Jul. 10, 2008) (emphasis added). Moreover, to the extent Liquidia's amendment does not include its own data or rely on UTC's INCREASE study, then it is improper under 21 C.F.R. §§ 314.54 because it *requires* data under 314.50(d)(5)(v) to support an indication that was not included in the original NDA.

**E.** **FDA's Unlawful Acceptance of Liquidia's Amendment Is a Final Agency Action That Has Deprived UTC of its Statutory Right to Obtain a 30-month Stay on Approval**

72.     FDA's acceptance of Liquidia's Amended 505(b)(2) NDA for substantive review was final agency action. This action marked the culmination of the agency's decision-making process on the issue presented here: whether it was appropriate for Liquidia to seek approval by way of an amendment, rather than by filing a new NDA. FDA's continued review of whether to grant final approval to Liquidia's amended NDA, a distinct issue, will not provide any occasion for FDA to revisit its acceptance decision. Moreover, legal consequences flow directly from FDA's decision to allow Liquidia to pursue its new indication by amendment rather than filing a new application. As a direct result of FDA's actions, UTC has been deprived of its statutory right to a 30-month stay to allow UTC to litigate its patent claims in an orderly manner before Liquidia irrevocably alters the market.

73.     By allowing Liquidia to seek allowance of its PH-ILD indication via an improper amendment, FDA has denied UTC the opportunity to obtain a statutory 30-month stay on approval of what should have been submitted as a separate original 505(b)(2) NDA. 21 U.S.C. § 355(c)(3)(C). Indeed, FDA's actions in this case are fundamentally inconsistent with the Hatch-Waxman Act's intricate and elaborate system of interlocking provisions that are designed to ensure that significant patent disputes can be litigated prior to FDA's approval of a new drug for its claimed indications. *See supra*, ¶¶ 24–31.

74.     In its July 2023 Amended 505(b)(2) NDA adding the new PH-ILD indication, Liquidia submitted "paragraph IV" certifications to several patents owned by UTC and listed in the Orange Book for UTC's TYVASO product, including the '793 patent. Within 45 days of Liquidia's paragraph IV certification, UTC timely sued Liquidia for patent infringement based on the '793 patent. *See* Complaint, *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 23-cv-975

(D. Del. Sept. 5, 2023), D.I. 1. If these paragraph IV certifications had been made as part of a separate, original 505(b)(2) NDA, UTC would have been entitled to obtain a stay of final approval of Liquidia's 505(b)(2) NDA for up to 30 months to allow time for UTC's infringement claim to be adjudicated. *See* 21 U.S.C. § 355(c)(3)(C). But the statute treats paragraph IV certifications in a proper amendment or supplement to a 505(b)(2) NDA differently. As discussed, the statute provides that a 30-month stay applies to listed patents for which information was submitted "before the date on which the application (*excluding an amendment or supplement to the application*) was submitted." *Id.* (emphasis added). The '793 patent was submitted for publication in the Orange Book after Liquidia submitted its Original 505(b)(2) NDA but *before* Liquidia's putative amendment to add PH-ILD as a proposed indication of use. FDA's decision to accept the amendment to Liquidia's pending Original 505(b)(2) NDA to add PH-ILD as a proposed indication, including the accompanying paragraph IV certifications, constitutes a violation of regulations and longstanding agency policy mandating the submission of a separate original application. *See, e.g.*, Bundling Rule. Thus, FDA allowed Liquidia to sidestep the 30-month statutory stay that the certifications otherwise would have triggered upon UTC's timely assertion of the '793 patent, depriving UTC of a valuable statutory right and fundamentally undermining the legislative bargain at the heart of the Hatch-Waxman Act.

75.     If FDA's decision to accept Liquidia's Amended 505(b)(2) NDA for substantive review is not vacated and set aside, UTC will suffer substantial and irreparable harm for which there is no adequate remedy at law. *See, e.g.*, *Hi-Tech. Pharm. Co. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (recognizing that the loss of "a clear statutory entitlement" qualifies as irreparable injury).

76.     On December 29, 2023, UTC submitted a letter to FDA identifying FDA's unlawful action in accepting Liquidia's Amended 505(b)(2) NDA for substantive review and urging FDA to rescind that unlawful action. FDA has not done so. UTC is thus bringing this suit to vindicate its statutory rights under the Hatch-Waxman Act before they are irrevocably lost.

