**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

UNITED THERAPEUTICS
CORPORATION,

*Plaintiff*,

v.

FOOD AND DRUG ADMINISTRATION,
*et al.*,

*Defendants*.

---

No. 24-cv-484-JDB

<u>**HEARING REQUESTED**</u>

---

**PLAINTIFF UNITED THERAPEUTICS CORPORATION'S MEMORANDUM
IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**

Shaun R. Snader (D.C. Bar No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

Douglas Carsten (*pro hac vice* forthcoming)
Art Dykhuis (*pro hac vice* forthcoming)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

Adam W. Burrowbridge (D.C. Bar No.
    1001783: admission application pending)
Paul Hughes (D.C. Bar No. 997235)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

William C. Jackson (D.C. Bar. No. 475200)
William M. Jay (D.C. Bar No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20001
(202) 346-4000

Gerard J. Cedrone (D.D.C. Bar No. MA0019)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

March  4, 2024                    *Counsel for United Therapeutics Corporation*

# TABLE OF CONTENTS

Introduction ..................................................................................................................1

Background ..................................................................................................................5

    I.      Statutory and Regulatory Framework ......................................................5

          A.     The FDCA and Hatch-Waxman Act ............................................ 5

          B.     Patent Disputes Under the Hatch-Waxman Act ......................... 7

          C.     FDA's Bundling Rule ................................................................. 9

          D.     The Medicare Modernization Act ............................................ 12

          E.     Regulatory Limitations on Major Amendments to New Drug Applications ............................................................................. 13

    II.     Factual Background ...............................................................................14

          A.     UTC Develops Novel Treatments for Rare Diseases ............... 15

          B.     Liquidia Applies To Market a Treprostinil Product and Subsequently Amends its Application To Add the PH-ILD Indication .............................................................................. 16

          C.     UTC and Liquidia Litigate Issues Related to the Validity of the '793 Patent and Yutrepia's Infringement of That Patent ......... 16

          D.     UTC Brings Infringement Litigation Regarding the New PH-ILD Indication .............................................................................. 17

          E.     Liquidia Tells the Market It Is Prepared To Launch Immediately Despite Ongoing Patent Litigation ......................................... 18

Argument ..................................................................................................................19

    I.      UTC is likely to succeed on the merits. ..................................................19

          A.     FDA's acceptance of Liquidia's PH-ILD amendment violated the Bundling Rule. ...................................................................... 21

          B.     FDA treated Liquidia differently from prior, similarly situated applicants. ............................................................................. 24

          C.     FDA's acceptance of Liquidia's PH-ILD amendment is improper under the regulations governing "major" amendments. .......... 27

II.     UTC will suffer irreparable harm if the Court does not grant immediate
        injunctive relief. ...................................................................................................29

        A.      UTC will suffer an irreparable injury to a statutory right if the
                FDA's unlawful conduct is not enjoined. .................................................. 29

        B.      UTC will face irreparable economic harm if Liquidia is allowed to
                enter the market.......................................................................................... 30

III.    The balance of harms and public interest strongly favor entry of an
        injunction. ..............................................................................................................34

IV.     The Court should enter relief *now* to protect UTC's statutory rights. ...................36

Conclusion ..............................................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Accrediting Council for Indep. Colls. & Schs. v. DeVos*,
   303 F. Supp. 3d 77 (D.D.C. 2018) ........................................................................22

*Air Transp. Ass'n of Can. v. FAA*,
   323 F.3d 1093 (D.C. Cir. 2003) ...........................................................................19

*Alphapointe v. Dep't of Veterans Affs.*,
   416 F. Supp. 3d 1 (D.D.C. 2019) ..........................................................................31

*Apotex Inc. v. FDA*,
   508 F. Supp. 2d 78 (D.D.C. 2007) .........................................................................34

*Apotex, Inc. v. FDA*,
   No. CA06-0627, 2006 WL 1030151 (D.D.C. Apr. 19, 2006) ................................30

*Appalachian Power Co. v. EPA*,
   208 F.3d 1015 (D.C. Cir. 2000) ...........................................................................22

*AstraZeneca Pharms. LP v. Burwell*,
   197 F. Supp. 3d 53 (D.D.C. 2016) (Moss, J.) ..........................................................37

*AstraZeneca Pharms. LP v. FDA*,
   2012 WL 1037457 (D.D.C. Mar. 28, 2012) ...........................................................37

* *Bayer HealthCare, LLC v. U.S. Food & Drug Admin.*,
   942 F. Supp. 2d 17 (D.D.C. 2013) .........................................................32, 33, 34

*Bennett v. Spear*,
   520 U.S. 154 (1997) .............................................................................................20

*Bracco Diagnostics, Inc. v. Shalala*,
   963 F. Supp. 20 (D.D.C. 1997) ............................................................................25

*Bristol-Myers Squibb Co. v. Royce Labs., Inc.*,
   69 F.3d 1130 (Fed. Cir. 1995) ..............................................................................29

*Collagenex Pharms., Inc. v. Thompson*,
   No. 03-cv-1405, 2003 WL 21697344 (D.D.C. July 22, 2003), *as amended*
   (Aug. 26, 2003) ...........................................................................................33, 35, 36

*Colo. Interstate Gas Co. v. FERC*,
   850 F.2d 769 (D.C. Cir. 1988) ..............................................................................25

*D.A.M v. Barr*,
    474 F. Supp. 3d 45 (D.D.C. 2020) ........................................................................19

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ...............................................................................31

*Eagle Broadcasting Grp., Ltd. v. FCC*,
    563 F.3d 543 (D.C. Cir. 2009) .............................................................................19

*Eli Lilly & Co. v. Medtronic, Inc.*,
    496 U.S. 661 (1990) ............................................................................................29

*Eli Lilly v. Teva Pharms. USA, Inc.*,
    557 F.3d 1346 (Fed. Cir. 2009) ........................................................................1, 8

*Feinerman v. Bernardi*,
    558 F. Supp. 2d 36 (D.D.C. 2008) ......................................................................31

*Gen. Elec. Co. v. EPA*,
    290 F.3d 377 (D.C. Cir. 2002) ............................................................................22

*Hi-Tech Pharmacal Co. v. FDA*,
    587 F. Supp. 2d 1 (D.D.C. 2008) (Bates, J.) ...........................................5, 33, 36

*Jennings v. Rodriguez*,
    583 U.S. 281 (2018) ............................................................................................24

*League of Women Voters of the U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................................................35

*Liquidia Techs, Inc. v. United Therapeutics Corp.*,
    No. 23-804, 2024 WL 675262 (Feb. 20, 2024) ...................................................17

*Liquidia Techs., Inc. v. United Therapeutics Corp.*,
    No. IPR2021-00406, 2022 WL 2820717 (P.T.A.B. July 19, 2022) .......................17

*Mova Pharm. Corp. v. Shalala*,
    140 F.3d 1060 (D.C. Cir. 1998) ....................................................................19, 30

*Mylan Labs., Inc. v. Leavitt*,
    484 F. Supp. 2d 109 (D.D.C. 2007) ....................................................................35

*Mylan Labs. Ltd. v. FDA*,
    910 F. Supp. 2d 299 (D.D.C. 2012) ....................................................................30

*Mylan Pharms., Inc. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000) ........................................................................30

*Nalco Co. v. E.P.A.*,
    786 F. Supp. 2d 177 (D.D.C. 2011) ...................................................................31

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) ...............................................................19, 22

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................35

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ................................................................35

*Ramaprakash v. FAA*,
    346 F.3d 1121 (D.C. Cir. 2003) ..............................................................26

*Rhea Lana, Inc. v. Dep't of Labor*,
    824 F.3d 1023 (D.C. Cir. 2016) ..............................................................20

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011)...............................................................32

*Sanofi-Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006)...............................................................34

*Smoking Everywhere, Inc. v. FDA*,
    680 F. Supp. 2d 62 (D.D.C. 2010), *aff'd sub nom. Sottera, Inc. v. FDA*,
    627 F.3d 891 (D.C. Cir. 2010) ................................................................31

*Steenholdt v. FAA*,
    314 F.3d 633 (D.C. Cir. 2003) ................................................................22

*Teva Pharms. USA, Inc. v. Sebelius*,
    595 F.3d 1303 (D.C. Cir. 2010)...........................................................8, 29, 36

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016)............................................................................20

*United Therapeutics Corp. v. Liquidia Techs., Inc.*,
    2023 WL 8794633 (Fed. Cir. Dec. 20, 2023) .......................................................17

*United Therapeutics Corp. v. Liquidia Techs., Inc.*,
    74 F.4th 1360 (Fed. Cir. 2023) .........................................................15, 16

*Veloxis Pharm., Inc. v. FDA*,
    109 F. Supp. 3d 104 (D.D.C. 2015)........................................................6, 7

*Water Quality Ins. Syndicate v. United States*,
    225 F. Supp. 3d 41 (D.D.C. 2016) ............................................................26

*Westar Energy, Inc. v. FERC,*
    473 F.3d 1239 (D.C. Cir. 2007) .................................................................24

*Xiaomi Corp. v. Dep't of Defense,*
    No. 21-280, 2021 WL 950144 (D.D.C. Mar. 21, 2021) ...........................32

**STATUTES:**

5 U.S.C. § 704 ...............................................................................................20

5 U.S.C. § 706(2)(A) .....................................................................................19

21 U.S.C. § 355(a) ...........................................................................................5

21 U.S.C. § 355(b)(1) ...................................................................................6, 7

21 U.S.C. § 355(b)(1)(A) .................................................................................6

21 U.S.C. § 355(b)(1)(A)(i) ..........................................................................28

21 U.S.C. § 355(b)(2)(A)(iv) ..........................................................................8

21 U.S.C. § 355(b)(4) ....................................................................................24

21 U.S.C. § 355(b)(4)(A) ..............................................................................13

21 U.S.C. § 355(b)(4)(B) ..............................................................................13

21 U.S.C. § 355(c) .........................................................................................12

21 U.S.C. § 355(c)(2) .......................................................................................7

21 U.S.C. § 355(c)(3) .......................................................................................8

* 21 U.S.C. § 355(c)(3)(C) ...........................................2, 8, 12, 23, 24, 29

