# EXHIBIT 3
# Civil Action No. 1:24-cv-484-JDB

ATTACHMENT E
July 12, 1993

INTERIM GUIDANCE

SEPARATE MARKETING APPLICATIONS AND CLINICAL DATA

FOR PURPOSES OF ASSESSING USER FEES UNDER

THE PRESCRIPTION DRUG USER FEE ACT OF 1992

I.  INTRODUCTION

The Prescription Drug User Fee Act of 1992 (User Fee Act) levies a user fee on each "human drug application" including applications: (1) for approval of a new drug submitted under section 505(b)(1) after September 1, 1992; (2) under 505(b)(2) submitted after September 30, 1992 for certain molecular entities or indications for use; (3) for initial certifications or approvals of antibiotic drugs submitted under section 507 after September 1, 1992; and (4) for licensure of certain biological products under section 351 of the Public Health Service Act submitted after September 1, 1992.[1]

The User Fee Act provides for different user fees for original applications depending upon whether they are accompanied by clinical data on safety and efficacy (other than bioavailability or bioequivalence studies).[2] The Act also levies fees on supplements[3] to human drug applications that contain clinical data.[4] Under the fee schedules provided in the User Fee Act, original applications without clinical data, and supplements with

---

[1] Section 735(1), 21 U.S.C. § 379g(1).

[2] Section 736(a)(1) and (b), 21 U.S.C. § 379h(a)(1) and (b). Bioavailability/bioequivalence studies are applicable only to applications submitted under sections 505 and 507 of the Federal Food, Drug, and Cosmetic Act. They are not addressed in section 351 of the Public Health Service Act.

[3] Changes to approved biological Product License Applications (PLA's) are called "amendments." Changes to unapproved new drug applications are also called "amendments" but changes to approved new drug applications are called "supplements." For convenience, in this interim guidance, the term "amendment" will be used to refer to changes to NDA's, PLA's, and ELA's submitted before an application is approved and "supplement" will refer to changes to NDA's, PLA's, and ELA's submitted after approval. CBER intends to incorporate this terminology into its regulations.

[4] Section 736(a)(1), 21 U.S.C. § 379h(a)(1).

clinical data, are assessed approximately one-half the fee of original applications with clinical data for fiscal years 1993-1997.

This document provides interim guidance on: (1) what should be contained in separate marketing applications and what should be combined into one application ("bundling guidance") for purposes of assessing user fees; and (2) the definition of "clinical data" for purposes of assessing user fees.

This document is not a proposed rule or a rule.[5] It is not binding on either FDA or sponsors, and does not create or confer any rights, privileges, or benefits for or on any person. It does, however, describe FDA's present intentions regarding what will be considered a separate marketing application and what will constitute clinical data for purposes of the User Fee Act.

A potential applicant should consider this guidance when it prepares its application or supplement. FDA expects to apply this guidance in assessing applications in the foreseeable future to determine whether an application is appropriate for filing. If FDA determines that an application has been inappropriately bundled, or that an applicant incorrectly concluded that an application did not contain clinical data, FDA will notify the applicant and request additional fees, if appropriate. This will not prevent the filing of the application if it is otherwise suitable for filing, or its review, if it is otherwise ready for review. If an applicant disagrees with the determination, it may appeal through appeal procedures to be established later in each Center and, subsequently, to the Ombudsman. Upon completion of the appeal, any fees deemed appropriate will be due and payable.

## II. FDA BUNDLING GUIDANCE

In 1975, the Acting Associate Director for New Drug Evaluation issued a memorandum to Bureau of Drugs staff describing when a new NDA should be submitted and when a supplement to an existing NDA should be submitted.[6] This memorandum called for new NDA's for changes in dosage form or major new indications not closely related to an approved indication. The memorandum called for a supplement for a new indication closely related to an approved indication. Other than this internal memorandum, neither the Center for Drug Evaluation and Research (CDER) nor the Center for Biologics Evaluation and Research (CBER) has issued written

---

[5] FDA is currently considering proposing a rule governing these issues.

[6] Memorandum from Marion J. Finkel, M.D., Acting Associate Director for New Drug Evaluation to Division Directors and Supervisors, January 9, 1975.

2

guidance stating which submissions were considered to be one application and which were considered separate applications (NDA or PLA). Similarly, the Centers did not previously specify what should be submitted as a separate original application and what should be submitted as an amendment to a pending application, or as a supplement to an approved original application.

