# EXHIBIT 5
# Civil Action No. 1:24-cv-484-JDB

# 42nd Annual J.P. Morgan Healthcare Conference

## Company Participants

- Michael Kaseta, Chief Financial Officer
- Roger Jeffs, Chief Executive Officer
- Rusty Schundler, General Counsel

## Other Participants

- Analyst
- Harry Pearson, JPMorgan Chase & Co.

## Presentation

### Harry Pearson  {BIO 23018115 <GO>}

Hello, all. Thank you for joining us this morning. My name is Harry Pearson. I'm a member of JPMorgan's Investment Banking Team. I'm pleased to welcome you all to Liquidia Corporation's Presentation and Q&A. Joined by Dr.Roger Jeffs, the CEO; Mike Kaseta, CFO; and Rusty Schundler, General Counsel. We'll have a presentation followed by Q&A. Take it away.

### Roger Jeffs  {BIO 2018787 <GO>}

Wonderful. Thank you, Harry. Everybody can hear me okay? Yes. So we're delighted to be presenting this -- our first podium presentation for Liquidia at JPM, and I think it signals an inflection moment for the company as a whole. I'm joined today by Mike Kaseta, our CFO; Rusty Schundler, our GC; Rajeev Saggar, our CMO; and Scott Moomaw, our Chief Commercial Officer. And I'd also like to welcome the Board members of Liquidia that are here today as well.

These are the regular forward-looking statements. I encourage you to read those and look to our filings for certain risk and uncertainties related to the stock and things I may or may not say today.

We are very excited about the acceleration and the progress that we're making at Liquidia, at the company. Our mission is to develop best-in-class therapies for patients with pulmonary hypertension, and we feel we've made significant strides towards that mission statement.

Strategically, we're positioned to drive significant market presence in a rapidly expanding PH market across our three verticals, what we call the three P's: PRINT platform technology; Products, which includes the pending approvals for YUTREPIA;

and our Pipeline asset, L606, which we licensed in this past year from our partner, Pharmosa, which is a twice a day sustained release formulation.

With regard to PRINT platform technology, and I want to spend a little bit of time here. Everything that we do in the pulmonary hypertension space is going to be accelerated by the way that we use our nano-molding technology to produce precise uniform particles of precise shape and composition. These particles we can really fine-tune into the appropriate range of the -- appropriate segment of the respirable range to maximize deep lung delivery.

YUTREPIA, as you may know, it has PAH approval, tentative approval for PAH. And for PH-ILD, in two weeks from today, we have a PDUFA date for that, which we're also seeking tentative approval. That approval, if granted, will be gated by market exclusivity that United Therapeutics has that ends in March.

We also have treprostinil injection. It's a generic form of Remodulin that we are the commercial partner with our partner Sandoz. And I talked to you about this sustained release formulation. But those are the three verticals where we're trying to maximize our business platform.

So, what are the markets and how do they look like? PAH and PH-ILD are highly attractive markets. And I'll break it down. If you don't know what pulmonary hypertension is, it's increased pulmonary pressure from vasculopathy in PAH or scarring of lung tissue in PH ILD. Results in right ventricular hypertrophy and eventually death for these patients. So, a severe rare disease with continuing unmet need.

In WHO Group 1 there's 40,000 patients treated today, roughly. Three-year survival is better, it's 75%, five year survival is about 50%. So still a lot to do there. Four mechanisms of action, 14 branded therapeutics, and over a $5 billion market opportunity if you just look at pulmonary hypertension alone. Of that, about $2.7 billion is in what we call the prostacyclin mimetic components of that. That's the market we're going after, both what's inhaled, what's in oral, and then also maybe infringing on the Remodulin franchise by having a durable therapy like YUTREPIA.

WHO Group 3 is a different beast. It was first approved in 2001, a study in WHO Group 3 patients with PH-ILD for nebulized Tyvaso. It's PAH associated with lung disease. In this instance, I'm showing that there's about 60,000 prevalent patients, which we can distill from academic research, syndicated academic research. Three-year survival is very morbid, 35%. Five year survival is even worse, about 14%. Currently, the only available option to these patients is inhaled treprostinil, both in a nebulized and DPI format that United Therapeutics offer.

If you look on the right hand curve, prior to 2021, the approval of PH ILD, and 2022, the approval of the DPI format, Tyvaso was fairly static, about $400 million per annum. And you can see it's inflected a significant amount of revenue growth. And at

the end of third quarter, they reported $1.3 billion run-rate across the nebulized and DPI format. So those are the markets that we're going to enter into.

