# EXHIBIT 2

Civil Action No. 1:24-cv-484-JDB

LAW OFFICES
# HYMAN, PHELPS & MCNAMARA, P.C.

700 THIRTEENTH STREET, N.W.
SUITE 1200
WASHINGTON, D.C. 20005-5929
(202) 737-5600

FACSIMILE
(202) 737-9329
———
www.hpm.com

KURT R. KARST

Direct Dial (202) 737-7544
KKarst@hpm.com

December 29, 2023

**SUBMITTED BY EMAIL**

*CONFIDENTIAL TREATMENT*
*REQUESTED PER 21 C.F.R. § 20.61*

Kim Dettelbach, Esq.
Assistant Deputy Chief Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Avenue
White Oak Building 1
Silver Spring, Maryland 20993-0002

Email: Kim.Dettelbach@fda.hhs.gov

Brian Cooney, MS, PSM
Regulatory Health Project Manager
Cardiology and Nephrology
Division of Regulatory Operations for
   Cardiology, Hematology,
   Endocrinology, & Nephrology
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, Maryland 20993-0002

Email: brian.cooney@fda.hhs.gov

     Re:    **Liquidia Technologies, Inc. NDA 213005**
              **YUTREPIA (Treprostinil) Inhalation Powder**
              **Preservation of 30-Month Stay; Violation of FDA's Bundling Rule**

Dear Ms. Dettelbach and Mr. Cooney:

     We write on behalf of our client United Therapeutics Corporation ("UTC") regarding the above-captioned New Drug Application ("NDA") sponsored by Liquidia Technologies, Inc. ("Liquidia")—the "Original YUTREPIA 505(b)(2) NDA" or "Liquidia's Original 505(b)(2) NDA"—and submitted to FDA under Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("FDC Act") identifying UTC's TYVASO® (treprostinil) Inhalation Solution, approved under NDA 022387, as the listed drug relied upon for approval.

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
December 29, 2023  
Page 2

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

As discussed below, in processing the Original YUTREPIA 505(b)(2) NDA, FDA failed to apply the Agency's longstanding "Different Indications or Claims" provisions in the Agency's December 2004 "Bundling Rule."[1] As a result, FDA is depriving UTC of the ability to pursue patent infringement claims with the benefits afforded under the Hatch-Waxman Amendments regarding a new indication, which raises separate issues from the indication previously contained in Liquidia's Original 505(b)(2) NDA. This also necessarily means that UTC has been denied the opportunity to obtain a statutory 30-month stay on approval of what should have been submitted as a separate original 505(b)(2) NDA seeking approval for a new indication. Instead, FDA, in direct contravention of the Agency's Bundling Rule, inappropriately bundled the Original YUTREPIA 505(b)(2) NDA with a supplement seeking approval for a new indication.

FDA must immediately (1) consider the new indication amendment to Liquidia's Original 505(b)(2) NDA null and void and require Liquidia to submit a new 505(b)(2) NDA;[2] (2) require Liquidia to certify to patent information currently listed in FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* ("Orange Book") for any listed drug relied on for approval (that is, patent information listed as of the date Liquidia submits a new original 505(b)(2) NDA); and (3) stay the approval of any new Liquidia 505(b)(2) NDA if there is timely filed patent infringement litigation in response to a notice of Paragraph IV certification to Orange Book-listed patent information. By doing so, FDA will not only be restoring the statutory rights owed to UTC but will be acting consistently with the Agency's long implementation history of the Bundling Rule.[3]

Because FDA's failure to follow its Bundling Rule has deprived UTC of benefits afforded under the Hatch-Waxman Amendments as to the new indication, UTC will have little choice but to seek judicial relief unless FDA changes course and applies the Bundling Rule. In an effort to avoid litigation over this matter, UTC requests a meeting

---

[1] *See* FDA, Guidance for Industry – Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees (Dec. 2004), *available at* https://www.fda.gov/media/72397/download.

[2] Alternatively, FDA could unbundle the two indications in Liquidia's Original 505(b)(2) NDA and administratively assign a separate NDA for the new indication (with a submission date as of the new NDA assignment) and require Liquidia to certify to patent information listed in the Orange Book as of the date Liquidia's Original 505(b)(2) NDA is unbundled and assigned a new NDA.

[3] In addition, FDA's application of the Bundling Rule here would require Liquidia's payment to FDA of an additional application user fee.

Kim Dettelbach, Esq.  Hyman, Phelps & McNamara, P.C.
Brian Cooney, MS, PSM
December 29, 2023  *Contains Confidential Information*
Page 3  *Exempt from Disclosure*

with FDA's Office of Chief Counsel and other appropriate FDA representatives to discuss resolution of the matter.

