# EXHIBIT 3

Civil Action No. 1:24-cv-484-JDB



Scott M. Lassman  　　1717 K Street, NW
+1 202-248-5426  　　Suite 900
scott@lassmanfdalaw.com  　　Washington, D.C. 20006

*CONFIDENTIAL TREATMENT REQUESTED PER 21 C.F.R. §§ 20.61 and 314.430*

February 2, 2024

**DELIVERED VIA EMAIL**

Kim Dettelbach, J.D.  
Assistant Deputy Chief Counsel  
U.S. Food and Drug Administration  
10903 New Hampshire Avenue  
Silver Spring, Maryland 20993  
Email: Kim.Dettelbach@fda.hhs.gov

Brian Cooney, M.S., P.S.M.  
Regulatory Health Project Manager  
Division of Regulatory Operations for Cardiology,  
　Hematology, Endocrinology & Nephrology  
Office of New Drugs  
Center for Drug Evaluation and Research  
10903 New Hampshire Avenue  
Silver Spring, Maryland 20993  
Email: Brian.Cooney@fda.hhs.gov

　　Re:　NDA 213005; YUTREPIA™ (treprostinil) Inhalation Powder;  
　　　　Response to December 29, 2023, Letter from United Therapeutics Corporation

Dear Ms. Dettelbach and Mr. Cooney:

　　On behalf of Liquidia Technologies, Inc. ("Liquidia"), this letter responds to the correspondence dated December 29, 2023, from Kurt Karst (submitted on behalf of United Therapeutics Corporation ("UTC")),[1] to the Food and Drug Administration ("FDA" or "the Agency") regarding approval of Liquidia's 505(b)(2) application for YUTREPIA™ (treprostinil) Inhalation Powder (NDA 213005) (hereafter referred to as the "UTC letter").[2] In that letter, which was provided to Liquidia on January 23, 2024, UTC asserts that FDA unlawfully permitted Liquidia to amend its pending 505(b)(2) application to add a new indication for pulmonary hypertension associated with interstitial lung disease ("PH-ILD")[3] and requests the Agency to take certain regulatory actions that would significantly delay the approval of Liquidia's application, including requiring Liquidia to submit a separate New Drug Application ("NDA"). For the reasons discussed below, UTC's request itself is defective and its arguments are baseless and unpersuasive. Because UTC's letter amounts to nothing more than an 11th hour attempt to delay the approval of YUTREPIA™, FDA should summarily reject it.

　　As an initial matter, UTC's request was submitted as a "confidential" letter to FDA even though the statute, regulations, and FDA's policies all provide for the submission of a Citizen

---

[1] UTC is the sponsor of the New Drug Application for TYVASO® (treprostinil) Inhalation Solution (NDA 022387), which is identified as the "listed drug" for Liquidia's 505(b)(2) application for YUTREPIA™.

[2] Liquidia is submitting this letter to its 505(b)(2) application for YUTREPIA™ and thus requests that all information in this submission be treated as confidential information within the meaning of 21 C.F.R. § 314.430, and as confidential commercial information within the meaning of 21 C.F.R. § 20.61, and that no information from this submission be made public without Liquidia's prior written consent.

[3] In its original 505(b)(2) application, Liquidia sought approval for the treatment of pulmonary arterial hypertension ("PAH").

Kim Dettelbach, J.D.
Brian Cooney, M.S., P.S.M.
Page 2

Petition for any request, like this one, that FDA take or refrain from taking any regulatory action – particularly one that could delay the approval of a 505(b)(2) application. *See* 21 U.S.C. § 355(q). Even if FDA were to consider UTC's arguments on the merits, the Agency must reject those arguments as baseless and unsupported.

First, UTC's argument is based entirely on recommendations contained in an FDA guidance document entitled *Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees* (commonly referred to as the "Bundling Guidance").[4] As the Agency well knows, guidance documents "do not establish legally enforceable rights or responsibilities" and "do not legally bind the public or FDA." 21 C.F.R. § 10.115(c)(3).

Second, the Bundling Guidance has been superseded in relevant part by both the Federal Food, Drug, and Cosmetic Act ("FD&C Act") and FDA's regulations.[5] Significantly, these statutory and regulatory provisions explicitly allowed Liquidia to submit, and FDA to accept, an amendment to the company's 505(b)(2) application to seek approval of a new indication regardless of the non-binding recommendations in the Bundling Guidance. Accordingly, FDA "lawfully permitted" Liquidia to amend its 505(b)(2) application for YUTREPIA$^{TM}$ to add the PH-ILD indication in accordance with these statutory and regulatory provisions, contrary to UTC's unfounded assertions. UTC fails to discuss or even mention these binding statutory and regulatory provisions in its December 29th letter.

Third, UTC's demand that Liquidia be required to submit a new NDA – with the expectation that UTC could then obtain an additional 30-month stay on newly-issued patents – is inconsistent with the statute, FDA's regulations, and even the Bundling Guidance itself. Under the Bundling Guidance, if an application has been "inappropriately bundled," this "will not prevent the filing of the application … *or its review*." Bundling Guidance, at 2 (emphasis added). In any event, Liquidia cannot be compelled to submit a separate NDA to add a new indication, and UTC is not guaranteed a new 30-month stay. On the contrary, it is beyond dispute that Liquidia could add a new indication to the YUTREPIA$^{TM}$ labeling by submitting a supplement after approval of the initial PAH indication. Under controlling statutory authority, this would not give UTC the opportunity to obtain another 30-month stay.

Furthermore, if FDA were to take the steps demanded in the UTC Letter, it would deprive Liquidia of its statutory rights, namely the rights to seek timely review and approval of its 505(b)(2) application properly submitted in accordance with FDA regulations. Finally, we note that unjustified delays of approval of YUTREPIA$^{TM}$ would further deprive patients and other stakeholders of the benefits that its approval would bring, including that of new and additional treatment options for patients diagnosed with one or more serious and life-threatening conditions. The grounds for Liquidia's position are set forth in detail below.[6]

---

[4] FDA, *Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees* (Dec. 2004) (Exhibit 1), *available at* https://www.fda.gov/media/72397/download.
[5] *See* 21 U.S.C. § 355(b)(4)(A); 21 C.F.R. §§ 314.60(e), (f)(1); *see also* 21 C.F.R. § 314.60(b)(6).
[6] In an effort to ensure satisfactory and efficient resolution of the matters discussed herein and in the UTC Letter, we respectfully request the ability to review and respond to any further submissions by or on behalf of UTC on these matters and to be included in any discussions with UTC that may take place with FDA on these matters.

Kim Dettelbach, J.D.
Brian Cooney, M.S., P.S.M.
Page 3

## I. Statutory and Regulatory Context

### A. Hatch-Waxman Act

Before a new drug may be introduced into interstate commerce, it must receive prior approval from FDA. 21 U.S.C. § 355(a). Innovative pharmaceutical products typically are approved by FDA via the New Drug Application, or NDA, process. *Id*. § 355(b)(1). Prior to submitting an NDA, an applicant must conduct a battery of preclinical tests (*i.e.*, laboratory and animal tests) and human clinical trials demonstrating that the product is safe enough for the next phase of testing and, ultimately, safe and effective for its intended use. *See generally* 21 C.F.R. § 314.50. Because of the extensive testing requirements, the NDA process typically is a time-consuming and expensive approval pathway.

