# EXHIBIT 4

Civil Action No. 1:24-cv-484-JDB

LAW OFFICES
## Hyman, Phelps & McNamara, P.C.

700 THIRTEENTH STREET, N.W.

SUITE 1200

WASHINGTON, D.C. 20005-5929

(202) 737-5600

FACSIMILE
(202) 737-9329

www.hpm.com

KURT R. KARST
MICHAEL D. SHUMSKY
SARA W. KOBLITZ

Direct Dial (202) 737-7544

February 12, 2024

**SUBMITTED BY EMAIL**

*CONFIDENTIAL TREATMENT
REQUESTED PER 21 C.F.R. § 20.61*

| | |
|---|---|
| Kim Dettelbach, Esq. | Brian Cooney, MS, PSM |
| Assistant Deputy Chief Counsel | Regulatory Health Project Manager |
| Office of the Chief Counsel | Cardiology and Nephrology |
| U.S. Food and Drug Administration | Division of Regulatory Operations for |
| 10903 New Hampshire Avenue |     Cardiology, Hematology, |
| White Oak Building 1 |     Endocrinology, & Nephrology |
| Silver Spring, Maryland 20993-0002 | Center for Drug Evaluation and Research |
| | U.S. Food and Drug Administration |
| Email: Kim.Dettelbach@fda.hhs.gov | 10903 New Hampshire Avenue |
| | Silver Spring, Maryland 20993-0002 |
| | |
| | Email: brian.cooney@fda.hhs.gov |

**Re: NDA 213005 – YUTREPIA (Treprostinil) Inhalation Powder
Response to February 2, 2024 Letter from Liquidia Technologies, Inc.**

Dear Ms. Dettelbach and Mr. Cooney:

On behalf of our client, United Therapeutics Corporation ("UTC"), we write in response to the letter dated February 2, 2024 from Liquidia Technologies, Inc. ("Liquidia") pertaining to its pending New Drug Application ("NDA") 213005 ("the YUTREPIA 505(b)(2) NDA") submitted pursuant to section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("FDC Act") and referencing UTC's TYVASO® (treprostinil) inhalation powder approved under NDA 022387. Ltr. from S. Lassman re Liquidia (Feb. 2, 2024) ("Liquidia Ltr.").

As UTC's December 29, 2023 letter explained, the U.S. Food and Drug Administration ("FDA" or "the Agency") erred in accepting Liquidia's attempt to amend its pending 505(b)(2) NDA because that course of action is foreclosed by FDA's

ACTIVE/127690147.3

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
February 12, 2024  
Page 2

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

longstanding, consistently applied, and never-previously-challenged Bundling Rule. Ltr. from K. Karst re Liquidia (Dec. 29, 2023) ("UTC Ltr."). Accordingly, the UTC Letter requested that FDA comply with its Bundling Rule and past precedents by withdrawing—or directing Liquidia to withdraw—the YUTREPIA 505(b)(2) NDA amendment and requiring a new NDA submission.

Liquidia's letter provides no persuasive reason why this request should not be granted. Although it claims that the Bundling Rule is outdated and was superseded by rulemaking, the very same rulemaking materials cited in the Liquidia Letter expressly provide that FDA's Bundling Rule remains in full force and effect. Indeed, while the Liquidia Letter paints a picture of a new regulatory scheme permitting the addition of new indications to pending NDAs by way of amendment, that "new" regulatory scheme makes clear that the Bundling Rule remains very much in effect. With its convoluted explanation of FDA's Medicare Modernization Act of 2003 ("MMA") rulemakings, Liquidia encourages FDA to ignore more than 30 years of clear policy—policy directly cited in the very preambles enacting the rulemaking Liquidia relies upon—in a blatant attempt to circumvent both FDA's longstanding Bundling Rule and the 30-month stay provisions Congress enacted in order to provide for an orderly resolution of patent disputes prior to the approval of pending 505(b)(2) NDAs and Abbreviated New Drug Applications ("ANDAs").

Given the misleading nature of the Liquidia Letter and the continued relevance of the Bundling Rule, UTC reiterates that Liquidia wrongly submitted, and that FDA erred in accepting, Liquidia's amendment adding a new indication to its YUTREPIA 505(b)(2) NDA. For that reason, UTC continues to request that FDA require Liquidia to submit a new 505(b)(2) NDA to request approval of a new indication; certify to the patent information listed in FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* ("Orange Book") as of the submission of that new NDA for any listed drug relied on for approval; and stay the approval of any new YUTREPIA 505(b)(2) NDA if there is timely filed patent infringement litigation in response to a notice of Paragraph IV certification to Orange Book-listed patent information.

### I.   BACKGROUND

#### A.   Legal Background

The Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act" or "Hatch-Waxman"), Pub. L. No. 98-417, 98 Stat. 1585, amended the FDC Act to remove barriers to entry, increase availability of drugs, and reduce prescription

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
February 12, 2024  
Page 3

H<small>YMAN</small>, P<small>HELPS</small> & M<small>C</small>N<small>AMARA</small>, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

costs. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). In so doing, the Hatch-Waxman Act established an abbreviated pathway to market for drug products, including both duplicates and follow-on products, by allowing applicants to rely on FDA's findings of safety and effectiveness for other drug products—"listed drugs"—as the basis of approval. 21 U.S.C. § 355(j), (b)(2). Applicants submit either an ANDA or a 505(b)(2) NDA referencing a drug listed in the Orange Book with data "bridging" the proposed drug to the listed drug so that the applicant need not duplicate the extensive testing performed by the listed drug sponsor for approval. *Id.* This process allows more affordable drugs to come to market more quickly than if full studies for safety and effectiveness were required.

