IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED THERAPEUTICS CORP.,

     *Plaintiff*,

  v.

FOOD AND DRUG ADMINISTRATION, *et al.*,

     *Defendants*,

  and

LIQUIDIA TECHNOLOGIES, INC.,

     *Defendant-Intervenor.*

No. 24-cv-484-JDB

LIQUIDIA TECHNOLOGIES, INC.'S
MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO UTC'S MOTION FOR INTERIM RELIEF

# Table of Contents

Introduction ................................................................................................ 1

Statutory and Regulatory Background ........................................................ 2

   I.    The FDCA, the Hatch-Waxman Act, and the MMA .................................... 2

   II.   Rulemaking implementing the MMA .......................................................... 5

   III.  User fees and FDA's Bundling Guidance .................................................. 7

Factual Background ..................................................................................... 8

Argument .................................................................................................... 13

   I.    UTC is not likely to prevail on the merits. ................................................ 13

      A.   FDA did not issue final agency action when it
            acknowledged receipt of Liquidia's July Amendment. ......................... 15

         1.    The September email is not final agency action and is not the
              culmination of FDA's decision-making process. ............................. 15

         2.    The September email does not affect UTC's rights. ........................ 19

      B.   Alternative remedies preclude UTC's APA claim. ................................ 23

         1.    Infringement litigation .................................................................... 23

         2.    Citizen petitions .............................................................................. 26

      C.   The July Amendment was appropriate. ................................................. 28

         1.    The FDCA and FDA's regulations authorize amendments to add
              indications. .................................................................................. 28

         2.    FDA's Bundling Guidance does not undermine the July
              Amendment. ................................................................................. 30

         3.    Accepting the July Amendment would not be inconsistent with
              prior FDA decisions........................................................................ 34

         4.    The July Amendment is not a major amendment including new
              data. ........................................................................................... 36

   II.   UTC will not suffer irreparable injury. ...................................................... 39

   III.  The equities and public interest weigh against UTC. ............................... 41

Conclusion .................................................................................................. 44

# Table of Authorities

## Cases

*Air Transp. Ass'n of Am., Inc. v. Export-Import Bk. of the U.S.*,
  840 F. Supp 2d 327 (D.D.C. 2012) .......................................................... 39

*Alfa Int'l Seafood v. Ross*,
  264 F. Supp. 3d 23 (D.D.C. 2017) ............................................................ 17

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
  38 F. Supp. 2d 114 (D.D.C. 1999) ........................................................... 13

*Am. Bioscience, Inc. v. Thompson*,
  243 F.3d 579 (D.C. Cir. 2001) ................................................................. 34

*Apotex, Inc. v. FDA*,
  2006 WL 1030151 (D.D.C. April 19, 2006) ........................................... 40

*Ark. Dairy Coop. Ass'n v. Dep't of Agric.*,
  573 F.3d 815 (D.C. Cir. 2009) ................................................................. 14

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ................................................................................. 27

*Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*,
  226 F. Supp. 2d 204 (D.D.C. 2002) ......................................................... 21

*Avadel CNS Pharms., LLC v. Becerra*,
  638 F. Supp. 3d 23 (D.D.C. 2022) ....................................... 23, 24, 25, 26

*Avocados Plus Inc. v. Veneman*,
  370 F.3d 1243 (D.C. Cir. 2004).............................................................. 27

*Bailey v. Fulwood*,
  793 F.3d 127 (D.C. Cir. 2015) ................................................................ 33

*Bennett v. Panama Canal Co.*,
  475 F.2d 1280 (D.C. Cir. 1973)............................................................... 22

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................... 15, 19

*Bethesda-Chevy Chase Broadcasters, Inc. v. FCC*,
  385 F.2d 967 (D.C. Cir. 1967) ................................................................ 16

*Bittner v. United States*,
    598 U.S. 85 (2023) ................................................................................. 22

*Boehringer Ingelheim Corp. v. Shalala*,
    993 F. Supp. 1 (D.D.C. 1997) .............................................................. 43

*Cal. Cmtys. Against Toxics v. EPA*,
    934 F.3d 627 (D.C. Cir. 2019) ............................................................ 15

*Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*,
    527 F.3d 1278 (Fed. Cir. 2008)............................................................ 4

*Cities of Anaheim & Riverside, Cal. v. FERC*,
    692 F.2d 773 (D.C. Cir 1982) ............................................................. 16

*Coal. for Common Sense in Gov't Procurement v. United States*,
    576 F. Supp. 2d 162 (D.D.C. 2008) ................................................... 39

*Colo. Interstate Gas Co. v. FERC*,
    850 F.2d 769 (D.C. Cir. 1988) ............................................................ 36

*Davis v. PBGC*,
    571 F.3d 1288 (D.C. Cir. 2009)........................................................... 13

*Del. & Hudson Ry. Co. v. United Transp. Union*,
    450 F.2d 603 (D.C. Cir. 1971) ............................................................ 43

*Dickson v. Sec. of Defense*,
    68 F.3d 1396 (D.C. Cir. 1995) ............................................................ 22

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*,
    396 F.3d 1265 (D.C. Cir. 2005)........................................................... 23

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ............................................................................ 34

*Farmers' & Merchants' Bk. of Monroe, N.C. v. Fed. Rsrv. Bk. of Richmond, Va.*,
    262 U.S. 649 (1923) ............................................................................ 22

*Garcia v. Vilsack*,
    563 F.3d 519 (D.C. Cir. 2009) ............................................................ 23

*Gomez v. U.S Dist. Court for N. Dist. of Cal.*,
    503 U.S. 653 (1992) ............................................................................ 41

*Hi-Tech Pharmacal Co. v. FDA*,
    587 F. Supp. 2d 1 (D.D.C. 2008) ................................................. 14, 39

*In re Sealed Case,*
    237 F.3d 657 (D.C. Cir. 2001) ............................................................................. 33

*Kingdomware Techns., Inc. v. United States,*
    579 U.S. 162 (2016) ............................................................................................. 22

*Lukens Steel Co. v. Perkins,*
    107 F.2d 627 (D.C. Cir. 1939) ............................................................................. 41

*Munaf v. Geren,*
    553 U.S. 674 (2008) ............................................................................................. 14

*Nasdaq Stock Market LLC v. SEC,*
    1 F.4th 34 (D.C. Cir. 2021) .................................................................................. 15

*Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.,*
    2015 WL 9269401 (D.D.C. Dec. 8, 2015) ............................................................ 13

*Pfizer v. Shalala,*
    182 F.3d 975 (D.C. Cir. 1999) ............................................................................. 18

*Ramirez v. Collier,*
    595 U.S. 411 (2022) ...................................................................................... 41, 42

*Sandoz, Inc. v. FDA,*
    439 F. Supp. 2d 26 (D.D.C. 2006) ....................................................................... 40

*Serono Labs., Inc. v. Shalala,*
    158 F.3d 1313 (D.C. Cir. 1998)............................................................................ 43

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011) ............................................................................. 13

*Soundboard Ass'n v. FTC,*
    888 F.3d 1261 (D.C. Cir. 2018)...................................................................... 17, 19

*Sw. Airlines Co. v. U.S. Dept. of Transp.,*
    832 F.3d 270 (D.C. Cir. 2016) ....................................................................... 15, 19

*UTC v. Liquidia Techns., Inc.,*
    2023 WL 8794633 (Fed. Cir. Dec. 20, 2023) ........................................................ 9

*UTC v. Liquidia Techns., Inc.,*
    74 F.4th 1360 (Fed. Cir. 2023) .............................................................................. 9

*Veloxis Pharm., Inc. v. FDA,*
    109 F. Supp. 3d 104 (D.D.C. 2015) ....................................................................... 3

*ViroPharma, Inc. v. Hamburg,*
  898 F. Supp. 2d 1 (D.D.C. 2012) .......................................................................... 16

*Westar Energy v. FERC,*
  473 F.3d 1239 (D.C. Cir. 2007)...................................................................... 35, 36

## Statutes

5 U.S.C. § 704.......................................................................................................... 15, 23

35 U.S.C. § 271(e)(4)(A)–(B) ...................................................................................... 25

Federal Food, Drug, and Cosmetic Act
  21 U.S.C. § 301 *et seq.*.......................................................................................*passim*
  21 U.S.C. § 355(a) ........................................................................................................ 2
  21 U.S.C. § 355(b)(1) ............................................................................................... 2, 3
  21 U.S.C. § 355(b)(1)(A)(viii) ..................................................................................... 3
  21 U.S.C. § 355(b)(2) ........................................................................................*passim*
  21 U.S.C. § 355(b)(2)(A)(iv) ....................................................................................... 4
  21 U.S.C. § 355(b)(3) ................................................................................................... 4
  21 U.S.C. § 355(b)(3)(B)(ii) ...................................................................................... 28
  21 U.S.C. § 355(b)(4) ................................................................................................. 21
  21 U.S.C. § 355(b)(4)(A) ............................................................................ 5, 6, 29, 30
  21 U.S.C. § 355(b)(4)(B) ....................................................................................... 5, 30
  21 U.S.C. § 355(c)(2) ................................................................................................... 3
  21 U.S.C. § 355(c)(3)(C) ...................................................................................*passim*
  21 U.S.C. § 355(c)(3)(C)(i)(I) .................................................................................. 24
  21 U.S.C. § 355(c)(3)(C)(ii)(II) ............................................................................... 24
  21 U.S.C. § 355(c)(3)(E)(iv) ..................................................................................... 10
  21 U.S.C. § 355(d) ........................................................................................................ 2
  21 U.S.C. § 355(j) ......................................................................................................... 2
  21 U.S.C. § 355(j)(5)(B)(iii) ...................................................................................... 22
  21 U.S.C. § 355(j)(7)(A)(i) .......................................................................................... 3
  21 U.S.C. § 355(q)(1)(A) ..................................................................................... 26, 27
  21 U.S.C. § 355(q)(1)(F) ........................................................................................... 26
  21 U.S.C. § 355(q)(1)(H)–(I) .................................................................................... 27
  21 U.S.C. § 355(q)(2) ................................................................................................. 27
  21 U.S.C. § 355(q)(2)(A)–(C) ................................................................................... 26
  21 U.S.C. § 355(q)(2)(B) ........................................................................................... 27
  21 U.S.C. § 379h(a) ...................................................................................................... 7
  21 U.S.C. § 379h(b)–(c) ............................................................................................... 7

