IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED THERAPEUTICS CORP.,

      *Plaintiff,*

   v.

FOOD AND DRUG ADMINISTRATION, *et al.,*

      *Defendants,*

   and

LIQUIDIA TECHNOLOGIES, INC.,

      *Defendant-Intervenor.*

No. 24-cv-484-JDB

LIQUIDIA TECHNOLOGIES, INC.'S
MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION TO DISMISS

# Table of Contents

Introduction ................................................................................................ 1

Statutory and Regulatory Background ...................................................... 2

    I.    505(b)(2) NDAs and 30-month stays ............................................ 2

    II.   Amendments to 505(b)(2) NDAs ................................................... 4

Factual Background ................................................................................... 6

    I.    Liquidia's 505(b)(2) NDA ............................................................. 6

    II.   The July Amendment of Liquidia's 505(b)(2) NDA ..................... 8

    III.  UTC's last-ditch effort to delay approval of Liquidia's 505(b)(2) NDA. ...... 9

Argument ................................................................................................ 12

    I.    UTC hasn't been and won't be deprived of a 30-month stay. ................... 12

    II.   UTC challenges non-final agency action. ................................... 17

    III.  Adequate remedies preclude UTC's APA claim. ........................ 20

    IV.  The July Amendment was procedurally appropriate. ................ 24

         1.   505(b)(2) applicants may amend to add new indications. .............. 25

         2.   UTC fails to get around the regulations that allow amending 505(b)(2) NDAs to add new indications. ........................... 26

         3.   Accepting the July Amendment is not inconsistent with prior FDA decisions. ........................................ 33

         4.   The July Amendment does not violate regulations about data submitted with amendments. ................................ 35

Conclusion ............................................................................................. 39

# Table of Authorities

## Cases

*Alfa Int'l Seafood v. Ross,*
    264 F. Supp. 3d 23 (D.D.C. 2017) ........................................................................ 19

*Ass'n of Am. Physicians & Surgeons, Inc. v. FDA,*
    226 F. Supp. 2d 204 (D.D.C. 2002) ..................................................................... 15

*Avadel CNS Pharms., LLC v. Becerra,*
    638 F. Supp. 3d 23 (D.D.C. 2022) ......................................................... 20, 22, 23

*Bailey v. Fulwood,*
    793 F.3d 127 (D.C. Cir. 2015) .............................................................................. 28

*Bennett v. Spear,*
    520 U.S. 154 (1997) ...................................................................................... 16, 17

*Bethesda-Chevy Chase Broadcasters, Inc. v. FCC,*
    385 F.2d 967 (D.C. Cir. 1967) .............................................................................. 18

*Cal. Cmtys. Against Toxics v. EPA,*
    934 F.3d 627 (D.C. Cir. 2019) .............................................................................. 18

*Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.,*
    527 F.3d 1278 (Fed. Cir. 2008)............................................................................... 3

*Cities of Anaheim & Riverside, Calif. v. FERC,*
    692 F.2d 773 (D.C. Cir 1982) .............................................................................. 18

*Clifton Power Corp. v. FERC,*
    294 F.3d 108 (D.C. Cir. 2002) .............................................................................. 19

*Colo. Interstate Gas Co. v. FERC,*
    850 F.2d 769 (D.C. Cir. 1988) .............................................................................. 33

*CSX Corp. v. United States,*
    909 F.3d 366 (11th Cir. 2018) .............................................................................. 30

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS,*
    396 F.3d 1265 (D.C. Cir. 2005)............................................................................. 20

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) .............................................................................................. 33

*Garcia v. Vilsack,*
    563 F.3d 519 (D.C. Cir. 2009) ............................................................................. 20

*Int'l Telecard Ass'n v. FCC,*
    166 F.3d 387 (D.C. Cir. 1999) ............................................................................. 19

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................ 17

*Nasdaq Stock Market LLC v. SEC,*
    1 F.4th 34 (D.C. Cir. 2021) ................................................................................. 18

*Pfizer v. Shalala,*
    182 F.3d 975 (D.C. Cir. 1999) ............................................................................. 18

*RadLAX Gateway Hotel LLC v. Amalgamated Bk.,*
    566 U.S. 639 (2012) ............................................................................................ 29

*In re Sealed Case,*
    237 F.3d 657 (D.C. Cir. 2001) ............................................................................. 30

*Soundboard Ass'n v. FTC,*
    888 F.3d 1261 (D.C. Cir. 2018)........................................................................... 19

*Sw. Airlines Co. v. U.S. Dept. of Transp.,*
    832 F.3d 270 (D.C. Cir. 2016) ............................................................................. 17

*TeleSTAR, Inc. v. FCC,*
    888 F.2d 132 (D.C. Cir. 1989) ............................................................................. 19

*UTC v. Liquidia Techns., Inc.,*
    2023 WL 8794633 (Fed. Cir. Dec. 20, 2023) ........................................................ 7

*UTC v. Liquidia Techns., Inc.,*
    74 F.4th 1360 (Fed. Cir. 2023) ............................................................................. 7

*UTC v. Liquidia Techns., Inc.,*
    No. 1:20-cv-755 (D. Del. Dec. 28, 2021) ............................................................... 7

*UTC v. Liquidia Techns., Inc.,*
    No. 1:23-cv-975-RGA (D. Del. Jan. 22, 2024) ....................................................... 8

*Veloxis Pharm., Inc. v. FDA,*
    109 F. Supp. 3d 104 (D.D.C. 2015) ...................................................................... 3

*Wash. Legal Found. v. Henney,*
    202 F.3d 331 (D.C. Cir. 2000) ............................................................................. 29

*iii*

*Watt v. Alaska,*
    451 U.S. 259 (1981) .................................................................................. 29

*Westar Energy v. FERC,*
    473 F.3d 1239 (D.C. Cir. 2007)............................................................. 33, 34

## Statutes

5 U.S.C. § 704.................................................................................... 17, 20

21 U.S.C. § 355(a) ...................................................................................... 2

21 U.S.C. § 355(b)(1) .............................................................................. 2, 3

21 U.S.C. § 355(b)(2) ............................................................................ 2, 37

21 U.S.C. § 355(b)(2)(A)(iv) ....................................................................... 3

21 U.S.C. § 355(b)(3)(B)(ii) ...................................................................... 25

21 U.S.C. § 355(b)(4) ................................................................................ 15

21 U.S.C. § 355(b)(4)(A) .................................................................. 4, 31, 33

21 U.S.C. § 355(b)(4)(B) ............................................................. 4, 31, 32, 33

21 U.S.C. § 355(c)(1) ................................................................................ 28

21 U.S.C. § 355(c)(3)(C) ....................................................................*passim*

21 U.S.C. § 355(c)(3)(C)(i)(I) ................................................................... 21

21 U.S.C. § 355(c)(3)(C)(ii)(II) ................................................................ 21

21 U.S.C. § 355(d) ...................................................................................... 2

21 U.S.C. § 355(j)(4) ................................................................................ 28

21 U.S.C. § 355(j)(5)(B)(iii) ..................................................................... 15

21 U.S.C. § 355(j)(7)(A)(i) ..................................................................... 2, 3

35 U.S.C. § 271(e)(4)(A)–(B) ................................................................... 21

Medicare Prescription Drug, Improvement, and Modernization Act of
    2003, Pub. L. No. 108-173, 117 § 314.70 Stat. 2065 (2003) ....................... 4

# Other Authorities

21 C.F.R. § 10.115(d)(1) ......................................................................... 27

21 C.F.R. § 201.57(a)(6) ........................................................................... 5

21 C.F.R. § 201.57(c)(2) ........................................................................... 5

21 C.F.R. § 314.54 .................................................................... 35, 36, 37

21 C.F.R. § 314.54(a) ..................................................................... 35, 36

21 C.F.R. § 314.54(a)(1)(ii) .................................................................. 35

21 C.F.R. § 314.54(a)(1)(iii) .................................................. 2, 35, 37, 38

21 C.F.R. § 314.54(a)(1)(iv) ................................................................. 36

21 C.F.R. § 314.60(a) ....................................................................... 4, 25

21 C.F.R. § 314.60(b)(6) ....................................................... 11, 25, 35, 36

21 C.F.R. § 314.60(e) .................................................................. 5, 32, 34

21 C.F.R. § 314.60(f) ....................................................................... 5, 25

21 C.F.R. § 314.60(f)(1) ...................................................................... 30

21 C.F.R. § 314.70(b)(2)(v) ................................................................. 15

21 C.F.R. § 314.101(a)(1) .................................................................... 18

MMA Final Rule, 81 Fed. Reg. 69580 .......................................... 30, 31

MMA Proposed Rule, 80 Fed. Reg. 6802 ...................................... 30, 32