## CLAIMS FOR RELIEF

### Count I
### Arbitrary and Capricious Agency Action, 5 U.S.C. § 706(2)
### (Violation of the Bundling Rule)

77.     UTC incorporates and re-alleges the foregoing paragraphs as through fully set forth herein.

78.     FDA's acceptance of Liquidia's Amended 505(b)(2) NDA for substantive review was arbitrary and capricious, without observation of procedure required by law, and otherwise not in accordance with law because the agency disregarded the longstanding requirements and procedures set forth in its Bundling Rule. Having set these standards in implementing the FDCA, FDA must adhere to them. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 335–341 (D.D.C. 2018) (recognizing that agency codification of internal policies may bring rise to a "binding norm").

79.     The Bundling Rule requires FDA to reject proposed 505(b)(2) amendments that seek "to add a new indication or claim." Bundling Rule at 5.

80.     FDA violated the Bundling Rule when it accepted Liquidia's Amended 505(b)(2) NDA for substantive review, rather than requiring Liquidia to submit a new 505(b)(2) application for the new PH-ILD indication, thereby depriving UTC of its statutory right to a 30-month stay that Congress designed for the manifest purpose of enabling a pre-approval resolution of UTC's patent claims against Liquidia.

81.     Because FDA acted contrary to the Bundling Rule, FDA's acceptance of Liquidia's Amended 505(b)(2) NDA for substantive review was arbitrary and capricious.

82.     Because Liquidia relies upon UTC's previous approval for TYVASO and seeks approval for the PH-ILD indication before UTC's listed patents expire, the Hatch-Waxman Act requires a stay of approval so that UTC's patent claims against Liquidia can be resolved through the statutory pre-launch procedure. FDA's decision to accept Liquidia's Amended 505(b)(2) NDA for substantive review rather than requiring Liquidia to submit a separate 505(b)(2) application deprived UTC of its statutory right to a 30-month stay.

83.     If FDA's decision to accept Liquidia's Amended 505(b)(2) NDA for substantive review is not vacated and set aside, UTC will suffer substantial and irreparable harm for which there is no adequate remedy at law.

## Count II
### Arbitrary and Capricious Agency Action, 5 U.S.C. § 706(2)
### (Differential Treatment of Similarly Situated Applicants)

84.     UTC incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

85.     FDA's acceptance of Liquidia's Amended 505(b)(2) NDA for substantive review was arbitrary and capricious because FDA engaged in different treatment of similarly situated applicants without providing any explanation to reconcile its disparate approach (because there is no such rationale). "If an agency treats similarly situated parties differently, its action is arbitrary and capricious in violation of the APA." *Bracco*, 963 F. Supp. at 27–28. FDA's acceptance of Liquidia's Amended 505(b)(2) NDA for substantive review was arbitrary and capricious because FDA permitted Liquidia to amend a pending 505(b)(2) application to add a proposed indication of use even though for decades it consistently and repeatedly has refused to permit other similarly situated applicants to amend pending 505(b)(2) or ANDA applications to add a proposed indication of use.

86.     Indeed, FDA's unexplained departure from precedent in this case not only arbitrarily and capriciously treated Liquidia more favorably than similarly situated applicants without any explanation of its disparate treatment, but has the effect of treating UTC *less* favorably than other similarly situated sponsors. After all, in the precedents described above, *supra*, ¶¶ 64–66, sponsors that were situated similarly to UTC enjoyed the protections afforded by the statute's 30-month stay of approval to litigate the sponsor's patent infringement claims, whereas FDA's departure from settled precedent in this case strips UTC of that valuable statutory right in derogation of the statute. FDA thus acted arbitrarily and capriciously, and that action must be vacated and set aside.

87.     If FDA's decision to accept Liquidia's Amended 505(b)(2) NDA for substantive review is not vacated and set aside, UTC will suffer substantial and irreparable harm for which there is no adequate remedy at law.

**Count III**
**Agency Action Not in Accordance with Law, 5 U.S.C. § 706(2)**
**(Violation of FDA Regulations on Major Amendments)**

88.     UTC incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

89.     FDA's acceptance of Liquidia's Amended 505(b)(2) NDA for substantive review was arbitrary and capricious, without observation of procedure required by law, and otherwise not in accordance with law because the agency acted in contravention of its own regulations and in a manner that undermines the Hatch-Waxman Act's intricate and elaborate system for ensuring that significant patent disputes can be litigated prior to FDA's approval of a new drug for its claimed indications.