21 U.S.C. § 355(c)(3)(C)(i) .............................................................................8

21 U.S.C. § 355(c)(3)(C)(ii) ............................................................................8

21 U.S.C. § 355(d)(2) .......................................................................................5

21 U.S.C. § 355(j)(2)(A) ..................................................................................6

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ...................................................................8

21 U.S.C. § 355(j)(7)(A)(i) ..............................................................................7

35 U.S.C. § 271(e)(2)(A) .................................................................................8

* Medicare Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066.............12, 13, 19, 23

Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat.
    1585 (1984)...............................................................................................................6

**REGULATIONS AND RULEMAKINGS:**

21 C.F.R. § 314.50(d)(5)(v)............................................................................28

21 C.F.R. § 314.50(h)......................................................................................7

21 C.F.R. § 314.53(d)......................................................................................7

* 21 C.F.R. § 314.60(b)(6)........................................................................14, 20, 27

21 C.F.R. § 314.94(a)(12)(i)(A)......................................................................8

21 C.F.R. § 314.107(b)(3)(viii).......................................................................8

Abbreviated New Drug Applications and 505(b)(2) Applications,
    81 Fed. Reg 69,580 (2016) ........................................................................10

Applications for Approval to Market a New Drug; Complete Response Letter;
    Amendments to Unapproved Applications,
    73 Fed. Reg. 39588 (July 10, 2008)............................................................14

FDA, Proposed Rule, Abbreviated New Drug Applications and 505(b)(2)
    Applications,
    80 Fed. Reg. 6802 (Feb. 6, 2015) ........................................................11, 23

**RULES:**

Fed. R. Civ. P 60(b)........................................................................................4

**LEGISLATIVE HISTORY:**

148 Cong. Rec. S6844 (2002)..............................................................12, 13, 24

H.R. Rep. No. 108-391 (2003)..............................................................12, 23

# GLOSSARY

'327 patent .........................................U.S. Patent No. 11,826,327

'793 patent .........................................U.S. Patent No. 10,716,793

1993 Bundling Rule ..........................FDA, *Interim Guidance: Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees Under the Prescription Drug User Fee Act of 1992* (July 12, 1993)

2004 Bundling Rule ..........................FDA, *Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees* (Dec. 2004)

ANDA ................................................abbreviated new drug application

FDA...................................................Food and Drug Administration

FDCA.................................................Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq.

Liquidia .............................................Liquidia Technologies, Inc.

MMA.................................................Medicare Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066

NDA...................................................new drug application

Orange Book .....................................FDA, *Approved Drugs with Therapeutic Equivalence Evaluations*

PAH...................................................pulmonary arterial hypertension

PH .....................................................pulmonary hypertension

PH-ILD ..............................................pulmonary hypertension associated with interstitial lung disease

PTAB .................................................Patent Trial and Appeal Board

UTC...................................................Plaintiff United Therapeutics Corporation

## INTRODUCTION

Plaintiff United Therapeutics Corporation (UTC) seeks preliminary injunctive relief to prevent its statutory rights from being eviscerated by arbitrary and unlawful agency decisionmaking.  If the Food and Drug Administration (FDA) had followed its own rules, precedents, and policies, a statutory, automatic 30-month stay would block the agency from approving an application to market a follow-on version of UTC's treprostinil product for an innovative new use while UTC asserts its patent claims covering that use.  But FDA disregarded those rules and, as a result, determined that no such stay applies.  The Court should take immediate action to preserve the status quo and protect UTC from irreparable harm while it litigates this case against FDA.

For at least three decades, FDA has barred drug manufacturers from amending a pending new drug application to seek approval for a new indication—*i.e.*, a new proposed use of the drug— not requested in the original application.  Instead, the agency requires such manufacturers to submit a separate application seeking approval of the new indication.  This established requirement, commonly referred to as the "Bundling Rule," has significant practical implications.  Relevant here, it prevents applicants from effectively backdating an application for a new indication, thereby sidestepping new patents relevant to that new indication.

Congress has struck a careful "balance between the sometimes-competing policy interests of inducing pioneering research and development of new drugs and enabling production of low-cost, generic copies of those drugs," *Eli Lilly v. Teva Pharms. USA, Inc.*, 557 F.3d 1346, 1348 (Fed. Cir. 2009).  Under the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 355, a manufacturer of a follow-on product can rely on FDA's previous approval of an innovator drug, and when it does so, the follow-on manufacturer must tell FDA whether it seeks approval before the innovator's patents expire.  If it seeks pre-expiration launch, the innovator can bring a patent

infringement action immediately, and FDA is then generally precluded from approving the follow-on manufacturer's application for up to 30 months—a period intended to allow the court to adjudicate the patent claims before FDA issues a final approval. This process is integral to the congressional bargain: follow-on manufacturers can freeride on earlier innovators but must clear the patent path before launch.

Crucially, however, a patent cannot be the basis of a 30-month stay if it issues after submission of the follow-on manufacturer's original application—even if the follow-on manufacturer then amends its application. A (lawful) amendment effectively relates back to the original filing for these purposes. 21 U.S.C. § 355(c)(3)(C). The Bundling Rule prevents the follow-on manufacturer from exploiting this gap—and avoiding the stay—by smuggling a *new* indication for a *newly* patented use into an *existing* application. Thus, just as a new and unrelated claim in an amended complaint cannot avoid the statute of limitations by relating back to a filing date before the limitations period ran, a new indication cannot avoid the patent stay by relating back to a filing date before the patent issued. This case demonstrates the importance of that rule—and the consequences of FDA's failure to follow it.

UTC develops innovative products that address the needs of patients with chronic and life-threatening conditions, including cardiovascular and pulmonary diseases and pediatric cancers. UTC developed Tyvaso® (treprostinil) Inhalation Solution, an inhaled form of the drug treprostinil that FDA has approved for two clinically distinct indications based on clinical trials sponsored by UTC: (1) pulmonary arterial hypertension (PAH) and (2) pulmonary hypertension associated with interstitial lung disease (PH-ILD). Liquidia Technologies, Inc. (Liquidia) seeks to market a competing inhaled treprostinil product. In 2020, Liquidia applied for approval of this product under a statutory pathway that allows an applicant to shortcut the normal review process by relying

on FDA's prior approval of an existing drug and its associated clinical data—in Liquidia's case, by piggybacking on FDA's approval of UTC's Tyvaso.  As originally submitted to FDA, Liquidia's product would be indicated exclusively for the treatment of PAH.  But in 2023—while its application was pending—Liquidia decided to seek approval for PH-ILD, too.  The Bundling Rule dictates how this needed to be done: Liquidia was required to submit a new application for the new PH-ILD indication, and the filing of a timely suit for patent infringement by UTC would then stay approval of the new application.

Instead, disregarding the Bundling Rule, Liquidia submitted an amendment to add the new PH-ILD indication to its *existing* application.  And FDA inexplicably allowed Liquidia to do so, accepting Liquidia's amendment for substantive review despite the clear violation of the Bundling Rule.  The agency then confirmed that any patents that UTC disclosed after Liquidia submitted its *original* application (back in 2020) could not provide the basis for an automatic stay.  Thus, even though UTC promptly filed patent-infringement litigation against Liquidia after Liquidia's amendment—including on a patent directed to a method of improving exercise capacity in patients with PH-ILD—FDA's decision to accept Liquidia's amendment has deprived UTC of its statutory right to maintain the status quo while the patent fight proceeds.

UTC is highly likely to succeed in its challenge to FDA's decision, which represents a complete and unexplained departure from the agency's established rules, precedents, and policies.  And absent preliminary injunctive relief to preserve the status quo, UTC faces imminent irreparable harm: the loss of its statutory right to a 30-month stay that Congress designed for the express purpose of enabling UTC's patent claims against Liquidia to be resolved prior to a game-changing approval of Liquidia's application.  FDA has already granted tentative approval to Liquidia's application for PAH, meaning that the agency has found that the application meets all

scientific and technical requirements for an approval.  Although FDA is currently barred from approving Liquidia's application by an order resulting from an earlier round of patent litigation on the PAH application, Liquidia has moved to lift that order in view of a Patent Office order invalidating the patent Liquidia infringes, and the Federal Circuit has affirmed that decision.[1] Moreover, an independent regulatory exclusivity that bars FDA from finally approving Liquidia's PH-ILD indication will expire on March 31, 2024.  If Liquidia receives final approval, the market will be permanently altered.  UTC will lose the entire benefit of the automatic stay conferred by Congress to protect innovators and the patent system, and UTC will incur substantial losses that it could not recover even after prevailing in this litigation.

Before filing this lawsuit, UTC made every effort to resolve its dispute with FDA.  On December 29, 2023, UTC submitted a letter to the agency identifying FDA's unlawful violation of the Bundling Rule in accepting Liquidia's amendment and urging the agency to rescind that unlawful action.  *See* Burgess Decl.[2] Ex. 6, UTC Letter; *see also* Ex. 8, UTC Reply Letter.  But despite UTC's call for FDA to rectify the situation immediately, FDA has not done so.  To the contrary, FDA gave no indication that it would even respond to UTC before finally approving Liquidia's amended application—at which point it would be too late to seek relief before Liquidia

---

[1] The District of Delaware concluded that Liquidia's original application infringed a UTC-owned patent, U.S. Patent No. 10,716,793 ('793 patent).  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, C.A. No. 20-cv-00755-RGA (D. Del. Sept. 9, 2022), D.I. 436.  On December 26, 2023, Liquidia filed a motion under Rule 60(b) seeking to modify that judgment and allow immediate approval based on a decision of the Patent Trial and Appeal Board (PTAB) finding the '793 patent unpatentable. The PTAB decision has been affirmed by a panel of the Federal Circuit, and although a petition for panel rehearing or rehearing en banc is pending, Liquidia has urged the Delaware court to amend its judgment immediately without waiting for any further action from the Federal Circuit.  Liquidia's motion is fully briefed and could be decided at any time.

[2] The prefix "Burgess Decl." refers to exhibits attached to the concurrently filed Declaration of Brian T. Burgess in Support of Plaintiff's Motion for Preliminary Injunction.  Unless otherwise specified, all exhibits referenced are attached to the Burgess Decl.

enters the market and permanently eviscerates UTC's statutory right to a 30-month stay.  After UTC filed suit, FDA rejected UTC's proposals to avoid a preliminary injunction, stating that it could not make any representations to UTC regarding the timing of approval for Liquidia's application based on the pendency of this suit.  UTC filed this motion for preliminary injunction on the first business day after FDA's statement.  *See* Ex. 2.