Because different user fees will be assessed on original applications and supplements, FDA believes it is useful to provide guidance to applicants on the agency's interpretation of what constitutes a separate original application, amendment, or supplement.

CDER and CBER interim guidance for determining whether separate applications will be accepted is described below. Section A contains the guidance for original applications and Section B contains guidance on supplements. Nevertheless, the agency may, for administrative reasons (e.g., review across two divisions or offices), assign separate reference numbers and separately track and take regulatory action on the various parts of what is considered to be one application under this guidance document.

### A. Original Applications and Amendments[7]

1. <u>Different Active Ingredients Or Combinations of Active Ingredients, or Products</u>

   a. Drugs

   Every different active ingredient[8] or combination of two or more different active ingredients should be submitted in a separate original application. Products to be marketed as both a racemic mixture and a single enantiomer should be in separate original applications. Similarly, drug substances purified from mixtures with multiple constituents of an active ingredient (e.g., enantiomers, polymorphs) should also be in separate original applications.

   b. Biological Products

   A biological product is identified in section 351 of the Public Health Service Act (42 U.S.C. § 262), as "any virus,

---

[7] "Original application" ordinarily means a complete new filing (NDA, PLA, or ELA) for an applicant. If related but separate applications are submitted, the second and subsequent applications in a series may cross-reference appropriate sections in the initial submission.

[8] Different salts, esters, complexes, etc. of the same active moiety are considered to be different active ingredients.

3

therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, or analogous product. . .applicable to the prevention, treatment, or cure of diseases or injuries of man. . ." The Prescription Drug User Fee Act describes those biologicals subject to User Fees.

Individual biological product applications may include a single or combination biological product meeting the above definition which would result in the issuance of a distinct product license. New applications for combination biological products should be submitted when any one of the constituents of the combination is altered in a manner which, for some other reason described in this guidance, warrants a separate application.

2. <u>Different Routes of Administration</u>

Products to be administered using different routes of administration (see Appendix A) should be submitted in separate original applications unless the product(s) for use by all routes in a given application are quantitatively and qualitatively identical (drugs) or alike (biologics) in composition (e.g., an injectable liquid dosage form intended for use by the intravenous and intraperitoneal routes).

3. <u>Different Dosage Forms</u>

Different dosage forms (Appendix B) should be submitted in separate original applications unless the products are identical (drugs) or alike (biologics) in quantitative and qualitative composition (e.g., a sterile liquid in a single dose vial that is intended for use as either an injectable or an inhalation solution).

4. <u>Pharmacy Bulk Packages and Products for Prescription Compounding</u> (CDER)

Pharmacy bulk packages and products for prescription compounding should be submitted as separate original applications and should have their own package insert.

5. <u>Different Strengths/Concentrations</u>

Different strengths or concentrations of one drug substance, active biological product, or combination product, if they are the same dosage form intended for the same route of administration and the same general indication(s) should be submitted in one original application if their qualitative composition is identical (drugs) or alike (biologicals).

4

6.  **Excipients**

    Single entity or combination products with excipients that differ qualitatively or quantitatively to accommodate different container sizes and configurations, or that differ qualitatively or quantitatively with respect to: colors, flavorings, adjustment of pH or osmolality, or preservatives,[9] should be submitted in a single original application unless for some other reason described in this guidance, a separate application is warranted. Differences in excipients that require separate clinical studies of safety or effectiveness should not be included in the same original application. Differences in excipients in topical products that require separate *in vivo* demonstration of bioequivalence should be included in separate original applications.

7.  **Container Sizes and Configurations**

    Except for pharmacy bulk packs (see section A.4, above), different container sizes and configurations (e.g., filled syringes, ampules, sealed vials) of one finished pharmaceutical product, intended to be for the same route of administration for the same indication(s) (or otherwise consistent with item 2 and 3 above), should be considered one application for purposes of assessing user fees.

8.  **Different Indications or Claims**

    If submitted simultaneously in one application, requests for approval of different indications and uses for the same dosage form to be administered by the same route of administration (or otherwise consistent with items 2 and 3, above) may be regarded, for the purposes of assessing user fees, as one application regardless of:

    i.   the dose to be administered;

    ii.  the duration of use;

    iii. the schedule of administration;

    iv.  the population in which the product is indicated; or

---

[9] Identical products in both single and multiple dose vials with and without preservatives may be submitted in a single application provided that data are included demonstrating the same clinical activity of the two presentations.