If you look at that more granularly, here's there, they broke it down for the first time, rapidly increasing demand for inhaled treprostinil. Really the value proposition though seems to be porting to the DPI formulation which we have with YUTREPIA. So again, stagnant through '21, ILD came to market, and then in '22 the DPI. If you look at the growth, the green bar is the DPI. Now the DPI accounts for about 65% of the inhaled treprostinil revenue, only 35% remains with nebulized Tyvaso. You can see it's cannibalized -- the DPI is cannibalizing nebulized share as well.

So, while all that looks good and the CAGR is impressive, the real-world reality is a little bit different. So here's a    and I'll try to make sure I get these numbers right. Here's a prospective study from the National Jewish Health Center that was published or abstracted at the PHPN Symposia in September. National Jewish is one of the largest and best pulmonary centers in the world. It's a very capable expert in the treatment of patients with PH ILD. They treated 26 patients that were naive to prostacyclines. So never experienced prostacyclines, but their disease demanded an increase in therapy. So they put them on inhaled treprostinil in the DPI format.

They also started 22 patients that were transitioned from Tyvaso, nebulized to Tyvaso DPI. Of the 26 that started, 18 discontinued in the naive subset group, so 69%. Of that, the main reason was clinical worsening and cough. In the naive group or the transition group, 22 started, 11 DCed, or 50% discontinuation. So, of the 18 DC's in the first group, 11 went back to nebulizer. Of the 11 DC's in the second group, 7 went back to the nebulizer. That tells you it's not the drug.

So they're going back from Tyvaso DPI back to nebulize formulation. So why is that? I think it's because they couldn't deliver the dose appropriately to the patients and titrate the dose to effect. So that's the real    first real world experience from a large prospective cohort of patients. The time on therapy on average was between three months to six months, so it didn't take long for the therapy to fail.

So that's the market opportunity. You see there's a preference for portability and DPI use versus nebulizer. But the sustainability of the therapy, at least the way this one center used it was not that impressive. So we think YUTREPIA is going to provide a much more attractive option. And why is that?

So it's the first and only product candidate using our PRINT technology. If you look on the left, we can reliably and with high fidelity print 1.3 micron MMAD particles. It's in a trefoil shape which mimics the natural form of pollen and it's free flowing. But what you also see here is no aggregation or clumping. The particles remain independent, which is critical.

On the right, this is a publication from one of our scientists in-house from 2012, where we looked within the respirable range. The respirable range is 1 micron to 5 microns. And we looked to see if we formulated particles at 4.6 microns or 1.3

microns, which is what YUTREPIA is. Look at the different distribution. And you can see on the right that the 1.3 microns performs beautifully, goes to the distal airways, fills the lungs and less deposition in the upper airway and throat. That's what you want when you have a dry powder formulation.

We have -- again, the history of what we did? How did we get this drug approved? It was through a 505 (b)(2) pathway. We showed comparable pharmacokinetics; we have a tablet formulation of 79.5 micrograms, which is comparable to nine breaths of Tyvaso. And everything now is viewed as breath equivalents, like how do you match the Tyvaso nebulized breath equivalent? So 79.5 micrograms for us matches a nine breath equivalents of Tyvaso, given four times a day.

We studied 121 patients, both naive or -- and/or transition from Tyvaso. And we've been continuing to treat patients since 2017, now with the longest duration of therapy of 5.5 years. We have seeking -- we have a PH-ILD indication which we filed for approval -- an amendment for approval over the summer, PDUFA date is January 24. So two weeks from today we'll get an answer on that application, hopefully. And critically, that application requires no additional clinical work, although we're beginning to do clinical work on PH-ILD to better inform our dosing strategy.

What we've learned at least in PAH patients through this open label extension study is that as patients progress over time, so here it's showing 2 months, 12 months, 24 months. The dose is on the left and the comparable breaths of Tyvaso is on the right.

The target breath dose is that gray bar, 9 to 12 breaths, that's what's in the indication label for Tyvaso and Tyvaso DPI. You can see, over time, the blue bars median dose that were at 15 breaths equivalents, and at 24 months 51% of patients are above 132.5 or 15 breath equivalents of Tyvaso with a max dose now at 30 breaths equivalent. This is completely changing the therapeutic profile of inhaled treprostinil. So these are at levels in terms of dose that have never been seen before. This is the clinical value and utility of YUTREPIA.