I.  FACTUAL BACKGROUND

UTC is the holder of five NDAs for drug products containing treprostinil, a prostacyclin analogue, but only TYVASO (treprostinil) Inhalation Solution, 0.6 mg/mL (NDA 022387)—the "TYVASO Listed Drug"—is relevant here as it is the listed drug relied on for approval of Liquidia's Original 505(b)(2) NDA. FDA initially approved the TYVASO Listed Drug on July 30, 2009 for the treatment of Pulmonary Arterial Hypertension (WHO Group I) in patients with NYHA Class III symptoms, to increase walk distance (the "PAH Indication"). On March 31, 2021, FDA approved a supplement to NDA 022387—Supplement S-017—for a new indication: "for the treatment of pulmonary hypertension associated with interstitial lung disease (PH-ILD; WHO Group 3) to improve exercise ability" (the "PH-ILD Indication").[4]

The TYVASO Listed Drug is currently listed in FDA's Orange Book with the following patent and exclusivity information:

**Patent Data**

| Patent No | Patent Expiration | Drug Substance | Drug Product | Patent Use Code | Delist Requested | Submission Date |
|---|---|---|---|---|---|---|
| 9339507 | 03/10/2028 |  | DP |  |  | 05/17/2016 |
| 9358240 | 05/05/2028 |  |  | U-1849 |  | 06/08/2016 |
| 9593066 | 12/15/2028 | DS |  |  |  | 03/14/2017 |
| 9604901 | 12/15/2028 | DS |  |  |  | 03/28/2017 |
| 10376525 | 05/14/2027 |  |  | U-1849 |  | 04/29/2020 |
| 10716793 | 05/14/2027 |  |  | U-1849 |  | 07/21/2020 |
| 11723887 | 12/15/2028 | DS |  |  |  | 08/15/2023 |

---

[4]  FDA, Supplement Approval Letter, NDA 22387/S-017 (Mar. 31. 2021), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2021/022387Orig1s017ltr.pdf.

Kim Dettelbach, Esq.  HYMAN, PHELPS & MCNAMARA, P.C.
Brian Cooney, MS, PSM
December 29, 2023  *Contains Confidential Information*
Page 4  *Exempt from Disclosure*

| Patent No | Patent Expiration | Drug Substance | Drug Product | Patent Use Code | Delist Requested | Submission Date |
|---|---|---|---|---|---|---|
| 11826327 | 01/04/2042 | | | U-3749 | | 11/28/2023 |

U-1849: METHOD OF TREATING PULMONARY HYPERTENSION BY ADMINISTERING TREPROSTINIL OR A SALT THEREOF BY INHALATION USING A DEVICE

U-3749: METHOD OF TREATING PULMONARY HYPERTENSION ASSOCIATED WITH INTERSTITIAL LUNG DISEASE BY ADMINISTERING TREPROSTINIL OR A SALT THEREOF BY INHALATION USING A DEVICE

**Exclusivity Data**

| Exclusivity Code | Exclusivity Expiration |
|---|---|
| I-856 | 03/31/2024 |

I-856: INDICATION FOR THE TREATMENT OF PULMONARY HYPERTENSION ASSOCIATED WITH INTERSTITIAL LUNG DISEASE TO IMPROVE EXERCISE ABILITY

Liquidia submitted NDA 213005 for the Original YUTREPIA 505(b)(2) NDA to FDA on January 20, 2020 seeking approval to market a version of treprostinil for the same PAH Indication approved for UTC's TYVASO Listed Drug. Liquidia's Original 505(b)(2) NDA contained certifications to the then-listed Orange Book patent information for the TYVASO Listed Drug. In particular, Liquidia certified Paragraph IV to U.S. Patent Nos. 9,593,066 ("the '066 patent") and 9,604,901 ("the '901 patent") listed in the Orange Book for the TYVASO Listed Drug. UTC timely sued Liquidia for patent infringement, thereby triggering a 30-month stay on the approval of Liquidia NDA 213005 that expired on or about October 24, 2022.[5]

On or about November 24, 2020, FDA issued to Liquidia a Complete Response Letter ("CRL") identifying certain deficiencies in the Original YUTREPIA 505(b)(2) NDA that precluded the Agency from granting final approval. On or about May 7, 2021, Liquidia amended NDA 213005 with a response to FDA's November 2020 CRL, and

---

[5] Liquidia later amended the Original YUTREPIA 505(b)(2) NDA to certify Paragraph IV to U.S. Patent No. 10,716,793 ("the '793 patent"). Because the '793 is a timely-listed, later-listed patent, Liquidia was required to certify to the patent, but a separate or superseding 30-month stay *as to the Original YUTREPIA 505(b)(2) NDA* did not apply.