In addition to the "full NDA" process described above, the FD&C Act provides two abbreviated pathways for FDA approval of certain types of generic and follow-on drug products: (1) the Abbreviated New Drug Application ("ANDA") process, and (2) the 505(b)(2) application process. *See* 21 U.S.C. §§ 355(b)(2), (j). These abbreviated approval pathways were created in 1984 by the Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the Hatch-Waxman Act. With the Hatch-Waxman Act, Congress intended to strike a balance between encouraging innovation in drug development and accelerating the availability to the public of lower-cost alternatives to innovator drugs.[7]

The abbreviated pathway relevant here is the 505(b)(2) application. It is often described as a hybrid between a full NDA and an ANDA because (1) like an ANDA, it can rely upon FDA's prior findings of safety and effectiveness for a previously approved "listed drug," to the extent scientifically justified, but (2) like a full NDA, it can also include independent data (including clinical data) to establish the safety and effectiveness of the product, to the extent necessary.

As part of the balance between innovation and access, the Hatch-Waxman Act modified the rules regarding patent infringement to accelerate patent infringement litigation and to link the timing of approval of ANDAs and 505(b)(2) applications to the status of relevant patents covering the previously-approved listed drug. First, it implemented a process for commencing patent infringement disputes *before* approval while FDA is still conducting its scientific and regulatory review of the ANDA or 505(b)(2) application. *See Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1283 ("[T]he Hatch-Waxman Act facilitates the early resolution of patent disputes between generic and pioneering drug companies by providing that the mere act of filing a Paragraph IV ANDA constitutes an act of patent infringement.").

Second, it tied the approval of ANDAs and 505(b)(2) applications to the status of relevant patents through a complex patent listing and certification process. That process is initiated by the NDA holder for the listed drug, who is required to submit, with its application, information pertaining to certain patents that relate to its product. 21 U.S.C. § 355(b)(1)(A)(viii). NDA holders

---

[7] *See* H.R. Rep. No. 98-857, pt. 1, at 14-15 (1984), reprinted in 1984 U.S.C.C.A.N. 2647-48; *see also, e.g.*, *Teva Pharm. Indus. Ltd. v. Crawford*, 410 F.3d 51, 54 (D.C. Cir. 2005).

Kim Dettelbach, J.D.
Brian Cooney, M.S., P.S.M.
Page 4

also are required to submit information about any relevant patent that is issued after approval of the NDA. *Id*. § 355(c)(2). Under the statute, FDA is required to publish this patent information, which it does in its publication *Approved Drug Products With Therapeutic Equivalence Evaluations*, commonly referred to as the Orange Book.

The listing of patents in the Orange Book is significant because it governs, in part, the timing of approval of a subsequent ANDA or 505(b)(2) application that relies upon the relevant listed drug. When such an application is submitted, it must – as a condition of approval – address each patent covering the innovator drug that is listed or required to be listed in the Orange Book. *Id*. §§ 355(b)(2)(A), (B); (j)(2)(A)(vii), (viii). The primary way of addressing such patents is by making one of four possible certifications with respect to each patent. Of relevance here, a "Paragraph IV" certification asserts that the patent "is invalid or will not be infringed by the manufacture, use or, sale of the new drug for which the application is submitted." *Id*. § 355(b)(2)(A)(iv). A Paragraph IV certification triggers what is known as an "artificial act of patent infringement" of the applicable patent(s) at issue, which in turn can trigger patent infringement litigation between the parties. In general, if a patent infringement lawsuit is filed by the NDA holder within 45 days of receiving a Paragraph IV Notice Letter,[8] a 30-month stay of approval is triggered, which prevents approval of the ANDA or 505(b)(2) application until the stay is terminated, even if the application is otherwise ready for approval by FDA. *Id*. § 355(c)(3)(C).

    B. <u>Statutory Amendments to Hatch-Waxman Under the Medicare Prescription Drug, Improvement, and Modernization Act and Related Rulemaking</u>

When the Hatch-Waxman Act was enacted in 1984, it did not explicitly limit the number of 30-month stays that an NDA holder could obtain. Moreover, as a result of FDA's policies, many NDA holders were able to obtain multiple, serial 30-month stays that blocked the approval of competing products by submitting new patents to FDA periodically prior to generic or follow-on approval. These serial 30-months stays drew attention from the Federal Trade Commission and others as inconsistent with the balance intended to be struck by the Hatch-Waxman Act.

As a result of this criticism, Congress amended the Hatch-Waxman Act in 2003 as part of the Medicare Prescription Drug, Improvement, and Modernization Act ("MMA").[9] Specifically, the MMA amended the FD&C Act to provide that a 30-month stay could attach only to patents submitted to FDA *prior to* the submission of the relevant ANDA or 505(b)(2) application. *See* 21 U.S.C. § 355(c)(3)(C). Significantly, the statute clarified that, for purposes of determining the relevant date of submission of the ANDA or 505(b)(2) application, amendments and supplements were to be excluded. *Id*. ("…the date on which the application (excluding an amendment or supplement to the application)…"). In other words, if a new patent certification were required to be submitted in an amendment or supplement to a 505(b)(2) application, a 30-month stay could be triggered only by patents submitted to FDA before the submission of the *original* 505(b)(2)

---

[8] If a 505(b)(2) applicant submits a Paragraph IV certification, it is required to provide notice to the NDA holder and patent owner within certain time frames in a Paragraph IV Notice Letter. 21 U.S.C. § 355(b)(3).
[9] Pub. L. No. 108-173, 117 Stat. 2066 (2003).

Kim Dettelbach, J.D.
Brian Cooney, M.S., P.S.M.
Page 5

application. For the most part, this statutory revision put an end to serial 30-month stays and limited NDA applicants to a single 30-month stay period.[10]

However, in order to protect brand companies' legitimate patent rights and preserve the opportunity for at least a single 30-month stay, Congress added a new provision to the Hatch-Waxman Act to limit the situations in which an amendment or supplement could be submitted to an ANDA or 505(b)(2) application. For 505(b)(2) applications, the statute now clarifies that an applicant "may not amend or supplement [a 505(b)(2) NDA] to seek approval of a ***drug that is a different drug than the drug identified*** in the application as submitted to the Secretary." *Id*. § 355(b)(4)(A) (emphasis added).