At the same time, however, the Hatch-Waxman Act recognized that many listed drugs are protected by valuable patents, and thus struck a balance between expediting follow-on product entry and respecting innovators' patent rights. To that end, Hatch-Waxman requires an NDA sponsor to file with FDA "the patent number and the expiration date of any patent which claims the drug . . . and with respect to which a claim of patent infringement could reasonably be asserted [against a competitor]," 21 U.S.C. § 355(b)(1); *see also* 21 C.F.R. § 314.50(h), and obligates FDA to "publish" and "make available to the public" a list of the patent data NDA holders have submitted to the Agency. 21 U.S.C. § 355(j)(7)(A)(i); *see also id.* § 355(c)(2). FDA publishes this patent information in the Orange Book. *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 880 (D.C. Cir. 2004).

To speed the resolution of patent disputes between brands and follow-on sponsors so that competition can start as soon as the law permits, Congress required each ANDA or 505(b)(2) NDA relying on a listed drug to include "a certification . . . with respect to each [Orange Book-listed] patent which claims the listed drug . . . or . . . a use for such listed drug." 21 U.S.C. § 355(j)(2)(A)(vii); *see also* 21 C.F.R. § 314.53(f). Several patent certification types are available. *See* 21 U.S.C. § 355(j)(2)(A)(vii).

Paragraph IV certifications are particularly integral to the statutory and regulatory scheme. To help follow-on sponsors obtain certainty about a listed patent's coverage without subjecting them to the *in terrorem* threat of massive damages, the Patent Act deemed an applicant's submission of a Paragraph IV certification to FDA to be a "highly artificial" act of patent infringement that immediately can be litigated without subjecting the follow-on applicant to damages. 35 U.S.C. § 271(e); *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990) ("Quite obviously, the purpose of [35 U.S.C. § 271](e)(2) and (e)(4) is to enable the judicial adjudication upon which the ANDA and paper NDA schemes depend."). Where an applicant submits a Paragraph IV certification in its original 505(b)(2) NDA, such notice must be provided "not later than 20 days after the date … [on]

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
February 12, 2024  
Page 4

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

which [FDA] informs the applicant that the application has been filed.  *Id.* § 355(b)(3)(B)(i).

Because the whole point of Hatch-Waxman's patent-submission, patent-listing, Paragraph IV certification, and Paragraph IV notice provisions is to resolve patent disputes before FDA approval, the statute incentivizes brand manufacturers to sue as soon as they receive the legally-required notice.  When the brand manufacturer sues within 45 days of receiving the legally-required notice, FDA may not approve the follow-on application until 30 months after the brand manufacturer receives the legally-required notice. 21 U.S.C. § 355(c)(3)(C).  This 30-month stay permits the innovator and follow-on manufacturer to litigate all relevant patents prior to approval and market entry of the follow-on product.  *Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 557 F.3d 1346, 1348-49 (Fed. Cir. 2009).  A 30-month stay is available only with respect to patent information submitted to FDA before the date a 505(b)(2) NDA is submitted to the Agency, and typically only a single 30-month stay is available for each 505(b)(2) NDA containing a Paragraph IV certification.  Ltr. to Gerald Masoudi, Docket No. FDA-2010-P-0223, at 5  (Oct. 19, 2010).

During the 30-month stay, FDA reviews the follow-on application.  While a pending follow-on application may be amended during that review—or supplemented after approval—there are limits to such submissions.  Specifically, the FDC Act states that "[a]n applicant may not amend or supplement an application . . . to seek approval of a drug that is a different drug that the drug identified in the application as submitted to the Secretary." 21 U.S.C. § 355(b)(4)(A).  FDA has interpreted this provision to prohibit "an applicant from amending or supplementing a 505(b)(2) application to seek approval of a drug that has been modified to have a *different active ingredient, different route of administration, different dosage form, or certain differences in excipients* than the drug proposed in the original submission of the 505(b)(2) application," which "conforms with FDA's current policy regarding the types of proposed changes to a drug product that should be submitted as a separate application (see guidance for industry on 'Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees'  (December 2004) [the '2004 Bundling Rule']." Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg. 69580, 69635 (Oct. 6, 2016) (emphasis added).  Conversely, the statute expressly permits the submission of an amendment or supplement to a pending NDA to seek approval for *a different strength*. 21 U.S.C. § 355(b)(4)(B).

No such permission is granted for a change in indication.  Absent direction from Congress on the addition of a new indication to a pending 505(b)(2) NDA, FDA has interpreted its regulations such that "[m]ost requests for approval of a different indication or condition of use by a 505(b)(2) applicant should *not* be made as an amendment to the

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
February 12, 2024  
Page 5

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

505(b)(2) application," in accordance with the 2004 Bundling Rule. The 2004 Bundling Rule sets forth FDA's clear requirements for "what will be considered a separate marketing application." 2004 Bundling Rule, at 1. As explained in UTC's December 2023 letter, the Bundling Rule states:

> If submitted simultaneously in one application, requests for approval of different indications and uses for the same dosage form to be administered by the same route of administration . . . can be regarded, for the purposes of assessing user fees, as one application. . . . *After initial submission, a pending original or supplemental application should not be amended to add a new indication or claim*. . . . If the original application is not yet approved, *a request for approval of other new indications or claims should be submitted in a separate, original application*. If the initial application is approved, the application can be subsequently supplemented to add a new indication.