# Regulations

21 C.F.R.

§ 10.85(k) .................................................................................. 17
§ 10.115(c)(3) ............................................................................ 32
§ 201.57(a)(6) ............................................................................. 6
§ 201.57(c)(2) ............................................................................. 6
§ 314.3 ...................................................................................... 37
§ 314.50(i) .................................................................................. 7
§ 314.53(d) ................................................................................. 3
§ 314.54(a)(1)(iii) .................................................................. 3, 36
§ 314.60 .................................................................................... 31
§ 314.60(a) ......................................................................... 2, 6, 28
§ 314.60(b)(6) .................................................................... *passim*
§ 314.60(e) ........................................................................ 6, 29, 35
§ 314.60(f) ......................................................................... 7, 28, 35
§ 314.70 ...................................................................................... 2
§ 314.70(b)(2)(v) ....................................................................... 21
§ 314.101(a)(1) .......................................................................... 17
§ 314.107(b)(3) ........................................................................... 6

Applications for Approval to Market a New Drug; Complete Response Letter;
Amendments to Unapproved Applications, 73 Fed. Reg. 39588 (July 10,
2008) ....................................................................................... 38

MMA Final Rule, 81 Fed. Reg. 69580 (Oct. 6, 2016) ....................................... 5, 29, 38

MMA Proposed Rule, 80 Fed. Reg. 6802 (Feb. 6, 2015) ........................................ 5, 29

New Drug and Antibiotic Regulations, 50 Fed. Reg. 7452 (Feb. 22, 1985) ......... 30, 31

Prescription Drug User Fee Rates for Fiscal Year 2024, 88 Fed. Reg. 48881
(July 28, 2023) ............................................................................... 7

# Other Authorities

FDA Approval Letter for EMLA Anesthetic Disc (Feb. 4, 1988), https://www.
accessdata.fda.gov/drugsatfda_docs/nda/98/20962.pdf ........................................... 18

FDA Approval Letter for Gonal-F (Mar. 25, 2004), https://www.access
data.fda.gov/drugsatfda_docs/appletter/2004/21765ltr.pdf ................................... 20

FDA, Approval Package, Administrative and Correspondence Documents, NDA 210709 (TEKTURNA) (Unacceptable For Filing Review Letter) (May 2017), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/210709 Orig1s000AdminCorres.pdf ................................................................. 35

FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 208780 (Esbriet) (May 2015), https://www.accessdata.fda.gov/ drugsatfda_docs/nda/2017/208780Orig1s000AdminCorres.pdf .......................... 35

FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 209400 (Omeprazole Delayed-release Orally Disintegrating Tablets), (Nov. 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/ 2017/209400Orig1s000AdminCorres.pdf ............................................... 35

FDA Approval Package, Administrative Document(s) & Correspondence, Application 021765 (Mar. 2004), https://www.accessdata.fda.gov/ drugsatfda_docs/nda/2004/021765s000_AdminCorres.pdf ................................ 20

FDA, Approval Package, Proprietary Name Review(s), Application Nos. 761825 & 761331 (Sept. 22, 2023), https://www.accessdata.fda.gov/ drugsatfda_docs/nda/2024/761285Orig1s000,761331Orig1s000NameR.pdf ....... 35

FDA, BLA Accelerated Approval Letter, BLA 761223, https://www.access data.fda.gov/drugsatfda_docs/appletter/2021/761223Orig1s000ltr.pdf .............. 35

FDA, Interim Guidance: Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees Under the Prescription Drug User Fee Act of 1992 (July 12, 1993) ................................................................. 7

FDA, Manual of Policies and Procedures 6025.4: Good Review Practice: Refuse to File (Sept. 5, 2018) ............................................................... 17

FDA, Manual of Policies and Procedures 6050.1 Rev. 2: Effect of Failure to Pay PDUFA Fees (Dec. 3, 2021) ........................................................... 18

FDA, NDA Approval Letter, NDA 021822, https://www.accessdata.fda.gov/ drugsatfda_docs/appletter/2008/021822s000ltr.pdf ................................................. 35

FDA, NDA Approval Letter, NDA 206628, https://www.accessdata.fda.gov/ drugsatfda_docs/appletter/2015/206628Orig1s000ltr.pdf ................................... 35

FDA, Standard Operating Policy and Procedure (SOPP) 8402: Designation as a Major (2023), https://www.fda.gov/media/84431/download .............................. 37

Medical Reviews for Gonal-F (NDA 21-765) (Mar. 4, 2004), https://www. accessdata.fda.gov/drugsatfda_docs/nda/2004/021765s000_MedR.pdf............... 18

# Glossary

| | |
|---|---|
| ANDA | abbreviated new drug application |
| Bundling Guidance | FDA, *Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing Prescription Drug User Fees* (Dec. 2004), attached as Ex. 4 to UTC's PI |
| "Compl. #" | citation of UTC's complaint in this action |
| FDA | the Defendant Food and Drug Administration |
| FDCA | Federal Food, Drug, & Cosmetic Act, 21 U.S.C § 301 *et seq.* |
| the July Amendment | Liquidia's amendment to its Section 505(b)(2) NDA seeking FDA approval to market Yutrepia for PH-ILD |
| MMA | Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2065 (2003) |
| MMA Proposed Rule | Abbreviated New Drug Applications and 505(b)(2) Applications, 80 Fed. Reg. 6802 (Feb. 6, 2015) |
| MMA Final Rule | Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg. 69580 (Oct. 6, 2016) |
| NDA | new drug application |
| PAH | pulmonary arterial hypertension |
| PDUFA | *Prescription Drug User Fee Act*, Pub. L. No. 102-571, 106 Stat. 4491 (1992) |
| PH-ILD | pulmonary hypertension associated with interstitial lung disease |
| "PI #" | citation of UTC's memorandum in support of its motion for a preliminary injunction in this action |
| the September email | an email from FDA project manager Brian Cooney to Liquidia, dated September 14, 2023, attached as Ex. 1 to UTC's PI |
| UTC | the Plaintiff United Therapeutics Corp. |

## Introduction

This case is an unprecedented and improper attempt by a monopolist to use the APA to maintain its monopoly. There is no final agency action. Last July, Liquidia appropriately submitted an amendment to its Section 505(b)(2) NDA, and FDA is reviewing it now. In the unlikely event that FDA determines that the amendment is inappropriate, FDA will "unbundle" it (not reject it), or Liquidia will submit a "supplement" (not file a brand-new NDA). Whatever happens, UTC has not been, and will not be, denied a 30-month stay of FDA approval because UTC has no right to "a statutory, automatic 30-month stay" of FDA approval in these circumstances. PI 1.

An APA claim is not an appropriate remedy to address UTC's concerns. UTC has two alternative remedies. UTC did not pursue one of them: it did not exhaust administrative remedies by filing a citizen petition. UTC has pursued the other alternative: last September, UTC sued Liquidia for patent infringement concerning the July Amendment, and in that action UTC seeks relief that is ultimately the same as the relief it seeks here, an injunction prohibiting Liquidia from launching YUTREPIA for treatment of PH-ILD. Indeed, a week before filing its preliminary-injunction motion asking this Court to delay Liquidia's ability to market YUTREPIA for PH-ILD while the infringement action proceeds, UTC filed a preliminary-injunction motion asking the Delaware District Court to delay Liquidia's ability to market YUTREPIA for PH-ILD while the infringement action proceeds. The motions are duplicative, even down to the evidence UTC submits in support of them.

UTC is not likely to prevail and is not likely to suffer irreparable injury without a preliminary injunction. What's more, UTC sat on its rights by waiting until the last minute to seek interim relief concerning things that happened last summer. All the preliminary-injunction factors weigh against UTC.

## Statutory and Regulatory Background

### I.    The FDCA, the Hatch-Waxman Act, and the MMA

Before a drug may be introduced into commerce, FDA must approve it. *See* 21 U.S.C. § 355(a). Innovative drugs typically are approved via NDAs, *id.* § 355(b)(1), in which applicants demonstrate their products' safety and efficacy, *id.* § 355(d). In the Hatch-Waxman Act, Congress provided two other pathways for FDA approval. One pathway is for generic drugs: an ANDA. *See id.* § 355(j). The other pathway is at issue here: a Section 505(b)(2) NDA. *See id.* § 355(b)(2).

A Section 505(b)(2) NDA is for innovative drugs, not generic copies. Section 505(b)(2) NDAs provide patients with innovative alternatives to existing products, frequently providing important contributions to patient care. Like other NDAs, Section 505(b)(2) NDAs are submitted under Section 505(b) and approved under Section 505(c). Like other NDA applicants or NDA holders, Section 505(b)(2) applicants and holders can modify their NDAs in two ways: modifications made *before* approval, called "amendments," 21 C.F.R. § 314.60(a), and modifications made *after* approval, called "supplements," *id.* § 314.70.

The distinguishing feature of Section 505(b)(2) NDAs is that some or all of the "full reports of investigations" (often, clinical studies) establishing the drug's safety

and effectiveness are provided by means of reliance on investigations "not conducted by or for the applicant and for which the applicant has not obtained the right of reference or use from the person by or for whom the investigations were conducted." 21 U.S.C. § 355(b)(2). Because, by definition, Section 505(b)(2) applicants do not have a "right of reference or use," the applicants do not include these "investigations" in their applications. Instead, their applications identify "each listed drug for which FDA has made a finding of safety and effectiveness and on which the finding the applicant relies in seeking approval." 21 C.F.R. § 314.54(a)(1)(iii). Thus, a Section 505(b)(2) applicant relies on FDA's finding of safety and effectiveness for a previously approved drug product, not on the underlying clinical data or investigations. A Section 505(b)(2) NDA, then, is a kind of hybrid application; the underlying drug shares some characteristics with a listed drug but is not a duplicate. *See Veloxis Pharm., Inc. v. FDA*, 109 F. Supp. 3d 104, 108–09 (D.D.C. 2015).

Like ANDAs, Section 505(b)(2) hybrid NDAs often implicate patents on listed drugs. The Hatch-Waxman Act dealt with this. As part of their applications, NDA applicants submit information about patents relevant to their drugs. 21 U.S.C. § 355(b)(1)(A)(viii). After approval, NDA holders have a continuing duty to submit information about newly issued patents relevant to their drugs. *Id.* § 355(c)(2); 21 C.F.R. § 314.53(d). FDA lists all these patents in its publication, commonly called the Orange Book. *See* 21 U.S.C. §§ 355(b)(1); (j)(7)(A)(i).

As part of their applications, amendments, and supplements, Section 505(b)(2) applicants must address certain patents listed in the Orange Book. One option is to

3

submit a Paragraph IV Certification—that a listed patent covering the listed drug "is invalid or will not be infringed by the manufacture, use or, sale of the new drug for which the application is submitted." *Id.* § 355(b)(2)(A)(iv). Applicants must notify the sponsor of the listed drug of any Paragraph IV Certification. *See id.* § 355(b)(3). Federal law treats a Paragraph IV Certification as an "artificial act of infringement," allowing the holders of patents covering the listed drug to bring an infringement action against the Section 505(b)(2) applicant. *See Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1283 (Fed. Cir. 2008).