# Glossary

| | |
|---|---|
| ANDA | abbreviated new drug application |
| Bundling Guidance | FDA, *Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing Prescription Drug User Fees* (Dec. 2004), attached as Burgess Decl Ex. 4 |
| "Burgess Decl. Ex. #" | citation of UTC's declaration exhibits filed in support of its motion for a preliminary injunction in this action (ECF 14-5–6, 8–10) |
| "Compl. ¶ #" | citation of UTC's complaint in this action (ECF 1) |
| FDA | the Defendant Food and Drug Administration |
| FDA PI Opp. # | citation of FDA's opposition to UTC's motion for a preliminary injunction (ECF 26) |
| FDCA | Federal Food, Drug, & Cosmetic Act, 21 U.S.C § 301 *et seq.* |
| the July Amendment | Liquidia's amendment to its 505(b)(2) NDA seeking FDA approval to market YUTREPIA for PH-ILD |
| "Killian Decl. Ex #" | citation of Liquidia's declaration exhibits filed in support of its opposition to UTC's motion for a preliminary injunction (ECF 24-2–3) |
| MMA | Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2065 (2003) |
| MMA Proposed Rule | Abbreviated New Drug Applications and 505(b)(2) Applications, 80 Fed. Reg. 6802 (Feb. 6, 2015) |
| MMA Final Rule | Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg. 69580 (Oct. 6, 2016) |
| NDA | new drug application |
| PAH | pulmonary arterial hypertension |
| PH-ILD | pulmonary hypertension associated with interstitial lung disease |

| "PI #" | citation of UTC's memorandum in support of its motion for a preliminary injunction in this action (ECF 14-1) |
|---|---|
| "PI Reply #" | citation of UTC's reply memorandum in support of its motion for a preliminary injunction in this action (ECF 31) |
| UTC | the Plaintiff United Therapeutics Corp. |

# Introduction

UTC has had a monopoly over the inhaled treprostinil market since FDA first approved Tyvaso® in 2009. After its years' long patent litigation against Liquidia came to an unsuccessful end, UTC still badly wanted to maintain its monopoly. So, it brought this APA case to stop FDA from *starting* review of the New Drug Application that, when approved, will finally bring needed competition to the market. UTC's case is unprecedented, and UTC's theory is legally and factually untenable. UTC contends that Liquidia violated a procedural rule when it submitted an amendment last July, that FDA irrevocably ratified the procedural violation when it accepted the amendment for substantive review last September, and that all these actions deprived UTC of a statutory right. When the facts are lined up and the law rightly stated, however, it becomes clear that Liquidia's amendment violated no rules, FDA has taken no final action, UTC has suffered no injury and *can* suffer no injury.

UTC cannot maintain its APA claims because it cannot satisfy the APA's threshold requirements. In refusing to grant UTC's preliminary-injunction motion at the outset of this case, this Court rightly held that UTC is challenging nonfinal agency action. That defect remains and requires dismissal. In addition, an APA claim is not available to UTC because UTC can obtain the same ultimate relief in its second patent-infringement case, pending against Liquidia in the Delaware District Court.

Even if UTC could clear all the threshold hurdles to its APA case, UTC's challenge to Liquidia's exercise of its procedural right to amend its 505(b)(2) NDA still fails as on the merits. As UTC admitted in its preliminary-injunction reply brief, the extreme

1

and rigid prohibition UTC alleges in its complaint—that 505(b)(2) NDAs *never* can be amended to add a new indication—is not the law. At least some amendments adding indications to 505(b)(2) NDAs are allowed, and the July Amendment is one. The whole point of Section 505(b)(2) is to streamline FDA's approval of innovative products that, like Liquidia's drug, share some characteristics with previously approved drugs. UTC's effort to compel FDA to reject Liquidia's amendment on procedural grounds would turn the statutory and regulatory scheme on its head.

## Statutory and Regulatory Background

### I.   505(b)(2) NDAs and 30-month stays

Before a drug may be introduced into commerce, FDA must approve it. *See* 21 U.S.C. § 355(a). Innovative drugs typically are approved via NDAs, *id.* § 355(b)(1), in which applicants demonstrate their products' safety and effectiveness, *id.* § 355(d). Innovative alternatives to approved drugs can be approved via 505(b)(2) NDAs. *See id.* § 355(b)(2). 505(b)(2) applicants demonstrate their products' safety and effectiveness by relying, in full or in part, on investigations "not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted." 21 U.S.C. § 355(b)(2). Applicants do this, in part, by identifying "each listed drug," *i.e.*, a previously approved NDA listed in FDA's Orange Book, "for which FDA has made a finding of safety and effectiveness and on which the finding the applicant relies in seeking approval." 21 C.F.R. § 314.54(a)(1)(iii). A 505(b)(2) NDA is *not* an ANDA for generic copies of innovative drugs; it is a hybrid application for drugs that share some, but not all,

characteristics with listed drugs. *See Veloxis Pharm., Inc. v. FDA*, 109 F. Supp. 3d 104, 108–09 (D.D.C. 2015).

505(b)(2) NDAs might implicate patents on listed drugs, which are also listed in FDA's Orange Book. *See* 21 U.S.C. §§ 355(b)(1); (j)(7)(A)(i). Whenever they submit, amend, or supplement their NDAs, 505(b)(2) applicants consider and address patents listed in the Orange Book. One option is to submit a Paragraph IV certification, which certifies that a patent covering a listed drug "is invalid or will not be infringed by the manufacture, use or, sale of the new drug for which the application is submitted." *Id.* § 355(b)(2)(A)(iv). A Paragraph IV certification is an "artificial act of infringement," allowing the holders of patents covering the listed drug to bring early patent litigation against the 505(b)(2) applicant. *See Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1283 (Fed. Cir. 2008).

Ordinarily, FDA's approval of a 505(b)(2) NDA "shall be made effective *immediately*" upon completion of its review. 21 U.S.C. § 355(c)(3)(C) (emphasis added). But, if a patentholder sues a 505(b)(2) applicant within 45 days of receiving a Paragraph IV notice, and if the subject of the suit is a patent listed in the Orange Book "before the date on which the [505(b)(2) NDA] (excluding an amendment or supplement to the application) was submitted," FDA's "approval may be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the [Paragraph IV] notice … or such shorter or longer period as the court may order[.]" *Id.* The delay described in Section 505(c)(2)(C) is commonly known as a 30-month stay.

## II.    Amendments to 505(b)(2) NDAs

NDA applicants and holders have the right to seek to change their NDAs. *See* 21 C.F.R. § 314.60(a). Changes proposed *before* final approval are "amendments." *Id.* Changes proposed *after* final approval are "supplements." *Id.* § 314.70. In the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2065 (2003), Congress modified the FDCA in two ways related to amending and supplementing 505(b)(2) NDAs.

First, the MMA added a parenthetical to Section 505(c)(3)(C). It clarifies that FDA may stay approval of a 505(b)(2) NDA for 30 months only for patents listed in the Orange Book "before the date" on which the NDA "(excluding an amendment or supplement to the application)" is originally submitted. 21 U.S.C. § 355(c)(3)(C). So, though an amendment or supplement can trigger new patent litigation for any patent, an amendment or supplement can trigger a 30-month stay only for patents listed in the Orange Book before the date on which the amended or supplemented 505(b)(2) NDA was originally submitted. Patents listed *after* the 505(b)(2) NDA, even if listed *before* the amendment or supplement, cannot trigger a 30-month stay.

Second, the MMA clarified that a 505(b)(2) applicant "may not amend or supplement [a 505(b)(2) NDA] to seek approval of a drug that is a *different drug* than the drug identified in the" original 505(b)(2) NDA. 21 U.S.C. § 355(b)(4)(A) (emphasis added). The MMA included a carveout from this prohibition: "nothing … prohibits an applicant from amending or supplementing the application to seek approval of a *different strength*." *Id.* § 355(b)(4)(B) (emphasis added). FDA implemented this

4

statutory prohibition by promulgating a regulation that lists every change that qualifies as a "different drug":

> [A] drug is a different drug if it has been modified to have a different active ingredient, different route of administration, different dosage form, or difference in excipients that requires either a separate clinical study to establish safety or effectiveness or, for topical products, that requires a separate in vivo demonstration of bioequivalence. However, … an applicant may amend the 505(b)(2) application to seek approval of a different strength.

21 C.F.R. § 314.60(e).

Noticeably absent from the list of amendments that make a "different drug" is adding a new indication to a drug's label.[1] Other regulations, in fact, clearly allow such amendments. In the same rulemaking where FDA defined "different drug," FDA promulgated a rule expressly acknowledging that 505(b)(2) applicants can submit amendments "to add a new indication" and instructing them to submit patent certifications along with amendments adding a new indication. 21 C.F.R. § 314.60(f).

This regulation is important. It plainly contemplates that applicants can amend 505(b)(2) NDAs to add new indications. It also plainly contemplates that amendments adding new indications might implicate patents—if not, the regulation's requirement to submit patent certifications along with an amendment would be pointless. Patent certifications often trigger patent litigation, so amendments adding new indications to a 505(b)(2) NDA often will be the subject of patent suits. Nevertheless, because of

---

[1]      The term "indication" refers to the use of a drug for a particular disease or condition. Regulations require a drug's label to state the drug's approved indications, *see* 21 C.F.R. § 201.57(a)(6)—that "the drug is indicated for the treatment, prevention, mitigation, cure, or diagnosis of a recognized disease or condition, or of a manifestation of a recognized disease or condition, or for the relief of symptoms associated with a recognized disease or condition," *id.* § 201.57(c)(2).

the parenthetical in Section 505(c)(3)(C), a patent suit challenging an amendment adding a new indication to a 505(b)(2) NDA cannot give rise to a 30-month stay of FDA's approval unless the patent at issue was listed in the Orange Book before the NDA was originally submitted.