90.     Under 21 C.F.R. § 314.60(b)(6), an applicant may not make (and FDA may not accept) a major amendment that includes data to support an indication or claim that was not

included in the original NDA. Liquidia's Amended 505(b)(2) NDA necessarily relies upon UTC's INCREASE phase 3 clinical study, which was not referenced in or relied upon by Liquidia's original NDA. As a result, Liquidia's Amended 505(b)(2) NDA includes data to support a new indication, in contravention of 21 C.F.R. § 314.60(b)(6).

91.    Alternatively, to the extent Liquidia did not rely on UTC's INCREASE phase 3 clinical study, its application was deficient for omitting the clinical data needed to support Liquidia's Amended 505(b)(2) NDA. FDA's acceptance of such a facially deficient application violates 21 C.F.R. § 314.54(a)(1)(ii), 21 C.F.R. § 314.50(d)(5) and 21 U.S.C. § 355(a)(1)(A)(i).

92.    If FDA's decision to accept Liquidia's Amended 505(b)(2) NDA for substantive review is not vacated and set aside, UTC will suffer substantial and irreparable harm for which there is no adequate remedy at law.

**Count IV**
**Agency Action Not in Accordance with Law, 5 U.S.C. § 706(2)**
**(Violation of FDCA)**

93.    UTC incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

94.    FDA's acceptance of Liquidia's Amended 505(b)(2) NDA for substantive review was agency action in excess of statutory jurisdiction, authority, or limitations, short of statutory right, or otherwise not in accordance with law. FDA's decision to accept Liquidia's Amended 505(b)(2) NDA undermines the Hatch-Waxman Act's intricate and elaborate system for ensuring that significant patent disputes can be litigated prior to FDA's approval of a new drug for its claimed indications. Congress did not intend to alter FDA's practice of prohibiting the submission of new indications in an amendment to a pending NDA. *See* 1993 Bundling Rule at 6; 2004 Bundling Rule at 4-5. To the contrary, the structure and history of the 2003 MMA demonstrate an intent by Congress to codify FDA practice on this issue.

95.     If FDA's decision to accept Liquidia's Amended 505(b)(2) NDA for substantive review is not vacated and set aside, UTC will suffer substantial and irreparable harm for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff UTC respectfully requests that the Court enter judgment in its favor and that the Court:

a.     declare that FDA's decision to accept Liquidia's Amended 505(b)(2) NDA for substantive review was arbitrary and capricious, not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law;

b.     vacate FDA's decision to accept Liquidia's Amended 505(b)(2) NDA for substantive review;

c.     compel FDA to order Liquidia to submit a new 505(b)(2) NDA and certify to patent information currently listed in FDA's Orange Book if Liquidia continues to pursue approval of its proposed new drug for a PH-ILD indication;

d.     compel FDA to order Liquidia to submit clinical data demonstrating substantial evidence of effectiveness of Liquidia's Proposed 505(b)(2) Product for the claimed PH-ILD indication, to the extent that Liquidia has not already done so;

e.     compel FDA to stay the approval of any such new 505(b)(2) NDA if Liquidia certifies to Orange Book-listed patent information and is then timely sued for patent infringement;

f.      award Plaintiff attorneys' fees and costs; and

g.      award Plaintiff such other and further relief as this Court deems just and

proper.

Dated: February 20, 2024

Respectfully submitted,

OF COUNSEL:

*/s/ William C. Jackson*
William C. Jackson (D.C. Bar No. 475200)

Shaun R. Snader (D.C. Bar. No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

William M. Jay (D.C. Bar No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC 20036
(202) 346-4000
wjackson@goodwinlaw.com
wjay@goodwinlaw.com
bburgess@goodwinlaw.com

Douglas Carsten
   (*pro hac vice* application forthcoming)
Art Dykhuis
   (*pro hac vice* application forthcoming)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

*Attorneys for Plaintiff United Therapeutics Corporation*

Adam W. Burrowbridge
   (admission application forthcoming)
Paul Hughes (D.C. Bar. No. 997235)
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

Gerard J. Cedrone (D.D.C. Bar No. MA0019)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA  02210
(617) 570-1000