This Court should grant UTC's motion for injunctive relief to preserve the status quo and to ensure that UTC may obtain review of its substantial legal arguments before it suffers irreparable harm.  At a minimum, the Court should ensure that UTC has an opportunity to be heard before FDA causes UTC to suffer irreparable harm by granting final approval to Liquidia's application.  *See, e.g.*, *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (Bates, J.) (ordering FDA to provide notice before making a decision that could result in approval, so the plaintiff would have an opportunity to seek emergency relief).

UTC asks that the Court act upon its motion no later than March 31, 2024, when the independent regulatory exclusivity that currently blocks approval of Liquidia's application for the PH-ILD indication will expire.  If the Court is unable to act on the motion for preliminary injunction before that date, UTC respectfully requests that the Court issue a temporary restraining order pending a decision on the motion for preliminary injunction.

## BACKGROUND

### I.     Statutory and Regulatory Framework

#### A.      The FDCA and Hatch-Waxman Act

Federal law requires anyone seeking to market a drug to first demonstrate to FDA's satisfaction that the product is effective and safe for its intended use.  *See* 21 U.S.C. § 355(d)(2); *see generally* § 355(a).  To do so, the sponsor must submit either a new drug application (NDA)

under section 505(b)(1) of the FDCA, 21 U.S.C. § 355(b)(1),[3] or one of the more streamlined applications created by the Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Act"), Pub. L. No. 98-417, 98 Stat. 1585 (1984).  The choice in application depends on whether (and to what extent) the sponsor relies on previous FDA approvals and associated studies to which it has no right of reference.

If an applicant seeks approval for an entirely new drug product—a "brand-name" drug—it typically submits a full, standalone NDA under section 505(b)(1).  An NDA must include the "full reports of investigations" conducted or licensed by the sponsor showing "whether or not such drug is safe for use and whether such drug is effective in use."  21 U.S.C. § 355(b)(1)(A).  By contrast, if an applicant seeks to market a generic drug that is a copy of an approved brand drug, the Hatch-Waxman Act allows the applicant to submit an abbreviated new drug application (ANDA) establishing that the proposed generic drug is bioequivalent and pharmaceutically equivalent to a previously approved "reference listed drug" (*i.e.*, the brand-name product).  *See id.* § 355(j)(2)(A).  In other words, the ANDA relies on FDA's prior determination that the reference listed drug is safe and effective.  That reliance on an earlier approval speeds the process and dramatically lowers costs for the ANDA sponsor.

The Hatch-Waxman Act also establishes an intermediate pathway for approval of a new drug product that shares features with a previously approved drug: an application under section 505(b)(2) of the FDCA.  This case involves such a section 505(b)(2) application.  "Like the full NDA, a [section] 505(b)(2) NDA must directly demonstrate that the proposed drug product is safe and effective."  *Veloxis Pharm., Inc. v. FDA*, 109 F. Supp. 3d 104, 108 (D.D.C. 2015).  But to do

---

[3] Section 505 of the FDCA is codified at 21 U.S.C. § 355.  This memorandum refers to provisions of the session law in text and provisions of the U.S. Code in citations.

so, the section 505(b)(2) NDA "can rely on clinical studies that were previously submitted to the FDA in support of another drug and that were not conducted or licensed by the [section] 505(b)(2) sponsor." *Id.* at 109 (brackets omitted).  In other words, a section 505(b)(2) application uses clinical studies to demonstrate the safety and effectiveness of the proposed new drug but differs from a section 505(b)(1) application because it relies, in whole or in part, on another sponsor's safety or efficacy data from a previously approved drug.

### B.        Patent Disputes Under the Hatch-Waxman Act

Many innovative drug products that improve the lives of patients also reflect the type of novel and valuable invention that is rewarded with a patent.  To strike a balance between expediting the entry of follow-on products and respecting innovators' patent rights, the Hatch-Waxman Act creates a carefully calibrated process for identifying and resolving patent disputes between brand-name manufacturers and would-be generic and section 505(b)(2) competitors.  Considered as a whole, this statutory framework promotes the orderly resolution of patent disputes *before* a follow-on product from an ANDA or section 505(b)(2) application enters the market.

The process begins with the brand-name manufacturer's public identification of its patent interests.  When a brand-name applicant files an NDA, it must list each patent that claims the proposed drug or a method of using the proposed drug for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug."  21 U.S.C. § 355(b)(1); *see also* 21 C.F.R. § 314.50(h).  The brand manufacturer must also submit timely updates to FDA of any such newly issued patents, both while the application is pending and after approval of the NDA.  *Id.* § 314.53(d).  FDA publishes all listed patents for each drug in a compendium called *Approved Drug Products with Therapeutic Equivalence Evaluations*, more commonly known as the "Orange Book."  21 U.S.C. § 355(j)(7)(A)(i); *see also* § 355(c)(2).

7

An ANDA or section 505(b)(2) applicant must then include in its application a certification regarding all the Orange Book–listed patents.  Several types of certifications exist; relevant here is the "paragraph IV" certification.  If there are any patents listed in the Orange Book for a given brand-name drug, and if the ANDA or section 505(b)(2) applicant wants to market its product before the expiration of any of those patents, a "paragraph IV" certification allows it to represent that, in its view, the patent is invalid or unenforceable or will not be infringed by the proposed drug.  21 U.S.C. § 355(b)(2)(A)(iv), (j)(2)(A)(vii)(IV); 21 C.F.R. § 314.94(a)(12)(i)(A).

Submitting a paragraph IV certification "comes with a risk," because it qualifies as a technical act of patent infringement that allows the patent owner to sue immediately—*i.e.*, before the product has been approved and marketed.  *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1305 (D.C. Cir. 2010); 35 U.S.C. § 271(e)(2)(A).  Filing suit within 45 days of receiving notice of the paragraph IV certification typically triggers an automatic stay of FDA's ability to approve the 505(b)(2) NDA or ANDA for up to 30 months.  21 U.S.C. § 355(c)(3)(C); 21 C.F.R. § 314.107(b)(3)(viii).  This stay allows patent disputes to be litigated before approval and market entry of the follow-on product.  *See Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 557 F.3d 1346, 1348-49 (Fed. Cir. 2009); *see also* Fed. Trade Comm'n, *Generic Drug Entry Prior to Patent Expiration: An FTC Study* 39 (July 2002) ("[H]istorically," this 30-month period has "approximated the . . . duration of a patent lawsuit.").  If the patent litigation ends sooner than 30 months, so does the stay.  *See* 21 U.S.C. § 355(c)(3)(C)(i)-(ii).

As explained in more detail below, pp. 12-13, *infra*, the automatic 30-month stay is only available for patents submitted to FDA before the 505(b)(2) NDA or ANDA was submitted to the agency.  *See* 21 U.S.C. § 355(c)(3).  During the 30-month stay, the patent disputes are litigated, and FDA reviews the follow-on application in parallel.

### C.   FDA's Bundling Rule

For more than three decades, FDA's "Bundling Rule" has provided that an applicant may not add a new indication to a pending application—including a "tentatively approved" application—via an amendment.  Instead, FDA has long maintained that requests to seek approval for new indications, together with several other types of requests, require entirely new applications.

In its 1993 articulation of the rule, FDA explained to applicants "what should be contained in separate marketing applications and what should be combined into one application."   FDA, *Interim Guidance: Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees Under the Prescription Drug User Fee Act of 1992* at 2 (July 12, 1993) ("1993 Bundling Rule").[4]  FDA explained that certain proposed additions or alternatives were not proper subjects for amendment, but rather could be sought only in a new application.  For example, "[e]very different active ingredient . . . should be submitted in a separate original application," as should "[p]roducts to be administered using different routes of administration" and "[d]ifferent dosage forms" (subject to narrow exceptions).  *Id.* at 3-4.  By contrast, applicants seeking approval for "[d]ifferent strengths or concentrations" of a drug were directed to combine their requests into a single application.  *Id.*  As most relevant here, the 1993 Bundling Rule directed that "[a]fter initial submission, a pending original or supplemental application should not be amended to add a new indication."  *Id.* at 6; *see also id.* ("New clinical or *in vitro* data to support a new claim(s) should not be submitted to an already submitted original application during the review of that application.").  Instead, "[i]f the original application is not yet approved, a request for approval of other indications or claims" should "be submitted in a separate, original, application."  *Id.*

---

[4] A copy of the 1993 Bundling Rule is attached as Exhibit 3 to the Burgess Decl.

FDA has carried forward the Bundling Rule throughout the years with only minor changes, immaterial here.  In its current form, issued by FDA in 2004, the agency reiterated that:

> After initial submission, a pending original or supplemental application should not be amended to add a new indication or claim. . . . If the original application is not yet approved, a request for approval of other new indications or claims should be submitted in a separate, original application.  If the initial application is approved, the application can be subsequently supplemented to add a new indication.

FDA, *Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees* at 4-5 (Dec. 2004) ("2004 Bundling Rule"[5]); *see also* Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg 69,580, 69,616 (2016) ("Most requests for approval of a different indication or condition of use by a 505(b)(2) applicant should *not* be made as an amendment to the 505(b)(2) application.").  FDA has consistently applied this Bundling Rule since 2004.  *See, e.g.*, *id.* at 69,635 (Oct. 6, 2016) (maintaining that an applicant may not "amend[] or supplement[] a 505(b)(2) application to seek approval of a drug that has been modified to have a different active ingredient, different route of administration, different dosage form, or certain differences in excipients than the drug proposed in the original submission of the 505(b)(2) application").  Indeed, FDA has reiterated the rule as recently as January 2024.  *See* FDA, *SOPP 8401 Administrative Processing of Original Biologics License Applications (BLA) and New Drug Applications (NDA)* 12 (2024), https://www.fda. gov/media/85659/download.