5

    v.  the condition for which the product is indicated.

After initial submission, a pending original or supplemental application should not be amended to add a new indication or claim. Previously submitted indications or claims may, however, be modified by, for example, reanalyses of previously submitted data or, in rare instances, supplementary clinical data. Such amendments could result in subsequent adjustments to the user fee review clock. New clinical or *in vitro* data to support a new claim(s) should not be submitted to an already submitted original application during the review of that application. Such a submission would be considered tantamount to developing the product on the review clock and is contrary to the spirit and intent of the User Fee Act. If the original application is not yet approved, a request for approval of other new indications or claims could, however, be submitted in a separate, original application. If the initial application is approved, the application then may be supplemented to add a new indication. See section II.B. on supplemental applications. The basic operating principle should be that, at the time of submission, an original application should be complete and ready for a comprehensive review.

**B. NDA Supplements and PLA Amendments**

 1. Changes in the composition of an approved product to support a change in the dosage form or route of administration (other than those discussed in section I.A.2 or I.A.3 above) should be submitted as a separate original application.

 2. Changes to an approved product, based on chemistry, manufacturing or controls data and bioequivalence or other studies (e.g. safety and immunogenicity) that change the strength or concentration, change the manufacturing process, equipment or facility, or change the formulation (e.g. different excipients), should be submitted as supplements to an approved application and do not ordinarily warrant a new original application unless they change the dosage form or route of administration (see items I.A.2 and I.A.3, above).

 3. Requests for approval of a new indication, or a modification of a previously approved indication,

6

      should each be submitted individually in a separate supplement to an approved original application.[10]

4. New clinical or *in vitro* data, submitted in support of a new indication or claim other than that required in safety updates, should not be submitted as part of the pending supplement during the review of a given supplemental application. Such a submission would be considered tantamount to developing the product on the review clock and is contrary to the spirit and intent of the User Fee Act. Previously submitted indications or claims may, however, be modified by, for example, reanalyses of previously submitted data or, in rare instances, supplementary clinical data.

5. The basic operating principle should be that, at the time of submission, a supplement should be complete and ready for a comprehensive review. Modifications of the supplement should be only to clarify part of the already submitted supplement or to answer specific questions raised by the review team. Modifications should not be to expand or broaden the scope of the already submitted supplement unless they are requested by the agency.

## III. DEFINITION OF CLINICAL DATA

Many different types of applications and supplements may be accompanied by data reporting clinical experiences in humans. Not all such reports of experience in humans are regarded by FDA as "clinical data" for purposes of assessing user fees. For example, FDA does not consider individual case reports describing experience in clinical use submitted in support of a labeling change to add adverse reactions to be "clinical data" under the User Fee Act. Clinical data encompasses a broad range of studies that are purported to be adequate and well-controlled investigations submitted in support of approval.

User fees will be assessed for original applications (NDAs or PLAs) and supplements containing the following types of clinical data required to form the primary basis for approval:

---

[10] The Prescription Drug User Fee Act states, "The term "supplement" means a request to the Secretary to approve a change in a human drug application which has been approved." Each indication is considered a separate change for which a separate supplement should be submitted. The policy allows FDA to approve each indication when it is ready for approval rather than delaying approval until the last of a group of indications is ready to be approved.

7

- study reports or literature reports of what are explicitly or implicitly represented by the applicant to be adequate and well-controlled trials; or

- reports of comparative activity (other than bioequivalence and bioavailability studies), immunogenicity, or efficacy, where those reports are necessary to support a claim of comparable clinical effect.

For purposes of assessing user fees, "clinical data" do not include data used to modify the labeling to add a restriction that would improve the safe use of the drug (e.g., to add an adverse reaction, contraindication, or warning to the labeling).

Supplements to new drug applications based solely on bioequivalence studies or studies of bioavailability of a drug, are not considered to contain clinical data for purposes of assessing user fees, even if the studies include clinical endpoints.

Supplements to biological product license applications in support of a process or site change which use safety, biochemical equivalence, and/or limited comparative product equivalence data generated in animals or humans as the supportable basis for such a change are not considered to contain clinical data for the purposes of assessing user fees.

8