So the four elements that are critical to our success and why this would drive significant share are; that it's a portable therapy, it's tolerable, it's titratable, and durable. So, a simple pocket-sized device, convenient storage. We use a low-resistance pocket-sized inhaler, one here. Proven device, both in COPD and asthma that physicians and patients are going to be very comfortable with. It's a plastic device. You just twist it, open the capsule, hold the capsule, pierce it, close it, close it, and then two breaths. You're done. And that's the therapy. Do that four times a day based on your dose.

We've shown that it's tolerable, that's why we're achieving the breath equivalence that we're achieving. So with inhaled nebulized Tyvaso, the target dose is 9 to 12, but patients have really struggled. And I'll show you some data to get above that 9 to 12 breath threshold. And we do it with a low resistance DPI. And the reason we can use low resistance, and this is going to be important from a marketing standard, is

because the particles are free-formed, mono-dispersed, and not agglomerated. You saw the pictures.

The competitive DPI molecule is not that. It's aggregated because its spray dried onto what's called an FDKP backbone. That's a co-opted technology from their inhaled insulin program. Because of that it clumps, you need a high resistance device to break that up. And then that takes more energy in a patient population where the number one symptom is shortness of breath. So probably not ideal for what you're trying to achieve.

We've shown it's titratable. Again, I showed you the curves where both the median dose and the max dose are increasing admirably over time. And then, we're trying to prolong the treatment. Again, it will help the patients and it will help from a revenue curve the longer we treat. So our goal with this type of profile is to be the best-in-class and first-in-choice prostacyclin.

And what does that mean? So that means, we're not just going to try to take the inhaled market, we're going to go after the oral market. So when a physician decides to add a prostacyclin in pulmonary arterial hypertension, they add YUTREPIA. And then we'll delay the time for the need for a more onerous parenteral therapy.

So, dose matters. And again, I think this is well-published data and it's across all routes. But I'll just show you specifically for inhaled treprostinil, first in PAH, and then I'll show it to you in PH-ILD. So this is a retrospective analysis of 5,000 patients, so a large survey sample from between 2009 and 2018. And it showed that if you got to 12 or more breaths in this data cut versus 9 breaths, you had a delayed transition to IV or subcu, greater persistence on therapy, and slightly improved survival rates.

At the bottom, though, you'll see only 25% of patients. This is real-world data, were titrated to greater than equal to 12 breaths four times a day of Tyvaso. So, with a nebulized formulation, it's been very hard to achieve satisfactory doses. That's the limitation of inhaled treprostinil.

In PH-ILD, similar story. So this is from the registration study for which PH-ILD was approved for a nebulized Tyvaso and then bridged for Tyvaso DPI. This time the data cuts are nine breaths, so greater than or equal to nine breaths with nine breaths. You can see on the left, if you got to nine breaths or more, more clinical improvement in the red, and less clinical worsening in the blue. The primary outcome measure, six minute walk distance, same thing. Better outcome, the higher the dose, particularly prominent as you got above into the 10 to 12 breath range. So we're excited about that because dose matters and we have the therapy that can deliver the highest and most effective dose, we believe.

And that will be manifest in our product labeling. So if you look at the products, people say, well, how do you differentiate? We're going to differentiate on formulation. So the print technology formulation allows the use of a low resistance device, which is easy for the patients to use. So it's highly user friendly. Our label will

encompass these higher doses. So if you look down to the dose titration described in the label, this is from our original submission. It included doses up to 24 breath equivalents of Tyvaso. The competitive molecule only has 11 to 12 breaths as their target indicated dose.

So we'll differentiate on the most critical aspect of the utility of a prostacyclin and an inhaled prostacyclin in particular as you've seen by dose. And we'll do it with a low resistance device. Our product requires no refrigeration during the product lifetime, and no loss of powder or required device orientation to the liver. So if you drop the device, no spillage. There's more sensitive and could spill drug if dropped.

I'll talk briefly about the legal just to frame it. In the Q&A, Rusty's here so he can answer questions on process. So, we had a Federal Circuit Court decision on December 20th that affirmed the invalidity of the 793 patent, the PTAB decision. That decision will override the previous district court decision. So now, in aggregate, all three patents that that were asserted against us, that were Orange Book listed, we found no claim that's either valid or infringed. So, we've passed the substantive bar of what we want to do. And we think this point forward for PAH, it's more of just a process issue, how do we turn the tentative approval that we have to a final approval.