| | |
|---|---|
| Kim Dettelbach, Esq.<br>Brian Cooney, MS, PSM<br>December 29, 2023<br>Page 5 | HYMAN, PHELPS & MCNAMARA, P.C.<br><br>*Contains Confidential Information*<br>*Exempt from Disclosure* |

FDA assigned a November 7, 2021 goal date to act on the NDA.[6] On November 4, 2021, FDA tentatively approved the Original YUTREPIA 505(b)(2) NDA for the same PAH Indication approved for UTC's TYVASO Listed Drug; however, due to the pendency of a 30-month stay, FDA was unable to grant final NDA approval.[7]

On or about July 24, 2023, Liquidia amended NDA 213005 to add a new indication, instead of submitting to FDA a new original 505(b)(2) NDA for that indication. Specifically, the Original YUTREPIA 505(b)(2) NDA was amended to add the same PH-ILD Indication approved for the TYVASO Listed Drug. Liquidia certified as to the then-existing Orange Book patent information for the TYVASO Listed Drug. UTC timely sued Liquidia for patent infringement; however, because information on the '793 patent, U.S. Patent No. 11,723,887 ("the '887 patent"), and U.S. Patent No. 11,826,327 ("the '327 patent") were added to the Orange Book for the TYVASO Listed Drug after the January 20, 2020 submission of the Original YUTREPIA 505(b)(2) NDA, FDA has apparently taken the position that a separate 30-month stay on the approval of Liquidia NDA 213005 does not apply.[8]

Putting aside FDA's apparent position on the availability of a new 30-month stay as a result of Liquidia's July 24, 2023 ***amendment*** to the Original YUTREPIA 505(b)(2) NDA to add a new indication—*i.e.*, the PH-ILD Indication—there is a more fundamental issue here: whether FDA could have lawfully permitted Liquidia to amend the Original YUTREPIA 505(b)(2) NDA to add the PH-ILD Indication in the first instance, or whether FDA was instead bound, as a result of the Agency's Bundling Rule, to require Liquidia to submit a new 505(b)(2) NDA for the PH-ILD Indication. Indeed, FDA failed to apply the Agency's longstanding Bundling Rule, and as a result, UTC has been denied the ability to pursue patent infringement claims with the benefits afforded under the Hatch-Waxman Amendments regarding the new PH-ILD Indication, and thus an

---

[6]   *See* Liquidia Press Release, Liquidia Announces FDA Acceptance of New Drug Application Resubmission for LIQ861 (treprostinil) Inhalation Powder (June 2, 2021), *available at* https://www.liquidia.com/news-releases/news-release-details/liquidia-announces-fda-acceptance-new-drug-application.

[7]   *See* FDA, Tentative Approval Letter, Liquidia NDA 213005 (Nov. 4, 2021), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2021/213005Orig1s000TAltr.pdf.

[8]   *See United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case 1:20-cv-00755-RGA-JLH, Document 458-5 (filed Nov. 15, 2023) (D. Del.) (attached as Exhibit A).

Kim Dettelbach, Esq.                   Hyman, Phelps & McNamara, P.C.
Brian Cooney, MS, PSM
December 29, 2023                         *Contains Confidential Information*
Page 6                                                      *Exempt from Disclosure*

opportunity to obtain a statutory 30-month stay on approval of what should have been submitted as a new original NDA.

## II.   STATUTORY AND REGULATORY BACKGROUND

The FDC Act and FDA regulations require that any person who seeks to market a new drug must first obtain approval of an application submitted pursuant to FDC Act § 505(b) or § 505(j). NDAs are submitted under FDC Act § 505(b)(1) and approved under FDC Act § 505(c). NDAs contain, among other things, "full reports of investigations"[9] of safety and effectiveness of the drug for the indication for which approval is sought.

There are two types of NDAs—505(b)(1) applications and 505(b)(2) applications. The difference between them is that, for a so-called "full" or "stand-alone" 505(b)(1) application, the investigations of safety and effectiveness must be conducted by or for the applicant or must be investigations for which the applicant has a right of reference. For a 505(b)(2) application, such as Liquidia NDA 213005, some of the information required for approval comes from studies not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use.[10] For example, a 505(b)(2) NDA may reference, in support of the safety and/or effectiveness of the proposed product, published literature and/or FDA's finding of safety and/or effectiveness for a listed drug.[11] When a 505(b)(2) applicant seeks to rely on a finding of safety and effectiveness for a previously approved drug product (*i.e.*, a listed drug such as UTC TYVASO NDA 022387), the applicant must establish that its basis for relying on a previous approval is scientifically justified. A 505(b)(2) applicant can "bridge" its proposed product to the previously approved product by submitting, for example, studies that measure the relative bioavailability of the two products or other appropriate scientific information.