In response to the enactment of the MMA (and other developments), FDA undertook a rulemaking in 2015[11] to update its regulations, which were finalized in 2016.[12] The final regulations made three significant changes that are relevant here. First, to implement the MMA revisions to Section 505(c)(3)(C) of the FD&C Act (21 U.S.C. § 355(c)(3)(C)), FDA revised its Hatch-Waxman regulations to provide that a 30-month stay is triggered only "with respect to patents for which required information was submitted under § 314.53 *before the date on which the 505(b)(2) application or ANDA was submitted to FDA (excluding an amendment or supplement to the 505(b)(2) application or ANDA)*." 21 C.F.R. §314.107(b)(3) (emphasis added).[13]

Second, to implement Section 505(b)(4)(A) of the FD&C Act (21 U.S.C. § 355(b)(4)(A)), FDA revised its regulations governing amendments to unapproved NDAs to add a new clause (e) that provides:

> "An applicant may not amend a 505(b)(2) application to seek approval of a drug that is a different drug from the drug in the original submission of the 505(b)(2) application. *For purposes of this paragraph (e), a drug is a different drug if it has been modified to have a different active ingredient, different route of administration, different dosage form, or difference in excipients that requires either a separate clinical study to establish safety or effectiveness or, for topical products, that requires a separate in vivo demonstration of bioequivalence.* However, notwithstanding the limitation described in this paragraph (e), an applicant may amend the 505(b)(2) application to seek approval of a different strength."

21 C.F.R. §314.60(e) (emphasis added). Significantly, the regulation does **not** define a drug that has been modified to have a different indication as a "different drug" for purposes of the prohibition on certain amendments to a 505(b)(2) application.

---

[10] Multiple 30-month stays remain possible in some, limited circumstances not relevant here where an amendment or supplement implicates a patent that was submitted to the Orange Book prior to the original ANDA or 505(b)(2) application.
[11] MMA Proposed Rule, 80 Fed. Reg. 6802 (Feb. 6, 2015).
[12] MMA Final Rule, 81 Fed. Reg. 69580 (Oct. 6, 2016).
[13] Related modifications were also made to 21 C.F.R. §314.107(b)(2).

Kim Dettelbach, J.D.
Brian Cooney, M.S., P.S.M.
Page 6

Third, FDA revised the patent certification requirements applicable to certain amendments. Significantly, the regulation acknowledges that 505(b)(2) applicants are permitted to submit amendments "to add a new indication" and thus clarifies the applicant's patent certification obligations in such situations. The revised regulation provides (in relevant part):

> "(1) An amendment to a 505(b)(2) application is required to contain an appropriate patent certification or statement described in § 314.50(i) or a recertification for a previously submitted paragraph IV certification *if approval is sought for any of the following types of amendments: (i) To add a new indication or other condition of use*; (ii) To add a new strength; (iii) To make other than minor changes in product formulation; or (iv) To change the physical form or crystalline structure of the active ingredient."

21 C.F.R. § 314.60(f) (emphasis added).

In this rulemaking process, FDA clearly grappled with and established regulations to address which changes to a 505(b)(2) application may be addressed through an amendment and which changes are sufficiently significant such that they should be addressed in a separate application. The omission of "a new indication or other condition of use" from the types of changes that would require a new application pursuant to 21 C.F.R. §314.60(e), and the inclusion of "a new indication or other condition of use" as a type of amendment that would require a new patent certification in 21 C.F.R. §314.60(f), makes clear that, for purposes of the Hatch-Waxman Act (including, specifically, the patent certification and 30-month stay requirements), a new indication or other condition of use may be added through an amendment to an NDA where, as here, no additional clinical data was provided in support of the amendment.[14]

### C. The Prescription Drug User Fee Act and FDA's Bundling Guidance

In 1992, Congress amended the FD&C Act by enacting the Prescription Drug User Fee Act ("PDUFA").[15] The PDUFA legislation imposes fees on prescription drug manufacturers in order to increase the resources available to FDA for the review of human drug applications, thereby significantly expediting the drug approval process. The PDUFA legislation must be re-authorized every five years.[16]

Although PDUFA has been revised significantly over the years, it has always authorized FDA to assess a fee on each NDA, including 505(b)(2) applications. *See* 21 U.S.C. § 379h(a). Because the application fee is typically significant,[17] it is important for both FDA and industry to

---

[14] FDA regulations provide in 21 C.F.R. §314.60(b)(6) that a major amendment seeking approval of a new indication may not include clinical data. The FDA regulations do not include any other restrictions on the amendment of an NDA to add a new indication. As described below, the amendment to add the new indication for YUTREPIA™ did not include any clinical data.

[15] Pub. L. No. 102-571, 106 Stat. 4491 (1992).

[16] Congress has re-authorized PDUFA six times since its initial passage in 1992.

[17] For fiscal year 2024, the application fee for an NDA requiring clinical data is over $4 million. 88 Fed. Reg. 48881, 48887 (July 28, 2023).

Kim Dettelbach, J.D.
Brian Cooney, M.S., P.S.M.
Page 7

have clarity on when different versions of a drug can be bundled into a single application and when separate applications – and separate application fees – will be required.

FDA initially provided that clarity in 1993 by issuing an *Interim Guidance: Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees Under the User Fee Act of 1992* (Exhibit 2). In 2004, FDA revised this guidance slightly, although its basic structure and recommendations remained unchanged. The 2004 version (now commonly referred to as the Bundling Guidance), like its 1993 precursor, "discusses (1) what should be contained in separate marketing applications and what should be combined into one application (bundling guidance) *for purposes of assessing user fees* and (2) the definition of clinical data *for purposes of assessing user fees*." Bundling Guidance at 2 (emphasis added). This context is important because, among other things, there is a relationship between user fees assessed by FDA and the review resources used in connection with application review. Over the years, including through the Bundling Guidance, FDA has developed policies and practices designed at a high level such that the user fees assessed for applications generally align with the resources expended in their review.[18]

With respect to adding a new indication, the Bundling Guidance recommends the following:

> "After initial submission, a pending original or supplemental application should not be amended to add a new indication or claim. Previously submitted indications or claims can be modified by, for example, reanalyses of previously submitted data or, in rare instances, supplementary clinical data. Such amendments could result in subsequent adjustments to the user fee review clock. Submitting new clinical or in vitro data to support a new claim(s) to an already submitted original application during the review of that application is not recommended. Such a submission would be considered developing the product on the review clock and is contrary to the spirit and intent of the Act. If the original application is not yet approved, a request for approval of other new indications or claims should be submitted in a separate, original application. If the initial application is approved, the application can be subsequently supplemented to add a new indication. (See section II.B. on supplemental applications.) At the time of submission, an original application should be complete and ready for a comprehensive review."

Bundling Guidance at 5.[19] In other words, the Bundling Guidance recommends submitting a new application if the proposed new indication is added before the original 505(b)(2) application is approved, but it recommends submission of a supplement if the new indication is added after initial approval.

---

[18] However, despite these general efforts, the Bundling Guidance does not on its face distinguish between 505(b)(1) and 505(b)(2) applications, despite their many review-resource differences. The general policies around utilization of review resources (including, for example, references to developing products "on the review clock") are included in the Bundling Guidance and are informative.

[19] We note that the UTC Letter contained excerpts of this portion of the Bundling Guidance. We emphasize that a review of this entire portion is necessary as the otherwise omitted language provides relevant context and information.