*Id.* at 4-5 (emphasis added). This Bundling Rule continues to be cited by the Agency in various documents, including, most recently, in a Standard Operating Procedures and Policies ("SOPP") publication dated *January 2024*. SOPP 8401 Administrative Processing of Original Biologics License Applications (BLA) and New Drug Applications (NDA), at 12 (Jan. 8, 2024) ("In limited circumstances, an applicant may submit two BLAs/NDAs for the same product that are concurrently reviewed as stand-alone applications with separate [Submission Tracking Numbers ('STNs')]. This occurs when an applicant has a pending BLA/NDA and seeks approval for another reason (for example a different indication or dosage) for the same product (refer to the [2004 Bundling Rule]")). Liquidia did not do this in their current application.

  **B.**  **Factual Background**

As UTC's December 2023 letter explained, UTC is the holder of five NDAs for drug products containing treprostinil, including TYVASO® (treprostinil) Inhalation Solution, 0.6 mg/mL, approved under NDA 022387. FDA initially approved TYVASO on July 30, 2009 for the treatment of Pulmonary Arterial Hypertension (WHO Group I) in patients with NYHA Class III symptoms, to increase walk distance (the "PAH Indication"). On March 31, 2021, FDA approved Supplement S-017 to the TYVASO NDA for a new indication: "for the treatment of pulmonary hypertension associated with interstitial lung disease (PH-ILD; WHO Group 3) to improve exercise ability" (the "PH-ILD Indication").

In January 2020, Liquidia submitted a 505(b)(2) NDA seeking approval of YUTREPIA (treprostinil) for the PAH Indication relying on UTC's TYVASO as the listed

drug. Liquidia's YUTREPIA 505(b)(2) NDA contained Paragraph IV certifications to some of the then-listed Orange Book patents for TYVASO, including, in particular, U.S. Patent Nos. 9,593,066 ("the '066 patent") and 9,604,901 ("the '901 patent"). UTC timely sued Liquidia for patent infringement, thereby triggering a 30-month stay on the approval of the YUTREPIA 505(b)(2) NDA that expired on or about October 24, 2022. Liquidia later amended its 505(b)(2) NDA and provided a Paragraph IV certification to a later-listed patent, U.S. Patent No. 10,716,793 ("the '793 patent"), but because that patent was later-listed, the Paragraph IV certification did not result in a 30-month stay. In May 2021, Liquidia responded to a Complete Response Letter ("CRL") from FDA resulting in an amendment to the YUTREPIA 505(b)(2) NDA and additional patent certifications. FDA tentatively approved the YUTREPIA 505(b)(2) NDA for the treatment of PAH, but, due to an ongoing 30-month stay, FDA could not grant final approval for the Liquidia 505(b)(2) NDA.

During the pendency of the 30-month stay for the PAH indication, UTC received approval of the new PH-ILD indication. Supplement Approval, NDA 22387/s-017 (Mar. 31, 2021). In July 2023, Liquidia—fully aware of FDA's Bundling Rule—decided to amend the YUTREPIA 505(b)(2) NDA instead of submitting a new 505(b)(2) NDA to add the PH-ILD indication. In that amendment, Liquidia certified to the Orange Book patent information for TYVASO, and UTC timely sued Liquidia for patent infringement, but the subsequent litigation on the patents covering the new indication—the '793 patent, and U.S. Patent No. 11,826,327 ("the '327 patent")—did not trigger a 30-month stay because those patents were added to the Orange Book for TYVASO after the January 20, 2020 submission of the original YUTREPIA 505(b)(2) NDA. According to the Liquidia Letter, the amendment contained no additional data.

FDA assigned the July 2023 amendment a goal date of January 2024—6 months after submission. In January 2024, however, FDA notified Liquidia that it was not going to issue an action letter in time to meet the . . . PDUFA goal date of January 24, 2024." Liquidia Ltr. at 10.

## II.   LIQUIDIA'S AMENDMENT MUST BE WITHDRAWN

Liquidia misleadingly suggests that UTC is manipulating the regulatory process to thwart competition, but the real issue here is that Liquidia failed to comply with longstanding, repeatedly applied, and recently reaffirmed FDA requirements (and FDA erred in failing to apply them). FDA's Bundling Rule is clear: a new NDA must be submitted to add a new indication to a pending NDA. Liquidia's attempts to circumvent those requirements by framing FDA's longstanding Bundling Rule as a "recommendation"

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
February 12, 2024  
Page 7

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

and outdated "policy" is unpersuasive. FDA cannot condone Liquidia's disregard of FDA's requirements and thereby allow Liquidia to deprive UTC of its statutorily-enabled right to enforce its intellectual property prior to the market entry of a flood of potentially infringing product.

Liquidia takes the position that FDA's 2016 final rule implementing the MMA ("2016 MMA Final Rule") obviates the Bundling Rule, but FDA repeatedly and consistently has emphasized its continued applicability, including when FDA promulgated the very regulations Liquidia claims to have superseded the Bundling Rule. *See, e.g.*, 81 Fed. Reg. at 69616, 69635 ("This final requirement conforms with FDA's current policy regarding the types of proposed changes to a drug product that should be submitted as a separate application (see guidance for industry on [the Bundling Rule] (December 2004). . ."). Contrary to Liquidia's position, nothing in FDA regulations expressly permits the addition of a new indication to a pending 505(b)(2) NDA, and the one regulation which arguably implies such an amendment might be permissible is applicable only in limited circumstances, such as prescription to over-the-counter switches ("RX-to-OTC"). *See* 81 Fed. Reg. at 69616 ("[W]e expect there would be limited circumstances in which [21 C.F.R. § 314.60(f)(1)] would apply to a 505(b)(2) application."). Liquidia fails to address FDA's explicit re-affirmation of the Bundling Rule's ongoing vitality in the very rulemaking proceeding that Liquidia now claims to have overturned decades of uninterrupted and consistently applied Agency rules.