Ordinarily, FDA's approval of a Section 505(b)(2) NDA "shall be made effective *immediately*" upon completion of its review. 21 U.S.C. § 355(c)(3)(C) (emphasis added). But if the holder or holders of patents covering the listed drug bring an infringement action within 45 days of receiving a Paragraph IV notice, and if the subject of the action is one or more patents that were listed in the Orange Book "before the date on which the [Section 505(b)(2) NDA] (excluding an amendment or supplement to the application) was submitted," "the approval may be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the [Paragraph IV] notice … or such shorter or longer period as the court may order[.]" *Id.* This delay is commonly known as a 30-month stay.

The statutory text about the 30-month stay did not always read this way. Before the MMA in 2003, some NDA holders had tried to create *de facto* exclusivity for their drugs for indefinite periods by triggering serial 30-month stays. *See* PI 12. In the MMA, Congress clarified that a 30-month stay can be triggered only for patents listed

in the Orange Book "before the date" on which the Section 505(b)(2) NDA, "excluding an amendment or supplement to the application," is originally submitted. 21 U.S.C. §355(c)(3)(C). So, though an amendment or supplement to a Section 505(b)(2) NDA may still require patent certifications and may, in turn, generate new patent litigation, the amendment or supplement will not trigger a 30-month stay for patents that were listed in the Orange Book after the date on which the original Section 505(b)(2) NDA was filed. In practice, the amended statutory text usually results in a single 30-month stay per Section 505(b)(2) NDA.

Also in 2003, Congress modified the circumstances in which Section 505(b)(2) NDAs could be modified. The MMA amended the FDCA to provide that an applicant "may not amend or supplement [a Section 505(b)(2) NDA] to seek approval of a drug that is a *different drug* than the drug identified in the application as submitted to the Secretary." 21 U.S.C. § 355(b)(4)(A) (emphasis added). Congress also clarified that "nothing … prohibits an applicant from amending or supplementing the application to seek approval of a different strength." *Id.* § 355(b)(4)(B).

## II.    Rulemaking implementing the MMA

In 2015 and 2016, FDA proposed and finalized rules to implement the MMA. *See* MMA Proposed Rule, 80 Fed. Reg. 6802 (Feb. 6, 2015); MMA Final Rule, 81 Fed. Reg. 69580 (Oct. 6, 2016). Three aspects of this rulemaking are relevant here.

First, parroting the MMA's revisions to the 30-month stay, FDA revised its regulations to provide that a 30-month stay is triggered only "with respect to patents for which required information was submitted under § 314.53 [*i.e.*, to the Orange Book]

*before the date on which the 505(b)(2) application or ANDA was submitted to FDA (excluding an amendment or supplement to the 505(b)(2) application or ANDA).*" 21 C.F.R. § 314.107(b)(3) (emphasis added). Patents listed in the Orange Book after the Section 505(b)(2) NDA date cannot trigger a 30-month stay.

Second, FDA implemented the statutory prohibition on amendments for "a different drug." 21 U.S.C. § 355(b)(4)(A). To do so, FDA did not revise the regulation that generally permits amendments to Section 505(b)(2) NDAs. *See* 21 C.F.R. § 314.60(a). Instead, FDA revised regulations to specify what counts as a "different drug":

> "An applicant may not amend a 505(b)(2) application to seek approval of a drug that is a different drug from the drug in the original submission of the 505(b)(2) application. *For purposes of this paragraph (e), a drug is a different drug if it has been modified to have a different active ingredient, different route of administration, different dosage form, or difference in excipients that requires either a separate clinical study to establish safety or effectiveness or, for topical products, that requires a separate in vivo demonstration of bioequivalence.* However, notwithstanding the limitation described in this paragraph (e), an applicant may amend the 505(b)(2) application to seek approval of a different strength."

21 C.F.R. § 314.60(e) (emphasis added). Absent from this list of amendments that make a "different drug" is adding a new or different indication to a drug's label.[1]

Third, FDA revised the patent certification requirements applicable to certain amendments. The regulation acknowledges that Section 505(b)(2) applicants are

---

[1]     The term "indication" refers to the use of a drug for a particular disease or condition. Regulations require a drug's label state the drug's approved indications, *see* 21 C.F.R. § 201.57(a)(6)—that "the drug is indicated for the treatment, prevention, mitigation, cure, or diagnosis of a recognized disease or condition, or of a manifestation of a recognized disease or condition, or for the relief of symptoms associated with a recognized disease or condition," *id.* § 201.57(c)(2).

permitted to submit amendments "to add a new indication" and explains the appli-

cants' patent-certification obligations in such situations:

> (1) An amendment to a 505(b)(2) application is required to contain an appro-
> priate patent certification or statement described in § 314.50(i) or a recertifi-
> cation for a previously submitted paragraph IV certification *if approval is
> sought for any of the following types of amendments: (i) To add a new indica-
> tion or other condition of use*; (ii) To add a new strength; (iii) To make other
> than minor changes in product formulation; or (iv) To change the physical
> form or crystalline structure of the active ingredient.

21 C.F.R. § 314.60(f) (emphasis added).

## III.   User fees and FDA's Bundling Guidance

In 1992, Congress enacted PDUFA. To increase the resources available to FDA

for reviewing applications and to expedite the drug-approval process, PDUFA im-

poses user fees on drug manufacturers. *See* 21 U.S.C. § 379h(a). User fees are deter-

mined, in part, by considering the resources FDA needs to review NDAs, as well as

the volume of applications submitted to the FDA. *Id.* § 379h(b)–(c). The fees are sub-

stantial—currently, the fee for an NDA requiring clinical data exceeds $4 million. *See*

Prescription Drug User Fee Rates for Fiscal Year 2024, 88 Fed. Reg. 48881, 48887

(July 28, 2023).

Owing to the costs, FDA has provided guidance on when different versions of a

drug can be included in a single application and when separate applications, requir-

ing separate user fees, should be submitted. The first version of this Bundling Guid-

ance came out in 1993. *See* Burgess Decl. Ex. 3 (FDA, Interim Guidance: Separate

Marketing Applications and Clinical Data for Purposes of Assessing User Fees Under

the Prescription Drug User Fee Act of 1992 (July 12, 1993)). In 2004, FDA revised

the Bundling Guidance slightly; that is the latest version. *See* Burgess Decl. Ex. 4 (FDA, Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing Prescription Drug User Fees (Dec. 2004)). Always, the focus of the Guidance has been user fees and deadlines. The title of the document expresses that it is "for purposes of assessing user fees." Inside, the document states that, if FDA deems an application "inappropriately bundled," FDA will assess "additional fees." Burgess Decl. Ex. 4 at 2. Moreover, because user fees are the focus, inappropriate bundling "will not prevent the filing of the application … or its review." *Id.*

## Factual Background

In January 2020, Liquidia submitted a Section 505(b)(2) NDA to the FDA. *See* Compl. ¶ 5. Liquidia initially sought approval to market a novel formulation of treprostinil inhalation powder (given the proposed brand name YUTREPIA™) for the treatment of PAH, for which UTC has provided the dominant treatments since 2002. *See id.* Liquidia's NDA established the safety and effectiveness of its product for PAH by relying, in part, on FDA's finding of safety and effectiveness of a listed drug, UTC's TYVASO™, which is a solution of treprostinil administered with a nebulizer and originally approved for PAH. *See* Compl. ¶¶ 25, 38. In accordance with statutory requirements, Liquidia's NDA contained Paragraph IV Certifications expressing Liquidia's view that YUTREPIA would not infringe patents then-listed in the FDA's Orange Book as covering TYVASO. *See* Compl. ¶¶ 45–47. After receiving notice of Liquidia's Paragraph IV Certifications, UTC sued Liquidia in the Delaware District Court, alleging that YUTREPIA would infringe two of UTC's patents—U.S. Patent No. 9,593,066 ("'066

patent") and U.S. Patent No. 9,604,901 ("'901 patent"). *See* Compl. ¶ 49. After UTC filed its infringement action, UTC was issued a new patent, U.S. Patent No. 10,716,793 (the "'793 patent'"), and amended its complaint to allege that YUTREPIA would infringe that patent. *See* Compl. ¶¶ 46–49.

Because UTC's infringement action was filed within the 45-day period and because it alleged infringement of two patents listed in the Orange Book before Liquidia filed its Section 505(b)(2) NDA, FDA declined to issue an immediately effective final approval. Instead, in November 2021, after finding that Liquidia's Section 505(b)(2) NDA satisfied all other relevant statutory and regulatory requirements, FDA issued a *tentative* approval, to become effective after either a 30-month period, the conclusion of the patent litigation, or the expiration of the patents. *See* Compl. ¶ 48.

Liquidia has prevailed in the infringement litigation. Most claims of the '066 patent were invalidated, and Liquidia was held not to infringe the patent's valid claims. UTC stipulated that Liquidia did not infringe any claims of the '901 patent. All of the claims of the '793 patent were invalidated in a proceeding before the Patent Trial and Appeal Board—whose ruling the Federal Circuit has now affirmed—though *after* the Delaware District Court found infringement of the '793 patent and issued an injunction prohibiting final approval of Liquidia's Section 505(b)(2) NDA before the '793 patent expires. *See* Compl. ¶ 49; *see also* Stipulation (ECF 276), *UTC v. Liquidia Techns., Inc.*, No. 1:20-cv-755 (D. Del. Dec. 28, 2021); *UTC v. Liquidia Techns., Inc.*, 74 F.4th 1360 (Fed. Cir. 2023), *cert. denied*, No. 23-804, 2024 WL 675262 (U.S. Feb. 20, 2024); *UTC v. Liquidia Techns., Inc.*, 2023 WL 8794633 (Fed. Cir. Dec. 20, 2023).

Though the injunction remains in effect, Liquidia has moved to set it aside in light of the invalidation of the '793 patent. *See* Compl. ¶ 49. Recently, the Federal Circuit denied UTC's request for rehearing of its decision affirming the invalidity of the '793 patent and indicated that its mandate will issue on March 19. *See* Order (ECF 63), *UTC v. Liquidia Techns., Inc.*, Case No. 23-1805 (Fed. Cir. Mar. 12, 2024).

In June 2020, UTC submitted a supplement to its NDA for Tyvaso, seeking FDA approval to add PH-ILD as a new indication to the Tyvaso label. *See* Compl. ¶ 40. In connection with FDA's approval of UTC's supplement, UTC obtained a three-year market exclusivity relating to PH-ILD, which expires on March 31, 2024. *See* Compl. ¶ 42; *see also* 21 U.S.C. § 355(c)(3)(E)(iv).