## Factual Background

### I.    Liquidia's 505(b)(2) NDA

In January 2020, Liquidia submitted NDA 213005, a 505(b)(2) NDA seeking FDA's approval to market YUTREPIA™, a novel formulation of treprostinil inhalation powder, for treatment of PAH. *See* Compl. (ECF 1) ¶¶ 5, 44. Liquidia's NDA established the safety and effectiveness of YUTREPIA for PAH by relying, in part, on FDA's finding of safety and effectiveness of a listed drug, UTC's TYVASO, a solution of treprostinil administered with a nebulizer, which FDA approved for PAH in 2002. *See id.* ¶¶ 25, 38. In accordance with statutory requirements, Liquidia's NDA contained Paragraph IV certifications expressing Liquidia's view that YUTREPIA will not infringe valid patents UTC had then listed in FDA's Orange Book as covering TYVASO. *See id.* ¶¶ 45–47. After receiving notice of the Paragraph IV certifications, UTC sued Liquidia in the Delaware District Court, alleging that YUTREPIA would infringe two of UTC's patents—U.S. Patent No. 9,593,066 ("the '066 patent") and U.S. Patent No. 9,604,901 ("the '901 patent"). After UTC filed its suit, UTC was issued another patent, U.S. Patent No. 10,716,793 ("the '793 patent'"), and UTC amended its complaint to allege that YUTREPIA would infringe that patent too. *See id.* ¶¶ 46–49.

6

UTC's patent suit failed. Most claims of the '066 patent were invalidated, and Liquidia was held not to infringe the remaining claims. UTC ultimately stipulated that Liquidia did not infringe any claims of the '901 patent. And the Patent Trial and Appeal Board invalidated all claims of the '793 patent, a ruling the Federal Circuit affirmed. *See id.* ¶ 49; *see also* Stipulation, *UTC v. Liquidia Techns., Inc.*, No. 1:20-cv-755 (D. Del. Dec. 28, 2021); *UTC v. Liquidia Techns., Inc.*, 74 F.4th 1360 (Fed. Cir. 2023), *cert. denied*, No. 23-804, 2024 WL 675262 (U.S. Feb. 20, 2024); *UTC v. Liquidia Techns., Inc.*, 2023 WL 8794633 (Fed. Cir. Dec. 20, 2023).[2]

While UTC's patent suit was pending, FDA determined that YUTREPIA will be safe and effective for PAH. However, because UTC's suit triggered a 30-month stay—the suit was filed within the statutory 45-day period and alleged infringement of two patents (the '066 patent and the '901 patent) listed in the Orange Book before Liquidia submitted its 505(b)(2) NDA—FDA declined to issue an immediately effective final approval of Liquidia's NDA. Instead, FDA issued a tentative approval to become effective after the 30-month stay, the conclusion of the patent litigation, or the expiration of UTC's patents. *See* Compl. ¶ 48. Even though Liquidia has now fully prevailed against UTC's patent claims, Liquidia remains unable to market YUTREPIA because, as explained in the next section, FDA began a new review of Liquidia's 505(b)(2) NDA when Liquidia amended it in July 2023.

---

2    Before the PTAB invalidated the '793 patent, the Delaware District Court found that YUTREPIA would infringe it and enjoined FDA from approving Liquidia's NDA before the '793 patent expired. After the Federal Circuit affirmed the PTAB's decision, the Delaware District Court vacated its injunction, freeing FDA to approve Liquidia's NDA. *See* Notice of Supplemental Authority (ECF 33).

## II.    The July Amendment of Liquidia's 505(b)(2) NDA

In June 2020, UTC submitted a supplement to its NDA 022387, seeking FDA's approval to add PH-ILD as an indication to the TYVASO label. *See* Compl. ¶ 40. FDA approved UTC's supplement in March 2021. *See id.* ¶ 42. Now, the TYVASO label states that TYVASO is approved for both PAH and PH-ILD.

In 2023, Liquidia sought FDA's approval to add PH-ILD as an indication to the YUTREPIA label. Because Liquidia's NDA was only tentatively approved at that time, Liquidia could not seek FDA's approval to add the indication by submitting a supplement. (Supplements can be submitted only after final approval.) So, Liquidia amended its NDA on July 24, 2023. *See id.* ¶ 50. The July Amendment included Paragraph IV certifications expressing Liquidia's view that marketing YUTREPIA for PH-ILD will not infringe any valid patents that UTC had then listed in the Orange Book. *See id.* ¶¶ 51–52. Liquidia sent UTC Paragraph IV notices at the same time.

UTC received the Paragraph IV notices and sued Liquidia for infringement on September 5, 2023. Even though the PTAB had already invalidated the '793 patent, UTC's second patent suit initially alleged infringement of only the '793 patent. *See id.* ¶¶ 49, 53. Two months later, on November 28, UTC was issued a new patent related to PH-ILD, U.S. Patent No. 11,826,327 ("the '327 patent"). UTC then amended its complaint to allege that marketing YUTREPIA for PH-ILD would infringe that patent as well. *See id.* ¶ 57. On January 22, 2024, after the Federal Circuit affirmed the PTAB's ruling invalidating the '793 patent, UTC dismissed its claims alleging infringement of the '793 patent. *See* Stipulation, *UTC v. Liquidia Techns., Inc.,*

8

No. 1:23-cv-975-RGA (D. Del. Jan. 22, 2024). As a result, the only patent at issue in UTC's second patent suit is UTC's newest patent, the '327 patent. *See* Compl. ¶ 58. That action remains pending in the Delaware District Court.

## III.   UTC's last-ditch effort to delay approval of Liquidia's 505(b)(2) NDA.

The text of Section 505(c)(3)(C) is clear: FDA may stay approval of a 505(b)(2) NDA only for patents listed in the Orange Book before the NDA is submitted. Conversely, FDA cannot stay approval of a 505(b)(2) NDA for patents listed in the Orange Book after the NDA is submitted. UTC rightly concedes that Section 505(c)(3)(C) contains this strict sequencing requirement. *See* Compl. ¶¶ 8, 74; PI (ECF 14-1) 12; PI Hearing Tr. (ECF 34) 8, 9 (Mar. 29, 2024).

The sequencing requirement of Section 505(c)(3)(C) applies straightforwardly here. The only patent at issue in UTC's second patent suit, the '327 patent, was listed in the Orange Book in November 2023. So, though the '327 patent can trigger a stay for 505(b)(2) NDAs originally submitted *after* November 2023, it cannot trigger a stay for 505(b)(2) NDAs submitted *before* November 2023 (or for any amendments or supplements to NDAs submitted *before* November 2023). Liquidia's 505(b)(2) NDA was submitted before November 2023—nearly four years before. *See* Compl. ¶ 56. So, as a matter of law, FDA cannot stay approval of Liquidia's 505(b)(2) NDA (or any amendment or supplement Liquidia submits to that NDA) based on the '327 patent.

Because the '327 patent indisputably fails Section 505(c)(3)(C)'s strict sequencing requirement vis-à-vis Liquidia's 505(b)(2) NDA, UTC is undertaking an elaborate effort to force FDA to force Liquidia to submit a brand-new 505(b)(2) NDA, hoping that

will trigger a 30-month stay. *See id.* ¶ 58. In late December 2023—more than five months *after* Liquidia submitted the July Amendment and sent UTC Paragraph IV notices advising UTC of the amendment (July 24), more than three months *after* UTC sued Liquidia for infringement over the amendment (September 5), three months *after* FDA accepted the amendment for review (September 22), and one month *after* UTC amended its complaint to allege infringement of the '327 patent (November 30)—UTC sent a letter to FDA, suddenly claiming that the July Amendment was procedurally improper and demanding that FDA reject it on procedural grounds. *See id.* ¶ 76; *see also* Burgess Decl. Ex. 6 (ECF 14-8). FDA invited Liquidia to respond, which it did on February 2, and UTC replied on February 12. *See* Burgess Decl. Exs. 7–8 (ECF 14-9–14-10).

Barely a week after replying, UTC brought this APA action against FDA. *See* Compl. ¶¶ 54–56. The single target of UTC's APA claims is FDA's decision in September 2023 "to accept Liquidia's amendment for substantive review." *Id.* ¶ 12; *see Id.* ¶¶ 60, 72, 75, 76, 78 (challenging FDA's "decision to accept" or "acceptance" of the amendment "for substantive review"). UTC claims that "accept[ing]" the amendment "for substantive review" violated procedures outlined in a regulatory document known as the Bundling Guidance (Count I); UTC also claims that FDA's acceptance of the amendment violated the agency's past practices (Count II) and the FDCA (Count IV). *Id.* ¶¶ 80, 85, 94. And, despite never seeing the July Amendment—NDAs are, as a matter of course, filed confidentially—UTC presumes "[o]n information and belief," Compl. ¶ 69, that the amendment violates a regulation limiting data that can

10

be included with an amendment, 21 C.F.R. § 314.60(b)(6), and UTC claims (Count III) that FDA violated this other procedural regulation by accepting the amendment "for substantive review." Compl. ¶ 89.