FDA has always understood that the Bundling Rule binds both itself and applicants.  For example, before FDA accepts an application (including an amendment) for substantive review, FDA staff must complete the agency's "RPM Filing Review" checklist to ensure that the

---

[5] A copy of the 2004 Bundling Rule is attached as Exhibit 4 to the Burgess Decl.  This memorandum refers to the 1993 Bundling Rule and 2004 Bundling Rule collectively as "the Bundling Rule," reflecting the fact that there are no material differences between the two versions.

submission is lawful and consistent with the statute.  As relevant here, that checklist permits FDA

to accept only those applications that comply with the Bundling Rule: "Has the user fee bundling

policy been appropriately applied? *If no, or you are not sure, consult the User Fee Staff*."  FDA,

Approval Package, Other Review(s), Application No. 208603, at PDF p. 4 (May 21, 2021), https://

www.accessdata.fda.gov/drugsatfda_docs/nda/2017/208603Orig1s000OtherR.pdf.

In addition, FDA has repeatedly enforced the Bundling Rule against companies that seek

to add new indications by way of an amendment.[6]  The Bundling Rule has also been consistently

applied in various additional contexts, including sought-after changes to pending applications that

are likely to implicate patent rights, such as changes to the dosage form or route of administration.[7]

Unsurprisingly, in light of this history, FDA has unequivocally characterized the Bundling Rule

as a "require[ment]."  FDA, Proposed Rule, Abbreviated New Drug Applications and 505(b)(2)

Applications, 80 Fed. Reg. 6802, 6851 (Feb. 6, 2015) ("Consistent with FDA's 'bundling' policy

---

[6] *See, e.g.*, FDA, Approval Package, Administrative and Correspondence Documents, Application No. 021822, at PDF pp. 5-6 (May 2006), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2008/021822s000admincorres.pdf (Aptivus Correspondence); FDA, Approval Package, Administrative and Correspondence Documents, Application No. 206682, PDF p. 45 (Jan. 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/206628Orig1s000Admincorres.pdf (Dexmedetomidine Correspondence); FDA, Approval Package, Proprietary Name Review(s), Application No. 761223, at PDF p. 3 (May 24, 2021), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2021/761223Orig1s000NameR.pdf (Jemperli Correspondence); *see also* FDA, Approval Package, Proprietary Name Review(s), Application Nos. 761825 & 761331, file p. 3 (Sept. 22, 2023), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2024/761285Orig1s000,761331Orig1s000NameR.pdf (Ustekinumab Correspondence).

[7] *See, e.g.*, FDA, Approval Package, Administrative and Correspondence Documents, NDA 210709 (Tekturna), PDF p. 60 (May 2017), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/210709Orig1s000AdminCorres.pdf (Tekturna Correspondence); FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 209400 (Omeprazole Delayed-release Orally Disintegrating Tablets), PDF pp. 63-64 (Nov. 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/209400Orig1s000AdminCorres.pdf (Omeprazole Correspondence); FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 208780 (Esbriet), PDF p. 76 (May 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/208780Orig1s000AdminCorres.pdf (Esbriet Correspondence).

. . . , the applicant is *required* to submit a new 505(b)(2) application [in certain circumstances]." (emphasis added)).

### D.        The Medicare Modernization Act

In 2003, Congress enacted the Medicare Modernization Act (MMA), Pub. L. No. 108-173, 117 Stat. 2066.  Among other things, the MMA reformed the process for the automatic stay to ensure the stay operated for its intended purpose: to provide an opportunity to litigate significant patent disputes prior to market-altering approvals.  Before passage of the Act, brand manufacturers sometimes could secure multiple 30-month stays by listing new—but insignificant—patents after the submission of a section 505(b)(2) application or ANDA.  For example, a brand manufacturer might have secured a patent covering minor secondary changes to a drug product (*e.g.*, related to color or packaging) and used it to trigger a new stay, even though the change "really did not indicate a different or improved use for the product."  148 Cong. Rec. S6844 (2002).  Congress aimed to curb this practice by amending the language of 21 U.S.C. § 355(c) to provide that a 30-month stay only kicks in with respect to patents listed in the Orange Book "before the date on which the [ANDA or section 505(b)(2)] application (excluding an amendment or supplement to the application) was submitted."  21 U.S.C. § 355(c)(3)(C).

In passing the MMA, Congress legislated against the backdrop of—and, indeed, effectively codified—the Bundling Rule.  As discussed above, the Bundling Rule was a fixture of FDA's regulatory regime for more than a decade before the MMA's passage.  *See* pp. 9-12, *supra*.  And Congress "d[id] *not* intend [the MMA] to alter current [FDA] practice regarding acceptance of . . . amendments and supplements to pending and approved [applications]."  H.R. Rep. No. 108-391, at 835 (2003).  Instead, Congress "intend[ed] [the MMA] to reflect the FDA's current practice regarding those changes and variations to both innovator and generic drugs that may be approved under amendments and supplements to previously filed NDAs and ANDAs."  *Id.*  With the

Bundling Rule in place, Congress understood that the MMA would not prevent a 30-month stay in the event of a follow-on patent for significant changes reflecting "different or improved use[s] for [a] product," 148 Cong. Rec. at S6844, because the Bundling Rule would bar the addition of such "different or improved" uses by way of an amendment to an existing application.

Consistent with the Bundling Rule, the text of the MMA provides that "[a]n applicant may not amend or supplement an application . . . to seek approval of a drug that is a different drug than the drug identified in the application as submitted to the Secretary." 21 U.S.C. § 355(b)(4)(A). Congress further echoed the Bundling Rule by making an exception for "approval of a different strength," as the MMA expressly *permits* an applicant to submit an amendment to a pending NDA to seek approval for a different strength—the type of minor change that is unlikely to implicate the innovator's patent rights. *See* 21 U.S.C. § 355(b)(4)(B) ("[N]othing in this subsection or subsection (c)(3) prohibits an applicant from amending or supplementing the application to seek approval of a different strength."). By contrast, the statute contains no exception allowing for the addition of a new indication by amendment—a possibility that would have directly contradicted the Bundling Rule.

### E.   Regulatory Limitations on Major Amendments to New Drug Applications

FDA typically divides amendments to applications into two categories: "minor" and "major." In the context of resubmissions, FDA has explained that minor resubmissions contain "minor clarifying information" (*e.g.*, "[f]inal printed labeling," "[s]afety updates submitted in the same format . . . as the original safety submissions," or "[a] minor analysis of data previously submitted to the application"). FDA, *SOPP 8402: Designation of Amendments as Major* 2-3 (2023), https://www.fda.gov/media/84431/download. Major resubmissions, by contrast, include "items that would require presentation to an advisory committee or a re-inspection of facilities" (*e.g.*, data "other than minor assay validation data"). *Id.*

FDA has long limited the types of major amendments that an applicant may submit to a pending application. Under 21 C.F.R. § 314.60(b)(6), an applicant may not submit a major amendment that includes "data to support an indication or claim that was not included in the original NDA." The applicant may, however, include data "to support a minor modification of an indication or claim that was included in the original NDA." *Id.* § 314.60(b)(6). As FDA has explained:

> [I]t is appropriate to allow a major amendment to include data to support a slightly modified indication (e.g., increasing or decreasing the age range, increasing the severity of the disease) *but not a completely new indication*, regardless of whether the data supporting the new indication were submitted at the applicant's initiative or at our request.

Applications for Approval to Market a New Drug; Complete Response Letter; Amendments to Unapproved Applications, 73 Fed. Reg. 39588, 39604 (July 10, 2008) (emphasis added).

## II.   Factual Background

This case concerns a prescription drug containing treprostinil and its innovative use to treat pulmonary hypertension (PH). PH is a rare, chronic, and often fatal disease generally characterized by increased pressure in the blood vessels between the heart and lungs. Compl. ¶ 35. That increased pressure strains the heart and, over time, can result in heart failure and death. *Id.* The World Health Organization has designated five subcategories of PH, each with a different cause and different expected clinical outcomes. Treprostinil is one of a number of therapies approved for Group I PH (also known as pulmonary arterial hypertension ("PAH")). In contrast, treprostinil is the only therapy ever approved to treat patients with pulmonary hypertension associated with interstitial lung disease ("PH-ILD"). To help treat various forms of PH, UTC has pioneered several inventions, including the methods claimed by the '793 patent for use of inhaled treprostinil to treat PH and the method of U.S. Patent No. 11,826,327 ('327 patent) for use of inhaled treprostinil to improve exercise capacity in patients with PH-ILD. *Id.* ¶ 43.

A.     **UTC Develops Novel Treatments for Rare Diseases**

UTC develops and commercializes products designed to address the needs of patients with chronic and life-threatening rare conditions.  Compl. ¶ 3.  Indeed, UTC was created to develop treatments for PAH.  United Therapeutics Corp., *United Therapeutics Corporation History*, https://www.unither.com/about-us/history (last visited Mar. 4, 2024).  UTC's treprostinil-based drug products include: an infusion administered subcutaneously or intravenously (Remodulin®), an extended-release tablet (Orenitram®), a nebulized inhaler (Tyvaso®), and a dry powder inhaler (Tyvaso DPI®).  UTC's efforts to develop innovative treprostinil-based therapies led to multiple patents, including the '793 patent, which expires on May 14, 2027, and the '327 patent, which expires on January 4, 2042.  Compl. ¶ 43.

In 2009, FDA approved Tyvaso, the first inhaled treprostinil therapy to treat PAH.  *See* Compl. ¶ 38; *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1363, 1365 (Fed. Cir. 2023).  In 2021, following an extensive clinical trial known as the INCREASE clinical trial, UTC discovered that inhaled treprostinil can improve exercise capacity in patients with PH-ILD. *Id.* ¶¶ 4, 40-42.  UTC's INCREASE study convinced FDA to approve a treprostinil-based treatment for patients with PH-ILD for the first time.  *Id.* ¶ 42.  This first-and-only approved therapy for PH-ILD follows clinical failures of attempts to use other PH drugs to treat PH-ILD. Because it secured this approval based on a new clinical trial, UTC received a period of regulatory exclusivity, which bars FDA from approving of other treprostinil products with a PH-ILD indication until March 31, 2024.  *Id.* ¶ 42.  In 2022, FDA also approved Tyvaso DPI, the first commercialized dry powder inhaler version of treprostinil, to treat both PAH and PH-ILD.  United Therapeutics Corp., *Tyvaso/Tyvaso DPI*, https://www.tyvaso.com (last visited Mar. 4, 2024).