For PH-ILD, there is a second Hatch-Waxman lawsuit that was filed. So when we filed the amendment, we had to recertify against the Orange Book listed patents. 793 was still in play at that time. Obviously, that will go away with the recent ruling. And the 327 patent, which we think is really -- we don't believe will -- we know it won't cause a regulatory stay. So it won't trigger a regulatory stay because it was not Orange Book listed at the time of our original NDA application. So it's more -- that would just be more of a legal case around what that patent is. And we press released it on Monday, what we think about that patent.

The next steps then from process, we're going to ask the district court to set aside the existing injunction. In fact, we did that on December 26. We have about, with the briefing schedules ongoing, by January 23, and Rusty can talk about the details. The case will be fully briefed in Judge Andrews' hands to releasing the existing injunction. And then, it's just determined by his own sort of schedule as to when that will happen.

In parallel, we're already in dialogue with the FDA on figuring out how we move the tentative approval to final approval. So they're aware of the affirmation in the Federal Circuit. And we're just -- we're trying to work with them now, especially with the pending tentative approval for ILD in play also, how do we get both done and on what timeline.

So the other question is, are you -- when will you be ready to launch? We're ready now. So that's the good news. So, we have 50 sales reps that we onboarded in October. They're very scientifically fluent and commercially capable. They have 10 years of rare disease experience on average. And about 60% to 70% of them have direct PAH experience, as you can see from companies at the bottom. If not, they're

superstars from the rare disease field and are used to these high-touch patients, and how to promote and sell into the space.

As I said, we put them in the field early. That was a bit at risk, but we wanted them trained and ready to go. Scott's had his team ready to go since January 1. So again, ready today. We're just waiting on the final things to happen from a process standpoint.

We also, in 2023, strengthened our pipeline. I won't spend a lot of time on this one as we begin to get more data. But if you look here, it's basically liposomal encapsulated treprostinil. The liposomal encapsulation extensive product PK from 4 hours to 12 hours. So it sets up for a twice a day versus 4x a day regimen. It has a 7x lower Cmax, which is good. So you've extended the PK curve, so having a lower Cmax should improve the tolerability profile. And we match on AUC to infinity, when you do the proper PKM comparisons.

We've got this license with very strong proof-of-concept data. So there was an existing open label ongoing study -- there's 20 of the 60 -- that study is enrolling now, there's 20 of those 60 patients event are in. Some heavy have gone past one year, some are already at the 25 to 27 breaths equivalents. So tolerable, titratable, durable. So the key hallmarks of YUTREPIA seem to be according to the twice-a-day formulation. And when you think about YUTREPIA and DPIs versus nebulized, we did four things, improved portability, tolerability, titratability, and durability. The one thing we didn't change was regimen, still 4x a day. L606 changes that fifth paradigm.

So that's the value proposition here. We're going to start that study, those plans by the end of this year. It'll go through its regular 18 months to 24 months enrollment. There's a precedent pathway, we'll just do the same study that UTHR did for Tyvaso nebulized, the INCREASE study. Six months to get the patients through this study; three months to analyze; one year for review and approval. So we think roughly four years from start we can get the goal. Low-hanging fruit. There's precedent knowledge that PH -- in PAH that inhaled treprostinil will work. We've just got a longer-acting formulation of that. So excited about that. And it also will be highly portable. It's using a modern breath actuated nebulizer, much different than what the current inhaled treprostinil format looks like.

We had an FDA Type C meeting in December. We got agreement with the agency that the comparable -- So we already -- the comparable vialability was done when we acquired the program. There are ongoing open label safety study I've talked about, which is informing dosing and how we'll design the algorithm in that patient. And then there was agreement that a single placebo control study in PH-ILD, which we'll do globally, will suffice for both PH-ILD and PAH approval. And the beauty of doing it in PH-ILD, there'll be no background therapy, so we just have to beat placebo, which should be a pretty low bar.

And finally, very well capitalized. We've been very active in the past month. We've raised $126 million since reporting Q3 earnings. We closed the third quarter with

$76.2 million in cash. We added $26 million in an equity raise, including $11 million from insiders, some on our Board. Added $20 million from a healthcare royalty revenue interest finance agreement, just topped up on that. And then importantly for us, we raised $75 million via PIPE, with a fund related to Patient Square Capital here in San Francisco. So we feel, and this is a critical aspect here, that if we're able to launch in both PAH and PH-ILD in April, that this funding will bridge us to profitability.