---

9     FDC Act § 505(b)(1)(A).

10    Specifically, FDC Act § 505(b)(2) provides:

> An application [may be] submitted under [section 505(b)(1)] for which the [safety and effectiveness] investigations . . . relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted . . . .

11    *See* 21 C.F.R. § 314.54 and FDA's draft guidance for industry Applications Covered by Section 505(b)(2) (Oct. 1999).

Aside from the content of an NDA, FDA's Bundling Rule sets forth, among other things, the Agency's clear requirements for "what will be considered a separate marketing application,"[12] whether submitted as an original 505(b)(1) NDA or as an original 505(b)(2) NDA. In particular, the Bundling Rule states:

> If submitted simultaneously in one application, requests for approval of different indications and uses for the same dosage form to be administered by the same route of administration . . . can be regarded, for the purposes of assessing user fees, as one application. . . . ***After initial submission, a pending original or supplemental application should not be amended to add a new indication or claim***. . . . If the original application is not yet approved, ***a request for approval of other new indications or claims should be submitted in a separate, original application***. If the initial application is approved, the application can be subsequently supplemented to add a new indication.[13]

Under the FDC Act, 505(b)(2) NDA submission and approval are subject to several restrictions. First, non-patent market exclusivity provisions could delay application submission or approval (*e.g.*, 3-year clinical investigation exclusivity). Second, a 505(b)(2) NDA applicant must notify an NDA holder and patent owner if a patent listed in FDA's Orange Book covers the listed drug. If the NDA owner timely files a patent infringement suit, a 30-month stay on approval is triggered and approval of the 505(b)(2) NDA may be delayed.

The FDC Act and FDA's regulations require each NDA sponsor—whether a 505(b)(1) NDA or a 505(b)(2) NDA—to submit with its application "the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the [NDA] or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug."[14] FDA's regulations clarify that "such patents consist of drug substance (active ingredient) patents, drug product (formulation and composition) patents, and method-of-use patents."[15]

---

[12]　　FDA Bundling Rule at 1.

[13]　　FDA Bundling Rule at 4-5 (emphasis added).

[14]　　FDC Act § 505(b)(1).

[15]　　21 C.F.R. § 314.53(b)(1).

Kim Dettelbach, Esq.           HYMAN, PHELPS & MCNAMARA, P.C.
Brian Cooney, MS, PSM
December 29, 2023           *Contains Confidential Information*
Page 8           *Exempt from Disclosure*

Once an NDA is approved, FDA is required to publish information in the Orange Book concerning the patents claiming the drug or a method of using the drug.[16] If a new patent meeting the requirements of FDC Act § 505(b)(1) and FDA's patent listing regulations issues while an NDA is pending FDA review or after NDA approval, the NDA sponsor must submit information on the patent to FDA within 30 days of issuance.[17]

An original 505(b)(2) NDA for a follow-on version of a brand-name drug must contain one of several possible certifications "with respect to each patent which claims the [innovator] drug . . . or which claims a use for such drug . . . and for which information is required to be filed" by the NDA holder and that is listed in the Orange Book.[18]

- If the patents have already expired, or if the required patent information has not been filed, then the applicant submits a "Paragraph II" or "Paragraph I" certification, respectively, and FDA can approve the 505(b)(2) NDA.[19]

- If there are patents on the drug and the 505(b)(2) NDA applicant does not want to challenge them prior to expiration, then the applicant submits a "Paragraph III" certification, and FDA cannot approve the 505(b)(2) NDA until the patents have expired.[20]

- If the 505(b)(2) NDA applicant does want to challenge a patent listed in the Orange Book, then the applicant submits a Paragraph IV certification claiming that the patent is "invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the [505(b)(2) NDA] is submitted."[21]

A Paragraph IV certification sets into motion additional potential responses from the NDA sponsor and FDA as follows:

---

16     *See* FDC Act § 505(b)(1) & 505(c)(2).

17     *See id.* § 505(c)(2); *see also* 21 C.F.R. § 314.53(c)(2)(ii).

18     FDC Act § 505(b)(2)(A).

19     *See* FDC Act § 505(b)(2)(A)(i)-(ii).

20     *See id.* § 505(b)(2)(A)(iii).

21     *Id.* § 505(b)(2)(A)(iv).