Kim Dettelbach, J.D.
Brian Cooney, M.S., P.S.M.
Page 8

It is important to note that the primary focus of the Bundling Guidance is to implement PDUFA's user fee requirement. It is not intended to address patent certification requirements or protect a brand company's right to a 30-month stay. Those rights are explicitly addressed and protected by the MMA statutory and regulatory provisions discussed above. Indeed, the original 1993 version of the Bundling Guidance predates the 2003 MMA revisions to the Hatch-Waxman Act discussed above by nearly a decade, and the 2004 Bundling Guidance predates, and as a result does not expressly address, FDA's 2016 MMA rulemaking, which is relevant to the question at issue here.

Finally, in the Bundling Guidance, FDA describes the appropriate process to rectify inappropriate or mistaken bundling. Specifically, the guidance provides that if "FDA determines that an application has been inappropriately bundled, or that an applicant has incorrectly concluded that an application did not contain clinical data, then FDA will notify the applicant and request additional fees, if appropriate." Bundling Guidance at 2. Significantly, FDA explains that "[t]his action will not prevent the filing of the application if it is otherwise suitable for filing, or its review, if it is otherwise ready for review." Bundling Guidance at 2.

## II.    Factual Background

Liquidia submitted NDA 213005 to FDA pursuant to section 505(b)(2) of the FD&C Act for YUTREPIA™ (treprostinil inhalation powder) Oral Inhalation on January 24, 2020. The YUTREPIA™ NDA referenced TYVASO® (NDA 022387), held by UTC, as the listed drug.

The YUTREPIA™ NDA contained Paragraph IV certifications to the four then-listed Orange Book patents — U.S. Patent Nos. 9,339,507 ("'507 patent"), 9,358,240 ("'240 patent"), 9,593,066 ("'066 patent"), and 9,604,901 ("'901 patent"). UTC filed suit against Liquidia in the United States District Court for the District of Delaware on June 4, 2020 (the "Original Hatch-Waxman Litigation"), alleging infringement of the '066 and '901 patents, and securing a 30-month stay of approval against Liquidia's NDA, such stay expiring on October 24, 2022.[20] Liquidia later submitted a Paragraph IV Certification to U.S. Patent No. 10,716,793 ("'793 patent"), and UTC amended its complaint in the Original Hatch-Waxman Litigation on July 22, 2020 to include alleged infringement of the '793 patent.[21] UTC correctly acknowledges in its Letter that no separate 30-month stay attached to the '793 patent because it was submitted to the Orange Book after the filing of Liquidia's original NDA.[22]

The YUTREPIA™ NDA received tentative approval from FDA on November 4, 2021, for the treatment of pulmonary arterial hypertension (PAH; WHO Group 1) to improve exercise ability in patients with NYHA functional Class II-III symptoms. The YUTREPIA™ NDA received tentative approval, rather than full approval, because of an unexpired 30-month stay resulting from the above-mentioned Original Hatch-Waxman Litigation.

---

[20] *See United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case 1:20-cv-00755-RGA-JLH.
[21] *Id*. at Document 16 (filed July 22, 2020) (D. Del.).
[22] UTC Letter at 4, fn. 5.

Kim Dettelbach, J.D.
Brian Cooney, M.S., P.S.M.
Page 9

Through the Original Hatch-Waxman Litigation, a related IPR proceeding before the U.S. Patent Trial and Appeal Board, and appeals to the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), Liquidia has now invalidated most of the claims of the '066 patent and all of the claims of the '793 patent, and has secured a final judgment of non-infringement directed to the valid claims of the '066 patent and all of the asserted claims of the '901 patent.[23]  Thus, as of the date of UTC's December 29, 2023 letter, none of the '066, '793, nor '901 patents can form a basis for UTC to obtain a new 30-month stay, nor are they patents that can prevent final approval of Liquidia's NDA.

Separately, on March 31, 2021, a supplement to the Tyvaso NDA was approved by FDA for a new indication for the treatment of PH-ILD.  Per the Orange Book, three-year Hatch-Waxman exclusivity related to the PH-ILD indication for TYVASO® expires on March 31, 2024.

On July 24, 2023, Liquidia submitted an amendment to the tentatively approved YUTREPIA™ NDA to add the PH-ILD indication (the "July Amendment"). The July Amendment did not include any data to support the PH-ILD indication. FDA set a PDUFA goal date for the July Amendment of January 24, 2024.

In accordance with the statute and FDA's regulations, the July Amendment contained Paragraph IV certifications with respect to the then-listed Orange Book patents for TYVASO™: the '507, '240, '066, '901, '793 patents and U.S. Patent No. 10,376,525 ("'525 patent"). Liquidia provided UTC with notice of its Paragraph IV certifications on July 24, 2023. In response to Liquidia's Paragraph IV certifications and notice letters with respect to the July Amendment, on September 5, 2023, UTC filed another patent infringement suit in the District of Delaware asserting only the '793 patent against Liquidia (the "New Hatch-Waxman Litigation").[24]  Notably, UTC listed U.S. Patent No. 11,723,887 ("'887 patent") in the Orange Book for TYVASO™ on August 15, 2023, but did not assert the '887 patent against Liquidia in the New Hatch-Waxman Litigation.  Subsequently, on October 16, 2023, Liquidia provided a Paragraph IV notice letter to UTC regarding the '887 patent.

On November 28, 2023, U.S. Patent No. 11,826,327 ("'327 patent") issued to UTC, and on November 30, 2023, UTC amended its complaint in the New Hatch-Waxman Litigation to add allegations of infringement of the '327 patent.[25]  Notably, despite Liquidia's '887 patent Paragraph IV certification, UTC did not assert the '887 patent against Liquidia when it added allegations of infringement of the '327 patent in the New Hatch-Waxman Litigation. Through correspondence and its failure to assert the '887 patent, UTC has confirmed that it does not have a good faith basis to assert the '887 patent against Liquidia.[26]

---

[23] *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Appeal No. 2023-1806, at Document 52 (filed December 20, 2023); *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Appeal Nos. 2022-2217, 2023-1021, at Document 61 (filed July 24, 2023); *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case 1:20-cv-00755-RGA-JLH, at Document 278 (filed January 3, 2022) (D. Del.).
[24] *See United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case 1:23-cv-00975-RGA, at Document 1 (filed September 5, 2023) (D. Del.).
[25] *Id*. at Document 8 (filed November 30, 2024).
[26] *Id*. at Document 12-1, Exhibit 42 (filed January 8, 2024).

On January 22, 2024, UTC voluntarily dismissed its infringement claims directed to the '793 patent from the New Hatch-Waxman Litigation in view of the Federal Circuit's December 20, 2023, opinion and order confirming the invalidity of the '793 patent.[27] As acknowledged by UTC, no additional 30-month stay arose as a consequence of the New Hatch-Waxman Litigation because both the '327 and '793 patents were listed after the filing of Liquidia's original NDA.[28]

On January 23, 2024, FDA provided Liquidia with a copy of the UTC Letter and invited Liquidia to submit a response. One day later, on January 24, 2024, FDA notified Liquidia that it was not going to issue an action letter in time to meet the previously established PDUFA goal date of January 24, 2024. The last remaining exclusivity period protecting TYVASO® expires on March 31, 2024, at which time YUTREPIA™ will be eligible for full approval of all indications.