In short, Liquidia—which appears to be represented by experienced FDA counsel in this matter—knew or should have known that a new 505(b)(2) NDA was required to seek approval of a new indication for YUTREPIA; the preamble to the "superseding" rules is clear. But Liquidia chose not to do so. Rather than administrative bifurcation or continuing review of the improperly filed amendment—the implied solutions suggested in the Liquidia Letter—FDA must withdraw the PH-ILD indication supplement and require Liquidia to submit a new NDA so that UTC can do exactly what Congress intended: File suit in order to litigate patents that are specifically related to the new PH-ILD indication before FDA barrels forward with an approval of the pending amendment for that indication. Any other interpretation would be contrary to the text and structure of the Hatch Waxman Act, FDA's longstanding Bundling Rule, and decades of uninterrupted FDA practice in materially indistinguishable cases.

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
February 12, 2024  
Page 8

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

    **A.**    **UTC's Letter Submission Was Proper**

At the outset, UTC disagrees with Liquidia's insistence that UTC's December 2023 letter should have been submitted to FDA as a citizen petition. UTC's December 2023 letter was properly submitted to FDA and shared with Liquidia at FDA's request.

Liquidia begins its assault on UTC's letter submission by noting that it "was submitted as a 'confidential' letter to FDA" rather than as a citizen petition, but in the same breath Liquidia accepts FDA's offer to participate in FDA's letter exchange process and likewise identifies its submission as "confidential." Liquidia Ltr. at 1, n.2. FDA's letter submission and exchange process is well-established in circumstances like those here, where a company wishes to raise with FDA a discrete, application-specific issue that is likely to lead to litigation with the Agency. Indeed, Liquidia's counsel has used the FDA letter submission process to do just that. *E.g.*, Letter from Scott M. Lassman to Grail Sipes dated Dec. 5, 2017, and Letter from Scott M. Lassman to Grail Sipes dated July 23, 2018, *Braeburn Inc. v. FDA*, No. 1:19-cv-00982 (D.D.C.), ECF Nos. 7-5 and 7-6 (Apr. 9, 2019); *see* ECF No. 7-5, at 2 (providing a "detailed legal analysis and position explaining why any exclusivity awarded to SUBLOCADE must be interpreted narrowly and in a manner that does not block approval of CAM2038 or any of its proposed conditions of use.").

In this case, UTC's counsel, in submitting the UTC Letter to FDA on December 29, 2023, requested an urgent call with FDA to discuss the letter submission and a path forward. Email from K. Karst, Counsel to UTC, to Kim Dettelbach, Office of Chief Counsel, FDA (Dec. 29, 2023) ("In an effort to avoid litigation over this matter, UTC requests a meeting with FDA's Office of Chief Counsel and other appropriate FDA representatives to discuss resolution of the matter. To that end, perhaps we can connect early next week after the holiday to schedule a meeting."). FDA responded and offered to speak with UTC's counsel on January 18, 2024. During the scheduled January 18, 2024 teleconference with FDA's Office of Chief Counsel, UTC's counsel asked FDA how it would like to proceed in seeking to resolve the discrete issue raised in the December 29, 2023 letter submission (and for the avoidance of doubt, UTC promptly would have agreed to submit a citizen petition to the Agency if FDA had asked it do so). Yet rather than asking UTC to withdraw its correspondence and re-file it as a citizen petition, FDA instead asked UTC for permission to share a copy of the December 29, 2023 submission with Liquidia. And UTC promptly agreed to participate in the Agency-requested process. In an email sent the same day as the FDA-UTC teleconference, UTC informed the Agency: "As to your question about sharing the December 29, 2023 correspondence, we discussed and would agree to such an arrangement provided Liquidia agrees to share any response with [UTC]. Please let us know if you decide to go down this road, and prior to sharing our

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
February 12, 2024  
Page 9

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

December letter." Email from K. Karst, Counsel to UTC, to Kim Dettelbach, Office of Chief Counsel, FDA (Jan. 18, 2024).

Liquidia itself did not appear to raise any concerns about the process FDA proposed; to the contrary, it appears to have agreed that the process was appropriate. After all, on January 23, 2024, FDA informed UTC counsel not only that the Agency intended to share the December 29, 2023 letter with Liquidia, but also that Liquidia had agreed to share any response with UTC. Email from Kim Dettelbach, Office of Chief Counsel, FDA, to K. Karst, Counsel to UTC (Jan. 23, 2024) ("FDA plans to share your Dec. 29, 2023 correspondence with Liquidia. Liquidia has agreed to share any response with UTC."). Given FDA's choice to proceed with a traditional letter exchange, and Liquidia's own agreement to participate in that process, its contention that UTC somehow engaged in an "unlawful regulatory process" rings hollow. Liquidia Ltr. at 10. In this case, FDA decided that the best path forward to resolve the issue presented was to initiate the well-established letter exchange process; Liquidia agreed to participate in it. That should be the end of this sideshow.