Following Tyvaso's approval for PH-ILD, Liquidia submitted an amendment to its tentatively approved Section 505(b)(2) NDA, seeking to add PH-ILD as an indication to the Yutrepia label. Liquidia submitted its amendment on July 24, 2023. *See* Compl. ¶ 50. The July Amendment included Paragraph IV Certifications expressing Liquidia's view that marketing Yutrepia for PH-ILD will not infringe any valid patents that UTC listed in the Orange Book before July 24, 2023. *See* Compl. ¶¶ 51–52.

On September 5, 2023, UTC filed a second infringement action against Liquidia, alleging that marketing Yutrepia for PH-ILD would infringe the '793 patent, which the Patent Trial and Appeal Board had already invalidated. *See* Compl. ¶¶ 49, 53. Two months into UTC's second infringement action, on November 28, 2023, UTC was issued a new patent related to PH-ILD, U.S. Patent No. 11,826,327 ("'327 patent"); UTC amended its complaint to allege that marketing Yutrepia for PH-ILD would

infringe that patent. *See* Compl. ¶ 57. Two months after that, on January 22, 2024, after the Federal Circuit affirmed the '793 patent's invalidation, UTC voluntarily dismissed its claims alleging infringement of the '793 patent. *See* Stipulation, *UTC v. Liquidia Techns., Inc.,* No. 1:23-cv-975-RGA (D. Del. Jan. 22, 2024). As a result, the only patent at issue in UTC's second infringement action is the '327 patent. *See* Compl. ¶ 58. That action remains pending in the Delaware District Court.

As UTC recognizes, its second infringement action did not trigger a 30-month stay of FDA's approval of Liquidia's amended Section 505(b)(2) NDA. A stay can be triggered only by infringement actions based on patents listed in the Orange Book "before the date on which the application (*excluding an amendment or supplement to the application*) was submitted." 21 U.S.C. § 355(c)(3)(C) (emphasis added). The '793 patent, the original subject of UTC's second infringement action, did not trigger a 30-month stay because, though UTC listed that patent before the July Amendment, UTC had not listed it before Liquidia submitted its original Section 505(b)(2) NDA. *See* Compl. ¶ 74. The '327 patent, the remaining subject of UTC's second infringement action, did not trigger a stay because UTC had not listed it before Liquidia submitted its NDA; that patent was not even issued until after the July Amendment.

Facing its failed allegations of patent infringement, the imminent expiration of its three-year market exclusivity for PH-ILD, and its recognition that FDA cannot stay approval of Liquidia's amended Section 505(b)(2) NDA, UTC is now pursuing two, parallel, last-ditch efforts to delay Liquidia's launch of YUTREPIA.

11

One effort is in its infringement case. On February 26, 2024, UTC asked the Delaware District Court to preliminarily enjoin Liquidia from making, marketing, and selling Yutrepia for PH-ILD "until a final decision on the merits of the issues of infringement, validity, and enforceability of" the '327 patent. *See* Motion for Preliminary Injunction (ECF 25), *UTC v. Liquidia Techns., Inc.*, No. 1:23-cv-975-RGA (D. Del. Feb. 26, 2024). Discovery is underway, and that motion will not be fully briefed and submitted until mid-April.

The other effort is this APA case. In late December 2023, more than five months *after* Liquidia submitted the July Amendment and sent UTC new Paragraph IV notices advising UTC of the amendment (July 24), more than three months *after* UTC sued Liquidia for infringement over the amendment (September 5), three months *after* Liquidia announced that the FDA accepted the amendment for substantive review (September 25), and one month *after* UTC amended its complaint to allege infringement of the '327 patent (November 30), UTC sent a letter to FDA, claiming that the July Amendment was improper under FDA's Bundling Guidance and demanding that FDA reject it. *See* Compl. ¶ 76; *see also* Burgess Decl. Ex. 6. UTC's stated goal was to convince FDA to reject the July Amendment and force Liquidia to file a brand-new NDA. Under UTC's theory, if Liquidia filed a brand-new NDA, Liquidia would have to submit brand-new Paragraph IV Certifications, including one for the '327 patent listed in the Orange Book last November, and UTC believes those certifications would trigger a 30-month stay of approval of the brand-new NDA. *See* Compl. ¶ 58.

After UTC submitted its December 2023 letter, Liquidia submitted a response letter on February 2, 2024, and UTC submitted a reply letter on February 12, 2024. *See* PI Exs. 7–8. For its part, FDA seems to have taken the letters under advisement; the agency has issued no formal response or taken any public action on the amended Section 505(b)(2) NDA since then. Too impatient to wait for the FDA's decision-making process to conclude, UTC initiated this APA action against the FDA on February 20 (barely a week after submitting its reply letter to FDA), challenging an email that an FDA employee sent Liquidia in September, which UTC claims accepted the July Amendment. *See* Compl. ¶¶ 54–56. UTC claims that this was a final agency action and that FDA cannot "revisit its acceptance decision." Compl. ¶ 72. UTC demands that the Court vacate the FDA's acceptance of the July Amendment and order FDA to order Liquidia to submit a brand-new NDA. *See* Compl. ¶¶ 80, 83, 86, 92, 95; *see also* Compl. p. 33. On March 4, UTC filed the pending motion for interim relief.

## Argument

## I.   UTC is not likely to prevail on the merits.

The Court cannot award interim relief unless UTC proves that it is likely to prevail on the merits. *See Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, 2015 WL 9269401, at *2 (D.D.C. Dec. 8, 2015); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999); *see also Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (reading precedent "to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction'") (quoting *Davis v. PBGC*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (concurring op.)).

In an APA case, the merits include more than the agency's interpretation or application of regulations and guidance documents; the merits also include threshold matters, such as whether UTC has properly stated an APA claim. *See, e.g.*, *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 8 (D.D.C. 2008) (Bates, J.).

UTC has not proved it is likely to prevail on the merits. *First*, UTC's APA claim is improper. UTC is not seeking review of final agency action; UTC is challenging action that initiates agency review of the July Amendment and that does not deny UTC any rights (because, among other things, UTC has no statutory right to a 30-month stay in these circumstances). To the extent that UTC has legitimate patent rights, they must be addressed in other ways. *Second*, UTC's contention—that the Bundling Guidance requires Liquidia to submit a brand-new NDA in order to obtain FDA approval to market YUTREPIA for PH-ILD—misunderstands the Guidance and ignores regulations that permit Section 505(b)(2) applicants to file amendments seeking approval to add indications.[2]

---

2   So that UTC's preliminary-injunction motion can be resolved quickly, Liquidia has not cross-moved to dismiss. Still, the Court can dismiss without a motion—if the Court finds that UTC's likelihood of success on the merits is zero. *See Ark. Dairy Coop. Ass'n v. Dept. of Agric.*, 573 F.3d 815, 833 (D.C. Cir. 2009) (holding, in connection with a preliminary injunction, that a court may consider "whether there is any insuperable objection, in point of jurisdiction or merits, to the maintenance of [the case], and if so, to direct a final decree dismissing it." (internal quotation marks omitted) (quoting *Munaf v. Geren*, 553 U.S. 674, 691 (2008)).

A.   **FDA did not issue final agency action when it acknowl-edged receipt of Liquidia's July Amendment.**

The APA authorizes judicial review of final agency action. *See* 5 U.S.C. § 704. Agency action is not final if it is "interlocutory," nor is agency action final unless it determines "rights" or creates "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). "An order must satisfy both prongs of the *Bennett* test to be considered final." *Sw. Airlines Co. v. U.S. Dept. of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016). Here, the target of UTC's APA action—a September email that FDA project manager Brian Cooney sent to Liquidia, *see* Compl. ¶ 55; Burgess Decl. Ex. 1—flunks both prongs.

1.   **The September email is not final agency action and is not the culmination of FDA's decision-making process.**

"[F]inality must be measured in relation to the agency's entire process, not just 'one phase of the process.'" *Nasdaq Stock Market LLC v. SEC*, 1 F.4th 34, 39 (D.C. Cir. 2021). In assessing whether an action is final or interlocutory, courts assess "what the [agency] has said" about its process, *id.* at 38, and the "idiosyncratic regime of statutes and regulations that govern," *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 632 (D.C. Cir. 2019).

UTC cites no publication, ruling, or order of FDA or of a court stating that an FDA employee's emailed acknowledgment of an amendment to a pending NDA is final agency action. UTC cites no authority holding that any agency's correspondence acknowledging receipt of an amendment or accepting an amendment for review qualifies as final agency action. The absence of authority supporting UTC's theory of

15

finality shows that UTC is seeking unprecedented intervention into an ongoing administrative process, which weighs against UTC's request for interim relief. *Cf. Viro-Pharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 28–29 (D.D.C. 2012) (finding that the unprecedented nature of the APA case weighed against preliminary relief).

Twice, in fact, the D.C. Circuit has held that agency action concerning an amendment to a pending application is *not* final. First, the court of appeals held that an agency's "invitation … to amend" an application is not final because it "does not impose an obligation, deny a right, or fix a legal obligation." *Bethesda-Chevy Chase Broadcasters, Inc. v. FCC*, 385 F.2d 967, 968 (D.C. Cir. 1967). Later, the court of appeals held that an agency's "acceptance" of an "amended license application" is not final because it is not the *consummation* of agency decision-making; it is the opposite, the action that "*initiate[s]* the investigative process" that could culminate in the awarding of a license. *Cities of Anaheim & Riverside, Calif. v. FERC*, 692 F.2d 773, 778 (D.C. Cir 1982) (emphasis added).

So too here. UTC claims that Mr. Cooney's September email is final because he determined that "it was appropriate for Liquidia to seek approval by way of an amendment" and "concluded that no 30-month stay was available based on the amendment." PI 20. UTC's characterization of the email is flawed:

- The September email does not purport to render a final, irrevocable finding that the July Amendment was appropriate. *See* PI 20. The email simply acknowledges receipt of the July Amendment and states that Liquidia must also submit certifications concerning UTC's patents. *See* Burgess Decl. Ex. 1.

16

•   FDA project managers have no authority to render decisions binding FDA, let alone authority to determine the appropriateness of an amendment. "A statement or advice given by an FDA employee orally, or given in writing but not under this section or section 10.90, is an informal communication that represents the best judgment of that employee at that time but does not constitute an advisory opinion, does not necessarily represent the formal position of FDA, and does not bind or otherwise obligate or commit the agency to the views expressed." 21 C.F.R. § 10.85(k). The September email is not *agency* action, final or otherwise. *See Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 53 (D.D.C. 2017) ("Plaintiffs … place too much stock in a lone e-mail communication. Plaintiffs cite no authority for the novel proposition that the personal opinion of a single agency employee … can displace the agency's *final* position regarding the scope of its jurisdiction."); *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1269–70 (D.C. Cir. 2018) (holding that "informal staff advice" is not "final agency action").