Counterintuitively, UTC contends that FDA's *initiation* of substantive review last September qualifies as *final* agency action. *See id.* ¶ 72; PI 20. As UTC sees it, that action was a "final decision" (Compl. ¶¶ 1, 59) because FDA is unable to "revisit its acceptance decision" (*id.* ¶ 72) and because FDA's acceptance of the amendment in September somehow "deprived" UTC "of its statutory right to a 30-month stay" (*id.* ¶ 72) based on a patent that did not even exist at the time.

Finally, in an intricate, multistep Prayer for Relief (*id.* p. 33), UTC demands that the Court enter a series of orders that, all together, would keep Liquidia from marketing YUTREPIA for PH-ILD while UTC's second patent suit proceeds:

a.   vacate FDA's acceptance of the July Amendment for substantive review;

b.   order FDA "to order Liquidia" to do all of the following: (1) "submit a new 505(b)(2) NDA," (2) "certify to patent information *currently listed* in FDA's Orange Book" (*i.e.*, to submit certifications concerning the '327 patent listed last November), and (3) "submit clinical data … *to the extent that Liquidia has not already done so*"; and

c.   compel FDA to stay approval "of any such new 505(b)(2) NDA *if* Liquidia certifies to Orange Book-listed patent information and is then timely sued [by UTC] for patent infringement."

11

# Argument

## I.   UTC hasn't been and won't be deprived of a 30-month stay.

UTC's case rests on its contention that FDA's acceptance of the July Amendment for substantive review "deprived UTC of" a "statutory right" to a 30-month stay. Compl. ¶¶ 11, 74, 80, 82. UTC relies on this contention in arguing that it has Art. III standing (to challenge a purely procedural question in an informal adjudication to which UTC is not a party) and in arguing that FDA's initiation of review affects UTC's rights (and qualifies as final agency action). *See* PI Reply (ECF 31) 3–6 (standing); *id.* at 8–10 (final agency action). *Accord* PI 3, 5, 21 ("statutory right to a 30-month stay"); *id.* at 8 ("automatic 30-month stay"); *id.* at 26, 29 ("valuable statutory right"). UTC's allegations confirm that UTC's contention lacks merit. As a matter of law, neither the July Amendment nor FDA's acceptance of the amendment for substantive review deprived UTC of any right to a 30-month stay, and nothing that could happen during or after FDA's review of the amendment could deprive UTC of any right to a 30-month stay.

Section 505(c)(3)(C) contains a strict sequencing requirement. *See* p. 9, *supra.* FDA may stay approval of a 505(b)(2) NDA for 30 months if and only if the applicant submits the NDA *after* a relevant patent is listed in FDA's Orange Book. *See* 21 U.S.C. § 355(c)(3)(C). (Other conditions also must be met, like filing a patent suit within 45 days of receiving notice of a Paragraph IV certification. *See id.*) FDA cannot stay approval of a 505(b)(2) NDA based on patents listed in the Orange Book *after*

the NDA is submitted, even if the applicant later amends or supplements that NDA. *See* pp. 2–4, *supra*.

The only patent UTC asserts against Liquidia in connection with the July Amendment is the '327 patent. UTC listed that patent in the Orange Book in November 2023—*after* Liquidia submitted its 505(b)(2) NDA and even *after* Liquidia submitted the July Amendment and *after* FDA accepted it for review. *See* Compl. ¶¶ 56–57. When all those events happened, the '327 patent did not yet exist, so UTC had no right to a stay that any of those events could have denied. Lining up the relevant events in chronological order defeats UTC's theory about what "should have" happened last September and thus defeats UTC's case. *Id.* ¶¶ 10, 11, 73; *see id.* ¶ 13 ("If FDA had followed …."). It is impossible for Liquidia's 505(b)(2) NDA, the July Amendment, and FDA's acceptance of the amendment to have deprived UTC of any statutory right related to a patent that did not even exist at any of those times.

The chronology also defeats UTC's contention that there would be a 30-month stay in effect right now if FDA, instead of accepting Liquidia's amendment in September, had "rejected the application and required Liquidia to submit a new NDA." *Id.* ¶ 10; *accord id.* ¶¶ 13, 59, 63, 72, 80. For, any brand-new 505(b)(2) NDA that Liquidia might have submitted before November 28, 2023 still would have been submitted *before* UTC obtained and listed the '327 patent. No stay would have been triggered, so no stay could now be in effect.

What's more, no action that FDA could take on Liquidia's amended 505(b)(2) NDA could deprive UTC of any right to a 30-month stay:

13

- Approving Liquidia's amended 505(b)(2) NDA on the merits would not deprive UTC of a stay. UTC listed the '327 patent after Liquidia submitted its original 505(b)(2) NDA. In accordance with the strict sequencing requirement of Section 505(c)(3)(C), FDA cannot, as a matter of law, stay approval of Liquidia's NDA or the amendment based on the '327 patent. *See* 21 U.S.C. § 355(c)(3)(C).

- Disapproving Liquidia's amended 505(b)(2) NDA on the merits would not deprive UTC of a stay, either. Section 505(c)(3)(C) authorizes FDA to stay *approval* of a 505(b)(2) NDA, not *disapproval*. *See* 21 U.S.C. § 355(c)(3)(C).

- Even determining that the July Amendment was procedurally improper would not deprive UTC of a stay. In that scenario, FDA would "unbundle" the July Amendment, *i.e.*, administratively convert it into a separate 505(b)(2) NDA. *See* Killian Decl. Ex. 2 (ECF 24-3) at 4 (FDA, Manual of Policies and Procedures 6050.1 Rev. 2: Effect of Failure to Pay PDUFA Fees (Dec. 3, 2021)). By paying any required user fee, Liquidia would preserve the July submission date for the unbundled NDA. *See id.* At that point, UTC could not be deprived of a stay because the submission date of the unbundled NDA (July 2023) would still precede the date when UTC listed the '327 patent in the Orange Book (November 2023).

Under Section 505(c)(3)(C), UTC could not be deprived of a stay unless Liquidia submitted a brand-new 505(b)(2) NDA after November 2023.[3] UTC desperately wants

---

3    UTC errs in assuming that it would have a "right" to an "automatic" 30-month stay of FDA's approval if Liquidia filed a brand-new 505(b)(2) NDA. Compl. ¶ 30. A stay under Section 505(c)(3)(C) is *discretionary*; the statutory text says that, when
(footnote continued on next page)

14

that to happen; UTC insists that Liquidia "must submit a new application" in order to obtain FDA's approval to add PH-ILD to the Yutrepia label (Compl. ¶ 9), and UTC even asks the Court to order FDA to order Liquidia to "submit a new 505(b)(2) NDA" (*id.* p. 33). *Accord id.* ¶¶ 10, 12. Filing a brand-new NDA is never required, and it is doubtful that FDA is authorized to require someone to do so. Last time FDA tried to require regulated entities to submit new NDAs, this Court enjoined the agency for violating the FDCA. *See Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*, 226 F. Supp. 2d 204, 209, 222 (D.D.C. 2002).

Finally, even if FDA rejected Liquidia's amendment to its 505(b)(2) NDA outright, filing a brand-new 505(b)(2) NDA to obtain FDA's approval to add PH-ILD to the Yutrepia label is simply one option Liquidia would have to add PH-ILD in this circumstance—and it's not Liquidia's only option. Liquidia also would have the option to seek FDA's approval for PH-ILD by submitting a supplement after FDA finalizes its approval for PAH. *See* 21 U.S.C. § 355(b)(4); 21 C.F.R. § 314.70(b)(2)(v). Liquidia's right to supplement should be undisputed. The Bundling Guidance allows supplements for adding indications. *See* Burgess Decl. Ex. 4 (ECF 14-6) at 6 ("A request for approval of a new indication … should be submitted individually in a separate

---

the strict sequencing requirement is met, approval of a 505(b)(2) NDA "*may* be made effective" after 30 months. 21 U.S.C. § 355(c)(3)(C) (emphasis added). UTC argues that the verb "may" in Section 505(c)(3)(C) is *mandatory* because "[t]he statute … cannot use the word 'shall.'" UTC PI Reply 10. That assertion makes no sense and is refuted by comparing Section 505(c)(3)(C) with Section 505(j)(5)(B)(iii), a parallel provision that is worded nearly identically—except that it mandates that approval of ANDAs "*shall* be made effective" after 30 months. 21 U.S.C. § 355(j)(5)(B)(iii) (emphasis added). Evidently, Congress *can* use the word "shall" when it intends a mandatory 30-month stay.

supplement to an approved original application"). FDA told the Court that Liquidia could supplement if FDA rejects the July Amendment. *See* FDA PI Opp. (ECF 26) 13. And supplementing is how UTC itself obtained approval to add PH-ILD to the TYVASO label. *See* Compl. ¶¶ 40–42.