Thus, UTC introduced not only the first inhaled treprostinil treatment, but also the first FDA-approved inhaled dry powder formulation, which offers patients a smaller, more convenient

device capable of treating both PAH and PH-ILD.  UTC currently markets both Tyvaso and Tyvaso DPI.  *See* Compl. ¶ 41-42; United Therapeutics Corp., *Tyvaso/Tyvaso DPI*, https://www.tyvaso. com/dpi/ (last visited Mar. 4, 2024).

**B.    Liquidia Applies To Market a Treprostinil Product and Subsequently Amends its Application To Add the PH-ILD Indication**

Liquidia is a late-stage clinical biopharmaceutical company seeking FDA approval to market Yutrepia, a dry powder inhaler version of treprostinil.  When filing its original section 505(b)(2) NDA in 2020, Liquidia relied on the approval of UTC's Tyvaso product to seek approval to market Yutrepia for the treatment of PAH.  Compl. ¶ 44.  Liquidia included paragraph IV certifications for UTC's patents that were then listed in the Orange Book.  *Id.* ¶ 45.

On July 27, 2023, Liquidia announced that it had submitted an amendment to its pending NDA No. 213005 to add the PH-ILD indication for Yutrepia.  *See id.* ¶ 50.  In December 2023, Liquidia provided notice of a paragraph IV certification to UTC, asserting that the claims of the '327 patent were invalid or not infringed by the Yutrepia product.  *Id.* ¶ 57.

**C.    UTC and Liquidia Litigate Issues Related to the Validity of the '793 Patent and Yutrepia's Infringement of That Patent**

After Liquidia submitted its original section 505(b)(2) NDA in 2020, UTC promptly filed suit against Liquidia in the District of Delaware, asserting that Liquidia's Yutrepia product would infringe several patents.  Compl. ¶ 49.  After a four-day trial, the District of Delaware concluded that "Liquidia . . . will induce infringement of claims 1, 4, 6, 7, and 8 of the '793 patent," and awarded the statutory Hatch-Waxman remedy, an order barring FDA from granting final approval of Liquidia's NDA before March 14, 2027.  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-cv-755, D.I. 436 ¶¶ 3-4 (D. Del. Sept. 9, 2022).  Liquidia appealed, and the Federal Circuit affirmed.  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360 (Fed. Cir. 2023).  Liquidia petitioned for a writ of certiorari, which the Supreme Court denied on February 20, 2024.

*Liquidia Techs, Inc. v. United Therapeutics Corp.*, No. 23-804, 2024 WL 675262 (Feb. 20, 2024).

In parallel with the District of Delaware case, Liquidia sought to administratively cancel claims 1-8 of the '793 patent through a process at the U.S. Patent & Trademark Office (Patent Office) called "*inter partes* review." *See Liquidia Techs., Inc. v. United Therapeutics Corp.*, No. IPR2021-00406, 2022 WL 2820717 (P.T.A.B. July 19, 2022). After the agency found the claims unpatentable, UTC appealed to the Federal Circuit, which affirmed. *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 2023 WL 8794633 (Fed. Cir. Dec. 20, 2023). On January 19, 2024, UTC filed a petition for panel rehearing and rehearing en banc, which remains pending. Case No. 23-1805, D.I. 54. On February 16, 2024, the Federal Circuit ordered Liquidia to respond to UTC's petition, which Liquidia did on February 26, 2024. Case No. 23-1805, D.I. 56; D.I. 57. Relying on the non-final decision of the Patent Office, Liquidia moved the District of Delaware for relief from the judgment enjoining FDA from approving its section 505(b)(2) NDA until the '793 patent expires. *See United Therapeutics*, No. 20-cv-755, D.I. 465. That motion is fully briefed and pending.

### D.     UTC Brings Infringement Litigation Regarding the New PH-ILD Indication

In September 2023, within 45 days of receiving notice of Liquidia's paragraph IV certifications, UTC asserted infringement of the '793 patent in a suit against Liquidia in the District of Delaware.  Compl. ¶ 53.[8]  Two months later, UTC amended that complaint to assert infringement of the '327 patent. Compl. ¶ 56.  In December 2023, Liquidia amended its section 505(b)(2) application to include a paragraph IV certification for the '327 patent. Compl. ¶ 57.

Although the PH-ILD patent litigation in Delaware remains ongoing, FDA has already

---

[8] UTC later stipulated to the dismissal of counts of infringement of the '793 patent without prejudice, reserving its right to amend its complaint to reassert the patent if the Patent Office's invalidation of the '793 patent is ultimately set aside on appeal.

determined that this litigation will not trigger a new 30-month stay period because the patents asserted were listed in the Orange Book after Liquidia submitted its *original* 505(b)(2) NDA. Compl. ¶¶ 55-56; *see* Ex. 1, Cooney Email (describing which patents could result in a stay, and excluding patents listed after Liquidia submitted the original section 505(b)(2) NDA).   But if Liquidia were required to submit a new application for approval of the PH-ILD indication, as the Bundling Rule directs, a paragraph IV certification to the '327 patent would trigger the statutory 30-month stay.  Compl. ¶ 58.

### E. Liquidia Tells the Market It Is Prepared To Launch Immediately Despite Ongoing Patent Litigation

Liquidia has already announced that it is prepared to launch Yutrepia immediately upon receiving final approval from FDA.  It plans to launch "for both the PAH and PH-ILD indications as soon as possible."  Press Release, Liquidia Submits Amendment to Add PH-ILD Indication to Tentatively Approved NDA for YUTREPIA™ (treprostinil) Inhalation Powder (July 27, 2023), https://www.liquidia.com/node/10556/pdf; Ex. 5, J.P. Morgan Healthcare Conference Tr. ("JPM Tr.") at 6 (Liquidia stating in response to the question "when will you be ready to launch" that "[w]e're ready now").  By amending its application to include a paragraph IV certification for the '327 patent, Liquidia represented its intention to commercially manufacture, use, and sell Yutrepia before the '327 patent expires.  Compl. ¶ 57.

Liquidia has also specifically relied on FDA's decision to bypass the Bundling Rule to assure the market that it can launch its product for the PH-ILD indication imminently after UTC's new clinical trial exclusivity expires on March 31, 2024.  *See* Ex. 5, JPM Tr. at 6 ("[T]he 327 patent . . . we know it won't cause a regulatory stay.  So it won't trigger a regulatory stay because it was not Orange Book listed at the time of our original NDA application."); *id.* at 9 (similar). Liquidia has further stated that it is willing to launch at risk rather than "hold back [its] launch"

while patent litigation continues.  *Id.* at 10.  Indeed, Liquidia has described its anticipated launch in April 2024 as key to the company's plans.  *Id.* at 12.

## ARGUMENT

In assessing a motion for preliminary injunction (or temporary restraining order), a court considers four factors: (1) the likelihood the plaintiff will succeed on the merits; (2) the probability the plaintiff will suffer irreparable injury if the requested injunction is denied; (3) the balance of the equities; and (4) the public interest.  *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); *see also D.A.M v. Barr*, 474 F. Supp. 3d 45, 55-56 (D.D.C. 2020).  All four factors strongly support granting preliminary injunctive relief.

### I.    UTC is likely to succeed on the merits.

Under the APA, a federal court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency decision flunks this test if, among other things, the agency "disregard[s] [a] statutory mandate," *Air Transp. Ass'n of Can. v. FAA*, 323 F.3d 1093, 1094 (D.C. Cir. 2003), "fails to comply with its own regulations," *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quotation marks omitted), or takes an "unexplained departure from [agency] precedent," *Eagle Broadcasting Grp., Ltd. v. FCC*, 563 F.3d 543, 551 (D.C. Cir. 2009).

FDA's final decision to accept Liquidia's amended section 505(b)(2) application—rather than requiring Liquidia to submit a new NDA seeking approval of the PH-ILD indication—ran afoul of these principles in at least three respects.  First, FDA's decision violated FDA's longstanding "Bundling Rule" requiring an applicant to submit a new section 505(b) application if it seeks approval for a new indication.  The structure of the FDCA, as amended by the 2003 MMA, presupposes FDA's faithful application of the Bundling Rule, precluding the agency from

selectively disregarding its established policies. Second, FDA's decision treated Liquidia differently from other applicants in similar circumstances, with the effect of abrogating UTC's statutory rights. Third, FDA's decision violated FDA regulations prohibiting amendments that include data to support an indication that was not in an original NDA. *See* 21 C.F.R. § 314.60(b)(6).

The Court also has ample authority to provide relief in this context. The APA allows a court to review a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The determination of whether a particular agency decision is "final" is a "pragmatic" and "flexible" inquiry. *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1027 (D.C. Cir. 2016). In general, an agency decision qualifies as "final" within the meaning of § 704 if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is a decision "by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

FDA's decision to accept Liquidia's amended section 505(b)(2) application and refusal to apply the automatic stay marked the consummation of the agency's decisionmaking process on the relevant question here: whether it was appropriate for Liquidia to seek approval by way of an amendment rather than by filing a new NDA. Moreover, FDA went even a step further and concluded that no 30-month stay was available based on the amendment. *See* Ex. 1, Cooney Email; p. 18, *supra*. Moreover, FDA's continued review of whether to grant final approval to Liquidia's application is a distinct issue. Absent judicial relief, FDA has made clear it will not revisit its procedural decision of whether to accept the amendment for substantive review, allowing Liquidia to bypass the statutory stay. And legal consequences clearly flow directly from FDA's decision

to allow Liquidia to pursue its new indication by amendment rather than by filing a new application.  As a direct result of FDA's actions, UTC has been deprived of its statutory right to a 30-month stay to allow UTC to litigate its patent claims in an orderly manner before Liquidia irrevocably alters the market.  Indeed, FDA has specifically informed Liquidia that no stay is applicable, and Liquidia has touted this final determination to the market.  *See* pp. 18-19, *supra*.

### A.    FDA's acceptance of Liquidia's PH-ILD amendment violated the Bundling Rule.

The Bundling Rule sets forth FDA's decades-old policy dictating the types of changes that must be made in "a separate marketing application."  2004 Bundling Rule at 1.  FDA's final decision to accept Liquidia's amended section 505(b)(2) application for substantive review violates that longstanding rule.  UTC is accordingly likely to succeed on the merits of its claim that FDA violated the Bundling Rule by accepting Liquidia's amendment rather than requiring the company to submit a new application.