So we're ready to launch, and we look forward to questions as we try to rewrite the future of these patients with pulmonary hypertension. Thank you.

## Questions And Answers

### Q - Harry Pearson  {BIO 23018115 <GO>}

(Question And Answer)

Great. Thank you, Roger. I think I might start off with one question, then we'll hand it over to the audience. Could you expand a little bit more on the process to getting final approval and launch in PAH, and then also in PH-ILD?

### A - Roger Jeffs  {BIO 2018787 <GO>}

Yes. So I'll turn it over to Rusty, because mostly in his -- the process of that is in his hands.

### A - Rusty Schundler  {BIO 18967477 <GO>}

So, as Roger pointed out earlier, we have two ongoing Hatch-Waxman lawsuits, and I'll touch on each of them.

In the first one, which is really the one that's gating our ability to get to market, that was the original Hatch-Waxman lawsuit that they filed. They asserted three different patents against us. With the December Federal Circuit decision that we received, we now have Federal Circuit-affirmed decisions that we don't infringe any valid claims of any of those patents.

So substantively, we feel like that first Hatch-Waxman lawsuit at this point is resolved. It's now processed. So the process is we need to; one, go to the FDA and seek final approval; and two, we think we're going to have to get Judge Andrews to rescind and set aside the injunction that he issued at the end of the trial.

Again, substantively, we don't think there's an issue. In fact, we had asked him for a stay of the injunction before the Federal Circuit decision. About a week before that decision came down he denied the stay, but he denied it on grounds that he wasn't going to speculate as to what the Federal Circuit was going to do. At this point, there's no question what the Federal Circuit's going to do. They did it.

He also said, as part of that opinion, that it was his view that if we did get an affirmance at the Federal Circuit, that we'd be able to launch our product. So we think he's already signaled what he thinks the answer is. Again, we just have to go through the process.

So as Roger said, on December 26 we filed our opening brief, asking him to set aside the injunction. Their response brief is due a week from yesterday, so next Tuesday. We'll get a reply the week after, on January 23. And at that point, as Roger said, it's in the judge's hands. We anticipate we'll get a decision relatively quickly on that because we do think this is top of mind for him.

The second lawsuit, we don't think is a gating issue for us on any of the indications. They again asserted the 793 patent. With December's decision we don't think there's really an issue in that lawsuit at all anymore. In fact, we filed, as we announced on Monday, a motion to dismiss all claims related to that patent.

The other patent, the 327 patent. I think there are a couple of things that are important to point out about that. First, as Roger noted, there's no 30-month stay. A 30-month stay, by statute, it has to be a patent that was submitted to the Orange Book before the original NDA was filed. There's no question the 327 patent was not submitted to the Orange Book before our original NDA was filed. What that means is that United Therapeutics would have to affirmatively get the court to issue a preliminary injunction for them to be able to interfere at all with our ability to launch in PAH and PH-ILD.

In order to do that, they've got to convince the judge that they're substantially likely to succeed on the merits. And as we've been saying, we pointed out this patent was coming last June. We've talked about it in our earnings calls. And as we said all along, we think there's substantial prior auth before this patent. And we think there are going to be significant challenges to United Therapeutics upholding the validity of that patent. We started showing some of our work in what we filed on Monday, and we press released that pointing out at least some of the prior auth. But I'd note that's not all the prior auth that's out there. This was a patent application they filed in 2020, meaning everything prior to 2020 is prior auth. That includes the 793 patent, which covers almost the same thing.

And the other thing to keep in mind is the 327 patent, what that's really covering is physicians treating PH-ILD patients with Tyvaso in accordance with the Tyvaso label. And doctors have been doing that for more than 10 years. Rajeev Saggar, our CMO, when he was treating patients, he was treating patients with Tyvaso, PH-ILD patients with Tyvaso. So again, we don't think there's anything in that patent that's anything new, and certainly not new as of 2020. Again, we anticipate that they will seek a preliminary injunction, but we feel confident that we've got the prior auth that we'll be ready for that assertion of a preliminary injunction.

## A - Roger Jeffs  {BIO 2018787 <GO>}

And again, that's specific to PH-ILD. Won't interfere with what we're doing in PAH in terms of launch.