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
December 29, 2023  
Page 9

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

- The original 505(b)(2) NDA applicant making a Paragraph IV certification must notify the NDA holder and patent owner that an application has been submitted with a Paragraph IV certification.[22]

- The NDA holder or patent owner has 45 days from the date of receipt of such notice to file a suit for patent infringement.[23]

- If a patent infringement suit is brought by the NDA holder or the patent owner within the 45-day period, then FDA cannot approve the original 505(b)(2) NDA until the earlier of: (1) the expiration of a 30-month litigation stay of approval[24] or (2) the date on which the 505(b)(2) NDA applicant prevails in the underlying litigation.[25]

### III. ARGUMENT

At issue here is whether FDA lawfully permitted Liquidia to amend the Original YUTREPIA 505(b)(2) NDA to add the PH-ILD Indication in the first instance, or whether FDA should have required Liquidia to submit a new original 505(b)(2) NDA for the PH-ILD Indication.[26] The Bundling Rule provides the answer: a new original 505(b)(2) NDA was required. Because FDA did not require compliance with the

---

[22] FDA Act § 505(b)(3).

[23] *See id.* § 505(c)(3)(C).

[24] *See id.*

[25] *See id.* § 505(c)(3)(C)(i)-(ii). In addition, or as an alternative, to these certifications, if the listed drug is covered by an Orange Book-listed "method of use patent which does not claim a use for which the [505(b)(2) NDA] applicant is seeking approval," then the applicant may choose to make a so-called "carve-out" statement (also referred to generally as a "section (b)(2)(B) statement" for 505(b)(2) NDAs, which is "a statement that the method of use patent does not claim such a use." *Id.* § 505(b)(2)(B).

[26] The fact that Liquidia's Original YUTREPIA 505(b)(2) NDA was tentatively approved at the time the company sought to add the PH-ILD Indication is irrelevant. The Bundling Rule differentiates between only approved and unapproved NDAs, and a tentatively approved NDA is not an approved NDA. *See* 21 C.F.R. 314.3(b) ("A drug product that is granted tentative approval is not an approved drug and will not be approved until FDA issues an approval letter after any necessary additional review of the NDA or ANDA."). Indeed, FDA took the tame tack in the case of NDA 021822 (Aptivus (tipranavir) Oral Solution) discussed below.

Kim Dettelbach, Esq.  HYMAN, PHELPS & MCNAMARA, P.C.
Brian Cooney, MS, PSM
December 29, 2023  *Contains Confidential Information*
Page 10  *Exempt from Disclosure*

Bundling Rule, FDA has deprived UTC of the ability to pursue patent infringement claims under the Hatch-Waxman Amendments regarding the PH-ILD Indication. Most notably, UTC has been denied the opportunity for a statutory 30-month stay on approval of what should have been submitted as a separate original NDA.

FDA must remedy the situation by (1) considering Liquidia's July 24, 2023 PH-ILD Indication amendment null and void and requiring Liquidia to submit a new original 505(b)(2) NDA; (2) requiring Liquidia to certify to patent information currently listed in the Orange Book for any listed drug—presumably the TYVASO Listed Drug—relied on for approval (that is, patent information listed as of the date Liquidia submits a new original 505(b)(2) NDA for the PH-ILD Indication); and (3) by staying the approval of any new Liquidia original 505(b)(2) NDA if there is timely filed patent infringement litigation in response to a Paragraph IV certification.

FDA's Bundling Rule, issued in final form in December 2004,[27] sets forth a crystal-clear rule that the submission of a separate marketing application is required to add a new indication when another application from the same sponsor for the same drug is pending (*i.e.*, not granted final NDA approval):

> If submitted simultaneously in one application, requests for approval of different indications and uses for the same dosage form to be administered by the same route of administration . . . can be regarded, for the purposes of assessing user fees, as one application. . . . ***After initial submission, a pending original or supplemental application should not be amended to add a new indication or claim***. . . . If the original application is not yet approved, ***a request for approval of other new indications or claims should be submitted in a separate, original application***. If the initial application is

---

[27] *See* FDA, Notice, Guidance for Industry on Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees; Availability, 70 Fed. Reg. 92 (Jan. 3, 2005); *see also* FDA, Notice, Draft Guidance for Industry on Separate Marketing Applications and Definition of Clinical Data for Purposes of Assessing User Fees; Availability, 66 Fed. Reg. 11,175 (Feb. 22, 2001) ("This draft guidance revises a procedural guidance entitled 'Attachment E—Interim Guidance: Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees Under the User Fee Act of 1992' issued in July 1993 . . . , which provided guidance on the agency's policy on 'bundling' applications and a definition of 'clinical data' for user fee purposes.").

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
December 29, 2023  
Page 11

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

approved, the application can be subsequently supplemented to add a new indication.[28]

The Bundling Rule, which FDA refers to as the Agency's "bundling policy" or "bundling guidance," is styled as a guidance document. Like other FDA guidance documents, it includes the standard disclaimer that the document "does not create or confer any rights for or on any person and does not operate to bind FDA or the public."[29] Yet the reality is quite different: it is a binding norm. Although the Bundling Rule is nominally phrased in hortatory terms, FDA has elevated it to a binding rule by repeatedly enforcing against companies that seek to add new indications like the PH-ILD Indication Liquidia seeks to add here.