### III. UTC's Letter Cannot Provide a Basis for Delaying Approval of the Pending 505(b)(2) Application for YUTREPIA™

As an initial matter, Liquidia objects to the unlawful regulatory process that UTC has initiated to raise an 11th hour regulatory obstacle to delay approval of Liquidia's pending 505(b)(2) application for YUTREPIA™. Even though the statute, FDA's regulations, and FDA guidance all required UTC to submit its request via a Citizen Petition, UTC ignored these clear requirements and instead requested FDA to delay approval of Liquidia's 505(b)(2) application via confidential correspondence. UTC cannot seek redress of alleged regulatory violations by FDA via a letter that itself violates the statute and FDA's regulations.

UTC's request is improper because, under the statute, FDA is prohibited from delaying the approval of a pending 505(b)(2) application "because of any request to take any form of action relating to the application" unless: (1) the request is submitted as a Citizen Petition pursuant to FDA's regulations at 21 C.F.R. §§ 10.30 and 10.35; and (2) FDA determines, upon reviewing the petition, "that a delay is necessary to protect the public health." 21 U.S.C. § 355(q)(1)(A). FDA has explained that

> communications with the Agency regarding any issues with the potential to delay the approval of an ANDA, a 505(b)(2) application, or a 351(k) application (regardless of whether the communications are considered to be petitions subject to section 505(q)) are appropriately submitted through the petition process pursuant to § 10.30 or 10.35 rather than as correspondence to the new drug application (NDA), ANDA, 505(b)(2) application, a biologics license application (BLA) submitted under § 351(a) of the PHS Act (42 U.S.C. 262(a)),15 351(k) application, or another process.

FDA, *Guidance for Industry: Citizen Petitions and Petitions for Stay of Action Subject to Section 505(q) of the Federal Food, Drug, and Cosmetic Act*, p. 6 (Sept. 2019) ("505(q) Guidance"); *see*

---

[27] *Id*. at Document 17 (filed January 22, 2024).
[28] UTC Letter at 5.

*also* 21 C.F.R. § 10.45(b) (explaining that a Citizen Petition is required to exhaust administrative remedies).

Congress enacted Section 505(q) specifically to prohibit the type of delay tactic that UTC has engaged in here. For example, to ensure that petitions are submitted in a timely manner, the statute requires petitioners to certify the date on which the information triggering the petition first became known to the petitioner. 21 U.S.C. § 355(q)(1)(H). Here, UTC became aware of the information "triggering" its requested action no later than July 24, 2023, the date upon which Liquidia provided its Paragraph IV notice letter to UTC informing them of the amendment to add the PH-ILD indication. Yet UTC waited more than 5 months, strategically submitting its letter to FDA less than one month before the publicly announced PDUFA action date of January 24, 2024.[29] It is noteworthy that UTC was able to initiate patent infringement litigation on September 5, 2023, but waited nearly four months after that to submit its letter to FDA. By failing to follow proper procedures, UTC avoided providing this certification, thereby obfuscating their delay.

In addition, the statute requires petitioners to certify that the petition "includes representative data and information known to the petitioner which are unfavorable to the petition." *Id*. § 355(q)(1)(H). In this case, as discussed further below, UTC failed to include any mention or discussion of the MMA statutory and regulatory changes that explicitly authorize the submission of the July Amendment and thus that significantly undercut UTC's position. UTC was able to omit this highly relevant but unfavorable information because it submitted a letter rather than a 505(q) petition.

Regardless, the statute prohibits FDA from delaying approval of a pending 505(b)(2) "either before or during consideration of the request" unless FDA determines "that a delay is necessary to protect the public health." *Id*. § 355(q)(1)(A).[30] In this case, even if UTC had submitted a 505(q) petition, delay would nevertheless be unlawful because it is not "necessary to protect the public health." *Id*. FDA has explained that it will analyze this issue by asking whether, if the petitioner's arguments against approval were meritorious, "the presence on the market of drug products that did not meet the requirements for approval identified by the petitioner [could] negatively affect the public health?" 505(q) Guidance at 9. In this case, even if FDA's acceptance of the amendment contravened the Bundling Guidance, as alleged by UTC, the approval and marketing of YUTREPIA™ in no way would "negatively affect the public health," and UTC's letter does not attempt to raise a public health concern.

---

[29] *See* https://www.liquidia.com/news-releases/news-release-details/liquidia-submits-amendment-add-ph-ild-indication-tentatively and https://www.liquidia.com/news-releases/news-release-details/fda-accepts-submission-add-ph-ild-yutrepiatm-label.

[30] If FDA makes such a determination, the Agency must provide the 505(b)(2) applicant with written notice within 30 days, including a brief summary of the basis for the determination and, if applicable, any clarification or additional data the 505(b)(2) applicant should submit to resolve the situation. 21 U.S.C. § 355(q)(1)(B).

Kim Dettelbach, J.D.
Brian Cooney, M.S., P.S.M.
Page 12

### IV. The July Amendment Was Lawfully Submitted Under the Statute and FDA's Regulations

Although UTC contends that the Bundling Guidance controls in this situation, it is mistaken. FDA's current regulations implementing the MMA revisions to the FD&C Act expressly allow the filing of an amendment to add a new indication to an unapproved NDA, including a 505(b)(2) application, so long as the amendment does not include data to support an indication or claim that was not included in the original NDA. Because the July Amendment did not contain any clinical data, it was lawfully and properly submitted as an amendment under FDA's clear and unambiguous regulations.

#### A. The Statute and FDA's Regulations Authorize the July Amendment

As described above, the FD&C Act directly addresses the question of whether a new indication may be submitted to a pending 505(b)(2) NDA via an amendment. Section 505(b)(4)(A) of the FD&C Act (as amended by the MMA) prohibits amending a pending 505(b)(2) NDA to "seek approval of a drug that is a different drug than the drug identified in the application as submitted." 21 U.S.C. § 355(b)(4)(A). Although the statute does not define the term "different drug," FDA's 2016 regulations squarely address this issue. Specifically, 21 C.F.R. §314.60(e) defines a "different drug" for purposes of this statutory provision as a drug that "has been modified to have a different active ingredient, different route of administration, different dosage form, or difference in excipients that requires either a separate clinical study to establish safety or effectiveness or, for topical products, that requires a separate in vivo demonstration of bioequivalence." ***Conspicuously absent from this detailed definition is any mention or reference to the addition of a new indication. Because the addition of a new indication does not constitute a "different drug" under the regulation, both the statute and regulations expressly permit the use of an amendment to add an indication***.