### B. FDA Clearly Requires a New NDA for the Addition of a New Indication

On the merits, Liquidia argues that submission of a new NDA should not be required for its attempt to seek approval for a new indication because the Bundling Rule "has been superseded in relevant part by both the [FDC Act] and FDA's regulations." Liquidia Ltr. at 2. But that simply is not true. FDA, as recently as January 2024, made clear that the Bundling Rule remains in full force and effect. *See, e.g.*, SOPP 8401 Administrative Processing of Original Biologics License Applications (BLA) and New Drug Applications (NDA), at 12 (Jan. 8, 2024) ("In limited circumstances, an applicant may submit two BLAs/NDAs for the same product that are concurrently reviewed as stand-alone applications with separate STNs. This occurs when an applicant has a pending BLA/NDA and seeks approval for another reason (for example a different indication or dosage) for the same product (refer to the Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees) [*i.e.*, 2004 Bundling Rule]")). And indeed, the very rulemaking proceedings that allegedly "supersede[d]" the Bundling Rule expressly direct industry to the Bundling Rule to support the premise that "[m]ost requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to the 505(b)(2) application." 81 Fed. Reg. at 69616.

Liquidia does not contest the substance of the Bundling Rule; nor could it, as the Bundling Rule unambiguously states that "[i]f the original application is not yet approved,

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 10

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information
Exempt from Disclosure*

a request for approval of other new indications or claims should be submitted in a separate, original application." 2004 Bundling Rule, at 4-5. Instead, Liquidia dismisses it as relevant only to user fees. Liquidia Ltr. at 7. While indeed the 2004 Bundling Rule was issued to establish when new applications are required for purposes of user fees, that history is irrelevant. That the Bundling Rule was developed for user-fee purposes does not negate its substantive import: That a new NDA (with a new NDA user fee) is required in order to seek a new indication.[1] 2004 Bundling Rule, at 4-5. Notwithstanding Liquidia's unsupported protests, the Bundling Rule reflects FDA's *current* interpretation of the governing statute and regulations.

Nor does the 2004 Bundling Rule stand alone. The FDC Act itself and the accompanying legislative history support the Bundling Rule. As Liquidia points out, FDC Act § 505(b)(4) precludes a pending 505(b)(2) NDA—which includes a tentatively approved 505(b)(2) NDA—from seeking "approval of a drug that is a different drug than the drug identified in the application as submitted" but "does not define the term 'different drug.'" Liquidia Ltr. at 12. Yet the very next provision of the statute expressly permits the submission of an amendment "to seek approval of a different strength." 21 U.S.C. § 355(b)(4)(b). It contains no comparable authorization for applicants to add new indications, and there is accordingly no reason to read into the statute a requirement that would abrogate the Bundling Rule and compel FDA to accept amendments to pending 505(b)(2) applications adding new indications. As the courts repeatedly have made clear, the inclusion of one specific permission is the exclusion of another. *See, e.g.*, *Jennings v. Rodriguez,* 583 U.S. 281, 300 (2018) ("That express exception to detention implies that there are no *other* circumstances under which aliens detained under §1225(b) may be released" (citing A. Scalia & B. Garner, Reading Law 107 (2012) ("Negative-Implication Canon: The expression of one thing implies the exclusion of others (*expressio unius est exclusio alterius*)")).

In the context of this case, that isn't just a background canon of statutory interpretation; its applicability is sharply underscored by the legislative history accompanying FDC Act § 505(b)(4). Indeed, the legislative history expressly indicates that the "different drug provision" was not intended to upend the Agency's longstanding Bundling Rule:

---

[1] As noted in both the UTC Letter and the Liquidia Letter, the Bundling Rule was first promulgated in 1993 and then revised in 2004 to its current form. UTC Ltr. at 10, n.27; Liquidia Ltr. at 7.

Kim Dettelbach, Esq.  HYMAN, PHELPS & MCNAMARA, P.C.
Brian Cooney, MS, PSM
February 12, 2024                                                *Contains Confidential Information*
Page 11                                                          *Exempt from Disclosure*

> Congress d[id] not intend this provision to alter current [FDA's] practice regarding acceptance of supplements to approved new drug applications ("NDAs"), or amendments and supplements to pending and approved abbreviated new drug applications ("ANDAs"). Instead, Congress intend[ed] this provision to reflect the FDA's current practice regarding those changes and variations to both innovator and generic drugs that may be approved under amendments . . . ."

H.R. Rep. No. 108-891, at 835 (2003). Thus, that silence was intended to maintain the FDA's 1993 Bundling Rule.

Rather than giving blanket permission to submit an amendment for a new indication to a pending 505(b)(2) NDA, FDA rulemakings implementing the statute prove that the 2004 Bundling Rule remains applicable. Indeed, each of these documents unambiguously directs applicants to the Bundling Rule for questions as to whether a new 505(b)(2) NDA must be submitted. In the 2015 notice of proposed rulemaking for FDA's implementation of the MMA ("2015 NPRM"), FDA makes no fewer than *five* references to the 2004 Bundling Rule, and the 2016 MMA Final Rule preamble references it twice.[2] All of the instances provide direction from the Agency to consult the Bundling Rule precisely because the Agency *expects* industry to consult and rely on the Bundling Rule to determine whether a new NDA is required. The idea that the 2004 Bundling Rule has been superseded by these rulemakings is simply preposterous.

Despite the clear meaning of the statute in light of settled norms of statutory interpretation and the direction from FDA in its rulemakings, Liquidia argues that FDA regulations nonetheless permit the addition of a new indication in an amendment to its 505(b)(2) NDA. Liquidia is wrong.

Pointing to FDA's definition of a "different drug"—which, statutorily, cannot be included in an amendment to a 505(b)(2)—in 21 C.F.R. § 314.60(e), Liquidia argues that FDA did not intend to preclude the filing of an amendment for a new indication. Liquidia Ltr. at 12. This is because, as Liquidia explains, FDA defined "different drug" only as one that "has been modified to have a different active ingredient, different route of administration, different dosage form, or difference in excipients that requires either a separate clinical study to establish safety or effectiveness or, for topical products, that requires a separate in vivo demonstration of bioequivalence." 21 C.F.R. § 314.60(e).