After the September email, FDA sent Liquidia a formal acknowledgment of receipt of the July Amendment. *See* Compl. ¶ 54. Like the September email, the acknowledgment does not determine the amendment's appropriateness. It accepts the amendment for filing in order to *initiate* substantive review; it does not *conclude* substantive review. *See* 21 C.F.R. § 314.101(a)(1) ("The filing of an NDA means that FDA has made a threshold determination that the NDA is sufficiently complete to permit a substantive review."). Consistent with its policy, FDA is currently reviewing the July Amendment and will determine the appropriateness of the amendment when the agency concludes its closed-to-the-public review of the NDA as a whole. *See* FDA,

17

Manual of Policies and Procedures 6025.4: Good Review Practice: Refuse to File (Sept. 5, 2018), p. 9 (noting that Division Directors "make the final determination about the fileability of an application") (attached as Ex. 1 to the Killian Decl.). Since, as the D.C. Circuit has held, FDA's acceptance of an *original application* is "merely the first step in the agency's approval process," *Pfizer v. Shalala*, 182 F.3d 975, 978 (D.C. Cir. 1999), it follows that FDA's acceptance of an *amendment* is likewise not final agency action.

UTC contends that FDA's "review of whether to grant final approval to Liquidia's amended NDA … will *not* provide any occasion for FDA to revisit its acceptance decision." Compl. ¶ 72 (emphasis added); *see* PI 20. UTC's contention lacks merit. After accepting an amendment for review, FDA retains power to reject it or unbundle it. *See* FDA, Manual of Policies and Procedures 6050.1 Rev. 2: Effect of Failure to Pay PDUFA Fees (Dec. 3, 2021), p. 4 (attached as Ex. 2 to the Killian Decl.). FDA has exercised its unbundling power before.[3]

UTC's contention is also disingenuous, as its own conduct confirms. Two months after the September email, which UTC now describes as final and irrevocable, UTC sent FDA a letter "urging FDA to rescind" its alleged decision to accept the July Amendment—that is, urging FDA to unbundle the July Amendment. Compl. ¶ 76;

---

[3]     In the case of EMLA® (lidocaine/prilocaine) Anesthetic Disc (NDA 020962), FDA reclassified a supplement to the original NDA as a separate NDA. *See* FDA Approval Letter for EMLA Anesthetic Disc, p. 1 (Feb. 4, 1988), *at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/98/20962.pdf. FDA reclassified a supplement for Gonal-F (follitropin alfa) (NDA 021765) as a new NDA. *See* Medical Reviews for Gonal-F (NDA 21-765), p. 5 (Mar. 4, 2004), *at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2004/021765s000_MedR.pdf.

*see also* Burgess Decl. Ex. 6 p. 2 (arguing that FDA could "unbundle"). UTC's current assertion that FDA is powerless to reject the July Amendment must be seen for what it is—an expediency to make the September email seem like final agency action.

### 2.    The September email does not affect UTC's rights.

The foundation of UTC's motion is that it has a right to "statutory, automatic 30-month stay." PI 1. *Accord* PI 3, 5, 21 ("statutory right to a 30-month stay"); PI 8 ("automatic 30-month stay"); PI 26, 29 ("valuable statutory right"). UTC contends that the September email is final agency action because it denies UTC this right. *See* Compl. ¶ 72; *see also* PI 20–21. UTC also contends that the loss of this right is what renders the September email the culmination of the agency's decision-making process. *See id.* (contending that FDA's continued review provides no opportunity for it to "revisit its procedural decision"). But "[t]hat approach bootstraps *Bennett*'s second prong into its first." *Soundboard*, 888 F.3d at 1272. The *Bennett* requirements are *cumulative*, not *alternative*. *See Sw. Airlines*, 832 F.3d at 275.

More fundamentally, UTC errs as a matter of law in contending that it is entitled to a 30-month stay of approval in these circumstances. Approval of a Section 505(b)(2) NDA must be "effective immediately" unless a patentholder brings an infringement action concerning a patent listed in the Orange Book "before the date on which the application (excluding an amendment or supplement to the application) was submitted." 21 U.S.C. § 355(c)(3)(C). The only patent UTC is seeking to enforce against Liquidia because of the July Amendment is the '327 patent, which UTC listed in the Orange Book in November 2023—*after* Liquidia submitted its Section 505(b)(2) NDA

and even *after* the July Amendment. *See* Compl. ¶¶ 56–57. Because that patent was listed so recently, a 30-month stay is not available now and could be available if and only if Liquidia were to file a brand-new NDA sometime after November 2023.

For the sake of argument, assume the July Amendment was inappropriate (it was not, *see* pp. 28–36, *infra*). That would, at most, cause FDA to reject the amendment as such. But, as explained below, it would not require Liquidia to file a brand-new NDA. In no event is UTC entitled to a new 30-month stay.

*1. Administrative unbundling.* If the July Amendment were inappropriate, FDA could administratively unbundle the amendment and treat it as an NDA *filed in July 2023*. FDA has unbundled applications in the past and assigned the amendment or supplement date as the unbundled NDA's filing date.[4] Under this scenario, no 30-month stay would trigger: if FDA unbundled the July Amendment, the filing date of the unbundled NDA would precede UTC's listing of the '327 patent in the Orange Book by four months—July 2023 versus November 2023.

*2. Supplementing.* Even if FDA rejected the amendment without unbundling, Liquidia would not have to file a brand-new NDA to obtain FDA approval to market Yᴜᴛʀᴇᴘɪᴀ for PH-ILD. UTC cites no authority that would require Liquidia to submit

---

4       For example, when FDA unbundled the supplement to the NDA for Gonal-F, *see* p. 18 n. 3, *supra*, FDA identified May 23, 2003 as the submission date of the administratively unbundled NDA—a date that corresponds to the date the supplement was submitted. *See* FDA Approval Letter for Gonal-F, p. 1 (Mar. 25, 2004), *at* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2004/21765ltr.pdf;   FDA Approval Package, Administrative Document(s) & Correspondence, Application 021765, at PDF pp. 68–69 (Mar. 2004), *at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2004/021765s000_AdminCorres.pdf.

a brand-new NDA to obtain that approval. This Court, in fact, has enjoined FDA's past attempt to require new NDAs for new indications. *See Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*, 226 F. Supp. 2d 204, 209, 222 (D.D.C. 2002). Instead of submitting a new NDA, the holder of an approved NDA can *supplement* it to add an indication. *See* 21 U.S.C. § 355(b)(4); 21 C.F.R. § 314.70(b)(2)(v). The Bundling Guidance, in fact, recommends supplements for adding indications. *See* PI Ex. 4 at 6 ("A request for approval of a new indication, or a modification of a previously approved indication, should be submitted individually in a separate supplement to an approved original application"). Just as *amendments* relate back to an NDA's original filing date and cannot trigger 30-month stays for newly listed patents, so do *supplements*. *See* 21 U.S.C. § 355(c)(3)(C) (linking 30-month stays to "the date on which the application *(excluding an amendment or supplement to the application)* was submitted") (emphasis added). UTC cites no authority that would forbid Liquidia from seeking approval to market Yutrepia for PH-ILD by supplementing its approved NDA. Indeed, supplementing is how UTC itself obtained FDA approval to market Tyvaso for PH-ILD. *See* Compl. ¶¶ 40–42. UTC cannot credibly dispute that Liquidia has the same right.

   *3. Stays under Section 505(c)(3)(C) are not clearly automatic.* UTC insists that, if Liquidia filed a brand-new NDA, then UTC would have a "statutory right" (PI 1, 3, 5, 20, 21, 26, 29, 34, 36) to an "automatic" 30-month stay (PI 1, 3, 4, 8, 12, 20, 23, 32, 34, 36). But the statutory text concerning 30-month stays for Section 505(b)(2) NDAs is not so clear and suggests that, at least in some instances, stays are discretionary:

> If [an infringement] action is brought before the expiration of such days, the approval [of the Section 505(b)(2) NDA] *may be made effective* upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under subsection (b)(3) …

21 U.S.C. § 355(c)(3)(C) (emphasis added). Unlike the verb "shall," the verb "may" implies a "discretionary character." *Bennett v. Panama Canal Co.*, 475 F.2d 1280, 1282 (D.C. Cir. 1973); *see Dickson v. Sec. of Defense*, 68 F.3d 1396, 1401 (D.C. Cir. 1995) (holding that "a permissive term such as 'may' … suggests that Congress intends to confer some discretion on the agency …"). Statutory context suggests that the verb "may" implies discretion here. *See Farmers' & Merchants' Bk. of Monroe, N.C. v. Fed. Rsrv. Bk. of Richmond, Va.*, 262 U.S. 649, 662–63 (1923). The subparagraph for 30-month stays for ANDAs is worded nearly identically—except that it uses the verb "shall" instead of "may." *See* 21 U.S.C. § 355(j)(5)(B)(iii) ("approval … *shall be made effective* upon the expiration of the thirty-month period …) (emphasis added). "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Kingdomware Techns., Inc. v. United States*, 579 U.S. 162, 171 (2016). That Congress varied these verbs in parallel subparagraphs suggests that Congress intended a difference. *See Bittner v. United States*, 598 U.S. 85, 94 (2023). Accordingly, UTC is not likely to establish a key premise of its case—that "legal consequences *clearly* flow *directly*" from FDA's initiation of review of the July Amendment. PI 20 (emphases added).

\* \* \* \*

UTC's rights were not determined in September. Even if the July Amendment were inappropriate, FDA could "unbundle" it while retaining the July filing date—

which would not trigger a 30-month stay. Or, Liquidia could seek approval to add the PH-ILD indication to the YUTREPIA label through a supplement (the same way UTC added the PH-ILD indication to the TYVASO label)—which would not trigger a 30-month stay. Or, FDA may have discretion to decline to stay approval for 30 months. In any instance, UTC lacks a "statutory entitlement" to 30-month stay, PI 30, and, for that reason, is not likely to prevail on the merits.

## B.   Alternative remedies preclude UTC's APA claim.

Even when final agency action exists, the APA authorizes judicial review only when "there is no other adequate remedy in a court." 5 U.S.C. § 704. An alternative remedy can be adequate even if not perfectly coextensive with the APA. *See Garcia v. Vilsack*, 563 F.3d 519, 525 (D.C. Cir. 2009). A remedy is adequate when it provides the plaintiff roughly the same "ultimate relief." *Avadel CNS Pharms., LLC v. Becerra*, 638 F. Supp. 3d 23, 32 (D.D.C. 2022). A cause of action against third parties can be an adequate alternative. *See El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 396 F.3d 1265, 1271 (D.C. Cir. 2005) (collecting cases).