Liquidia's right to supplement devastates UTC's case. For, just as FDA cannot stay approval of an *amendment* for patents listed after the submission of the underlying 505(b)(2) NDA, FDA also cannot stay approval of a *supplement* for patents listed after the submission of the underlying 505(b)(2) NDA. *See* 21 U.S.C. § 355(c)(3)(C) (linking 30-month stays to "the date on which the application *(excluding an amendment or supplement to the application)* was submitted") (emphasis added). If Liquidia ever exercised its right to supplement, FDA could not stay approval of that supplement based on the '327 patent.

The foundation of UTC's case—that it *has been* or *will be* deprived of a *right* to a 30-month stay—is contrary to the law and the alleged facts. Nothing that happened before UTC listed the '327 patent triggered a stay. Nothing that would happen after will trigger a stay. And UTC simply cannot claim any entitlement to a 30-month stay when Liquidia has a clear entitlement to avoid such a stay.

Accordingly, FDA's acceptance of the July Amendment did not injure UTC and did not affect its "legal rights." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). FDA's eventual disposition of the July Amendment also will not injure UTC or affect its legal rights. Because the 30-month stay is not implicated here, UTC is a mere bystander to the procedural question between Liquidia and FDA whether the July

16

Amendment satisfies FDA's procedural rules on bundling. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) ("When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well."). UTC has no right to litigate this question, so the Court should dismiss UTC's case.

## II.   UTC challenges non-final agency action.

The APA authorizes judicial review only of final agency action. *See* 5 U.S.C. § 704. Agency action is not final if it is "interlocutory," nor is it final unless it determines "rights" or has "legal consequences." *Bennett*, 520 U.S. at 177–78. "An order must satisfy both prongs of the *Bennett* test to be considered final." *Sw. Airlines Co. v. U.S. Dept. of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016).

Here, the sole target of UTC's APA action—FDA's acceptance of the July Amendment for review—flunks both prongs of the *Bennett* test. As discussed above, FDA's acceptance of the amendment had no effect on UTC's legal rights based on the '327 patent. *See* pp. 12–17, *supra*. And as the Court recognized in its decision denying UTC's motion for preliminary relief, FDA's acceptance of the amendment marked the beginning of the agency's process, not its "consummation." *Bennett*, 520 U.S. at 178.

FDA's regulations and guidance confirm the correctness of the Court's preliminary-injunction ruling. In assessing whether agency action is final or interlocutory,

17

courts consider "what the [agency] has said" about its process, *Nasdaq Stock Market LLC v. SEC*, 1 F.4th 34, 38 (D.C. Cir. 2021), and the "idiosyncratic regime of statutes and regulations that govern," *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 632 (D.C. Cir. 2019). FDA's regulations state that acceptance of a submission for review reflects "a *threshold* determination that the NDA is sufficiently complete to permit a substantive review." 21 C.F.R. § 314.101(a)(1) (emphasis added). FDA can revisit that threshold procedural determination. During substantive review, FDA can unbundle an amendment that it deems procedurally inappropriate. *See* Killian Decl. Ex. 2 at 4. FDA renders a "final determination about the fileability of an application" only when the review process officially ends. Killian Decl. Ex. 1 (ECF 24-2) at 9 (FDA, Manual of Policies and Procedures 6025.4: Good Review Practice: Refuse to File (Sept. 5, 2018)).

Case law is in accord with FDA's pronouncements and practices. FDA's acceptance of an amendment to a pending application is not final for the same reason that FDA's acceptance of an original application is not final: both are "merely the first step in the agency's approval process." *Pfizer v. Shalala*, 182 F.3d 975, 978 (D.C. Cir. 1999). That elementary logic has led the court of appeals to consistently dismiss petitions for review challenging an agency's acceptance of an amendment to a pending application. *See Cities of Anaheim & Riverside, Calif. v. FERC*, 692 F.2d 773, 778 (D.C. Cir 1982) (holding that "acceptance" of an "amended license application" is not final because it "*initiate[s]* the investigative process") (emphasis added); *see also Bethesda-Chevy Chase Broadcasters, Inc. v. FCC*, 385 F.2d 967, 968 (D.C. Cir. 1967)

18

(holding that an agency's "invitation … to amend" an application "does not impose an obligation, deny a right, or fix a legal obligation").

Future actions that FDA might take on Liquidia's amendment cannot cure the defect in UTC's claims. UTC has not brought a premature challenge to a future final decision, nor does UTC predict that it will be injured by future final decision. UTC has purposefully and explicitly challenged only FDA's interlocutory decision last September to "accept[]"the July Amendment "for substantive review," and UTC claims that it already has been injured by this past agency action.[4] Compl. ¶¶ 10, 12, 60, 72, 75, 78, 80–83, 85, 87, 89, 92, 94, 95, & p. 33. Whatever future final decision FDA may reach will not change that FDA's initiation of review caused UTC no harm. This case thus falls in line with others dismissed because their challenge to nonfinal agency action was incurably premature. *See TeleSTAR, Inc. v. FCC*, 888 F.2d 132, 133–34 (D.C. Cir. 1989) ("This court has in the past dismissed challenges to non-final agency action, even after final agency action has been taken."); *Int'l Telecard Ass'n v. FCC*, 166 F.3d 387, 388 (D.C. Cir. 1999) ("Ongoing agency review renders an order nonfinal for purposes of judicial review, and a petition for review of the order is incurably premature."); *Clifton Power Corp. v. FERC*, 294 F.3d 108, 110 (D.C. Cir. 2002) ("Our

---

4    Opposing UTC's preliminary-injunction motion, FDA revealed that it accepted the July Amendment on September 22. *See* Ex. A to FDA PI Opp. (ECF 26-2). UTC's complaint, however, alleges that FDA accepted the amendment on September 14, via an email from an FDA regulatory project manager. *See* Compl. ¶ 54. That email is not agency action, let alone final agency action. *See Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 53 (D.D.C. 2017); *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1269–70 (D.C. Cir. 2018).

cases make clear that a petition seeking review of … a non-final [agency] action is not only premature but incurably so.").

## III.   Adequate remedies preclude UTC's APA claim.

The APA authorizes judicial review only when a plaintiff has "no other adequate remedy in a court." 5 U.S.C. § 704. A remedy is adequate when it provides the plaintiff roughly the same "ultimate relief" as he seeks through the APA. *Avadel CNS Pharms., LLC v. Becerra*, 638 F. Supp. 3d 23, 32 (D.D.C. 2022). A remedy can be adequate even if not perfectly coextensive with the APA. *See Garcia v. Vilsack*, 563 F.3d 519, 525 (D.C. Cir. 2009). Thus, a cause of action against third parties can be an adequate alternative. *See El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 396 F.3d 1265, 1271 (D.C. Cir. 2005) (collecting cases).

Here, UTC's APA challenge to the procedural appropriateness of the July Amendment is part of a broader effort to get Liquidia to submit a brand-new 505(b)(2) NDA, which UTC hopes will have a domino effect culminating in FDA staying approval of this brand-new 505(b)(2) for 30 months based on the '327 patent, thereby delaying Liquidia's ability to market YUTREPIA for PH-ILD. *See, e.g.*, Compl. p. 33 (Prayer for Relief). UTC does not need this APA case to obtain that relief. UTC's patent-infringement action against Liquidia, also based on the '327 patent, provides UTC adequate and effective non-APA remedies.

Under Section 505(c)(3)(C), a 30-month stay is a *de facto* preliminary injunction for a subset of patent litigation between drug manufacturers. A 30-month stay is not available for every patent suit brought against a 505(b)(2) applicant; it is available

only for patent suits filed within 45 days of when the patentee receives notice of the applicant's Paragraph IV certifications about patents listed in the Orange Book before the applicant submitted the 505(b)(2) NDA. *See* 21 U.S.C. § 355(c)(3)(C). For the subset of patent cases that satisfy the statute's strict sequencing requirement, FDA may delay approval of the 505(b)(2) NDA for 30 months, but the actual length of the delay is ultimately controlled by the district court hearing the patent litigation that triggered the stay. That court can make the stay "shorter or longer" if one side unreasonably slows down proceedings. *Id.* If that court invalidates the patent or finds no infringement before 30 months, FDA's approval is made effective immediately. *Id.* § 355(c)(3)(C)(i)(I). If that court finds infringement, the court must set the date when FDA's approval can become effective. *Id.* § 355(c)(3)(C)(ii)(II). As UTC recognizes, the 30-month stay is not an end in and of itself—it is not a period during which a manufacturer has the right to market a product exclusive of competition—it functions like a preliminary injunction for the subset of patent cases that satisfy Section 505(c)(3)(C). *See* Compl. ¶¶ 7, 9, 30; *see also* PI 3, 8, 29.