The terms of the Bundling Rule are clear: "After initial submission, a pending original or supplemental application should not be amended to add a new indication."  2004 Bundling Rule at 5.  Instead, "a request for approval of other new indications . . . should be submitted in a separate, original application."  *Id.*; *see also* 1993 Bundling Rule, at 6 ("If the original application is not yet approved, a request for approval of other indications or claims" should "be submitted in a separate, original, application.").[9]

---

[9] The agency has a name for such a "separate, original application" for a new indication: FDA identifies those applications as "Type 9 NDAs."  *See* FDA, *Manual of Policies and Procedures 5018.2: NDA Classification Codes* 6 (2022), https://www.fda.gov/media/94381/download ("A *Type 9* NDA is for a new indication or claim for a drug product that is currently being reviewed under a different NDA (the 'parent NDA'), and the applicant does not intend to market this drug product under the *Type 9* NDA after approval.  Generally, a *Type 9* NDA is submitted as a separate NDA so as to be in compliance with the guidance for industry on *Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees*.").

The final agency action that UTC challenges directly conflicts with the Bundling Rule.  In 2020, Liquidia filed a section 505(b)(2) application for approval of an inhaled treprostinil product for the treatment of PAH—and only PAH.  *See* p. 16, *supra*.  Then, in 2023, while that application was pending, Liquidia sought approval for the distinct PH-ILD indication, too.  Disregarding the Bundling Rule, FDA let Liquidia request approval for that different indication by way of an amendment to its earlier application—rather than the submission of a new, freestanding application.  There is no way to reconcile that decision with the Bundling Rule.  Accordingly, UTC is likely to succeed on the merits.  *See, e.g.*, *Nat'l Env't. Dev. Ass'n*, 752 F.3d at 1099 ("[A]n agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'" (citation omitted)); *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) ("[F]ederal agencies [must] follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions."); *Accrediting Council for Indep. Colls. & Schs. v. DeVos*, 303 F. Supp. 3d 77, 103 (D.D.C. 2018) ("[I]t is a fundamental principle of administrative law that an agency is [also] bound to adhere to its own regulations." (second alteration in original)).

FDA cannot disregard the Bundling Rule on the theory that the rule has been articulated in "guidance" documents.  The D.C. Circuit has made clear that a nominally non-binding guidance document can have the "force of law" if it "is applied by the agency in a way that indicates it is binding."  *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383-84 (D.C. Cir. 2002) (treating an EPA guidance document as binding because "[t]o the applicant reading the Guidance Document the message is clear: in reviewing applications the Agency will not be open to considering approaches other than those prescribed in the Document."); *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (treating agency guidance document as binding notwithstanding disclaimer

that "[t]he policies set forth in this paper are intended solely as guidance, do not represent final Agency action, and cannot be relied upon to create any rights enforceable by any party").

Here, FDA has left no doubt that the Bundling Rule binds both applicants and the agency. FDA has described the rule as a "require[ment]." 80 Fed. Reg. at 6851. It has developed a checklist that precludes agency staff from accepting a submission if it fails to comply with the Bundling Rule. *See* FDA, Approval Package, Other Review(s), Application No. 108603, at PDF p. 4 (May 21, 2021), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/208603Orig1 s000OtherR.pdf ("Has the user fee bundling policy been appropriately applied? *If no, or you are not sure, consult the User Fee Staff*."). And, as described above and in the next section, it has enforced the rule against numerous applicants. *See* pp. 10-12 & nn.6-7, *supra*; pp. 24-27, *infra*.

Moreover, the Bundling Rule is sufficiently longstanding that it has become embedded into the statutory and regulatory structure related to patent listings and certifications. As described above, pp. 12-13, *supra*, Congress legislated against the backdrop of the Bundling Rule when it amended the FDCA in 2003. Indeed, the House Committee Report for the MMA expressly noted Congress's "inten[t] to reflect the FDA's current practice regarding those changes and variations to both innovator and generic drugs that may be approved under amendments and supplements to previously filed NDAs and ANDAs." H.R. Rep. No. 108-391, at 835 (2003).

Thus, when Congress directed that patents listed after the submission of an original 505(b)(2) application would not trigger an automatic stay, without regard to any application amendments, 21 U.S.C. § 355(c)(3)(C), it did so on the understanding that FDA would continue to police the lines between proper and improper amendments as set forth in the Bundling Rule. Indeed, mirroring the Bundling Rule, Congress amended section 505 to provide that "[a]n applicant may not amend or supplement an application . . . to seek approval of a drug that is a

different drug than the drug identified in the application as submitted to the Secretary," while Congress also carved out an exception for approvals of a different strength. 21 U.S.C. § 355(b)(4). The enumeration of this "express exception" for amendments adding different strengths implies no other exceptions are contemplated to the rule barring amendments that fundamentally alter the nature of the approval request. *Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018). Notably, the Bundling Rule contains the same limited exception for a new strength, but makes clear that adding a new indication is different—a new application is required.

Legislative history further confirms what is apparent from the statute's structure. Members of Congress explained that the differential treatment for amendments under 21 U.S.C. § 355(c)(3)(C) was not meant to enable applicants to avoid a 30-month stay for new patents covering "different or improved use[s] for [a] product"—*i.e.*, new indications. 148 Cong. Rec. at S6844. Congress did not perceive requests for approval to treat a new condition as the type of minor change where a stay to allow for patent litigation might be inappropriate. But FDA's failure to enforce the Bundling Rule allows applicants like Liquidia to skirt a 30-month stay for subsequent patents claiming new inventions, undermining Congress's goal of pre-launch resolution of significant patent disputes.

In short, UTC is likely to succeed because there is no way to reconcile FDA's decision to accept Liquidia's amendment for the PH-ILD indication with the Bundling Rule, which is binding on FDA and is deeply embedded in the statutory and regulatory structure.

### B.      FDA treated Liquidia differently from prior, similarly situated applicants.

"A fundamental norm of administrative procedure requires an agency to treat like cases alike." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). In disregarding a rule of such long standing as the Bundling Rule, FDA treated Liquidia differently from similarly situated applicants who came before. This, too, violates the APA. *See, e.g.*, *Colo. Interstate Gas*

*Co. v. FERC*, 850 F.2d 769, 774 (D.C. Cir. 1988) ("[T]he Commission's dissimilar treatment of evidently identical cases . . . seems the quintessence of arbitrariness and caprice."); *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27 (D.D.C. 1997) ("Government is at its most arbitrary when it treats similarly situated people differently.").

For decades, FDA has repeatedly enforced the Bundling Rule against companies seeking to add new indications to pending applications.  In 2006, for example, FDA rejected Boehringer Ingelheim Pharmaceuticals' attempt to amend an NDA for Aptivus (tipranavir) oral solution: "Because [the] original NDA . . . was intended for an adult indication," the agency explained, "[the] proposal to resubmit the NDA with a pediatric indication [was] considered a new indication and thus [had to] be submitted as a new NDA application."  Aptivus Correspondence, n. 6 *supra*, at PDF pp. 5-6.  Similarly, in 2015, FDA explained to HQ Specialty Pharma that it could not amend a previously submitted NDA for a dexmedetomidine hydrochloride injection product to include a new indication.  *See* Dexmedetomidine Correspondence, n. 6 *supra*, at PDF p. 45.  Citing the Bundling Rule, the agency explained that "if you amend a pending application and add another indication, it should be submitted in a separate original application."  *Id.*

FDA has also consistently enforced the Bundling Rule for other significant changes to a pending application.  For example, in 2017, FDA ruled that Noden Pharma DAC could not amend its previous NDA for 150 and 300 mg Tekturna (aliskiren) tablets to include 37.5 mg pellets in capsule formulation.  Tekturna Correspondence, n. 6 *supra*, at PDF p. 60.  FDA explained that, under the Bundling Rule, "a change to an approved product" cannot be submitted "as a supplement to [an] approved application" if it "changes the dosage form or routes of administration."  *Id.*; *see also id.* ("In this case, the proposed 37.5 mg pellets in capsule formulation has a different dosage form than the currently approved 150mg and 300mg tablets.  Therefore, the new product has to

come in and be reviewed as a new NDA." (emphasis omitted)).   These examples are just representative—there are numerous others.[10]

FDA's acceptance of Liquidia's improper amendment not only treated Liquidia more favorably than similarly situated applicants—it also has the effect of treating UTC less favorably than other similarly situated sponsors.   In the precedents described above, sponsors that were situated similarly to UTC enjoyed the protections afforded by the statute's 30-month stay of approval to litigate the sponsor's patent-infringement claims, whereas FDA's departure from settled precedent in this case strips UTC of that valuable statutory right.   *See* pp. 18, 25-26 & n.10, *supra*.

FDA offered no explanation for its failure to apply the Bundling Rule to Liquidia's amendment.   Indeed, FDA did not even acknowledge its departure from that longstanding policy. For this reason, too, UTC is likely to succeed on the merits.   *See Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) ("[A]gency action is arbitrary and capricious if it departs from agency precedent without explanation."); *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 79 (D.D.C. 2016) (setting aside an agency determination based on "an anomalous application

---

[10] *See, e.g.*, Omeprazole Correspondence, *supra* n. 6, at PDF pp. 63-64 ("Delayed-release tablets and delayed-release, orally disintegrating tablets are two distinct dosage forms. Per the [Bundling Rule], different dosage forms should be submitted in separate original applications unless the products are identical in quantitative and qualitative composition." (citation omitted)); Esbriet Correspondence, *supra* n. 6, at PDF p. 76 ("We note that your questions make reference to submission of pirfenidone film-coated tablets as a supplemental New Drug Application (sNDA). We remind you that an application with a new dosage form constitutes a new NDA."); *cf.* Jemperli Correspondence, *supra*, n. 6, at PDF p. 3 ("We note above that under FDA's prescription drug user fee bundling policy, after initial submission, a pending original or supplemental application should not be amended to add a new indication or claim."); Ustekinumab Correspondence, *supra* n. 6, at 2 ("Under FDA's prescription drug user fee bundling policy, after initial submission, a pending original or supplemental application should not be amended to add a new indication or claim. If the original application is not yet approved, a request for approval of other new indications or claims should be submitted in a separate, original application. Thus, Amgen submitted two separate BLAs." (footnote omitted)).

of the administrative definition of [the applicable statutory term] that [was] inconsistent with prior administrative decisions").