### Q - Analyst

Assuming no preliminary injunction --

### Q - Harry Pearson  {BIO 23018115 <GO>}

Sorry. Would you just mind into the microphone?

### Q - Analyst

Assuming no preliminary injunction, are you willing to launch at risk in 2024 in PH-ILD?

### A - Rusty Schundler  {BIO 18967477 <GO>}

Yes. So what we've said consistently is, we'll make that decision at the time that we're preparing to launch. But if we look at and survey the patents that are out there at that time, and we don't think there are any valid patents that have been issued at that point in time. We're not going to hold back our launch for a patent that we think is invalid.

### Q - Analyst

And then similarly, if there's some way you can't launch in PH-ILD, would you consider just launching in PAH, and then waiting until PH-ILD is resolved?

### A - Roger Jeffs  {BIO 2018787 <GO>}

Yes. We're going to launch the product as soon as we're able. I mean, our goal is to get this therapy to patients. We've been waiting a long time to do this. There's a demand curve that I think warrants that we get there, and get there soon. And you can see potentially that the current existing therapies are problematic, that we can improve upon that. So, as soon as we're able to launch, as I said, we're ready to launch. We have the sales team in force, sales aides, marketing materials, everything is ready to go as soon as we have freedom to operate.

### Q - Analyst

Thank you.

I just had a question. What drove the timing of the ILD amendment? Why didn't you file earlier, I guess?

### A - Roger Jeffs  {BIO 2018787 <GO>}

Some of it was just to see -- really nothing drove it. And again, what's really driving it is the back end. Market exclusivity expires in end of March, so we worked from that point backwards. And we wanted to have a decision in hand. Again, what's going to happen on the 24 if the agency agrees is they'll give us another tentative approval and add PH-ILD to the tentative approval indication. So it's really just trying to get ahead of that timeline, nothing specific about trying to try to do anything clever.

### Q - Analyst

All right. So it was just coincidence I was close to the pot of the patent.

### A - Roger Jeffs  {BIO 2018787 <GO>}

Like I said, we worked backwards.

### A - Rusty Schundler  {BIO 18967477 <GO>}

And just to be clear, for them to have gotten a 30 month stay that patent would have had to be submitted to the Orange Book before the original NDA, not the amendment. And again, the statute's very clear at that point.

### Q - Harry Pearson  {BIO 23018115 <GO>}

I guess maybe one follow-up question. Sorry, I think there's one more in the audience.

### Q - Analyst

How are you guys thinking about pricing? Is this going to be a premium product priced at parity or discounted Tyvaso?

### A - Roger Jeffs  {BIO 2018787 <GO>}

Yes. Maybe Mike, you've been managing that, you can talk about it.

### A - Michael Kaseta  {BIO 20437086 <GO>}

Yes. So, obviously, it's one of the areas of launch that we've been thinking about and strategizing, and having a lot of discussions about. We're not going to divulge our specific pricing strategy. I think our goal from day one has always been to make sure have -- that patients have choice. Patients haven't had choice in 20 years in this space. And we want to make sure that patients have the option to be able to get our product.

And we're committed to that goal and that is top of mind in all of our thinking. We have great relationships with the payers. We've had discussions with them over the last couple of years. They've obviously ramped up and are aware of the situation. And we are, like I said, our main commitment is to patients in PAH and PH-ILD, and we're going to do what we need to do to make sure that they have access to our product.

### A - Roger Jeffs  {BIO 2018787 <GO>}

And we've had top-to-top conversations with the leadership at the payers already.

### Q - Harry Pearson  {BIO 23018115 <GO>}

What is the strategy of the new PH-ILD study?

## A - Roger Jeffs  {BIO 2018787 <GO>}

Yes. So principally -- so really there's been no prospective DPI study with inhaled treprostinil in the space. So for us, we thought, it would be the right thing to do is to try to study the drug in that patient population for which we are seeking approval. So it's really just a better-informed dosing.

And what we want to learn there is, what's the pace of titration in PH-ILD with YUTREPIA? And how does that compare to the pace of titration for patients with pulmonary arterial hypertension? Because they have a comorbid lung disease, it is possible they could be a little bit more sensitive to dose increase. And not that they won't tolerate it, but you may have to go a little bit slower. Because everybody wants to tweak and tune the dose to maximum effect so you get maximum benefit with minimal side effects, so the patient feels better. They come into your office, they're short of breath, fatigued, miserable. So, they want to feel better faster.