Indeed, there is a litany of instances in which FDA has over decades imposed, or otherwise characterized, the Bundling Rule as a binding obligation on NDA applicants—as well as Biologics License Application ("BLA") applicants—requiring them to adhere to the terms of the "guidance document."[30] Moreover, the Bundling Rule has been binding upon FDA itself, permitting the Agency to accept only applications that meet the standards in the "guidance document,"[31] including the new indication scenario here.[32] Consider, for example, the following instances and FDA statements:

---

[28] FDA Bundling Rule at 4-5 (emphasis added).

[29] *Id.* at 1.

[30] New original NDAs submitted to FDA to add an indication while another original NDA is pending are specifically identified by the Agency as "Type 9 NDAs." *See* FDA, MAPP 5018.2, NDA Classification Codes, at 6 (Dec. 8, 2022) ("A Type 9 NDA is for a new indication or claim for a drug product that is currently being reviewed under a different NDA (the 'parent NDA'), and the applicant does not intend to market this drug product under the Type 9 NDA after approval. Generally, a Type 9 NDA is submitted as a separate NDA so as to be in compliance with the guidance for industry on *Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees*.").

[31] *See, e.g.*, *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 385 (D.C. Cir. 2002) (concluding that "the Guidance Document does bind the Agency").

[32] In fact, adherence to the Bundling Rule has been a stand-alone question asked in FDA's long-used "RPM FILING REVIEW" template, which asks—referring to the 2004 guidance—"Has the user fee bundling policy been appropriately applied? If no, or you are not sure, consult the User Fee Staff." *See, e.g.*, FDA, Approval Package, Other Review(s), NDA 208603, at PDF page 4 (May 24, 2021), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/208603Orig1s000OtherR.pdf.

- ***NDA 021822 (Aptivus (tipranavir) Oral Solution)***

  o "Your proposed plan for submission of an efficacy supplement to NDA 21-822 for use of tipranavir oral solution in the pediatric population does not follow the Guidance for Industry: "Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fee." As per this guidance, "If the original application is not yet approved, a request for approval of other new indications or claims should be submitted in a separate, original application." ***Because your original NDA 21-822 application (that is considered pending due to the June 22, 2006 approvable letter) was intended for an adult indication, your proposal to resubmit the NDA with a pediatric indication is considered a new indication and thus must be submitted as a new NDA application***."[33]

- ***NDA 210709 (TEKTURNA (aliskiren) Oral Pellets)***

  o "Per FDA guidance 'Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees' (the Bundling Guidance), under section III.B., subsection 2, it specifies that a change to an approved product in terms of strength/concentration/formulation can be submitted as a supplement to the approved application, unless it changes the dosage form or routes of administration. In this case, the proposed 37.5 mg pellets in capsule formulation has a different dosage form than the currently approved 150mg and 300mg tablets. ***Therefore, the new product has to come in and be reviewed as a new NDA***. We have administratively assigned NDA 210709 to this application and all future amendments should be submitted to this application number."[34]

---

[33]  FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 021822 (Aptivus), PDF pages 5-6 (May 2006), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2008/021822s000admincorres.pdf (emphasis added).

[34]  FDA, Approval Package, Administrative and Correspondence Documents, NDA 210709 (TEKTURNA), PDF page 60 (Unacceptable For Filing Review Letter) (May 2017), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/210709Orig1s000AdminCorres.pdf (bold emphasis in original; bold italics emphasis added).

Kim Dettelbach, Esq.            H<small>YMAN</small>, P<small>HELPS</small> & M<small>C</small>N<small>AMARA</small>, P.C.
Brian Cooney, MS, PSM
December 29, 2023            *Contains Confidential Information*
Page 13            *Exempt from Disclosure*

- ***NDA 206682 (Dexmedetomidine Hydrochloride Injection)***

    o "This is in reference to your NDA # 206628 for dexmedetomidine Injection . You submitted your application on May 12, 2014, with the following indication.

    Dexmedetomidine Hydrochloride Injection is a relatively selective alpha2-adrenergic agonist indicated for: Sedation of non-intubated patients prior to and/or during surgical and other procedures.

    Your amendment dated July 1, 2014, has the following revised indication. Dexmedetomidine Hydrochloride Injection is a relatively selective alpha2-adrenergic agonist indicated for: [DELETED INDICATION TEXT]

    Please refer to the Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM079320.pdf

    Please note that an original application can be submitted with multiple indications for which a single User Fee is assessed. ***However, if you amend a pending application and add another indication, it should be submitted in a separate original application, and you have to pay a separate User Fee for that***. Refer to Section A/Original Applications and Amendments for further information."[35]

- ***NDA 209400 (Omeprazole Delayed-release Orally Disintegrating Tablets)***

    o "<u>Question 1</u>
    DPT plans to submit a supplemental New Drug Application (sNDA) for addition of Omeprazole ODT formulation, 20 mg. The proposed ODT product has the same active ingredient and is intended for the same therapeutic indication: treatment of frequent heartburn. Does the agency

---

[35] FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 206682 (Dexmedetomidine Hydrochloride Injection), PDF page 45 (Jan. 2015), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/206628Orig1s000Admincorres.pdf (emphasis added).