FDA's decision to allow amendments for new indications was not accidental. On the contrary, FDA specifically considered – and rejected – proposals and interpretations that would have considered labeling changes to constitute a "different drug."[31] Instead, FDA considered and expressly agreed that requests for approval of a different indication or condition of use may, at least in some instances, be submitted as an amendment to a 505(b)(2) NDA.[32] In fact, the only circumstance in which such an amendment would not be permitted under FDA regulations would

---

[31] The MMA Proposed Rule reveals that alternatives were considered, but ultimately rejected, by FDA. Specifically, FDA found that: "[t]he narrowest reading of this text would preclude the submission of an amendment or a supplement to a 505(b)(2) application for any change (including labeling changes and manufacturing changes) that would arguably render the proposed product a 'different drug' than the drug identified in the original submission of the application. If labeling changes, for example, could not be made through an amendment or a supplement to a 505(b)(2) application, each such change would require the submission of a separate 505(b)(2) application, with related regulatory and administrative burdens, and user fee and review cycle implications. We did not adopt this reading because it would have resulted in an unwarranted departure from FDA's previous practice for handling such changes." MMA Proposed Rule, 80 Fed. Reg. 6802, 6851.

[32] MMA Final Rule, 81 Fed. Reg. 69580, 69616. FDA provides one example in the preamble relating to a 505(b)(2) applicant seeking approval for a drug product for which the indication is changing from prescription to over-the-counter status, following an analogous change in the approval for the listed drug holder's NDA, which has significant similarities to the indication change submitted in connection with the July Amendment.

Kim Dettelbach, J.D.
Brian Cooney, M.S., P.S.M.
Page 13

be if the sponsor was also submitting new data to support the new indication. *See* 21 C.F.R. §314.60(b)(6). As explained above, the July Amendment contained no new data and thus complied with FDA's regulations.

Because the rulemaking clearly establishes that at the very least some 505(b)(2) amendments seeking to add indications are proper, a strict reading of the Bundling Guidance alone, as UTC has done, to determine whether an amendment to a 505(b)(2) NDA seeking to add an indication is proper is simply no longer reasonable. Though other aspects of the Bundling Guidance may remain consistent with the MMA rulemaking (such as the need for a new NDA for a drug with a different dosage form or when new data is submitted to support a new indication),[33] on this point, there is a clear conflict between an earlier-published guidance and later rulemaking. Consequently, the earlier guidance must give way to the subsequent rulemaking.[34]

There are a number of reasons for this. First, the MMA implementation efforts were rulemaking and not guidance, and a binding rule trumps mere non-binding guidance. Second, the applicable portions of the Bundling Guidance are not supported or bolstered by statutory or regulatory authority cited in the guidance. *See* Bundling Guidance at 1. Third, the MMA rulemaking took place significantly later in time, signifying a more recent interpretation of the agency's authorities by FDA. In other words, the Bundling Guidance is simply not an accurate view of FDA's current policy on point, despite the assertions in the UTC Letter to the contrary.[35] Turning to the MMA rulemaking then for direction, it is clear that the July Amendment was proper and lawful.

In its December 29, 2023, letter, UTC inexplicably fails to discuss, or even mention, the governing statutory and regulatory provisions that authorize the submission of Liquidia's July Amendment. Instead, UTC focuses exclusively on the Bundling Guidance, and its arguments depend entirely on the premise that the Bundling Guidance is a "rule" that can be read alone while ignoring any further regulatory or policy evolution in the intervening nearly two decades. Given the clarity and express scope of the regulations adopted in 2016, the prior Bundling Guidance simply cannot be read to be an accurate description of FDA's current policy on the particular question at issue here. Nonetheless, we address the arguments made in the UTC Letter and explain why they are, in addition to the foregoing, otherwise unpersuasive.

### B. The Bundling Guidance is Not a Binding Rule

The UTC Letter consistently mischaracterizes FDA's Bundling Guidance as the "Bundling Rule" in an apparent attempt to give it a binding authority and status as a "rule" that is greater than its reality. But the Bundling Guidance is not a rule; it is a guidance document. And FDA's longstanding position – enshrined in its actual regulations – is that guidance documents "do not

---

[33] *See, e.*g., MMA Proposed Rule, 80 Fed. Reg. 6802, 6851.

[34] While the UTC letter correctly points out that the MMA rulemaking expressly refers to the Bundling Guidance, it does so only limited instances with respect to amendments, including in connection with 21 C.F.R. §§ 314.60(b)(6), 314.60(e), and 314.60(f)(1).

[35] FDA may wish to consider clarifying its guidance documents as they pertain to the permissibility of submitting an amendment to a pending 505(b)(2) application for a new indication in light of the clear statutory and regulatory language, whether in connection with a revision to the Bundling Guidance or otherwise.

Kim Dettelbach, J.D.
Brian Cooney, M.S., P.S.M.
Page 14

establish legally enforceable rights or responsibilities" and "do not legally bind the public or FDA." 21 C.F.R. § 10.115(c)(3). This or similar language is included in virtually all guidance documents issued by FDA, including the Bundling Guidance, which contains the following statement:

> FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. *The use of the word should in Agency guidances means that something is suggested or recommended, but not required.*

Bundling Guidance, at 1 (emphasis added). As noted above, neither specific regulatory nor specific statutory requirements are cited in support of the relevant portions of the Bundling Guidance and, thus, these portions of the Bundling Guidance, per operation of the document itself, are merely recommendations.

While it is true that the Agency has obligations to consistently and fairly apply its policies, the mere fact that the Agency actually (or even regularly and consistently) applies its policies, standing alone, does not somehow change their character to anything other guidance recommendations from the agency, contrary to the assertions in the UTC Letter.[36] And an agency can satisfy its duty of consistency and fairness by announcing a change in policy (as FDA did in its MMA regulations) and then applying the new policy consistently and fairly. UTC's reliance on case law about consistency and fairness is a misplaced effort to force FDA to adhere to outdated guidance.

      C. <u>UTC's Examples are Inapplicable and Unpersuasive</u>

Moreover, the "litany" of examples[37] provided in the UTC Letter are unpersuasive and inapplicable to the July Amendment. Whether or not the referenced examples may describe situations in which FDA's Bundling Guidance has been applied, they are neither helpful nor instructive with respect to the July Amendment.

As we described above in Section IV.A, the question of whether the July Amendment was properly and lawfully submitted as an amendment must be addressed with reference to FDA's authorities, regulations, and policies as they currently exist and as they apply to the specific facts in question. As a result, and looking to FDA's obligations to treat "like cases alike," relevant examples of agency practice on this question must, at a minimum: (1) reflect decisions made applying the *current* FDA regulations and policies, which must then include the impact of the MMA Final Rule (that is, decisions made after October 6, 2016) because aspects of this rulemaking effort have altered the policy in question; (2) reflect decisions applying the bundling question to an amendment to a 505(b)(2) NDA because the MMA rulemaking altered these policies in specific ways specifically with respect to 505(b)(2) NDAs; and (3) reflect decisions relating to a change of indication (or, at the very least, not relate to types of changes to a product where the MMA

---

[36] *See, e.g.,* UTC Letter at 11.
[37] UTC Letter at 11-15.

Kim Dettelbach, J.D.
Brian Cooney, M.S., P.S.M.
Page 15

rulemaking would dictate a different bundling result, e.g., changes that would constitute "different drugs" as defined by 21 C.F.R. §314.60(e)).