---

[2]  *See* 80 Fed. Reg. at 6823, 6849, 6850, 6851, and 6874; *see also* 81 Fed. Reg. at 69616, 69635.

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 12

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

These, according to Liquidia, are the only types of changes to a 505(b)(2) that cannot be submitted in an amendment.  Liquidia Ltr. at 12.  This argument, however, ignores the final sentence of that provision, which states: "*However, notwithstanding the limitation described in this paragraph (e), an applicant may amend the 505(b)(2) application to seek approval of a different strength.*"  21 C.F.R. § 314.60(e) (emphasis added).  That sentence provides an express authorization for a different strength to be submitted in an amendment but says *nothing* about a new indication; if FDA had intended to authorize the addition of new indication through an amendment, it just as easily could have said that.  Applying Liquidia's own logic, the absence of a new indication from the second half of the provision supports UTC's position that an amendment *cannot* be submitted for a new indication.  Thus, at best, the regulation is a wash, but it assuredly provides no concrete support for Liquidia's claims.

Despite the limitations of the argument, the Liquidia Letter makes much of the omission of a new indication from the definition of a "different drug."  It implies that FDA "specifically considered—and rejected—proposals and interpretations" that would have considered a new indication a "different drug."  *See* Liquidia Ltr. at 12.  But Liquidia chooses its words carefully for a reason: FDA considered and rejected proposals related to *labeling* changes, which could include almost any change to a product, but FDA *never* rejected the addition a new indication to the definition of a "different drug."  With no evidence that FDA or Congress considered and rejected a new indication in the definition of a "different drug" and without specific permission for an amendment submission (like for a change in strength), Liquidia's attempt to invoke 21 C.F.R. § 314.60(e) falls well short of the mark.

The same analysis applies to 21 C.F.R. § 314.60(b).  These regulations, governing the submission of major amendments, specifically prohibit the submission of a major amendment that includes "data to support an indication or claim that was not included in the original NDA;" it may, however, include data "to support a minor modification of an indication or claim that was included in the original NDA . . . ." 21 C.F.R. § 314.60(b)(6).  To the extent that Liquidia's amendment *does* include new data (whether by disclosing Liquidia data or by referencing UTC's TYVASO® NDA to rely on UTC clinical data regarding PH-ILD), 21 C.F.R. § 314.60(b)(6) *compels* the submission of a new NDA, and thus Liquidia's amendment independently violates this regulation.  For example, although Liquidia asserts that its amendment did not include any data to support its new request for approval of the PH-ILD indication, Liquidia Ltr. at 9, the amendment seeking approval of such an indication necessarily references and relies upon UTC's INCREASE Phase 3 clinical study, submitted by UTC in support of its own supplemental NDA adding the PH-ILD indication.  Information as to that study was not included in Liquidia's original

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 13

H<small>YMAN</small>, P<small>HELPS</small> & M<small>C</small>N<small>AMARA</small>, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

application. To the extent that Liquidia's application actually contains no clinical data to support the PH-ILD indication, then it is facially deficient under 21 C.F.R. § 314.50(d)(5)(v).

In any event, nothing in these regulations affirmatively *permits* the submission of an amendment for a new indication where data is not required to support it. *Id.* Although 21 C.F.R § 314.60(f)(1) does appear to contemplate that an amendment for a new indication may be submitted in certain circumstances, FDA itself repeatedly emphasized that the scope of this narrow exception is exceptionally "limited." *See* 81 Fed. Reg. at 69616 (discussing the need for additional certifications under 21 C.F.R. § 314.60(f)(1) and stating that "we expect there would be limited circumstances in which this provision would apply to a 505(b)(2) application"). Indeed, both the 2015 NPRM and the preamble to the 2016 MMA Final Rule make very clear that 21 C.F.R. § 314.60(f)(1) applies only in narrow circumstances. The 2015 NPRM states that "most requests for approval of a different indication or condition of use by a 505(b)(2) applicant could not be made as an amendment to the 505(b)(2) application." Proposed Rule, Abbreviated New Drug Applications and 505(b)(2) Applications, 80 Fed. Reg. 6802, 6849 (Feb. 6, 2015). While the 2015 NPRM recognized that "there are certain scenarios in which an applicant may submit an amendment to a 505(b)(2) application (or ANDA) for a new indication or condition of use," FDA noted only a single circumstance in which doing so might be permissible: Where the "indication has changed from prescription status to OTC use." *Id.* The 2016 MMA Final Rule takes the same position, noting that "[m]ost requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to the 505(b)(2) application" and that "there would be limited circumstances in which [an amendment to add a new indication] would apply to a 505(b)(2) application (e.g., indication changed from prescription status to OTC use.)" 81 Fed. Reg. at 69616. In other words, it is abundantly clear that this narrow proviso for an amendment to add an indication is a carefully circumscribed exception to the general rule that such amendments are impermissible. Liquidia's reading of the regulations, however, would make this narrow window wide enough to drive a truck through.