Here, UTC complains about the July Amendment, in order to delay YUTREPIA's entry into the market while UTC prosecutes its claim that YUTREPIA infringes the '327 patent. UTC does not need the APA to object to the July Amendment or to keep YUTREPIA off the market. Congress has provided UTC effective non-APA remedies.

### 1.   Infringement litigation

UTC's effort to obtain a 30-month stay is ultimately an effort to delay approval of Liquidia's amended NDA and keep Liquidia from marketing YUTREPIA for PH-ILD

while UTC's patent litigation proceeds. Under the FDCA, when a 30-month stay is triggered, it initially delays FDA's approval of a Section 505(b)(2) NDA for 30 months, *see* 21 U.S.C. § 355(c)(3)(C), but the actual length of the delay is ultimately controlled by the district court hearing the patent litigation. That district court can make a stay "shorter or longer" if one side is unreasonably slowing down proceedings. *Id.* If that court invalidates the patent or finds no infringement before 30 months, approval is effective immediately. *Id.* § 355(c)(3)(C)(i)(I). If that court finds infringement, the court must set the date when approval can become effective. *Id.* § 355(c)(3)(C)(ii)(II). As UTC recognizes, the 30-month stay is not an end in and of itself but functions like a preliminary injunction for patent litigation. *See* PI 3 (describing the stay as a "right to maintain the status quo while the patent fight proceeds"); PI 8 (admitting the stay ends with the patent litigation); *see also* PI 29 (quoting cases).

Owing to the clear statutory links between the 30-month stay and patent litigation, Judge Mehta recently denied a preliminary injunction and dismissed an APA claim, holding that "Congress plainly contemplated that the affirmative patent litigation … would itself resolve any dispute between the patentholder and the NDA applicant and lead to the establishment of the effective date of approval for the NDA." *Avadel*, 638 F. Supp. 3d at 33. In that case, the APA claim was filed by the NDA applicant, who objected to FDA's decision that the applicant had to submit a patent certification, which in turn triggered a 30-month stay. *See id.* at 28. While the immediate question Avadel posed (whether a certification was required) is different than the immediate question UTC poses (whether the July Amendment was appropriate),

the ultimate questions in both cases are identical (whether to stay effective approval for 30 months). And it was that ultimate question which Judge Mehta held Congress intended to be answered in patent litigation, not APA litigation. *See id.* at 33–34.

The second, still-pending patent litigation that UTC brought against Liquidia in the Delaware District Court can vindicate the rights and interests UTC wants to vindicate here. That court is empowered to set the effective date of approval of Liquidia's Section 505(b)(2) NDA, as amended, and prevent Liquidia from marketing YUTREPIA for PH-ILD. *See* 35 U.S.C. § 271(e)(4)(A)–(B). The relief the Delaware District Court could grant is *superior* to the relief this Court could grant. If this Court granted everything UTC wants—ordering FDA to reject the July Amendment, requiring Liquidia to file a brand-new NDA, and staying approval for 30 months (*see* Compl. p. 33 *a–e*)—the Delaware District Court could undo it all by shortening the 30-month stay, invalidating the '327 patent, or finding no infringement. Patent litigation is a more-than-adequate alternative to an APA claim in UTC's situation.

UTC cannot disagree. Just seven days before filing its motion for a preliminary injunction against FDA in this Court, UTC filed a motion for a preliminary injunction against Liquidia in the patent litigation. *See* Motion for Preliminary Injunction (ECF 25), *UTC v. Liquidia Techns., Inc.*, Case No. 1:23-cv-975-RGA (D. Del. Feb. 26, 2024). That motion asks the Delaware District Court to enjoin Liquidia from making, marketing, and selling YUTREPIA for PH-ILD "until a final decision on the merits of the issues of infringement, validity, and enforceability of" the '327 patent. *Id.* In both motions, UTC presents an identical theory and identical evidence of irreparable

harm. The only difference between the motions is trivial: UTC's motion in the patent case seeks *directly* the relief that UTC's motion in this case seeks *indirectly*—delaying YUTREPIA's entry into the market. Because "the adequate remedy inquiry focuses on the outcome sought by the movant," *Avadel*, 638 F. Supp. 3d at 34, UTC's patent claims preclude UTC's APA claims.

### 2.   Citizen petitions

UTC also has failed to avail itself of remedies Congress provided under the FDCA. Nonparty citizens must file administrative petitions for FDA "to take any form of action relating to" an NDA, including delaying approval. 21 U.S.C. § 355(q)(1)(A). FDA, in turn, must "take final agency action on a petition" within "150 days," a period that cannot be "extend[ed] … for any reason." *Id.* § 355(q)(1)(F). Afterward, a petitioner unhappy with FDA's response may seek judicial review. *Id.* § 355(q)(2)(A)–(C).

The FDCA imposes no limits on the content of the objections a citizen petition may raise, so UTC could have used this administrative process to object to the July Amendment at any time. Had UTC submitted a citizen petition when it received notice of the July Amendment (July 2023, *see* Compl. ¶¶ 50–52), when it sued Liquidia for patent infringement (September 2023, *see* Compl. ¶ 53), or when Liquidia announced that FDA accepted the July Amendment for substantive review (September 2023, *see* Compl. ¶¶ 54–56), the 150-day clock would have run out by the end of February 2024. This Court would have everything it needs to undertake judicial review: final agency action and an administrative record. Instead, the Court has neither.

The letter UTC sent FDA in December 2023 is not a citizen petition. *See* Burgess Decl. Ex. 6. It lacks a certification and verification and is not signed and submitted under penalty of perjury, which Congress required and for which Congress provided precise wording. *See id.* § 355(q)(1)(H)–(I). Treating the December letter as a citizen petition would not save UTC's case, either, because the 150-day clock on that letter will not run out until May 2024. This suit would be premature, and the Court would have to dismiss "for failure to exhaust administrative remedies." *Id.* § 355(q)(2)(B).

Federal courts cannot "enjoin unlawful executive action" when doing so would contradict "express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Because citizen petitions are the only way for third parties to obtain judicial review before FDA finally acts on an application, *see* 21 U.S.C. § 355(q)(2), this Court cannot grant equitable relief until UTC exhausts administrative remedies, *see Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247–48 (D.C. Cir. 2004). And because citizen petitions cannot "delay approval of a pending application" except when "necessary to protect public health," 21 U.S.C. § 355(q)(1)(A)—something UTC has *never* claimed here—this Court cannot delay FDA's approval of Liquidia's Section 505(b)(2) NDA in these circumstances. UTC's motion for interim relief is an end-run around these statutory limitations and manifestly contrary to the detailed and orderly scheme that Congress devised.

C.    The July Amendment was appropriate.

1.    The FDCA and FDA's regulations authorize amendments to add indications.

The FDCA acknowledges an applicant's right to amend a pending application. For example, Congress anticipated that an "amendment or supplement" might implicate patents and obligated applicants to send patent notifications "at the time at which the applicant submits the amendment or supplement, regardless of whether the applicant has already given notice with respect to another such certification contained in the application or in an amendment or supplement to the application." 21 U.S.C. § 355(b)(3)(B)(ii). And, as discussed above, Congress specified that amendments do not trigger 30-month stays for patents listed in the Orange Book after the date of the underlying Section 505(b)(2) NDA. *See id.* § 355(c)(3)(C).

FDA's regulations enshrine the right to amend. *See* 21 C.F.R. § 314.60(a) ("[T]he applicant may submit an amendment to an NDA … ."). The regulations identify when amendments are allowed, when they aren't, and the requirements for different types of amendments. Relevant to the July Amendment, the regulations specifically state that, when applicants amend a Section 505(b)(2) NDA "to add a new indication," they must submit patent certifications as well. 21 C.F.R. § 314.60(f). If new indications never could be added by amendment, FDA would not have needed to require applicants to submit patent certifications along with those amendments. Another regulation holds that "major amendments" to a Section 505(b)(2) NDA "may not include data to support an indication or claim that was not included in the original NDA." 21 C.F.R. § 314.60(b)(6). Again, if new indications never could be added by

28

amendment, FDA would not have needed to limit the data submitted "to support an indication … that was not included in the original NDA." *Id.*

Amendments to add an indication also are not included on FDA's list of prohibited amendments. The FDCA prohibits amending a Section 505(b)(2) NDA to "seek approval of a drug that is a *different drug* than the drug identified in the application as submitted." 21 U.S.C. § 355(b)(4)(A) (emphasis added). In regulations, FDA lists everything that it views as qualifying as a "different drug"—a "different active ingredient," "different route of administration," "different dosage form," and more. 21 C.F.R. § 314.60(e). Absent from that list is a new or different indication.

That exclusion was no oversight. In the MMA rulemaking, FDA drew a line between changes to a drug *itself* and changes just to a drug's *label*, and FDA rejected the view that changes to a label create a "different drug." *See* MMA Proposed Rule, 80 Fed. Reg. 6802, 6851 ("If labeling changes … could not be made through an amendment or a supplement to a 505(b)(2) application, each such change would require the submission of a separate 505(b)(2) application, with related regulatory and administrative burdens, and user fee and review cycle implications. *We did not adopt this reading because it would have resulted in an unwarranted departure from FDA's previous practice for handling such changes.*") (emphasis added). Indications relate to a drug's label, not to the drug itself. *See* p. 6 n. 1, *supra*. Accordingly, one of FDA's examples of an appropriate amendment involved a new indication. *See* MMA Final Rule, 81 Fed. Reg. 69580, 69616 (stating that amending a Section 505(b)(2) NDA to

29

change the indication from prescription to over-the-counter status, after the listed drug holder made the same change, is permissible).

Seen in light of the distinction between changing a drug and changing a label, UTC's reliance on 21 U.S.C. § 355(b)(4)(B) is misplaced. *See* PI 13, 24. That provision specifies that "nothing in this subsection or subsection (c)(3) prohibits an applicant from amending or supplementing the application to seek approval of a different strength." 21 U.S.C. § 355(b)(4)(B). From this exemption for strength changes, UTC infers that the FDCA prohibits amendments proposing any other change, including adding indications. *See* PI 23–24. UTC's inference is unwarranted. Because an amendment proposing to change a drug's strength proposes to change the drug itself (not just the drug's label), the exemption merely shields such amendments from 21 U.S.C. § 355(b)(4)(A)'s prohibition against amendments for a "different drug."

Read as a whole, the FDCA and FDA's regulations allow amendments to add indications. UTC is not likely to prevail on the merits.