The second, still-pending patent litigation that UTC brought against Liquidia in the Delaware District Court can vindicate the rights and interests UTC wants to vindicate here. If that court finds the '327 patent to be valid and infringed, it is empowered to set the effective date of approval of Liquidia's amended 505(b)(2) NDA and prevent Liquidia from marketing YUTREPIA for PH-ILD until that patent expires. *See* 35 U.S.C. § 271(e)(4)(A)–(B). The relief the Delaware District Court could grant is *superior* to the relief this Court could grant. If this Court granted everything UTC

wants—ordering FDA to reject the July Amendment, requiring Liquidia to submit a brand-new NDA, and staying approval for 30 months, *see* Compl. p. 33—the Delaware District Court could undo it all by shortening the 30-month stay, invalidating the '327 patent, or finding no infringement. Patent litigation is a more-than-adequate alternative to an APA claim in UTC's situation.

Owing to the clear statutory links between the 30-month stay and patent litigation, Judge Mehta denied a preliminary injunction and dismissed an APA claim in *Avadel*, 638 F. Supp. 3d at 35. The APA claim in *Avadel* was immaterially different from UTC's APA claim here. Avadel was the 505(b)(2) applicant, who objected to FDA's decision that it must submit a patent certification, which in turn triggered a 30-month stay. *See id.* at 28. Avadel contended that no patent certification was required and that the patentee (Jazz Pharmaceuticals) should delist its patent from the Orange Book. Judge Mehta held that patent litigation Jazz brought against Avadel barred Avadel's APA claim for two reasons. First, in Jazz's patent case, Avadel had the right to assert a counterclaim to delist the patent. *See id.* at 32. Second, and more broadly, Judge Mehta held that, "[e]ven if an aggrieved NDA applicant were not to file a counterclaim, Congress plainly contemplated that the affirmative patent infringement action … would itself resolve any dispute between the patentholder and the NDA applicant and lead to the establishment of the effective date of approval for the NDA." *Id.* at 33.

UTC has tried to distinguish *Avadel* because this case does not involve a dispute over patent certifications and delisting. *See* PI Reply 13. UTC's distinction fails.

Using telltale language ("*Even if* an aggrieved NDA applicant were not to file a counterclaim … "), Judge Mehta clearly marked a break between narrower holding about counterclaims and a broader holding about Section 505(c)(3)(C). It is the broader holding that applies here and bars UTC's APA claim.

UTC also objects that its patent case will not answer the question whether FDA "disregard[ed ] its own rules limiting amendments." PI Reply 13. Judge Mehta rejected a similar objection in *Avadel*: "[T]he test for determining adequacy of relief is not whether there is perfect alignment of the legal 'questions' before the respective courts. Rather, the inquiry centers on the remedies available to the plaintiff and the ability of those remedies to put the plaintiff in the position in which they seek to be placed." *Avadel*, 638 F. Supp. 3d at 33. Just as it did not matter in *Avadel* that the immediate question Avadel posed (whether a patent certification was required) could not be answered in the patent case, it does not matter here that the immediate question UTC poses (whether the July Amendment is procedurally appropriate) cannot be answered in its patent case. The ultimate questions in both cases (the timing of FDA's ultimate approval of a 505(b)(2) NDA) is a question that Congress intended to be answered in patent litigation, not APA litigation. *See id.* at 33–34.

Because "the adequate remedy inquiry focuses on the outcome sought by the movant," *id.* at 34, UTC's patent claims preclude UTC's APA claims. The Court should dismiss this case.

## IV.    The July Amendment was procedurally appropriate.

In its order denying UTC's preliminary-injunction motion, the Court indicated that UTC's "threshold hurdles" might "fall away once FDA renders a decision on Liquidia's application." PI Hearing Tr. 74. A final decision will not cure the threshold problems discussed above. Even after a final decision, FDA's acceptance of the July Amendment still will not deprive UTC of any rights; UTC's challenge still will be incurably premature; and UTC's patent case still will be an adequate remedy.

Accordingly, the Court does not have to address the merits of UTC's claims even if FDA approves the July Amendment while this motion to dismiss is pending. Still, UTC's claims challenging the July Amendment are unsound. UTC's primary contention—that FDA categorically prohibits all amendments adding new indications to 505(b)(2) NDAs, *see* Compl. ¶ 9 ("FDA's Bundling Rule has provided that an applicant may not add a new indication to a pending application"), ¶ 79 ("'The Bundling Rule' requires FDA to reject proposed 505(b)(2) amendments that seek to add a new indication or claim.'")—is so clearly wrong that UTC has abandoned that contention. On its back feet, UTC now contends vaguely that "most" amendments adding new indications are prohibited. PI Reply 16–17; *see* PI Hearing Tr. 20; *see also* Burgess Decl. Ex. 8 at 13 (conceding that FDA's regulations "contemplate that an amendment for a new indication may be submitted in certain circumstances").

As a matter of law, it was procedurally proper for Liquidia to submit the July Amendment; it was procedurally proper for FDA to accept it for substantive review; and it will be procedurally proper for FDA to approve it. There is no merit to UTC's

24

claims that FDA violated a categorical prohibition on new-indication amendments (Count I), that FDA cannot deviate from its alleged habit of rejecting new-indication amendments (Count II), and that Congress implicitly codified the nonexistent categorical prohibition in the FDCA (Count IV). Nor is there merit to UTC's claim that the July Amendment violates a regulation limiting the amount of new data that an applicant can submit with an amendment (Count III).

### 1.   505(b)(2) applicants may amend to add new indications.

An applicant's right to amend a 505(b)(2) application is codified in the FDCA and in FDA's regulations. Several statutory provisions applicable to 505(b)(2) NDAs specifically apply to "amendments." *See* 21 U.S.C. § 355(b)(3)(B)(ii) (requiring patent certifications for amendments); *id.* § 355(c)(3)(C) (noting that amendments are excluded from triggering 30-month stays). FDA's regulations also have long enshrined 505(b)(2) applicants' right to amend. *See* 21 C.F.R. § 314.60(a) ("[T]he applicant may submit an amendment to an NDA ....").

Even more specifically, FDA's regulations specifically recognize a right to amend 505(b)(2) NDAs *to add new indications*. The most significant of these regulations is Section 314.60(f), which states that an applicant amending a 505(b)(2) NDA "to add *a new indication*" must submit patent certifications along with the amendment. 21 C.F.R. § 314.60(f) (emphasis added). Another regulation states that "major amendments" to a 505(b)(2) NDA "may not include data to support *an indication* or claim *that was not included in the original NDA*." 21 C.F.R. § 314.60(b)(6) (emphasis added). If new indications never could be added by amendment, both of these

regulations would be pointless, as both impose specific instructions applicable only to amendments adding new indications to 505(b)(2) NDAs.

2. **UTC fails to get around the regulations that allow amending 505(b)(2) NDAs to add new indications.**

(i) **FDA's Bundling Guidance does not save UTC's case.**

UTC contends that FDA's Bundling Guidance (what UTC mislabels the Bundling *Rule*) requires FDA to reject any amendment that adds a new indication to a 505(b)(2) NDA. *See, e.g.*, Compl. ¶¶ 9, 79. UTC's contention is wrong as a matter of law.

The Bundling Guidance is a document that FDA issued in 1993 (Burgess Decl. Ex. 3 (ECF 14-5)) and modified in 2004 (Burgess Decl. Ex. 4). It addresses a range of changes that applicants may make to an NDA or ANDA. The Guidance does not dictate how applicants can and cannot change their applications; it advises applicants on how their procedural choices affect the agency's timelines and the user fees the applicant owes. The Bundling Guidance explicitly states that it "discusses (1) what should be contained in separate marketing applications and what should be combined into one application (bundling guidance) *for purposes of assessing user fees* and (2) the definition of clinical data *for purposes of assessing user fees*." Burgess Decl. Ex. 4 at 2 (emphases added). Similarly, if an applicant chooses a procedure the Bundling Guidance does not recommend, FDA advises that it "will notify the applicant and *request additional fees*, if appropriate." *Id.* (emphasis added). Significantly, FDA explains that "[t]his action will not prevent the filing of the application if it is otherwise suitable for filing, or its review, if it is otherwise ready for review." *Id.*

26

Gliding by these limitations and qualifiers, UTC maintains that the Bundling Guidance flatly forbids amending a pending 505(b)(2) NDA to add a new indication and instead "*required* Liquidia to submit a new NDA for this indication." Compl. ¶ 10 (emphasis added). The Bundling Guidance establishes no requirements or duties, however. FDA's regulations caution that guidance documents "do not establish legally enforceable rights or responsibilities" and "do not legally bind the public or FDA." 21 C.F.R. § 10.115(d)(1). The Bundling Guidance itself cautions that "FDA's guidance documents, *including this guidance*, do not establish legally enforceable responsibilities." Burgess Decl. Ex. 4 at 1 (emphasis added); *accord* Burgess Decl. Ex. 3 at 2 ("This document is not a proposed rule or a rule. It is not binding on either FDA or sponsors, and does not create or confer any rights, privileges, or benefits for or on any person.").

Consistent with FDA's cautionary statements, the snippet of the Guidance that UTC relies on—but only partially quotes, *see* Compl. ¶ 79—merely *recommends* that applicants submit a new application to add a new indication: "After initial submission, a pending original or supplemental application *should* not be amended to add a new indication or claim. … If the original application is not yet approved, a request for approval of other indications or claims *should* be submitted in a separate, original application." Burgess Decl. Ex. 4 at 5. As the Guidance states at its outset, "[t]he use of the word should in Agency guidances means that something is suggested or recommended, but not required." *Id.* at 1. On its face, the Guidance does not *prohibit* amendments to add indications.