**C.    FDA's acceptance of Liquidia's PH-ILD amendment is improper under the regulations governing "major" amendments.**

Under 21 C.F.R. § 314.60(b)(6), "[a] major amendment [to an existing application] may not include data to support an indication or claim that was not included in the original NDA, supplement, or resubmission, but it may include data to support a minor modification of an indication or claim that was included in the original NDA, supplement, or resubmission."  FDA's acceptance of Liquidia's amendment for substantive review violates this rule because Liquidia's amendment is supported by data seeking approval for a new indication "that was not included in the original NDA."

FDA cannot reasonably dispute that Liquidia's addition of the PH-ILD indication is a "major" amendment.  Indeed, the agency specifically classified Liquidia's submission that way. *See* Press Release, Liquidia Corp., FDA Accepts Submission to Add PH-ILD to YUTREPIA™ Label (Sept. 25, 2023), https://www.liquidia.com/node/10646/pdf (stating that FDA "confirmed" its amendment as "Class II").  That is unsurprising:  Liquidia's section 505(b)(2) NDA adds a completely new indication for PH-ILD that was not sought in its original 505(b)(2) NDA for PAH.

Nor is there any basis to dispute that Liquidia "include[d] data to support an indication or claim that was not included in the original NDA": *i.e.*, the PH-ILD indication.  21 C.F.R. § 314.60(b)(6).  Liquidia has insisted otherwise, asserting that "no additional clinical data was provided in support of the amendment." Ex. 7, Liquidia Letter at 6.  But whether Liquidia provided its *own* data in the amendment does not address whether new data was "include[d]" in support of the amendment to support the new indication, expressly or by implication.  21 C.F.R. § 314.60(b)(6).  Every NDA *must* include a clinical data section "describing the clinical

27

investigations of the drug, including . . . [a]n integrated summary of the data demonstrating substantial evidence of effectiveness *for the claimed indications*." 21 C.F.R. § 314.50(d)(5)(v) (emphasis added); *see also* 21 U.S.C. § 355(b)(1)(A)(i) (NDA must include "full reports of investigations which have been made to show whether such drug is safe for use and . . . effective in use"). Failure to include any such data to substantiate the PH-ILD indication would alone compel rejection of Liquidia's amendment as defective and preclude its approval.

Instead, what Liquidia appears to mean is that it did not submit any new data of its own with its amendment; rather, it relied on UTC's INCREASE phase 3 clinical study, which provided the basis for UTC to obtain approval for the PH-ILD indication in 2021. *See* pp. 15-16, *supra*. But Liquidia's original section 505(b)(2) application submitted in 2020 did not include data from that study, which were not available until after Liquidia's application submission. Aaron Waxman et al., *Inhaled Treprostinil in Pulmonary Hypertension Due to Interstitial Lung Disease*, 384 New Eng. J. Med. 325 (2021), https://www.nejm.org/doi/pdf/10.1056/NEJMoa2008470. Accordingly, Liquidia is necessarily supporting its new PH-ILD indication with new data that Liquidia did not rely on in its original NDA. The fact that the data belongs to UTC, which invested the resources to complete the study, does not somehow mitigate the violation of this regulation.

FDA's decision nevertheless to accept Liquidia's amendment to add a new indication that was not supported by studies included or referenced by Liquidia's original application is unlawful, and UTC is likely to succeed on its claim for this reason as well.

*****

For any one of these reasons, UTC is likely to succeed on the merits of its claim that FDA's acceptance of Liquidia's amendment is arbitrary, capricious, and contrary to law.

II.     **UTC will suffer irreparable harm if the Court does not grant immediate injunctive relief.**

UTC will suffer two independent kinds of irreparable harm if this Court does not enjoin FDA's unlawful conduct.  First, UTC will lose a valuable statutory right, specifically, the Hatch-Waxman Amendments' statutory grant of a 30-month stay of FDA approval of Liquidia's follow-on 505(b) product while UTC litigates whether Liquidia's PH-ILD indication infringes UTC's patent rights.  Second, UTC will suffer irreparable economic injury due to the entry of Liquidia's Yutrepia product into the market for PH-ILD, with the new market entry resulting in unrecoverable price erosion, lost market share, and loss of goodwill associated with UTC's Tyvaso-DPI product.

A.     **UTC will suffer an irreparable injury to a statutory right if the FDA's unlawful conduct is not enjoined.**

As described above, pp. 5-8, *supra*, the Hatch-Waxman Act provides for a careful balance between the interests of innovative pharmaceutical companies and those that follow in their footsteps.  *Bristol-Myers Squibb Co. v. Royce Labs., Inc.*, 69 F.3d 1130, 1132 (Fed. Cir. 1995).  Companies like Liquidia that seek to rely on an innovator's data to support their own drug applications must certify that their products will not infringe any valid patents that the innovator has listed.  Importantly, this certification process allows the innovator to file suit on all listed patents, "which typically brings a 30-month stay of generic competition."  *Teva Pharms. USA Inc. v. Sebelius*, 595 F.3d 1303, 1315 n.4 (D.C. Cir. 2010); 21 U.S.C. § 355(c)(3)(C).

This statutorily guaranteed stay provides an important "mechanism designed to guard against infringement of patents relating to pioneer drugs,' with enforcement provisions that 'apply only to drugs and not to other products.'"  *Bristol-Myers Squibb*, 69 F.3d at 1136 (quoting *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676-78 (1990)).  "[T]he stay period was extended for the benefit of the brand-name drug manufacturers," providing such companies with an opportunity to enforce their patent rights before facing follow-on competition that undercuts those patents' value.

*Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 41 (D.D.C. 2000). And it also benefits the system as a whole, ensuring patent claims can be fully and fairly litigated without forcing follow-on manufacturers to risk substantial damages or burdening courts with emergency motions.

Yet absent preliminary injunctive relief, UTC will forever lose the benefit of this statutory protection, as Liquidia can secure final approval and launch despite UTC's timely suit to enforce patents that were properly listed in the Orange Book. Courts in this Circuit have repeatedly recognized that the loss of such a "statutory entitlement . . . [i]s a harm that [is] sufficiently irreparable" to support injunctive relief because "[o]nce the statutory entitlement has been lost, it cannot be recaptured." *Apotex, Inc. v. FDA*, No. CA06-0627, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006) (citing *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1067 (D.C. Cir. 1998)), *aff'd*, 449 F.3d 1249 (D.C. Cir. 2006); *see also Mylan Labs. Ltd. v. FDA*, 910 F. Supp. 2d 299, 313 (D.D.C. 2012) (explaining that the loss of an exclusivity period "specifically intended by Congress" is inherently irreparable). This Court should apply the same reasoning here and hold that UTC's loss of its right to secure a 30-month stay by promptly bringing patent litigation on a properly listed patent constitutes irreparable harm.

### B. UTC will face irreparable economic harm if Liquidia is allowed to enter the market.

UTC will also suffer irreparable economic harm if the Court does not preliminarily enjoin FDA from approving (in its current form) Liquidia's application to market its proposed Yutrepia product for the PH-ILD indication. Liquidia's unlawful, infringing competition in the market for PH-ILD will deal severe harms to UTC, which are neither quantifiable nor compensable by money damages. And there is a significant, imminent risk of FDA final approval and unlawful competition. As discussed, pp. 16-17, *supra*, the Delaware district court may lift the approval bar premised on the '793 patent at any time, and the regulatory exclusivity applicable to the PH-ILD

expires on March 31, 2024.  No doubt that is why Liquida has been telling the market that the company is planning "to launch in both PHA and PH-ILD in April."  Ex. 5, JPM Tr., at 8.[11]

First, UTC's economic injury from a premature launch occasioned by FDA's unlawful final action is inherently irreparable because it cannot be recovered.  This is a suit for injunctive and declaratory relief against federal agencies and officials who are immune from damages. Where, as here, "a plaintiff cannot recover damages from an agency because the agency has sovereign immunity, any loss of income suffered by [the] plaintiff is irreparable *per se*."  *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010) (quotation marks omitted), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891, 898 (D.C. Cir. 2010); *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008); *Nalco Co. v. E.P.A.*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011); *see also Alphapointe v. Dep't of Veterans Affs.*, 416 F. Supp. 3d 1, 9 (D.D.C. 2019) (noting that financial losses suffered by plaintiffs in cases presenting only APA claims against the government were "by definition, irreparable" because they "could not recover any money damages against the government even if they were to prevail"); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) ("[W]here parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable.").

The possibility that UTC might recover damages against a *different* party in *different* litigation—*i.e.*, the patent-infringement litigation UTC has filed against Liquidia—does not change the analysis.  Damages there would not be tied to the specific injury UTC would suffer as

---

[11] UTC has also filed a motion for preliminary injunction against Liquidia in its Delaware patent litigation.  *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 23-cv-975 (D. Del. Feb. 26, 2024), D.I. 25.  No hearing date has been scheduled for that motion, and the possibility of relief directed against Liquidia temporarily enjoining its ability to market Yutrepia for the PH-ILD indication would not redress UTC's injury from an unlawful FDA approval.

a result of a premature and unlawful FDA approval, but rather would be evaluated under the Patent Act based on Liquidia's infringing conduct.  Moreover, Liquidia itself lacks the means to adequately compensate UTC for its harm, as UTC explained in its motion for preliminary injunction in that case. *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 23-cv-975, D.I. 33 at 18-19.  Liquidia has never turned a profit, and even were it allowed on the market, an approximation of UTC's damages from price erosion and lost sales would be of greater value than Liquidia's potential revenue, making those damages irreparable.  Selck Decl. ¶¶ 137-44; *see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155-56 (Fed. Cir. 2011) (defendant's inability to satisfy a damages judgment renders economic loss from patent infringement irreparable).