So really that study we're going to now, for the first time, put YUTREPIA into a PH-ILD patient and see does it -- do they behave, from a tolerability standpoint, like a PH patient? Or do we need to go a little bit softer. So that's all we're trying to do. We think that, personally, I think the product profile is going to be the same in both populations, but we're going to test that theory.

It's open label data, so we're going to have a good hard look at it, and we'll present that data as it accrues over time. So I think it will inform a lot of things, and hopefully contradict what the experience that's being seen at the National Jewish Health Center, where there's clear issues. They're not getting to an effect that warrants that those patients want to stay on that drug, they're coming off. We're going to do the research to make sure that doesn't happen with YUTREPIA.

## Q - Harry Pearson  {BIO 23018115 <GO>}

Any other questions in the audience? I think one follow-up I just had, and Roger, you touched upon this briefly, is about the cash runway. And Mike, I wonder if you have any color you wanted to add to that and how you feel about that?

## A - Michael Kaseta  {BIO 20437086 <GO>}

No, thanks for the question. I think, over the last couple of years, maintaining strength on our balance sheet has always been important to us. And I think we feel today, as Roger talked about, the $126 million that we raised, we've never been in a stronger position. It has afforded us the opportunity to onboard our sales force, have them hit the ground running. We've been building commercial supply since the beginning of 2002 -- 2022. So we have sufficient commercial supply for what we anticipate to be the first years of demand, and we are accelerating that production.

So, we feel very confident, as Roger said, if we're able to launch, let's say by April in both PAH and PH-ILD, we think our current cash, as it stands now, can bridge us to profitability. And we'll not need to access capital markets unless we chose to.

### Q - Harry Pearson {BIO 23018115 <GO>}

Fantastic.

### A - Roger Jeffs {BIO 2018787 <GO>}

Yes. And it's -- I mean, I think the thing is it just -- we have the proper amount of fuel to really fire it on all cylinders on all things we're trying to achieve. So across the three verticals of platform, products, and pipeline, we now can spend away and maximize the value of the product. That's what we're trying to do because it's going to benefit patients and it'll benefit other stakeholders, obviously.

### Q - Harry Pearson {BIO 23018115 <GO>}

Sure. Fine.

### Q - Analyst

Thanks. I guess, a question for Rusty. Can you just review one more time, can you de-link PAH from ILD to get a full approval on PAH first? Or how, what are the mechanics of that?

### A - Rusty Schundler {BIO 18967477 <GO>}

Yes. So I think that's part of the dialogue with the agency. Again, from our perspective, though, first of all, if somehow they got an injunction on PH-ILD, yes, ultimately we will decouple the two. I think the specific sequence over the next three months is what we're talking to the agency about with the regulatory exclusivity that goes until March 31. So that's part of the dialogue with the agency. But from our perspective, again, you're talking about a couple weeks here or there, probably. So, again, it's part of the dialogue, though.

### A - Roger Jeffs {BIO 2018787 <GO>}

But that's the exact logistics that we're trying to say, like, what's the best opportunity for us to convert the tentative for PAH to full. And then, once you decide on PH-ILD, what's the implication of that favorable decision and how do we then convert that.

### Q - Harry Pearson {BIO 23018115 <GO>}

Great. Well, if there are no other questions, any last remarks? Otherwise, I think we can wrap up.

### A - Roger Jeffs {BIO 2018787 <GO>}

No. So, we appreciate your time and attention, even those online. Thank you for listening in. And we look forward to working hard and providing the value we all seek. Thank you.

Liquidia Corp (LQDA US Equity)
2024-01-10

*This transcript may not be 100 percent accurate and may contain misspellings and other inaccuracies. This transcript is provided "as is", without express or implied warranties of any kind. Bloomberg retains all rights to this transcript and provides it solely for your personal, non-commercial use. Bloomberg, its suppliers and third-party agents shall have no liability for errors in this transcript or for lost profits, losses, or direct, indirect, incidental, consequential, special or punitive damages in connection with the furnishing, performance or use of such transcript. Neither the information nor any opinion expressed in this transcript constitutes a solicitation of the purchase or sale of securities or commodities. Any opinion expressed in the transcript does not necessarily reflect the views of Bloomberg LP. © COPYRIGHT 2024, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.*