Kim Dettelbach, Esq.  HYMAN, PHELPS & MCNAMARA, P.C.
Brian Cooney, MS, PSM
December 29, 2023  *Contains Confidential Information*
Page 14  *Exempt from Disclosure*

agree that the sNDA regulatory pathway is appropriate for submission of the Omeprazole Delayed–release Orally Disintegrating Tablets?

FDA Preliminary Response Question 1
No, we do not agree. Delayed-release tablets and delayed-release, orally disintegrating tablets are two distinct dosage forms [see FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations" (the Orange Book), Appendix C]. Per the FDA "Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees," different dosage forms should be submitted in separate original applications unless the products are identical in quantitative and qualitative composition. ***Therefore, submit the proposed marketing application for the ODT dosage form as an original NDA***."[36]

- *NDA 208780 (Esbriet (pirfenidone) Film-coated Tablets)*

  o "We note that your questions make reference to submission of pirfenidone film-coated tablets as a supplemental New Drug Application (sNDA). ***We remind you that an application with a new dosage form constitutes a new NDA.*** To prevent duplication of data that has been previously submitted, you may cross-reference relevant data from the pirfenidone capsules NDA, if necessary. Refer to the Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees. You may contact the User Fee staff if you have any further questions regarding this issue."[37]

- *BLA 761223 (JEMPERLI (dostarlimab-gxly) Injection)*

  o "Under FDA's prescription drug user fee bundling policy, after initial submission, a pending original or supplemental application should not be

---

[36] FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 209400 (Omeprazole Delayed-release Orally Disintegrating Tablets), PDF pages 63-64 (Nov. 2015), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/209400Orig1s000AdminCorres.pdf (bold and italics in original; bold-italics emphasis added).

[37] FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 208780 (Esbriet), PDF page 76 (May 2015), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/208780Orig1s000AdminCorres.pdf (emphasis added).

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
December 29, 2023  
Page 15

Hyman, Phelps & McNamara, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

amended to add a new indication or claim. ***If the original application is not yet approved, a request for approval of other new indications or claims should be submitted in a separate, original application. Thus, GSK submitted two separate BLAs.*** However, as noted above, the drug substance in BLA 761223 is already covered by BLA 761174, and the BLAs share the same formulation, dosage form, strength, dose, frequency of administer, and route of administration—***i.e., they differ only in indication***."[38]

Further supporting FDA's Bundling Rule as a binding norm is the Agency's use of the Rule to inform the Agency's decision making—and with characterizations of the Bundling Rule as imposing requirements on applicants. For example, FDA referred to the Bundling Rule as a requirement in the preamble to the Agency's 2015 proposed rule to implement portions of the 2003 Medicare Modernization Act ("MMA"):

> Consistent with FDA's 'bundling' policy in effect at the time of enactment of the MMA, an applicant may not seek approval for these types of changes to a drug through an amendment or supplement to the 505(b)(2) application; ***the applicant is required to submit a new 505(b)(2) application*** (see draft guidance for industry entitled 'Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees'. . . ."[39]

FDA similarly referred to the Bundling Rule as a "requirement" in the Agency's 2016 final rule implementing the 2003 MMA:

---

[38]   FDA, Approval Package, Proprietary Name Review(s), BLA 761223 (JEMPERLI), at PDF page 3 (May 24, 2021), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2021/761223Orig1s000NameR.pdf (emphasis added); *see also id.* ("We note above that under FDA's prescription drug user fee bundling policy, after initial submission, a pending original or supplemental application should not be amended to add a new indication or claim. ***If the original application is not yet approved, a request for approval of other new indications or claims should be submitted in a separate, original application. Thus, GSK submitted two separate BLAs.*** If one of the BLAs was approved prior to submission of the second indication, the additional indication could be managed under a supplement to the approved BLA, which would not have resulted in a change to the proper name under the approach to nonproprietary naming described in the final guidance.") *Id.* (emphasis added).

[39]   FDA, Proposed Rule, Abbreviated New Drug Applications and 505(b)(2) Applications, 80 Fed. Reg. 6802, 6851 (Feb. 6, 2015) (emphasis added).

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
December 29, 2023  
Page 16

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

Most requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to the 505(b)(2) application (see § 314.60(b)(6) and guidance for industry entitled "Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees" (December 2004) at 4 to 5, available at *http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/ Guidances/default.htm*). . . .