The examples cited in the UTC Letter all fail because they differ from the July Amendment in *at least* one way that makes comparison between the two inapplicable. Specifically, of the six examples provided, (a) two, NDA 021822 (Aptivus (tipranavir) Oral Solution)[38] and NDA 206682 (Dexmedetomidine Hydrochloride Injection)[39] pre-date the MMA Final Rule, and thus were made under a different regulatory framework; (b) three, NDA 210709 (Tekturna (Aliskiren Oral Pellets),[40] NDA 209400 (Omeprazole Delayed-release Orally Disintegrating Tablets),[41] and NDA 208780 (Esbriet (pirdenidone) film-coated tablets),[42] each sought to change the dosage form of the product, which unlike a change to an indication, is expressly prohibited by 21 C.F.R. §314.60(e); and (c) the final example, BLA 761223 (JEMPERLI (dostarlimab-gxly) Injection),[43] concerned a biologics license application (BLA), which is a different application form and type than a 505(b)(2) NDA, and as such inapplicable to the July Amendment and the specific policy applicable here.[44] As a result, these examples are inapplicable and uninstructive to the issues under consideration and do not establish what FDA has previously done in similarly situated situations.

Collectively, UTC has failed to establish that the July Amendment was not properly submitted and accepted by FDA for review in accordance with applicable statutes and FDA regulations.

**V.    UTC is Not Entitled to a New 30-Month Stay Under Any Circumstance**

UTC argues that by allowing Liquidia to amend its NDA 213005 to add PH-ILD as an indication, rather than requiring Liquidia to file an entirely new NDA directed to PH-ILD, UTC was robbed of a 30-month stay of approval to which it is entitled. UTC thus requests that FDA declare Liquidia's July Amendment null and void and require Liquidia to submit a new 505(b)(2) application for the PH-ILD indication, thereby giving UTC another opportunity for a 30-month stay, including with respect to patents submitted to the Orange Book *after* the July Amendment.

---

[38] NDA 021822 was approved on June 23, 2008.  (FDA, NDA Approval Letter, NDA 021822, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2008/021822s000ltr.pdf)

[39] NDA 206628 was approved on October 21, 2015.  (FDA, NDA Approval Letter, NDA 206628, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/206628Orig1s000ltr.pdf.)

[40] NDA 210709 related to a proposal to change the product from a tablet to a capsule.  (FDA, Approval Package, Administrative and Correspondence Documents, NDA 210709 (TEKTURNA), PDF page 60 (Unacceptable For Filing Review Letter) (May 2017), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/210709Orig1s000AdminCorres.pdf.)

[41] NDA 209400 related to a proposal to change the product from a delayed-release tablet to a delayed-release, orally disintegrating tablet. (FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 209400 (Omeprazole Delayed-release Orally Disintegrating Tablets), PDF pages 63-64 (Nov. 2015), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/209400Orig1s000AdminCorres.pdf.)

[42] NDA 208780 related to a proposal to change the product from a capsule to a film-coated tablet.  (FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 208780 (Esbriet), PDF page 76 (May 2015), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/208780Orig1s000AdminCorres.pdf.)

[43] FDA, BLA Accelerated Approval Letter, BLA 761223, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2021/761223Orig1s000ltr.pdf.

[44] 21 C.F.R. §314.60 does not govern BLAs, and the regulations governing BLAs do not have any corollary to 21 C.F.R. §314.60(b)(6), (e), and (f) that would clearly supersede the Bundling Guidance in the BLA context.

Kim Dettelbach, J.D.
Brian Cooney, M.S., P.S.M.
Page 16

There are a number of glaring defects with UTC's request. First, UTC already obtained a 30-month stay against Liquidia's NDA, arising from Liquidia's paragraph IV certifications to the then-listed Orange Book patents for TYVASO[TM] in its *original January 2020 NDA filing*. UTC now seeks a second 30-month stay – a serial stay which the MMA amendments were designed to prevent – and which UTC is not entitled to under any circumstance.

UTC's Letter points to three patents, the '793 patent, the '887 patent, and the '327 patent, all issuing after the filing of Liquidia's original NDA, but which UTC contends could form the basis of an additional 30-month stay against Liquidia's NDA if Liquidia were now required to file a new NDA directed to PH-ILD.[45] UTC relies on a straw man argument, assuming that Liquidia would be required to file a new 505(b)(2) application to add PH-ILD to the label for YUTREPIA[TM] rather than amend or supplement its existing NDA, because it recognizes that controlling statutes, regulations, and FDA practice mandate that it is not entitled to any additional 30-month stay if Liquidia simply amends or supplements its original NDA.

Under no circumstances would Liquidia ever be required to submit a new, original 505(b)(2) NDA to seek approval for the PH-ILD indication for YUTREPIA[TM]. As discussed above, it was proper for Liquidia to amend its NDA to add the PH-ILD indication. However, even if FDA determined that the PH-ILD indication could not be properly added to the label through an amendment, Liquidia could and would simply wait for approval of the YUTREPIA[TM] NDA with just the PAH indication and then add PH-ILD through a supplement. Adding a new indication through a supplement is clearly permitted by FDA regulations.[46] *See* 21 C.F.R. §314.70(b)(2)(v). Indeed, this is precisely the process that UTC used to add PH-ILD to the label for TYVASO®.[47]

Having dispensed with the straw man argument that Liquidia would have had to file a brand new NDA to add PH-ILD to the label for YUTREPIA[TM], the FD&C Act then speaks directly to the application of 30-month stays in the context of an amendment or supplement to an NDA, clearly preventing the imposition of additional 30-month stays in the current circumstance. The statute provides in relevant part that:

> "If the applicant made a certification described in clause (iv) of subsection (b)(2)(A), the approval shall be made effective immediately unless, before the expiration of 45 days after the date on which the notice described in subsection (b)(3) is received, an action is brought for infringement of the patent that is the subject of the certification and for which information was submitted to the Secretary under paragraph (2) or subsection (b)(1) ***before***

---

[45] Although UTC had no right to a 30-month stay with respect to the '887 patent, UTC unequivocally gave up any claims to a 30-month stay with respect to the '887 patent when it failed to assert this patent against Liquidia. UTC had no good faith basis to assert the '887 patent and FDA should disregard UTC's assertions with respect to this patent. The same holds true of the '793 patent, which was invalidated in an IPR, and affirmed by the Federal Circuit in December 2023, thus preventing UTC from obtaining a 30-month stay based on this patent.
[46] It is also notable that even the Bundling Guidance cited by the UTC Letter contemplates the addition of indications through the filing of supplements. *See* Bundling Guidance at 6.
[47] UTC Letter at 3.

> *the date on which the application (excluding an amendment or supplement to the application) was submitted.*"

21 U.S.C. § 355(c)(3)(C) (emphasis added); *see also* 21 C.F.R. §314.107(b)(3).

By expressly excluding the later filing dates of any amendment or supplement to a 505(b)(2) NDA application, the statute makes clear that the operative date for determining the availability of a 30-month stay is the filing date of the original NDA – here January 24, 2020. Specifically, only those patents for which information was submitted to the Orange Book prior to the filing date of the original application can form the basis of the 30-month stay. Patents issued and submitted to the Orange Book after the filing of the original NDA, even if before the filing of the NDA amendment or supplement, cannot form the basis of a 30-month stay with respect to the application.