To be clear, *nothing* in the 2004 Bundling Rule conflicts with FDA's regulations or the statute; the Bundling Rule merely clarifies. The notion that the Bundling Rule has been "superseded" and "trump[ed]" by these regulations, *see* Liquidia Ltr. at 2, 13, is misleading, unsupported, and nonsensical. And, in fact, FDA's most recent Manual of Policies and Procedures ("MAPP") for NDA Classification Codes, updated in December 2022, has a code specifically for these types of NDAs for new indications, anticipating that they will be filed. FDA, MAPP 5018.2, at 6 (Dec. 8, 2022). That MAPP notes "Generally,

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
February 12, 2024  
Page 14

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

a Type 9 NDA is submitted as a separate NDA so as to be in compliance with the [2004 Bundling Rule]." *Id.*

Liquidia seems to believe that its amendment is somehow special enough not to trigger the 2004 Bundling Rule and is thus exempt from its requirements. But Liquidia has failed to show any reason why its NDA is not subject to the Bundling Rule. Absent an exemption from the Bundling Rule, 21 C.F.R. § 314.60(f)(1) is inapplicable, because, as FDA explained, "most requests for approval of a different indication or condition of use by a 505(b)(2) applicant could not be made as an amendment to the 505(b)(2) application . . . ." 80 Fed. Reg. at 6849. As noted, FDA was clear in its preambles that an amendment to a pending NDA for a new indication is reserved for exceptional circumstances, and Liquidia highlights no reason why its NDA is exceptional.

    **C.    A New 30-Month Stay Logically Follows the Addition of a New Indication**

Liquidia positions UTC's request as an anticompetitive attempt to usurp an undeserved additional 30-month stay in "nothing more than an 11th hour attempt to delay the approval" of a competitor, *see* Liquidia Ltr. at 1, but this blatantly mischaracterizes UTC's position. UTC is simply asking that Liquidia (and FDA) follow the law so that UTC can do exactly what Congress wanted: File suit and allow the parties to obtain clarity about their patent dispute prior to a drastic change in the marketplace. That's the tradeoff Liquidia accepted when it shortcut its own approval process by relying on TYVASO data. Liquidia may not like that, but FDA and Congress have repeatedly emphasized that the 30-month stay is a critical element of the Hatch-Waxman Act that was intended to aid *both parties* by providing certainty before any launch. That Liquidia is willing to risk that certainty—and treble damages for willfully infringing UTC's patents—for an earlier launch date is its prerogative, but Liquidia's decision not to follow the law (and FDA's failure to correct that error) is not a legitimate basis for ignoring the delicate balance Congress struck between the interests of generics in launching earlier and the intellectual property rights of brand manufacturers.

The importance of the 30-month stay for the effective application of the Hatch-Waxman Act cannot be overstated. Congress created the 30-month stay "not necessarily to extend the patent holder's monopoly, but to create an adequate window of time during which to litigate the question of whether a generic will infringe the patented product, without actually having to introduce the generic product to the market." *Ben Venue Labs. Inc. v. Novartis Pharm. Corp.*, 146 F. Supp. 2d 572, 579 (D. N.J. 2001). That 30-month period, intended both to give assurance to the innovator that a follow-on drug manufacturer

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
February 12, 2024  
Page 15

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information  
Exempt from Disclosure*

would not obtain approval and market its product until the patent is litigated and to remove the risk that brands would hold patents in reserve and thereby lead generics to delay the launch of approved drugs because of patent uncertainty, was critical to the "compromise" that allowed the Hatch-Waxman Act to be enacted. 130 Cong. Rec. H9118 (daily ed. Sept. 6, 1984) (statement of Rep. Waxman) (explaining the support for a 30-month stay rather than an 18-month stay).

As FDA explained in adopting its 2016 MMA Final Rule regulations, "[o]ur interpretation of section [FDC Act § 505(b)(4)] seeks to preserve the legislative balance of the Hatch-Waxman Amendments with respect to facilitating the availability of drug products that meet the statutory requirements for approval while protecting innovator intellectual property rights (and allowing for an early resolution of any patent infringement litigation)." 80 Fed. Reg. at 6851. While this discussion was in the context of FDA's interpretation of "different drug," FDA's logic is equally applicable to a new indication: "Consistent with FDA's 'bundling' policy in effect at the time of enactment of the MMA," changes listed in the 2004 Bundling Rule "are significant enough that it is reasonable to assume that one or more patents for the listed drug might be implicated by the change and, if an action for patent infringement is brought in response to a paragraph IV certification to a listed patent, an opportunity for 30-month stay would be appropriate." 80 Fed. Reg. at 6851. The situation here clearly was not anticipated by the statute, but it was anticipated by FDA, which is exactly why FDA has been clear that most changes to indications will require a new NDA.

And an additional 30-month stay here simply makes sense. The intent of the bar on 30-month stays for later-listed patents assumes that the later-listed patents could have covered the product at approval. Where a new indication is developed and approved, the relevant patents can be listed only after approval of the new indication. These patents, even though they are "later-listed," cover the new aspects of the product that only became relevant because of an additional approval; such patents are not the same as, and cannot be treated the same as, later-listed patents that could have been listed at approval, had they been issued. This, again, is precisely why FDA requires new NDAs where a change to the product might implicate other patent rights. The absence of a 30-month stay for a patent covering a newly-approved condition of use provides no opportunity for the innovator to protect its intellectual property on that indication without immediate competition. This not only disrupts the balance intended by the Hatch-Waxman Act, but it also undermines patent protections covering the further development of existing drugs, diluting incentives to repurpose older drugs.

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
February 12, 2024  
Page 16

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

    In this case, the absence of a 30-month stay would allow Liquidia to flood the market with an infringing product—a bell that cannot be unrung even in the face of treble damages.