## 2. FDA's Bundling Guidance does not undermine the July Amendment.

Over time, FDA has announced a series of policies about application bundling, focused on timelines and agency resources. Before PDUFA, FDA developed regulations relating to review timeframes, including provisions relating to amendments. *See, e.g.*, New Drug and Antibiotic Regulations, 50 Fed. Reg. 7452, 7493 (Feb. 22, 1985). These regulations permitted amendments generally and provided that "major" amendments ("for example, an amendment that contains significant new data from a previously unreported study or detailed new analyses of previously submitted data")

would extend FDA's deadline for reviewing an application. *Id.* at 7498. Now codified at 21 C.F.R. § 314.60, the regulation has been updated many times, always with a focus on the resource-intensity of an amendment and how it affects the agency's timelines and costs.

FDA issued Interim Bundling Guidance in 1993 (Burgess Decl. Ex. 3) and modified it in 2004 (Burgess Decl. Ex. 4). This latest version of the Bundling Guidance addresses a range of changes that applicants might make to an application. The Bundling Guidance does not dictate what applicants can and cannot do, but advises on how applicants' choices affect the agency's timelines and costs. The Bundling Guidance explicitly states that it "discusses (1) what should be contained in separate marketing applications and what should be combined into one application (bundling guidance) *for purposes of assessing user fees* and (2) the definition of clinical data *for purposes of assessing user fees.*" Burgess Decl.  Ex. 4 at 2 (emphases added). Similarly, if an applicant bundles inconsistently with the Bundling Guidance, FDA advises that it "will notify the applicant and *request additional fees*, if appropriate." *Id.* (emphasis added). Significantly, FDA explains that "[t]his action will not prevent the filing of the application if it is otherwise suitable for filing, or its review, if it is otherwise ready for review." *Id.*

Gliding by these limitations and qualifiers, UTC maintains the Bundling Guidance flatly forbids amending a pending Section 505(b)(2) NDA to add a new indication and, in Liquidia's situation, "require[es] the company to submit a new application." PI 21. But the Bundling Guidance is not a requirement and does not have the "force

of law." PI 22. FDA's guidance documents generally "do not establish legally enforce-able rights or responsibilities" and "do not legally bind the public or FDA." 21 C.F.R. § 10.115(c)(3). The Bundling Guidance, in particular, warns that "FDA's guidance documents, *including this guidance*, do not establish legally enforceable responsibili-ties." Burgess Decl. Ex. 4 at 1 (emphasis added).[5] UTC ignores this disclaimer and, citing two cases, argues that courts sometimes treat guidance as a "rule" subject to judicial review—at least when the guidance alters and controls private conduct. *See* PI 22. Yet UTC adduces no evidence to meet that high standard; UTC shows only that, in some circumstances, FDA has followed its Bundling Guidance. *See* PI 23. If that transformed guidance into a rule, *all* guidance would be a rule.

Consistent with the conclusion that the Bundling Guidance is not a rule, the por-tions of the Guidance that UTC quotes merely *recommend* submitting a new applica-tion to add indications. *See* Burgess Decl. Ex. 4 at 5–6 (using verbs like "should" and "recommends"). The Guidance states that it "should be viewed only as recommenda-tions, unless specific regulatory or statutory requirements are cited. *The use of the word should in Agency guidances means that something is suggested or recom-mended, but not required.*" Burgess Decl. Ex. 4 at 1 (emphasis added). Plainly, the Guidance does not *prohibit* amendments to add indications. FDA's practice of

---

5       The Interim Bundling Guidance was more direct: "This document is not a pro-posed rule or a rule. It is not binding on either FDA or sponsors, and does not create of confer any rights, privileges, or benefits for or on any person." Burgess Decl. Ex. 3 at 2.

administratively unbundling inappropriate amendments, *see* pp. 18 & 20, *supra*, confirms that the recommendations in Bundling Guidance are not requirements.

FDA's MMA regulations, promulgated more than a decade after FDA revised the Bundling Guidance in 2004, also confirm that UTC's interpretation of the Bundling Guidance is incorrect. UTC characterizes the Bundling Guidance as prohibiting *all* amendments adding indications, but the newer MMA regulations establish, at a minimum, that *some* amendments adding indications are appropriate. *See* pp. 28–30, *supra*. Critically, UTC conceded the regulation's import in its reply letter to FDA. *See* Burgess Decl. Ex. 8 p. 13 (admitting that the MMA regulations "contemplate that an amendment for a new indication may be submitted in certain circumstances"). Even if UTC were correct that the Bundling Guidance at one time forbade amendments adding indications, the MMA regulations would supersede it. *See Bailey v. Fulwood*, 793 F.3d 127, 134 (D.C. Cir. 2015) ("[I]t would be somewhat unusual to deem that the unpublished 1991 Policy Guideline trumps a … published regulation.").

UTC contends that the Bundling Guidance "has become embedded into the statutory and regulatory structure" and that Congress enacted the MMA "against the backdrop" of the Bundling Guidance. PI 23. UTC's contention is a misdirection: the dispute here is not about the Bundling Guidance *as a whole* but about UTC's incorrect reading of *one aspect* of the Guidance—amendments adding indications to Section 505(b)(2) NDAs. That Congress in legislative history[6] and FDA in regulatory

---

6    If Congress wanted to freeze the Bundling Guidance, it had to do so in statutory text, not legislative history. *See In re Sealed Case*, 237 F.3d 657, 669 (D.C. Cir. 2001) ("The limits on the [agency's] authority—like that authority itself—are derived

preambles expressed support for FDA's past bundling policies *generally*, *see* PI 23, cannot defeat the import of *specific*, later-promulgated regulations allowing and contemplating amendments to add indications to Section 505(b)(2) NDAs.

### 3.   Accepting the July Amendment would not be inconsistent with prior FDA decisions.

Collecting examples of times when FDA supposedly rejected amendments, UTC contends that FDA departed from past practice by treating Liquidia more favorably than other applicants. *See* PI 24–26. Because Liquidia's Section 505(b)(2) NDA is confidential, UTC's claim that FDA has failed to provide a reasoned explanation for its decision to accept the July Amendment is pure speculation. "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Without an administrative record revealing FDA's explanation for its action on the July Amendment, the Court cannot find that UTC is likely to prevail on this contention. *See Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001) (holding that courts need an administrative record before they "assess probability of success on the merits" in APA cases).

What's more, because the administrative records in UTC's examples are not public, it is not clear that FDA even did something different in Liquidia's case. From what Liquidia can tell, every example UTC cites is distinguishable. Liquidia amended its Section 505(b)(2) NDA to add an indication, something the current regulations

---

from statutory provisions, not from loosely worded fragments extracted from congressional reports and speeches.").

permit. UTC's examples appear to be different because they either (1) do not involve Section 505(b)(2) NDAs,[7] (2) do not involve amendments adding indications,[8] or (3) precede the 2016 rulemaking in which FDA clarified that Section 505(b)(2) NDAs can be amended to add indications.[9]

---

[7] Two examples involve Biologics License Applications (BLAs), not Section 505(b)(2) NDAs, and are not governed by 21 C.F.R. § 314.60(b)(6), (e), and (f). *See* FDA, BLA Accelerated Approval Letter, BLA 761223, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2021/761223Orig1s000ltr .pdf; FDA, Approval Package, Proprietary Name Review(s), Application Nos. 761825 & 761331, file p. 2–3 (Sept. 22, 2023), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2024/761285Orig1s000,761331 Orig1s000NameR.pdf.

[8] Three examples sought to change the dosage form of the product, which 21 C.F.R. § 314.60(e) prohibits. NDA 210709 had a proposal to change the product from a tablet to a capsule. *See* FDA, Approval Package, Administrative and Correspondence Documents, NDA 210709 (TEKTURNA), PDF p.60 (Unacceptable For Filing Review Letter) (May 2017), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/210709Orig1s000AdminC orres.pdf. NDA 209400 had a proposal to change the product from a delayed-release tablet to a delayed-release orally disintegrating tablet. *See* FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 209400 (Omeprazole Delayed-release Orally Disintegrating Tablets), PDF pp. 63–64 (Nov. 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/209400Orig1s000AdminC orres.pdf. And NDA 208780 had a proposal to change the product from a capsule to a film-coated tablet. *See* FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 208780 (Esbriet), PDF p. 76 (May 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/208780Orig1s000AdminC orres.pdf.

[9] NDA 021822 was approved in June 2008. *See* FDA, NDA Approval Letter, NDA 021822, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2008/021822s000ltr.pdf. NDA 206628 was approved in October 2015. *See* FDA, NDA Approval Letter, NDA 206628, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2015/206628Orig1s000ltr .pdf.

The "fundamental norm" that agencies should "treat like cases alike," PI 24 (quoting *Westar Energy v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007)), presupposes "like cases." UTC has not identified any cases like Liquidia's—no amendment UTC cites is "evidently *identical*" to the July Amendment. *Colo. Interstate Gas Co. v. FERC*, 850 F.2d 769, 774 (D.C. Cir. 1988) (emphasis added). Each example presents at least one "relevant distinction." *Westar Energy*, 473 F.3d at 1241. So even if the administrative record were filed, UTC still would not be likely to prevail on the merits of its arbitrary-treatment theory.

### 4.    The July Amendment is not a major amendment including new data.

UTC objects that the July Amendment violates FDA rules governing "major amendments." *See* PI 27–28. UTC cites 21 C.F.R. § 314.60(b)(6):

> A major amendment may not include data to support an indication or claim that was not included in the original NDA, supplement, or resubmission, but it may include data to support a minor modification of an indication or claim that was included in the original NDA, supplement, or resubmission.

This regulation does not prohibit the July Amendment.