27

Nor does the Bundling Guidance purport to address every conceivable amendment, as UTC claims. The Guidance does not speak to amendments, like the July Amendment, which are submitted to a 505(b)(2) NDA during the period between tentative approval and final approval. The Guidance explains FDA's basis for generally discouraging amendments to add a new indication: it "could result in subsequent adjustments to the user fee review clock" and "would be considered developing the product on the review clock." Burgess Decl. Ex. 4 at 5. FDA's concern is the "review clock"—the agency's nondiscretionary duty to complete review of NDAs and ANDAs within 180 days. *See* 21 U.S.C. § 355(c)(1), (j)(4). Amendments like the July Amendment, submitted after tentative approval, do not implicate the review clock because a tentative approval stops the review clock on the original 505(b)(2) NDA. Because Liquidia's 505(b)(2) NDA was tentatively approved in November 2021, *see* Compl. ¶ 48, the July Amendment did not extend the review clock for the original review cycle. The July Amendment started a new review cycle with its own review clock, *see* Compl. ¶ 54, and is therefore not the kind of amendment the Guidance discourages.

Even if the Bundling Guidance could be read to forbid all amendments adding indications, UTC concedes that FDA's current regulations allow some amendments adding indications. In that conflict, the current regulations would come out on top, for three reasons. First, notice-and-comment regulations trump mere guidance. *See Bailey v. Fulwood*, 793 F.3d 127, 134 (D.C. Cir. 2015) ("[I]t would be somewhat unusual to deem that the unpublished 1991 Policy Guideline trumps a … published

regulation."). Second, the newer regulations (promulgated in 2016) supersede the older Bundling Guidance (last published in 2004) to the extent of any conflict. *See Watt v. Alaska*, 451 U.S. 259, 266 (1981) (endorsing the "general rule" that the "more recent" of conflicting rules controls); *cf. Wash. Legal Found. v. Henney*, 202 F.3d 331, 334 n. 4 (D.C. Cir. 2000) (accepting FDA's position that newer regulations superseded older guidance). Third, the specific regulations govern the general Guidance: the regulations specifically allow amending 505(b)(2) NDAs to add indications, whereas the Guidance only generally advises against amending NDAs and ANDAs to add indications. *See RadLAX Gateway Hotel LLC v. Amalgamated Bk.*, 566 U.S. 639, 645 (2012) ("The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission.").

UTC alleges that "the structure and history" of amendments to the FDCA "demonstrate an intent by Congress to codify" FDA's bundling practices. Compl. ¶ 94. That is, UTC contends that the Bundling Guidance "has become embedded into the statutory and regulatory structure" and that Congress amended the FDCA in 2003 "against the backdrop" of the Bundling Guidance. PI 23. UTC's contention is a misdirection for two reasons. First, as discussed above, the pre-2003 Bundling Guidance does not specifically or categorically prohibit amending tentatively approved 505(b)(2) NDAs to add an indication. Second, statements in legislative history and in regulatory preambles, expressing support for the Bundling Guidance *as a whole*, are too generic to undermine *specific*, *later-promulgated regulations* allowing

amendments to add indications to 505(b)(2) NDAs. *See In re Sealed Case*, 237 F.3d 657, 669 (D.C. Cir. 2001) ("The limits on the [agency's] authority—like that authority itself—are derived from statutory provisions, not from loosely worded fragments extracted from congressional reports and speeches.").

(ii)    The preamble to FDA's regulations does not prohibit the July Amendment.

Admitting that FDA's regulations unequivocally allow applicants to amend 505(b)(2) NDAs "to add a new indication," 21 C.F.R. § 314.60(f)(1), UTC cobbles together a last-ditch effort to read the regulations narrowly. Pointing to the regulatory preamble to the proposed rule, UTC observes that FDA "identified only one circumstance where such an amendment might be permissible: changing an indication 'from prescription status to OTC [*i.e.*, over-the-counter] use." PI Reply 16–17 (quoting MMA Proposed Rule, 80 Fed. Reg. 6802, 6849). In UTC's view, that is the one and only new-indication amendment that Section 314.60(f)(1) allows.

UTC's argument lacks merit. In the preamble, FDA envisioned multiple "scenarios" (plural) "in which an applicant may submit an amendment to a 505(b)(2) application (or ANDA) for a new indication," and FDA gave, as one "example," an amendment to change a drug from prescription status to over-the-counter use. 80 Fed. Reg. at 6849. In the final rule, FDA prefaced the same example with a telling signal, "e.g." MMA Final Rule, 81 Fed. Reg. 69580, 69616. A single example mentioned outside the text of a law, in legislative or regulatory history, does not override or limit the plain meaning of the text. *See CSX Corp. v. United States*, 909 F.3d 366, 369 (11th Cir. 2018).

30

The example in the preamble simply underscores the breadth of Section 314.60(f)(1)'s requirement that 505(b)(2) applicants must submit patent certifications whenever they amend to add a new indication. An amendment to switch a drug to over-the-counter use does *not* typically implicate patents, old or new. Yet, by giving that particular indication change as an example of an amendment that requires patent certifications, FDA expressed that *all* indication changes or additions done by amendment, whether they implicate new patents, old patents, or no patents, must be accompanied by new patent certifications. *Accord* 81 Fed. Reg. at 69616 (expressing that Section 314.60(f)(1) adopts a bright-line rule because whether to submit a patent certification should not "be left entirely to the applicant's discretion"). The regulatory example does not limit the regulatory text, so UTC's fallback argument fails as a matter of law.

(iii)   FDCA provisions concerning "different drugs" do not prohibit adding new indications to a label.

UTC contends that, notwithstanding FDA's regulations, the July Amendment violates a prohibition against seeking approval of a "different drug" via amendment. *See* Compl. ¶ 32; *see also* 21 U.S.C. § 355(b)(4)(A). In UTC's view, no amendment changing or adding an indication is allowed—*i.e.*, all amendments changing or adding an indication are amendments that seek approval of a different drug—except for amendments changing a drug's strength, which the FDCA specifically permits. *See* PI 13; *see also* 21 U.S.C. § 355(b)(4)(B).

UTC's contention rests on a fundamental misunderstanding. Changing or adding an *indication* changes a drug's label, but does not change the *drug itself*. *See* p. 5 n. 1,

31

*supra*. Changing something about a drug, such as its route of administration or dosage form, would likely necessitate changing the label. But the converse is not true—changing a label, as for an indication change, does not change the drug.

FDA's regulations confirm that UTC is wrong. In the MMA rulemaking, FDA adopted the distinction between changing a drug and changing a label and rejected the view that UTC espouses here, that changing a label creates a "different drug." *See* MMA Proposed Rule, 80 Fed. Reg. 6802, 6851 ("If labeling changes … could not be made through an amendment or a supplement to a 505(b)(2) application, each such change would require the submission of a separate 505(b)(2) application, with related regulatory and administrative burdens, and user fee and review cycle implications. *We did not adopt this reading because it would have resulted in an unwarranted departure from FDA's previous practice for handling such changes.*") (emphasis added). Accordingly, FDA's regulations list the types of amendments that would (improperly) seek approval of a different drug—amendments proposing a "different active ingredient," "different route of administration," "different dosage form," and more. 21 C.F.R. § 314.60(e). All would change the drug product itself. Absent from that list is a new or different indication—because changing an indication does not change the drug.

Seen in light of the distinction between changing a drug and changing a label, UTC's reliance on 21 U.S.C. § 355(b)(4)(B) is misplaced. *See* PI 13, 24. That provision specifies that "nothing in this subsection or subsection (c)(3) prohibits an applicant from amending or supplementing the application to seek approval of a different

32

strength." 21 U.S.C. § 355(b)(4)(B). From this exemption for strength changes, UTC infers that the FDCA prohibits amendments proposing any other change, including adding indications. *See* PI 23–24. UTC's inference is unwarranted. Because an amendment proposing to change a drug's strength proposes to change the drug itself (not just the label) and would therefore be barred under 21 U.S.C. § 355(b)(4)(A), the exemption merely provides an express carve-out, shielding such amendments from 21 U.S.C. § 355(b)(4)(A)'s prohibition against amendments for a "different drug."