FDA's unlawful decision and the resulting loss of an automatic stay on approval will also cause UTC to suffer harm in the form of price erosion, lost market share, and loss of goodwill—all forms of injury that courts have recognized as paradigmatic examples of irreparable harm. *See Bayer HealthCare, LLC v. U.S. Food & Drug Admin.*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013) ("Courts have recognized that price erosion and diminished market share can constitute irreparable harm."); *Xiaomi Corp. v. Dep't of Defense*, No. 21-280, 2021 WL 950144, at * 9 (D.D.C. Mar. 21, 2021) ("[B]ecause '[i]njury to reputation or goodwill is not easily measurable in monetary terms' it is typically 'viewed as irreparable.'" (second alteration in original) (quoting 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2021)).

To begin, if Yutrepia enters the market with an indication for PH-ILD, Liquidia will offer a steep discount relative to UTC's Tyvaso products.  Selck Decl. ¶¶ 62-75.  When more than one drug is available to treat a condition, insurance companies and pharmacy benefit managers force manufacturers to compete for "formulary status."  Selck Decl. ¶ 63.  There are compelling reasons

to believe this will occur here.  *See* Selck Decl. ¶ 64.  The amount of price erosion attributable to Liquidia's launch in the PH-ILD indication will be even more difficult to quantify than usual, because Liquidia also plans to launch Yutrepia with a PAH indication.  *See* pp. 16-19, *supra*; Ex. 5, JPM Tr., at 10.  If FDA is not enjoined from approving Liquidia's amendment and Liquidia is allowed to enter the market with the PH-ILD indication for Yutrepia, this price erosion will likely be permanent because of the complex and "sticky" nature of the pharmaceutical market, regardless of whether UTC ultimately prevails in this litigation.  Selck Decl. ¶ 74.

Likewise, UTC has expended significant resources building up the Tyvaso and Tyvaso-DPI brands.  Selck Decl. ¶ 94.  FDA's unlawful actions will allow Liquidia to enter the market and freeride on UTC's goodwill by prematurely marketing a copying product that would impact UTC's reputation in the market in ways that UTC could never repair.  Selck Decl. ¶¶ 95-97.  Moreover, the trajectory of Tyvaso and Tyvaso-DPI sales will be permanently impacted because UTC will see a significant and irrecoverable diminution of its first-mover advantages in the market for Tyvaso and Tyvaso-DPI if Yutrepia is permitted to come to market prematurely.  *Id.*; *see also Collagenex Pharms., Inc. v. Thompson*, No. 03-cv-1405, 2003 WL 21697344, at *10 (D.D.C. July 22, 2003), *as amended* (Aug. 26, 2003) (finding irreparable harm in part because innovator "would lose its head start in the market."); *see also Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (Bates, J.) (citing *Collagenex*).  Finally, the sales of Tyvaso and Tyvaso-DPI support UTC's efforts to research and develop innovative therapies.  Selck Decl. ¶ 99.  If Liquidia enters the market, UTC may be forced to reduce its expenditures on research and development, permanently and negatively impacting its capacity to compete in the future. Selck Decl. ¶¶ 98-100; *see Bayer HealthCare, LLC v. FDA*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013) ("[L]oss of research and development funding as a result of" generic's entry contributed to irreparable harm.).

In short, UTC will suffer imminent irreparable harm unless the Court maintains the status quo and prevents the FDA from granting final approval to Yutrepia with a PH-ILD indication in violation of the automatic stay that would have applied but-for the agency's unlawful final action in accepting Liquidia's amendment.

### III.    The balance of harms and public interest strongly favor entry of an injunction.

Both the balance of harms and the public interest favor the immediate entry of an injunction.  FDA would not be harmed by a preliminary injunction because the agency's only legitimate interest here is the proper administration of the law.  Ensuring the proper application of the law and protecting UTC's statutory right outweighs any purported harm to FDA stemming from an order maintaining the status quo while this litigation proceeds, particularly because UTC is prepared to move this case forward to a final resolution expeditiously.  *See Bayer*, 942 F. Supp. 2d at 27 (granting temporary restraining order against final approval of a generic product and concluding that FDA's "institutional interest" could not outweigh plaintiff's interest in avoiding irreparable harm from a potentially unlawful approval).

As for Liquidia, any injury it would suffer from maintenance of the status quo does not outweigh the injury UTC would suffer from the abrogation of its statutory rights and premature market entry.  Selck Decl. ¶¶ 133-136.  A generic company's "calculated risk" to try to launch before resolution of its patent disputes does not outweigh the harm to the innovator of an unlawful and premature launch.  *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006).  As courts in this Circuit have recognized, "[t]he erosion of" an innovative pharmaceutical manufacturer's "statutory right" to exclusivity "is a significant harm" in the context of the balance of harms prong of the preliminary injunction analysis.  *Apotex Inc. v. FDA*, 508 F. Supp. 2d 78, 88 (D.D.C. 2007).  It is not offset by any inconvenience to Liquidia in waiting for final approval of

the PH-ILD indication until after this dispute is resolved—which is the precise course that Congress prescribed.  *See* Selck Decl. ¶ 136.

Finally, the relief requested by UTC would serve the public interest.  *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (recognizing that the weighing of relative harms and of public interests "merge when the Government is the opposing party" because "the government's interest *is* the public interest" (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009))). "There is generally no public interest in the perpetuation of unlawful agency action" like FDA's current course.  *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). As discussed, pp. 5-8, *supra*, the Hatch-Waxman Act balances the interests of the public in obtaining innovative drugs and lower cost generic versions of those drugs.  "The public interest does not favor a distortion of the principles of the Hatch-Waxman Act." *Mylan Labs., Inc. v. Leavitt*, 484 F. Supp. 2d 109, 124 (D.D.C. 2007); *see also Collagenex*, 2003 WL 21697344, at *11 ("[T]he barriers to competition that Congress has erected are in the public interest because they encourage the development of innovative drugs by ensuring a period of market exclusivity."). Permitting FDA to subvert the structure of the Hatch-Waxman Act and prevent innovators from being able to defend their patent rights before follow-on products are approved would erode the value of those patents and reduce the incentive for companies to develop lifesaving medicines in the first place.

FDA's unlawful decision to accept Liquidia's amended section 505(b)(2) application upset the balance struck by the Hatch-Waxman Act by denying UTC a 30-month stay in which to litigate infringement of UTC's duly issued '327 patent.  FDA and Liquidia's actions have not allowed that process to play out as the statute provided.  The result is to place more burdens on the federal courts, as UTC has been forced not only to seek relief here, but also to file a motion for a

preliminary injunction in the Delaware patent litigation to stop the premature marketing of Liquidia's product with the PH-ILD indication.  *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 23-cv-975 (D. Del. Feb. 26, 2024), D.I. 25.  If FDA had not acted unlawfully in accepting Liquidia's improper amendment, thus allowing the company to circumvent the automatic stay, none of this would have been necessary. The public interest would be served by an injunction here to reinforce the Hatch-Waxman Act's framework and allow for orderly resolution of UTC and Liquidia's patent dispute.

## IV.  The Court should enter relief *now* to protect UTC's statutory rights.

The Court should order *immediate* injunctive relief to protect UTC's statutory right to an automatic stay.  There is no basis to wait to rule until after FDA has finally approved Liquidia's Amended 505(b)(2) NDA.  Indeed, once such an approval decision is rendered, UTC will already have suffered irreparable injury from the loss of its statutory right to seek enforcement of its patents before the agency approves a follow-on product for launch.  *See* pp. 29-30, *supra*.  Because UTC's challenges are "purely legal" in nature, and because this suit to protect UTC's statutory rights is highly "time-sensitive," the Court should grant injunctive relief now before UTC suffers irreparable injury.  *Teva v. Sebelius*, 595 F.3d at 1308, 1311; *see also Collagenex*, 2003 WL 21697344, at *1, *4-5 (granting preliminary injunctive relief and holding that a brand manufacturer's suit challenging an FDA legal determination that would permit final approval of generic competitors' applications was ripe even though FDA had not yet approved any ANDAs).

At a minimum, this Court should use its equitable authority to require FDA to provide notice to the Court and to UTC before the agency grants final approval to Liquidia's Amendment 505(b)(2) NDA for the PH-ILD indication.  Both Your Honor and other judges in this District have exercised such authority to ensure plaintiffs like UTC seeking to vindicate their statutory rights are not irreparably harmed before they can be heard on an emergency motion.  *See, e.g.*, *Hi-Tech*,

587 F. Supp. 2d at 13 (Bates, J.) (requiring FDA to provide "the Court and the parties notice of its intent to release an exclusivity decision" in advance of that determination to ensure an opportunity for a legal challenge before final approval of a generic application); *AstraZeneca Pharms. LP v. Burwell*, 197 F. Supp. 3d 53, 56-60 (D.D.C. 2016) (Moss, J.) (exercising authority under the All Writs Act to require FDA to provide notice to the Court before approving pending ANDAs in order to allow the Court to hold a hearing on the plaintiff's motion for injunctive relief before generic competitors could launch).

UTC made every effort to work constructively with FDA to avoid litigation, but UTC has been waiting since December for FDA to take corrective action and properly apply the Bundling Rule. FDA has refused to do so, and in fact, refuses to provide any notice regarding the timing of Liquidia's approval. UTC has no choice but to seek preliminary injunctive relief.

If courts do not intervene to provide innovators with an opportunity to defend their right to statutory exclusivity on the merits before FDA compromises that exclusivity by approving competing follow-on products in a manner that blatantly disregards controlling law, FDA's decisions will become effectively unreviewable and the value of statutory exclusivity will sharply diminish. *See AstraZeneca Pharms. LP v. FDA*, 2012 WL 1037457, at *4 (D.D.C. Mar. 28, 2012).

## CONCLUSION

The Court should enter a preliminary injunction precluding FDA from approving Liquidia's amended section 505(b)(2) application for the PH-ILD indication.

March 4, 2024

Respectfully submitted.

Shaun R. Snader (D.C. Bar No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

Douglas Carsten (*pro hac vice* forthcoming)
Art Dykhuis (*pro hac vice* forthcoming)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

Adam W. Burrowbridge (D.C. Bar No.
    1001783: admission application pending)
Paul Hughes (D.C. Bar No. 997235)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

 /s/ *Brian T. Burgess*
William C. Jackson (D.C. Bar. No. 475200)
William M. Jay (D.C. Bar No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

Gerard J. Cedrone (D.D.C. Bar No. MA0019)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA  02210
(617) 570-1000

*Counsel for United Therapeutics Corporation*