Section 505(b)(4)(A) and (j)(2)(D)(i) of the FD&C Act generally prohibits the submission of certain types of changes in an amendment or a supplement to a 505(b)(2) application or an ANDA, respectively. Sections 314.60(e) and 314.70(h) would prohibit an applicant from amending or supplementing a 505(b)(2) application to seek approval of a drug that has been modified to have a different active ingredient, different route of administration, different dosage form, or certain differences in excipients than the drug proposed in the original submission of the 505(b)(2) application. ***These changes must be requested in a new 505(b)(2) application. This final requirement conforms with FDA's current policy regarding the types of proposed changes to a drug product that should be submitted as a separate application*** (see guidance for industry on "Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees" (December 2004), available at *http://www.fda.gov/Drugs/ GuidanceComplianceRegulatoryInformation/Guidances/default.htm*).[40]

FDA cannot deny or ignore its longstanding treatment of the Bundling Rule as establishing binding obligations for regulated industry and for FDA itself as to the submission of marketing applications. Nevertheless, FDA, in violation of the Administrative Procedure Act ("APA"), failed to follow the Bundling Rule here and allowed Liquidia to amend its pending Original YUTREPIA 505(b)(2) NDA to add a new indication, instead of requiring the company to submit a new original 505(b)(2) NDA as the Bundling Rule requires. In doing so, FDA deprived UTC of the ability to pursue patent infringement claims with the benefits afforded under the Hatch-Waxman Amendments regarding the PH-ILD Indication, including the ability to obtain a statutory

---

[40] FDA, Final Rule, Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg. 69,580, 69,616, 69,635 (Oct. 6, 2016) (emphasis added).

Kim Dettelbach, Esq.  HYMAN, PHELPS & MCNAMARA, P.C.
Brian Cooney, MS, PSM
December 29, 2023  *Contains Confidential Information*
Page 17  *Exempt from Disclosure*

30-month stay on the approval of a stand-alone original 505(b)(2) NDA for the PH-ILD Indication.

FDA must act immediately to rectify this situation and restore UTC's Hatch-Waxman Amendment rights. In this case that means FDA must consider Liquidia's July 24, 2023 PH-ILD Indication amendment null and void and require Liquidia to submit a new original 505(b)(2) NDA with certifications to patent information currently listed in the Orange Book for the TYVASO Listed Drug (*i.e.*, as of the date Liquidia submits a new original 505(b)(2) NDA for the PH-ILD Indication).

FDA's disparate treatment of, on the one hand, Liquidia, and on the other hand, all of the other NDA applicants the Agency has informed over the years of an obligation to submit a new original NDA as a result of the Bundling Rule, violates a central precept of administrative law: that federal agencies must "treat like cases alike."[41] Applying this "fundamental norm of administrative procedure,"[42] the D.C. Circuit repeatedly has vacated agency actions subjecting "similarly situated competitors" to disparate regulatory standards.[43] FDA is no exception to the rule: the D.C. Circuit likewise has vacated FDA decisions that subjected similarly situated parties to dissimilar standards.[44] And if presented with the situation here, there is no doubt a court would likewise find FDA violated the APA by failing to apply the Bundling Rule to Liquidia's proposed addition of the PH-ILD indication.

###

---

[41] *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007); *see also Bracco Diagnostics v. Shalala*, 963 F. Supp. 20, 27-28 (D.D.C. 1997).

[42] *Westar*, 473 F.3d at 1241.

[43] *See, e.g.*, *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1025 (D.C. Cir. 2018) (invalidating decision requiring one competitor to charge cost-based rates despite allowing another competitor to charge market rates); *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 19-20 (D.C. Cir. 2014) (vacating decision requiring one competitor to charge the rate in effect when a service request was submitted despite allowing other competitors to charge the rate in effect when the service agreement was finalized).

[44] *See, e.g.*, *Bracco Diagnostics v. Shalala*, 963 F. Supp. 20, 27 (D.D.C. 1997) (vacating FDA decision requiring one competitor to meet the FDCA's stringent drug-approval requirements despite allowing another competitor to meet the less onerous device-approval requirements); *Allergan, Inc. v. Shalala*, 1994 U.S. Dist. LEXIS 21716, No. 94-1223, *10-11 (Nov. 10, 1994) (rejecting FDA's refusal to take enforcement action against one company despite doing so against similarly situated ones).

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
December 29, 2023  
Page 18

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

      We look forward to a prompt response to this letter or to correspondence from you to schedule a meeting to further discuss the issues raised in this letter.

          Respectfully submitted,

*Counsel for United Therapeutics Corporation*

KRK/dlw  
Attachment