In the MMA Final Rule, FDA indicates when another 30-month stay of approval may be available in this type of situation. 81 Fed. Reg. 69580, 69616 (Response 39). FDA "recognize[s] that a 30-month stay of approval may result from the initiation of a patent infringement action in response to a second notice of paragraph IV certification that is provided with an amendment to a 505(b)(2) application. . . ." *Id*. But FDA clarified that an additional 30-month stay "may occur if the patent at issue in the infringement action was *listed before the date of submission of the original 505(b)(2) application*. . . ." *Id*. (emphasis added). Here, the '793, '887, and '327 patents all issued and were listed after the date of submission of Liquidia's original 505(b)(2) application on January 24, 2020, and therefore none of these patents can form the basis of a 30-month stay as to Liquidia's NDA even if it is subsequently amended or supplemented. Accordingly, UTC has not been and will not be deprived of any statutory 30-month stay because under operative statutes, regulations and FDA's implementation of such, UTC is not entitled to a 30-month stay with respect to the '793, '887 and '327 patents regardless of whether PH-ILD is added to the label for YUTREPIA™ through an amendment or a supplement.

Seeking to delay approval of Liquidia's 505(b)(2) application and recognizing that neither an amendment nor supplement to Liquidia's NDA would provide UTC with the opportunity to secure a serial 30-month stay of approval, UTC is forced to take the untenable position that FDA should have required Liquidia to submit a new original 505(b)(2) application directed to PH-ILD. To be clear: UTC's position is premised on its assumption that Liquidia would have filed a new NDA directed to PH-ILD only *after* the '887 and '327 patents had issued and been listed in the Orange Book for TYVASO™. For the reasons already discussed, Liquidia's amendment to its NDA was procedurally proper. Regardless, and contrary to the underlying premise of UTC's Letter, even if the amendment was determined to be improper, Liquidia would never be required to file a new NDA for PH-ILD. It would simply file a supplement after the original NDA is approved. Therefore, there is no circumstance in which UTC has been deprived of an additional 30-month stay.

For all these reasons, the fact that FDA permitted Liquidia to amend its NDA to include an additional indication for PH-ILD did not in any way violate "UTC's Hatch Waxman Amendment

Kim Dettelbach, J.D.
Brian Cooney, M.S., P.S.M.
Page 18

rights" to a serial 30-month stay or regulatory approval.[48] Liquidia's amendment was proper under both controlling statutory and regulatory authority and there is no circumstance under which UTC would have otherwise had a right to another 30-month stay of approval for Liquidia's NDA. Further, UTC has not been harmed or deprived of a serial 30-month stay of FDA approval even if Liquidia had to file a supplement directed to PH-ILD. Accordingly, even under the scenario posited by UTC where the amendment to add PH-ILD was improper, it is not entitled to a serial 30-month stay of FDA approval of Liquidia's NDA.

The second glaring defect with UTC's request is that it is inconsistent with the Bundling Guidance itself, the sole source of UTC's alleged right to another 30-month stay. Under the Bundling Guidance, if an application has been "inappropriately bundled," this "will not prevent the filing of the application … or its review." Bundling Guidance, p. 2. In other words, even if UTC is correct that FDA allowed the July Amendment to be "inappropriately bundled" with the original 505(b)(2) application, the solution is not to declare the amendment "null and void" or to require the submission, now, of a new 505(b)(2) application. On the contrary, the Bundling Guidance expressly provides that FDA should continue to "review" the application (and, presumably, approve it if appropriate).

Indeed, FDA has adopted a policy of administratively separating a single application into multiple NDAs if, during the course of the review, it determines that the application was inappropriately bundled.[49] We are aware of at least two precedents (and expect there may be many more) where FDA has administratively separated an application that was determined to be inappropriately bundled but nevertheless continued to review it without interruption. In the case of EMLA® (lidocaine/prilocaine) Anesthetic Disc (NDA 020962), FDA reclassified a supplement to the original NDA as a separate new NDA without requiring rescission and the submission of a new NDA.[50] Likewise, FDA reclassified a supplement for Gonal-F (follitropin alfa) (NDA 021765) as a new NDA based on a determination that it had been inappropriately bundled under the 1993 version of the Bundling Guidance.[51] As with EMLA, FDA did not require rescission of the supplemental application or the submission of a new NDA. Moreover, in both cases, it appears that FDA considered the submission date of the administratively converted NDAs to be the submission date of the original supplement. As such, even under the Bundling Guidance, if FDA were to administratively convert the July Amendment to a new 505(b)(2) NDA, the submission date would remain July 24, 2023, which is **before** the '887 and '327 patents even issued, let alone were listed in the Orange Book.

It is not surprising that the Bundling Guidance does not require rescission and resubmission of an NDA, as urged by UTC, because it was drafted for purposes of implementing PDUFA's user fee provisions, which sought to speed the review and approval of new drug products. Imposing artificial and unnecessary roadblocks on this process based on technical disagreements and/or

---

[48] UTC Letter at 17.
[49] *See, e.g.*, FDA, Manual of Policies and Procedures 6050.1 Rev. 2, p. 4 (Dec. 3, 2021) (Exhibit 3).
[50] FDA Approval Letter for EMLA Anesthetic Disc, p. 1 (Feb. 4, 1988) (Exhibit 4), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/98/20962.pdf.
[51] Medical Reviews for Gonal-F (NDA 21-765), p. 5 (March 4, 2004) (Exhibit 5), *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2004/021765s000_MedR.pdf.

mistakes would be antithetical to the spirit and purpose of the PDUFA legislation. Thus, even if the Bundling Guidance controls, there is no basis for FDA to declare the July Amendment null and void or require the submission of a separate 505(b)(2) application. Consequently, even applying the remedies provided for in the Bundling Guidance, UTC is not eligible for another 30-month stay.

## VI. Conclusion

In summary, Liquidia's July Amendment has been and remains properly submitted, received, subject to review, and ultimately approvable as an amendment to the YUTREPIA$^{TM}$ NDA. Application of FDA's current bundling policies, specifically as they pertain to amendments to 505(b)(2) NDAs to add a new indication where no additional data is being submitted to support that indication, permit such change to be submitted to FDA in the form of an amendment and do not require a submission of a separate NDA. Further, UTC was not, and is not, entitled to a serial 30-month stay of FDA approval of Liquidia's NDA and has suffered no harm from FDA's acceptance of the July Amendment. Liquidia, on the other hand, will be irreparably harmed if FDA changes course. The demands of the UTC Letter are unwarranted and, in fact, deciding otherwise would be a violation of FDA regulation and policy and a denial of Liquidia's rights with respect to the YUTREPIA$^{TM}$ NDA, including the July Amendment.

Thank you for your time and consideration of this matter. Please do not hesitate to contact me directly at 202-320-4250 or scott@lassmanfdalaw.com if you have any questions.

Sincerely,

Scott M. Lassman
Counsel to Liquidia Technologies, Inc

Exhibits