### D. FDA Must Withdraw the Liquidia PH-ILD Amendment

    Liquidia argues that the 2004 Bundling Rule does not require FDA to refuse to file or review the pending NDA. But even if FDA may sometimes excuse minor, inadvertent errors under the Bundling Rule, Liquidia's clear disregard of unambiguous FDA policy to avoid the requirements of the Hatch-Waxman Act cannot be countenanced. Nor can the FDA disregard Liquidia's violation of binding regulations. *See* 21 C.F.R. §§ 314.50(d)(5), 314.60(b)(6). At a minimum, nothing in the Bundling Rule precludes FDA from requiring Liquidia to file an NDA rather than an amendment—and nothing in the rule permits FDA to approve the amendment in its improper form. That FDA erred in accepting an amendment unlawfully submitted by Liquidia in the first instance provides no justification for the agency to compound that error by continuing review of or approving the unlawful submission, particularly in a situation that would undermine the essential bargain at the heart of Hatch-Waxman. And FDA clearly has the authority to mandate withdrawal of the amendment that it never should have accepted in the first place. *See Ranbaxy Labs., LTD v. Burwell*, 82 F. Supp. 3d 159, 193 (D.D.C. 2015) (holding that the Agency has the ability to correct its administrative errors to ensure that the FDC Act's "statutory purpose is followed"); *Ivy Sports Medicine, LLC v. Burwell* (*Ivy Sports*), 767 F.3d 81, 86, 412 U.S. App. D.C. 452 (D.C. Cir. 2014) ("[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions . . . .").

    The Liquidia Letter urges FDA not to withdraw the amendment on the theory that, essentially, this is a harmless error; but this is neither harmless nor, on Liquidia's part, an error. First, Liquidia, advised by counsel and led by experienced pharmaceutical executives, knew or should have known that a separate NDA submission was required by FDA. Even a cursory reading of the Bundling Rule and the 2015 NPRM and 2016 MMA Final Rule preambles makes that clear. Second, even if it were simply an error, it is far from harmless: UTC is being deprived of the opportunity to take advantage of an important statutory protection, which includes the opportunity to enforce its patents before the market is overrun with infringing product.

    Rather than withdrawal and submission of a new 505(b)(2) NDA, Liquidia also suggests administrative bifurcation of the NDA, assigning the new indication a submission date of July 2023. But this would reward Liquidia for its nonconformance to plain FDA requirements. Indeed, Liquidia's proposed solution results in the avoidance of the timely-submitted patents, which, other than ignorance of controlling law, is the only plausible

Kim Dettelbach, Esq.  
Brian Cooney, MS, PSM  
February 12, 2024  
Page 17

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*  
*Exempt from Disclosure*

reason that Liquidia submitted an amendment to add the PH-ILD indication rather than submitting a new NDA to begin with. Liquidia should not be rewarded for its avoidance of well-known FDA requirements.

That Liquidia claims it will refuse to submit a new NDA is immaterial to the discussion at hand. This is not about what Liquidia is willing to do but what the law requires FDA to do. Here, the law requires FDA to rectify this situation and restore UTC's Hatch-Waxman rights. In this case that means FDA must consider Liquidia's July 24, 2023 PH-ILD Indication amendment null and void and require Liquidia to submit a new original 505(b)(2) NDA with certifications to patent information currently listed in the Orange Book for the TYVASO Listed Drug (*i.e.*, as of the date Liquidia submits a new original 505(b)(2) NDA for the PH-ILD Indication).

### E. FDA Must Treat Similar Applicants Similarly

Liquidia dismisses the multitude of examples cited in UTC's previous letter as inapt, as more recent examples involve amendments to applications for reasons other than changes in indication. But Liquidia misses the point: Liquidia insists that the 2004 Bundling Rule is just a recommendation, non-binding on the Agency, and cannot be the source of an Administrative Procedure Act argument that FDA is treating similarly-situated applications dissimilarly. *See* Liquidia Ltr. at 14 ("[T]he 'litany' of examples provided in the UTC Letter are . . . inapplicable to the July Amendment."). The point is that FDA has consistently applied the Bundling Rule for more than 30 years. Liquidia's argument that the Bundling Rule is inapplicable because it is superseded by regulation is proved incorrect by the continued application of that rule. *See* UTC Ltr. at 11. In other words, it is not the treatment of the specific applications referenced that render the applicants similar—it is the fact that the 2004 Bundling Rule was equally applied in all situations covered by that rule that makes the situations comparable. Timing, type of application, and type of change are all irrelevant; what is relevant is that FDA applied the 2004 Bundling Rule as written to all of those applications. There is no reason that Liquidia should not also have followed the Bundling Rule, or that FDA should not apply the rule to Liquidia.

### III. CONCLUSION

As explained in our December 29, 2023 letter, FDA has, for decades, applied the Bundling Rule to require the submission of a new NDA to add a new indication. Liquidia depicts the Bundling Rule as an outdated, superseded recommendation, but this obfuscates FDA's continued reliance and reference to the Bundling Rule. There is no reason that Liquidia would not have known that a separate NDA is required for such a change, and

Kim Dettelbach, Esq.
Brian Cooney, MS, PSM
February 12, 2024
Page 18

HYMAN, PHELPS & MCNAMARA, P.C.

*Contains Confidential Information*
*Exempt from Disclosure*

Liquidia cannot be rewarded for its duplicity with acceptance of that amendment as of July 2023. To be consistent with its rulemakings, its policies, congressional intent, and its history of enforcement as described in our earlier letter, FDA must consider Liquidia's July 2023 amendment null and void and require the company to submit a new 505(b)(2) NDA for the PH-ILD indication.

###

We look forward to hearing from FDA on this matter. To that end, FDA's failure to take prompt action consistent with the Bundling Rule, and to UTC's satisfaction, will leave UTC with no other option than to initiate litigation against FDA.

Respectfully submitted,

Kurt R. Karst
Michael D. Shumsky
Sara W. Koblitz
*Counsel for United Therapeutics Corporation*