UTC reads the regulation as if it prohibits *all* amendments adding indications. But the regulation applies only to "major amendments" and, even then, only to major amendments that "include data to support an indication or claim that was not included in the original NDA." *Id.* The July Amendment, however, includes no new clinical data supporting the PH-ILD indication or otherwise. Consistent with the FDCA and FDA regulations, *see* 21 U.S.C. § 355(b)(2); 21 C.F.R. § 314.54(a)(1)(iii), the July Amendment relies on FDA's prior finding that TYVASO is safe and effective

for PH-ILD. Because the July Amendment includes no new data, it cannot violate rules concerning major amendments containing new data.[10]

UTC resists Liquidia's characterization of the July Amendment. Having never seen the confidentially submitted July Amendment, UTC accepts Liquidia's representation that it submitted no "new data *of its own* with its amendment," but argues that Liquidia's reliance on FDA's approval of UTC's supplement to the TYVASO NDA for PH-ILD nonetheless qualifies as "includ[ing] data to support" a new indication. PI 27–28 (emphasis added). That is not how the Section 505(b)(2) NDA process works. The whole point of Section 505(b)(2) is to authorize NDAs based on FDA's prior findings of safety and effectiveness, not on the prior applicants' data. *See* 21 U.S.C. § 355(b)(2) ("a drug for which the investigations … relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from [the listed drug holder]"). A Section 505(b)(2) NDA cannot "include" data that another applicant submitted in its application because, by definition, a Section 505(b)(2) NDA applicant

---

10      UTC contends that the July Amendment is "major" because FDA classified it as a "Class II" amendment. *See* PI 27. These are different concepts. *See* 21 C.F.R. § 314.3 (defining "Class 1 resubmissions" and "Class 2 resubmissions"). The Standard Operating Policy and Procedure (SOPP) that UTC cites, *see* PI 13, does not equate major amendments with Class II amendments. Rather, the SOPP advises that major amendments are amendments with a "substantial amount of *new data not previously submitted to or reviewed by the Agency*, … [a] *major re-analysis* of previously submitted study/studies … [or a] *new analysis* of studies *not previously submitted* to the pending application or supplement." FDA, Standard Operating Policy and Procedure (SOPP) 8402: Designation as a Major (2023), p. 4 (attached as Ex. 3 to the Killian Decl. and available at https://www.fda.gov/media/84431/download) (emphasis added). UTC also misses that the SOPP applies only to applications under the purview of FDA's Center for Biologics Evaluation and Research. *Id.* at 1.

has no "right of reference." *Id.* Accordingly, FDA illustrated a major amendment as "an amendment that contains *significant* new data *from a previously unreported study* or detailed new analyses of previously submitted data." Applications for Approval to Market a New Drug; Complete Response Letter; Amendments to Unapproved Applications, 73 Fed. Reg. 39588, 39602 (July 10, 2008). Liquidia's reliance on FDA's prior finding of safety and effectiveness for TYVASO is not the same as reliance on data UTC submitted with its supplement. And even if it were, it would not be "significant *new* data from a previously *unreported* study," *id.* (emphases added), and treating it as such would preclude *all* amendments adding indications to Section 505(b)(2) NDAs, as well as other permitted amendments, like amendments proposing strength changes.

To be sure, many Section 505(b)(2) NDA applicants submit clinical data in support of the indications for which they seek approval. In those circumstances, 21 C.F.R. § 314.60(b)(6) very well might preclude amendments containing such data. It may be for this reason, and under the assumption that most amendments seeking to add indications would include such data, that FDA observed that "[m]ost requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to a 505(b)(2) application." MMA Final Rule, 81 Fed. Reg. 69580, 69616. The July Amendment, however, is not such an amendment—because it relies on FDA's approval of UTC's supplement to the TYVASO NDA for PH-ILD.

38

## II.    UTC will not suffer irreparable injury.

UTC claims it will suffer two sorts of irreparable injuries without interim relief. First is the loss of a statutory right. *See* PI 29–30. But since UTC has no right to a 30-month stay in this situation, *see* pp. 19–23, *supra*, UTC has no statutory right to lose. Second are economic injuries flowing from Liquidia's launch of Yutrepia in competition with Tyvaso. *See* PI 30–33. These injuries are not the sort of irreparable injuries that warrant equitable relief.

Citing the same cases UTC cites, *see* PI 31, courts in this district have rejected UTC's simplistic theory that a federal agency's sovereign immunity renders a plaintiff's economic losses inherently irreparable. "Any movant that could show any damages against an agency with sovereign immunity—even as little as $1—would satisfy the standard." *Air Transp. Ass'n of Am., Inc. v. Export-Import Bk. of the U.S.*, 840 F. Supp 2d 327, 335 (D.D.C. 2012). "The wiser formula requires that the economic harm be significant, even where it is irretrievable because a defendant has sovereign immunity." *Id.* "To demonstrate irreparable injury, a plaintiff must show that it will suffer harm that is more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." *Hi-Tech Pharmacal*, 587 F. Supp. 2d at 11 (internal quotation marks omitted). "'[M]erely economic' injuries" must be "sufficiently grave to constitute irreparable harm." *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 170 (D.D.C. 2008) (Bates, J.).

UTC has not tried to show that monetary losses it might experience when Yutrepia competes with Tyvaso pose an existential threat to UTC. UTC alleges lost sales,

price erosion, and lost first-mover advantage. *See* PI 32–33. Those are the ordinary economic consequences of competition, and UTC fails to establish that it will suffer serious or grave harms because of them. UTC does not allege, for instance, that it will go out of business. The most UTC musters is speculation that it "*may* be forced" to cut back research and development spending. PI 33 (emphasis added). In that regard, UTC will be no worse off than other drug manufacturers who, though they stood to lose millions of dollars in sales from increased competition, failed to establish irreparable injury in suits against FDA. *See, e.g.*, *Apotex, Inc. v. FDA*, 2006 WL 1030151, at *16–17 (D.D.C. April 19, 2006) (Bates, J.) (loss of $9.9 million); *Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) (loss of $31 million).

UTC cites no authority for its assertion that its right to recover infringement damages from Liquidia is irrelevant to the adequacy of its remedies at law. *See* PI 31–32. Since all economic harms UTC alleges arise from competing with Liquidia, and since UTC's alleged rights all relate to the '327 patent, it follows that infringement damages are at least *relevant*. UTC asserts that infringement damages are inadequate because they depend on UTC proving infringement and will not compensate UTC for injuries it might "suffer as a result of a premature and unlawful FDA approval." PI 31–32. That assertion is improperly treats the 30-month stay as a statutory period of exclusivity. The 30-month stay is not for UTC's economic benefit; as UTC elsewhere admits, "Congress designed" the 30-month stay "for the express purpose of enabling UTC's patent claims against Liquidia to be resolved." PI 3. If UTC ultimately proves infringement, any economic losses UTC might suffer from

competing with Liquidia can be compensated via infringement damages. And if UTC ultimately fails to prove infringement, any economic losses UTC might suffer from competing with Liquidia cannot sustain equitable relief. *See Lukens Steel Co. v. Perkins*, 107 F.2d 627, 647 (D.C. Cir. 1939), *rev'd*, 310 U.S. 113 (1940) (Edgerton, J., dissenting) ("[I]t is settled that one cannot complain of or prevent damage by lawful competition, even though the competition or its damaging character may be due to the action by officers of the United States which is attacked as lawless.").

Finally, UTC's economic damages are speculative. Even if the July Amendment were inappropriate, it would not change that, after the Delaware District Court vacates the injunction concerning the now-invalidated '793 patent, YUTREPIA will be eligible for full approval for PAH. UTC acknowledges that the economic losses it envisions include losses attributable to Liquidia's lawful sales of YUTREPIA for PAH. *See* PI 33. That UTC finds it "difficult to quantify" those losses vis-à-vis any losses it might incur from sales of YUTREPIA for PH-ILD, PI 33, only cuts against UTC's request for preliminary relief.

## III.   The equities and public interest weigh against UTC.

"[W]ell-worn principles of equity … can provide a sound basis for denying equitable relief." *Ramirez v. Collier*, 595 U.S. 411, 434 (2022). Among them are "late-breaking changes in position, last-minute claims arising from long-known facts, and other 'attempt[s] at manipulation'." *Id.* (quoting *Gomez v. United States Dist. Court for Northern Dist. of Cal.*, 503 U.S. 653, 654 (1992) (*per curiam*). UTC has engaged in these inequitable acts here.

UTC has been in a position to bring this action for months, yet sat on its rights and delayed bringing this "last-minute claim[] arising from long-known facts," *Ramirez*, 595 U.S. at 434, until its exclusive marketing period for PH-ILD was nearly expired. UTC learned about the July Amendment in July 2023 when Liquidia sent UTC Paragraph IV notices referencing the amendment, and UTC responded by initiating infringement litigation in September 2023. *See* Compl. ¶ 53. A few weeks later, UTC learned that FDA acknowledged receipt of the July Amendment. *See* Compl. ¶ 54. A few weeks after that, UTC obtained a copy of the September email. *See* Compl. ¶ 55. The emergency underlying UTC's motion is of UTC's own making.

UTC's letter-writing campaign does not justify waiting to seek relief. UTC should have known that its letters could not generate a delay because the FDCA clearly states that citizen petitions are the only way for nonparties to ask FDA to delay approval of pending Section 505(b)(2) NDAs. *See* pp. 26–28, *supra*. Furthermore, while UTC's letters asked FDA to reject the July Amendment, *see* Burgess Decl. Ex. 6 p. 2, UTC now argues that its letters were pointless because FDA supposedly has no "occasion … to revisit its acceptance decision" after September, Compl. ¶ 72. UTC switches position because UTC mistakenly thinks it establishes final agency action, *see* PI 20, yet this "late-breaking change[] in position," *Ramirez*, 595 U.S. at 434, weighs against UTC's request for interim relief.

UTC's "attempts at manipulation," *id.*, impose costs on the Court and on Liquidia. For example, in connection with its duplicative preliminary-injunction motion in the Delaware District Court, UTC and Liquidia are engaged in substantial discovery

42

concerning UTC's claim of irreparable injury. Just one business day before Liquidia filed this opposition, Liquidia's patent counsel deposed the same expert whose report UTC attached to its preliminary-injunction motion in this Court. It smacks of games-manship for UTC to ask this Court for interim relief *with no discovery* while relying on an expert report that is the subject of *intense discovery* in UTC's parallel patent litigation.

As "often happens … one party or the other will be injured whichever course is taken." *Del. & Hudson Ry. Co. v. United Transp. Union*, 450 F.2d 603, 620 (D.C. Cir. 1971). Temporarily enjoining FDA's ability to approve Liquidia's amended Section 505(b)(2) NDA for PH-ILD will obviously harm Liquidia by keeping YUTREPIA off the market for this indication, and it disserves the public interest in accelerating compe-tition in the drug market and providing patients with additional treatment options. *See Boehringer Ingelheim Corp. v. Shalala*, 993 F. Supp. 1, 3 (D.D.C. 1997); *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (observing that, in FDA cases, "the public interest … is inextricably linked with the merits of the case").

## Conclusion

The Court should deny UTC's motion for preliminary relief.


Dated: March 18, 2024                  Respectfully submitted,

                                       /s/ Bryan Killian
                                       Bryan Killian (DC Bar No. 989803)
                                       David B. Salmons (DC Bar No. 476299)
                                       MORGAN, LEWIS & BOCKIUS LLP
                                       1111 Pennsylvania Avenue, NW
                                       Washington, DC 20004
                                       T: (202) 373-6191
                                       F: (202) 739-3001
                                       bryan.killian@morganlewis.com
                                       david.salmons@morganlewis.com

44