### 3.    Accepting the July Amendment is not inconsistent with prior FDA decisions.

Collecting examples of a few times when FDA supposedly rejected amendments, UTC claims that FDA arbitrarily departed from an alleged past practice of rejecting amendments adding new indications to 505(b)(2) NDAs. *See* Compl. ¶¶ 64–66, 85–86; *see also* PI 24–26. Because, however, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), UTC's Count II is ultimately an objection to FDA's "unexplained departure from precedent," Compl. ¶ 86. The simple answer is, FDA hasn't explained its decision because it hasn't made its decision. FDA has no duty to explain itself *before* taking final agency action. *See* pp. 17–20, *supra.*

The "fundamental norm" that agencies should "treat like cases alike," *Westar Energy v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007), presupposes "like cases." UTC has not identified any cases like Liquidia's—no amendment UTC cites is "evidently *identical*" to the July Amendment. *Colo. Interstate Gas Co. v. FERC*, 850 F.2d 769, 774 (D.C. Cir. 1988) (emphasis added). Each presents at least one "relevant

distinction." *Westar Energy*, 473 F.3d at 1241. From what Liquidia can tell, every example UTC cites is distinguishable. UTC's examples either (1) do not involve 505(b)(2) NDAs,[5] (2) do not involve amendments adding indications,[6] or (3) precede the 2016 rulemaking in which FDA clarified that 505(b)(2) NDAs can be amended to add indications.[7] Also, none of UTC's examples address an amendment submitted to a tentatively approved NDA.

---

5 Two examples (PI Reply 11 n. 6) involve Biologics License Applications (BLAs), not 505(b)(2) NDAs, and are not governed by 21 C.F.R. § 314.60(b)(6), (e), and (f). *See* FDA, BLA Accelerated Approval Letter, BLA 761223, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2021/761223Orig1s000ltr .pdf; FDA, Approval Package, Proprietary Name Review(s), Application Nos. 761825 & 761331, file p. 2–3 (Sept. 22, 2023), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2024/761285Orig1s000,761331 Orig1s000NameR.pdf.

6 Three examples (Compl. ¶ 65) sought to change the dosage form of the product, which 21 C.F.R. § 314.60(e) prohibits. NDA 210709 had a proposal to change the product from a tablet to a capsule. *See* FDA, Approval Package, Administrative and Correspondence Documents, NDA 210709 (TEKTURNA), PDF p. 60 (Unacceptable For Filing Review Letter) (May 2017), https://www.accessdata.fda.gov/drugsatfda_docs/ nda/2017/210709Orig1s000AdminCorres.pdf. NDA 209400 had a proposal to change the product from a delayed-release tablet to a delayed-release orally disintegrating tablet. *See* FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 209400 (Omeprazole Delayed-release Orally Disintegrating Tablets), PDF pp. 63–64 (Nov. 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/ 209400Orig1s000AdminCorres.pdf. And NDA 208780 had a proposal to change the product from a capsule to a film-coated tablet. *See* FDA, Approval Package, Administrative Document(s) & Correspondence, NDA 208780 (Esbriet), PDF p. 76 (May 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/ 208780Orig1s000AdminCorres.pdf.

7 NDA 021822 was approved in June 2008. *See* FDA, NDA Approval Letter, NDA 021822, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2008/ 021822s000ltr.pdf. NDA 206628 was approved in October 2015. *See* FDA, NDA Approval Letter, NDA 206628, https://www.accessdata.fda.gov/drugsatfda_docs/ appletter/2015/206628Orig1s000ltr.pdf.

### 4. The July Amendment does not violate regulations about data submitted with amendments.

UTC finally claims (Count III) that several FDA regulations, taken together, effectively preclude amendments adding new indications to 505(b)(2) NDAs. *See* Compl. ¶¶ 67–71, 88–92. UTC first contends that 21 C.F.R. § 314.54 "*requires* data … to support an indication that was not included in the original NDA." Compl. ¶ 71. Then, pointing to 21 C.F.R. § 314.60(b)(6), UTC argues that 505(b)(2) applicants are *forbidden* from submitting an amendment "with data to support an indication that was not included in the original NDA." Compl. ¶ 67.

UTC misreads the regulations and misses the whole point of Section 505(b)(2). 505(b)(2) NDAs are hybrid NDAs. Drugs approved under Section 505(b)(2) share some characteristics with listed drugs yet have unique characteristics. Accordingly, 505(b)(2) applicants must submit data proving safety and effectiveness *only as needed* to prove the safety and effectiveness of the drugs' unique characteristics. Insofar as a 505(b)(2) applicant seeks approval for a "modification of a listed drug (e.g., a new indication or new dosage form)," the applicant must submit data that "are essential to the approval of the changes." 21 C.F.R. § 314.54(a); *see id.* § 314.54(a)(1)(ii) (stating that data is required only "as needed"). A 505(b)(2) applicant does not have to submit data to prove the safety and effectiveness of the characteristics that its drug shares with a listed drug. As to the shared characteristics, a 505(b)(2) applicant may rely on FDA's prior finding that a listed drug is safe and effective, simply by identifying the name and NDA number of the listed drug. *See* 21 C.F.R. § 314.54(a)(1)(iii).

Right off the bat, then, UTC errs in asserting that Section 314.54 requires a 505(b)(2) applicant to submit data "to support an indication that was not included in the original NDA." Compl. ¶ 71. Section 314.54 doesn't say anything about amendments or new indications that were not in the original 505(b)(2) NDA. Rather, Section 314.54 delineates the requirements for original 505(b)(2) NDAs and, in particular, original 505(b)(2) NDAs that seek approval for an indication for which *the listed drug is not* approved. *See* 21 C.F.R. § 314.54(a) (stating that a "new indication" for which data are needed is one "that represents a modification of a listed drug"); *see also id.* § 314.54(a)(1)(iv) (telling 505(b)(2) applicants what to submit when they seek approval "only for a new indication and not for the indications approved for the listed drug on which the applicant relies"). Put another way, a new indication might be one of the unique characteristics of a 505(b)(2) NDA; if it is, the 505(b)(2) applicant must prove safety and effectiveness as to that indication. But if a 505(b)(2) applicant seeks approval only for the same indications for which the listed drug has been approved, safety and effectiveness data are not necessarily required to support the indications.

The requirement to submit data to support a 505(b)(2) drug's unique characteristics carries over to Section 314.60, the regulation governing amendments to 505(b)(2) NDAs. Section 314.60(b)(6) proscribes amendments of 505(b)(2) NDAs that "include data to support an indication or claim that was not included in the original NDA." 21 C.F.R. § 314.60(b)(6). Indications, in other words, can be added by amendment, as long as the amendment does not include data to support the new indication. And so, it follows that, when a 505(b)(2) NDA amendment seeks approval of an indication for

which the listed drug is not approved—*i.e.*, when the new indication is unique to the 505(b)(2) drug—data may be required under Section 314.54 but forbidden under Section 314.60(b)(6). Conversely, when a 505(b)(2) amendment seeks approval of an indication for which the listed drug is approved—*i.e.*, when the new indication is not unique to the 505(b)(2) drug—data are not necessarily required under Section 314.54 for that indication and thus not necessarily forbidden under Section 314.60(b)(6).

Whether in an original 505(b)(2) NDA, in an amendment, or in a supplement, 505(b)(2) applicants may seek FDA's approval of an indication for which the listed drug is already approved. And that's exactly what the July Amendment seeks. After UTC obtained FDA's approval to add PH-ILD to the TYVASO label, Liquidia submitted the July Amendment to seek FDA's approval to add PH-ILD to the YUTREPIA label. The July Amendment properly includes no new clinical data supporting the PH-ILD indication. Consistent with the FDCA and FDA regulations, *see* 21 U.S.C. § 355(b)(2); 21 C.F.R. § 314.54(a)(1)(iii), the July Amendment relies on FDA's prior finding that TYVASO is safe and effective for PH-ILD. Because the July Amendment includes no new data, it cannot violate rules concerning major amendments containing new data.

UTC has argued that Liquidia's reliance on FDA's approval of UTC's supplement to the TYVASO NDA for PH-ILD qualifies as "includ[ing] data to support" a new indication. PI 27–28. That argument lacks merit. A 505(b)(2) applicant is, by definition, not allowed to use or even "refer[]" to data submitted by the listed drug holder. 21 U.S.C. § 355(b)(2) ("a drug for which the investigations … relied upon by the applicant for approval of the application were not conducted by or for the applicant and

37

for which the applicant has not obtained a right of reference or use from [the listed drug holder]"). Instead, a 505(b)(2) applicant "identifi[es ] each listed drug for which FDA has made a finding of safety and effectiveness and on which finding the applicant relies" and, in doing so, relies on that previous finding of safety and effectiveness. 21 C.F.R. § 314.54(a)(1)(iii). In accordance with FDA's regulations, the July Amendment identifies TYVASO and FDA's finding that it is safe and effective for PH-ILD and does not include or refer to UTC's studies or data. Liquidia's reliance on FDA's finding of safety and effectiveness for TYVASO is not the same as reliance on data UTC submitted to secure that finding and certainly does not constitute the submission of data for purposes of Section 314.60(b)(6).

## Conclusion

The Court should dismiss UTC's complaint with prejudice.


Dated: May 7, 2024                    Respectfully submitted,

                                      /s/ Bryan Killian
                                      Bryan Killian (DC Bar No. 989803)
                                      David B. Salmons (DC Bar No. 476299)
                                      MORGAN, LEWIS & BOCKIUS LLP
                                      1111 Pennsylvania Avenue, NW
                                      Washington, DC 20004
                                      T: (202) 373-6191
                                      F: (202) 739-3001
                                      bryan.killian@morganlewis.com
                                      david.salmons@morganlewis.com