# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED THERAPEUTICS
CORPORATION,

<em>Plaintiff</em>,

v.

FOOD AND DRUG ADMINISTRATION,
*et al.*,

<em>Defendants</em>,

and

LIQUIDIA TECHNOLOGIES, INC.,

<em>Defendant-Intervenor</em>.

No. 24-cv-484-JDB

## PLAINTIFF UNITED THERAPEUTICS CORPORATION'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Shaun R. Snader (D.C. Bar No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

Douglas Carsten (admitted *pro hac vice*)
Art Dykhuis (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

Adam W. Burrowbridge (D.C. Bar No.
   1001783)
Paul Hughes (D.C. Bar No. 997235)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

William C. Jackson (D.C. Bar No. 475200)
William M. Jay (D.C. Bar No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20001
(202) 346-4000

Gerard J. Cedrone (D.D.C. Bar No. MA0019)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

June 4, 2024                    *Counsel for United Therapeutics Corporation*

**TABLE OF CONTENTS**

Introduction ................................................................................................................1

Background ................................................................................................................3

    I.      Statutory and Regulatory Framework ....................................................3

          A.     The FDCA and Hatch-Waxman Act ........................................ 3

          B.     Patent Disputes Under the Hatch-Waxman Act......................... 4

          C.     FDA's Bundling Rule .............................................................. 6

          D.     The Medicare Modernization Act ............................................ 9

          E.     Regulatory Limitations on Major Amendments to New Drug Applications ........................................................................ 10

    II.     Factual Background ................................................................................11

          A.     UTC Develops Novel Treatments for Rare Diseases. ............... 12

          B.     Liquidia Applies to Market a Treprostinil Product, Leading to Patent Litigation..................................................................... 13

          C.     Liquidia Submits an Amendment to Add the PH-ILD Indication, and UTC Brings Timely Infringement Litigation.................... 14

          D.     Liquidia Tells the Market It Is Prepared To Launch Immediately. .......... 15

LEGAL STANDARD................................................................................................15

Argument ................................................................................................................16

    I.      The Court has jurisdiction over this action. ..........................................16

          A.     UTC has Article III standing to challenge FDA's acceptance of Liquidia's amendment. ........................................................... 16

          B.     FDA conflates APA statutory arguments with the test for jurisdiction. ........................................................................... 22

          C.     UTC's December 2023 letter to FDA does not deprive this Court of jurisdiction. ........................................................................ 23

    II.     Defendants' non-jurisdictional objections provide no basis to avoid APA review.................................................................................................25

      A.      FDA's acceptance of Liquidia's amendment is "final agency action." ........................................................................................ 26

      B.      UTC faces hardship if this Court does not consider its claims. ............... 34

      C.      Patent litigation is not an adequate remedy for UTC to challenge FDA's disregard of its own rules, resulting in the deprivation of a statutory right. ........................................................................................ 35

III.      UTC has adequately pleaded its APA claims. ....................................................38

      A.      The Complaint properly pleads that FDA violated its Bundling Rule by accepting Liquidia's amendment to add a new indication, instead of requiring a separate 505(b)(2) application. ............................ 39

      B.      UTC has adequately alleged a claim of differential treatment. ............... 43

      C.      UTC has adequately alleged that FDA acted contrary to its regulations governing "major" amendments by accepting Liquidia's PH-ILD amendment. ............................................................... 44

CONCLUSION .....................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*32 Cnty. Sovereignty Comm. v. Dep't of State*,
  292 F.3d 797 (D.C. Cir. 2002) ........................................................................25

*Am. Acad. of Pediatrics v. FDA*,
  379 F. Supp. 3d 461 (D. Md. 2019) ................................................................41

*Am. Libr. Ass'n v. FCC*,
  401 F.3d 489 (D.C. Cir. 2005) ........................................................................23

*\*Apotex, Inc. v. FDA*,
  2006 WL 1030151 (D.D.C. Apr. 19, 2006) (Bates, J.), *aff'd and remanded*,
  449 F.3d 1249 (D.C. Cir. 2006) ................................................................17, 34

*Aston v. Johnson & Johnson*,
  248 F. Supp. 3d 43 (D.D.C. 2017) ..................................................................16

*Augustus v. McHugh*,
  No. 02-2545, 2011 WL 13377119 (D.D.C. Nov. 16, 2011) ............................23

*Avadel CNS Pharmaceuticals, LLC v. Becerra*,
  638 F. Supp. 3d 23 (D.D.C. 2022) ............................................................37, 38

*Bellion Spirits, LLC v. United States*,
  7 F.4th 1201 (D.C. Cir. 2021) ........................................................................26

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................................32

*Bethesda-Chevy Chase Broads., Inc. v. FCC*,
  385 F.2d 967 (D.C. Cir. 1967) (per curiam) ..................................................30

*Better Gov't Ass'n v. Dep't of State*,
  780 F.2d 86 (D.C. Cir. 1986) ..........................................................................34

*Bhd. of Locomotive Eng'rs & Trainmen v. FDA*,
  972 F.3d 83 (D.C. Cir. 2020) ..........................................................................23

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ........................................................................................35

*Braeburn Inc. v. FDA*,
  389 F. Supp. 3d 1 (D.D.C. 2019) ....................................................................22

*Bristol-Myers Squibb Co. v. Royce Labs., Inc.*,
    69 F.3d 1130 (Fed. Cir. 1995) ........................................................................17

*Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*,
    344 F. Supp. 3d 158 (D.D.C. 2018) ...............................................................19

*Cantu v. United States*,
    2011 WL 13385444 (D.D.C. Dec. 21, 2011) ..................................................34

*Ciba-Geigy Corp. v. EPA*,
    801 F.2d 430 (D.C. Cir. 1986) .......................................................................29

*Cities of Anaheim & Riverside v. FERC*,
    692 F.2d 773 (D.C. Cir. 1982) .......................................................................30

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice*,
    846 F.3d 1235 (D.C. Cir. 2017) ...............................................................35, 36

*Clifton Power Corp. v. FERC*,
    294 F.3d 108 (D.C. Cir. 2002) .......................................................................24

*Cohen v. United States*,
    650 F.3d 717 (D.C. Cir. 2011) (en banc) ......................................................22

*Coker v. Sullivan*,
    902 F.2d 84 (D.C. Cir. 1990) .........................................................................38

*CTIA-The Wireless Ass'n v. FCC*,
    530 F.3d 984 (D.C. Cir. 2008) .......................................................................35

*Darby v. Cisneros*,
    509 U.S. 137 (1993) .......................................................................................29

*Eli Lilly & Co. v. Medtronic, Inc.*,
    496 U.S. 661 (1990) .......................................................................................17

*Eli Lilly & Co. v. Teva Pharms. USA, Inc.*,
    557 F.3d 1346 (Fed. Cir. 2009) .......................................................................6

*Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*,
    317 F. Supp. 3d 504 (D.D.C. 2018) ...............................................................23

*FTC v. Standard Oil Co. of Cal.*,
    449 U.S. 232 239 (1980) ................................................................................28

*Gonzalez Boisson v. Pompeo*,
    459 F. Supp. 3d 7 (D.D.C. 2020) (Bates, J.) .................................................36

*Gustave-Schmidt v. Chao*,
226 F. Supp. 2d 191 (D.D.C. 2002) ............................................................................16

*Heuer v. Smithsonian Inst.*,
619 F. Supp. 3d 202 (D.D.C. 2022) ............................................................................17

*\*Hill Dermaceuticals, Inc. v. FDA*,
709 F.3d 44 (D.C. Cir. 2013) ......................................................................................39

*ICC v. Bhd. of Locomotive Eng'rs*,
482 U.S. 270 (1987) .............................................................................................24, 25

*Int'l Tel. & Tel. Corp. v. Local 134, Int'l Bhd. of Elec. Workers*,
419 U.S. 428 (1975) .............................................................................................27, 28

*\*Ipsen Biopharmaceuticals, Inc. v. Azar*,
943 F.3d 953 (D.C. Cir. 2019) ....................................................................................33

*Ipsen Biopharmaceuticals, Inc. v. Becerra*,
678 F. Supp. 3d 20 (D.D.C. 2023) ........................................................................20, 22

*\*Jafarzadeh v. Nielsen*,
321 F. Supp. 3d 19 (D.D.C. 2018) ........................................................................15, 29

*Jeffries v. Volume Servs. Am., Inc.*,
928 F.3d 1059 (D.C. Cir. 2019) ..................................................................................20

*Jibril v. Mayorkas*,
20 F.4th 804 (D.C. Cir. 2021) ...............................................................................16, 18

*King v. Leavitt*,
475 F. Supp. 2d 67 (D.D.C. 2007) ..............................................................................25

*Lannett Co. v. FDA*,
300 F. Supp. 3d 34 (D.D.C. 2017) ..............................................................................30

*Liquidia Techs., Inc. v. United Therapeutics Corp.*,
No. IPR2021-00406, 2022 WL 2820717 (P.T.A.B. July 19, 2022) .........................13

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
70 F.4th 582 (D.C. Cir. 2023) .....................................................................................44

*Mylan Pharms., Inc. v. Shalala*,
81 F. Supp. 2d 30 (D.D.C. 2000) ................................................................................18

*Nasdaq Stock Mkt. LLC v. SEC*,
1 F.4th 34 (D.C. Cir. 2021) .........................................................................................31

*Nat. Res. Def. Council v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) ...........................................................28

*Nat'l Treasury Emps. Union v. FLRA*,
745 F.3d 1219 (D.C. Cir. 2014) .........................................................28

*Nat'l Treasury Emps. Union v. United States*,
101 F.3d 1423 (D.C. Cir. 1996) .........................................................16

*Norwich Pharms., Inc. v. Becerra*,
2023 WL 7174558 (D.D.C. Nov. 1, 2023) ...........................................38

*Nostrum Pharms., LLC v. FDA*,
35 F.4th 820 (D.C. Cir. 2022) ...........................................................30

*Outland v. C.A.B.*,
284 F.2d 224 (D.C. Cir. 1960) ...........................................................24

*Perry Cap. LLC v. Mnuchin*,
864 F.3d 591 (D.C. Cir. 2017) ....................................................16, 26

*\*Pfizer Inc. v. Shalala*,
182 F.3d 975 (D.C. Cir. 1999) ....................................................19, 29

*Philip Morris USA Inc. v. FDA*,
202 F. Supp. 3d 31 (D.D.C. 2016) .....................................................41

*Rhea Lana, Inc. v. Dep't of Lab.*,
824 F.3d 1023 (D.C. Cir. 2016) .........................................................26

*S. Poverty L. Ctr. v. Dep't of Homeland Sec.*,
605 F. Supp. 3d 157 (D.D.C. 2002) ....................................................22

*Sackett v. EPA*,
566 U.S. 120 (2012) ........................................................................24

*Sandoz Inc. v. Becerra*,
2022 WL 2904262 (D.D.C. July 22, 2022) ...........................................19

*Sidak v. ITC*,
678 F. Supp. 3d 1 (D.D.C. 2023) .......................................................34

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ........................................................................25

*Swed. Am. Hosp. v. Sebelius*,
691 F. Supp. 2d 80 (D.D.C. 2010) .....................................................16

*Syncor Int'l Corp. v. Shalala,*
    127 F.3d 90 (D.C. Cir. 1997) ................................................................41

*Teva Pharms. USA, Inc. v. Azar,*
    369 F. Supp. 3d 183 (D.D.C. 2019) ........................................................19

*\*Teva Pharms. USA, Inc. v. Sebelius,*
    595 F.3d 1303 (D.C. Cir. 2010) ......................................................5, 17, 19

*Titan Tire Corp. v. Case New Holland, Inc.,*
    566 F.3d 1372 (Fed. Cir. 2009) ..............................................................37

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ..............................................................................18

*Union of Concerned Scientists v. Dep't of Energy,*
    998 F.3d 926 (D.C. Cir. 2021) ................................................................42

*Union Pacific Railroad Co. v. STB,*
    No. 23-1125, 2023 WL 4982772 (D.C. Cir. Aug. 3, 2023) ......................25

*United Therapeutics Corp. v. Liquidia Techs., Inc.,*
    2023 WL 8794633 (Fed. Cir. Dec. 20, 2023) ..........................................13

*United Therapeutics Corp. v. Liquidia Techs., Inc.,*
    74 F.4th 1360 (Fed. Cir. 2023) ......................................................12, 13, 14

*United Therapeutics Corp. v. Liquidia Techs., Inc.,*
    No. 24-1658 (Fed. Cir. May 9, 2024) ......................................................14

*United Transp. Union v. ICC,*
    871 F.2d 1114 (D.C. Cir. 1989) ..............................................................24

*Veloxis Pharms., Inc. v. FDA,*
    109 F. Supp. 3d 104 (D.D.C. 2015) ..........................................................4

*Walter O. Broswell Mem'l Hosp. v. Heckler,*
    749 F.2d 788 (D.C. Cir. 1984) ................................................................39

*Westar Energy, Inc. v. FERC,*
    473 F.3d 1239 (D.C. Cir. 2007) ..............................................................43

*Wheaton Coll. v. Sebelius,*
    703 F.3d 551 (D.C. Cir. 2012) ................................................................34

*Young v. Dep't of Lab.,*
    2020 WL 1557170 (D.D.C. Apr. 1, 2020) ................................................28

STATUTES:

5 U.S.C. § 551(6) ...............................................................................................27, 28

5 U.S.C. § 551(13) ..............................................................................................26, 27

5 U.S.C. § 704 ....................................................................................................26, 35

21 U.S.C. § 355 ......................................................................3, 4, 5, 9, 13, 14, 15, 28

21 U.S.C. § 355(a) ......................................................................................................3

21 U.S.C. § 355(b)(1) ..............................................................................................3, 5

21 U.S.C. § 355(b)(1)(A) .............................................................................................3

21 U.S.C. § 355(b)(2)(A)(iv) ........................................................................................5

21 U.S.C. § 355(b)(4)(A) ...........................................................................................10

21 U.S.C. § 355(b)(4)(B) ......................................................................................10, 43

21 U.S.C. §§ 355(c)(2) .................................................................................................5

21 U.S.C. § 355(c)(3) ...................................................................................................6

*21 U.S.C. § 355(c)(3)(C) ...............................................................................6, 9, 17, 32

21 U.S.C. § 355(c)(3)(C)(i)-(ii) ....................................................................................6

21 U.S.C. § 355(c)(3)(D)(ii) ......................................................................................38

21 U.S.C. § 355(d)(2) ..................................................................................................3

21 U.S.C. § 355(j)(2)(A) ...........................................................................................3, 5

35 U.S.C. § 271(j)(7)(A)(i) ...........................................................................................5

35 U.S.C. § 271(e)(2)(A) ..............................................................................................6

35 U.S.C. § 318(b) .....................................................................................................14

Hatch-Waxman Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) .............................3, 4, 17, 26, 33

*Medicare Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066
........................................................................................9, 10, 40, 42, 43, 45

REGULATIONS & RULEMAKINGS:

21 C.F.R. 314.3(b) ......................................................................................................40

21 C.F.R. § 10.33 ..............................................................................................................25

21 C.F.R. § 10.35 ..............................................................................................................25

21 C.F.R. § 314.50(h) ..........................................................................................................5

21 C.F.R. § 314.53(d) ..........................................................................................................5

*21 C.F.R. § 314.60(b)(6) ......................................................................................11, 44, 45

*21 C.F.R. § 314.60(e) .......................................................................................................43

21 C.F.R. § 314.60(f)(1)(i) ................................................................................................42

21 C.F.R. § 314.94(a)(12)(i)(A) ...........................................................................................5

*21 C.F.R. § 314.101(a) .....................................................................................................27

21 C.F.R. § 314.101(a)(1) ..............................................................................................4, 30

21 C.F.R. § 314.101(a)(2) ....................................................................................................4

21 C.F.R. § 314.101(a)(3) ....................................................................................................4

49 C.F.R. § 1115.3 .............................................................................................................25

49 C.F.R. § 1117.1 .............................................................................................................25

73 Fed. Reg. 39,588 (July 10, 2008) ...........................................................................11, 40

80 Fed. Reg. 6802 (Feb. 6, 2015) ...................................................................9, 40, 42, 43

81 Fed. Reg 69,580 (Oct. 6, 2016) ..................................................................................7, 42

**LEGISLATIVE HISTORY:**

148 Cong. Rec. S6844 (daily ed. July 16, 2002) ..........................................................9, 10, 43

H.R. Rep. No. 108-391 (2003) ......................................................................................10, 43

**RULES**

Fed. R. Civ. P. 12(b)(6) ..............................................................................................15, 16, 23

# GLOSSARY

'327 patent ..........................................U.S. Patent No. 11,826,327

'793 patent .........................................U.S. Patent No. 10,716,793

1993 Bundling Rule ..........................FDA, *Interim Guidance: Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees Under the Prescription Drug User Fee Act of 1992* (July 12, 1993) (ECF No. 14-5)

2004 Bundling Rule ..........................FDA, *Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees* (Dec. 2004) (ECF No. 14-6)

ANDA .................................................abbreviated new drug application

Burgess MTD Decl. .........................Declaration of Brian T. Burgess in Support of Plaintiff's Opposition to Defendants' Motions to Dismiss

Burgess MTD Decl. Ex. 1 .................Exhibit 1 to the Concurrently-Filed Declaration of Brian T. Burgess in Support of Plaintiff's Opposition to Defendants' Motions to Dismiss: Transcript of March 29, 2024 Hearing on Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction (ECF No. 34)

Compl .................................................UTC's Complaint (ECF No. 1)

Cooney Email .....................................United Therapeutics Corp. v. Liquidia Techs., Inc., C.A. No. 20-cv-00755 (D. Del. Nov. 15, 2023), D.I. 458-5 (E-mail from Brian Cooney, Regulatory Health Project Manager, Center for Drug Evaluation & Research, FDA, to Jennifer Weidman, Liquidia Techs., Inc. (Sept. 14, 2023)) ("Cooney Email") (ECF No. 14-3)

FDA ....................................................Food and Drug Administration

FDA MTD Mem. ...............................Memorandum in Support of Federal Defendants' Motion to Dismiss (ECF No. 37-1)

FDCA .................................................Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq.

JPM Tr. ..............................................Final Transcript, Liquidia Corporation 42nd Annual J.P. Morgan Healthcare Conference (Jan. 10, 2024) ("JPM Tr.") (ECF No. 14-7)

Liquidia .............................................Liquidia Technologies, Inc.

Liquidia MTD Mem...........................Liquidia Technologies, Inc.'s Memorandum of Points and Authorities in Support of its Motion To Dismiss (ECF No. 38-1)

MMA..................................................Medicare Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066

NDA...................................................new drug application

Orange Book .....................................FDA, *Approved Drugs with Therapeutic Equivalence Evaluations*

PAH...................................................pulmonary arterial hypertension

PH .....................................................pulmonary hypertension

PH-ILD .............................................pulmonary hypertension associated with interstitial lung disease

PTAB .................................................Patent Trial and Appeal Board

UTC...................................................Plaintiff United Therapeutics Corporation

UTC Mem. ........................................Plaintiff United Therapeutics Corporation's Memorandum in Support of its Motion for a Temporary Restraining Order and/or Preliminary Injunction (ECF No. 14-1)

## INTRODUCTION

For at least three decades, FDA has barred drug manufacturers from amending a pending New Drug Application (NDA) to seek approval for a new indication—*i.e.*, a new proposed use of the drug—not requested in the original application. Instead, the agency requires a separate application seeking approval for the new indication. This requirement, commonly referred to as the "Bundling Rule," has significant practical implications. Relevant here, it prevents applicants from effectively backdating an application for a new indication, thereby sidestepping the mandatory stay of approval that would be based on patents covering the new indication.

Neither FDA nor intervenor Liquidia Technologies, Inc. (Liquidia) dispute the legal significance of allowing an applicant to pursue a new indication via an amendment rather than requiring a new application. As Liquidia explains, "FDA cannot stay approval of a 505(b)(2) NDA based on patents listed in the Orange Book *after* the NDA is submitted, even if the applicant later amends or supplements that NDA." Liquidia MTD Mem. 12-13; *see* FDA MTD Mem. 12. Nor have Defendants reconciled FDA's acceptance decision with the Bundling Rule. FDA has yet to engage with the issue at all, while Liquidia has insisted that the Bundling Rule is mere guidance that FDA properly disregarded—contradicting both the plain language of the Bundling Rule and decades of consistent agency practice.

Instead, Defendants have retreated to procedural objections, which they now renew. But Defendants have provided no basis to dismiss this action and deprive Plaintiff United Therapeutics Corporation (UTC) of judicial review before FDA has even produced the administrative record.

To begin, despite Defendants' arguments to the contrary, UTC plainly has standing to challenge FDA's decision to accept Liquidia's amendment: UTC lost its statutory right to a 30-month stay because FDA decided to accept Liquidia's amendment for substantive review instead of requiring Liquidia to comply with the Bundling Rule and file a new application. Additionally,

UTC faces the threat of significant economic harm caused by the imminent, unlawful introduction of Liquidia's product for the new indication into the market. Those facts suffice to establish Article III standing. The possibility that FDA might voluntarily rescind its acceptance decision does not deprive UTC of standing, and Defendants' speculation that Liquidia might find other ways to evade a 30-month stay if FDA revokes acceptance is legally irrelevant.

None of Defendants' other arguments supports dismissal. Defendants contend that FDA's acceptance decision is not ripe for judicial review because it does not qualify as final agency action. But FDA has already reached a final decision on the relevant question—whether Liquidia could submit its new indication for substantive review as an amendment—and that decision has spawned legal consequences. FDA's litigation counsel has asserted that FDA is still actively considering whether to accept Liquidia's amendment even as the agency simultaneously decides whether to approve Liquidia's application. That contention is inconsistent with FDA's correspondence to Liquidia, Liquidia's own understanding of that correspondence, and well-established FDA practice separating the threshold acceptance determination from substantive review to decide approval. To the extent the assertion is nonetheless considered, it should be evaluated based on the administrative record—which FDA has yet to produce—rather than the *post hoc* assertions of the agency's litigation counsel. Defendants also cannot evade review by pointing either to the post-acceptance letter that UTC submitted to FDA or the patent lawsuit UTC filed against Liquidia. UTC's informal request for FDA to reconsider its acceptance decision does not negate finality, and its patent suit against Liquidia cannot provide UTC with the relief it is seeking here: the restoration of its right to a 30-month stay and the vacatur of FDA's unlawful action.

Finally, Liquidia (but not FDA) proceeds to challenge the merits of UTC's claims. But those challenges are plainly premature at the motion to dismiss stage before an administrative

2

record has been produced, which is presumably why FDA has not joined those arguments.  In any

event, all of UTC's claims have been viably alleged.

    For these reasons, and as further explained below, Defendants' motions should be denied.

## BACKGROUND

**I.      Statutory and Regulatory Framework**

    **A.      The FDCA and Hatch-Waxman Act**

    Anyone seeking to market a drug must first demonstrate to FDA's satisfaction that the

product is effective and safe for its intended use.  *See* 21 U.S.C. § 355(d)(2); *see generally*

§ 355(a).  To do so, the sponsor must submit either an NDA under section 505(b)(1) of the FDCA,

21 U.S.C. § 355(b)(1),[1] or one of the more streamlined applications created by the Drug Price

Competition and Patent Term Restoration Act (Hatch-Waxman Act), Pub. L. No. 98-417, 98 Stat.

1585 (1984).  The choice depends on whether (and to what extent) the sponsor relies on previous

FDA approvals and associated studies to which it has no right of reference.

    If an applicant seeks approval for an entirely new drug product—a "brand-name" drug—it

typically submits a full, standalone NDA under section 505(b)(1).  An NDA must include the "full

reports of investigations" conducted or licensed by the sponsor showing "whether such drug is

safe for use and whether such drug is effective in use."  21 U.S.C. § 355(b)(1)(A).  By contrast, if

an applicant seeks to market a generic drug that is a copy of an approved brand drug, the applicant

may submit an abbreviated new drug application (ANDA) establishing that the proposed generic

drug is bioequivalent and pharmaceutically equivalent to a previously approved "reference listed

drug" (*i.e.*, the brand-name product).  *See id.* § 355(j)(2)(A).  In other words, the ANDA relies on

FDA's prior determination that the reference listed drug is safe and effective.  That reliance speeds

---

[1] Section 505 of the FDCA is codified at 21 U.S.C. § 355.  This memorandum refers to provisions of the session law in text and provisions of the U.S. Code in citations.

the process and dramatically lowers costs for the ANDA sponsor.

The Hatch-Waxman Act also establishes an intermediate pathway for approval of a new drug product that shares features with a previously approved drug:  an application under section 505(b)(2) of the FDCA.  This case involves such a section 505(b)(2) application.  "Like the full NDA, a [section] 505(b)(2) application must directly demonstrate that the proposed drug product is safe and effective[.]"  *Veloxis Pharms., Inc. v. FDA*, 109 F. Supp. 3d 104, 108 (D.D.C. 2015).  But to do so, the section 505(b)(2) NDA "can rely on clinical studies that were previously submitted to FDA in support of another drug and that were not conducted or licensed by the [section] 505(b)(2) sponsor."  *Id.* at 109 (brackets omitted).  In other words, a section 505(b)(2) application uses clinical studies to demonstrate the safety and effectiveness of the proposed new drug but differs from a section 505(b)(1) application because it relies, in whole or in part, on another sponsor's safety or efficacy data from a previously approved drug.

As set forth in agency regulations, FDA first determines whether to accept an application before proceeding to substantive review.  "Within 60 days" after receipt of an NDA, FDA "will determine whether the NDA may be filed," with the agency making "a threshold determination that the [NDA] is sufficiently complete to permit a substantive review."  21 C.F.R. § 314.101(a)(1).  If FDA finds no basis to refuse the filing, it must notify the applicant in writing, and the acceptance triggers the start of the clock for the agency's substantive review.  *Id.* § 314.101(a)(2).  Conversely, if FDA refuses to the file the FDA, it must also notify the applicant in writing, which provides the applicant with an opportunity to protest the adverse decision.  *Id.* § 314.101(a)(3).

### B.    Patent Disputes Under the Hatch-Waxman Act

Many innovative drug products that improve the lives of patients also are the type of novel and valuable inventions that are rewarded with a patent.  To strike a balance between expediting the entry of follow-on products and respecting innovators' patent rights, the Hatch-Waxman Act

creates a carefully calibrated process for identifying and resolving patent disputes between brand-name manufacturers and would-be generic and section 505(b)(2) competitors.  Considered as a whole, this statutory framework promotes the orderly resolution of patent disputes *before* a follow-on product from an ANDA or section 505(b)(2) application enters the market.

The process begins with the brand-name manufacturer's public identification of its patent interests.  When an applicant files an NDA, it must list each patent that claims the proposed drug or a method of using the proposed drug for which "a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug."  21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.50(h).  The brand manufacturer must also submit timely updates to FDA of any such newly issued patents, both while the application is pending and after approval of the NDA.  21 C.F.R. § 314.53(d).  FDA publishes all listed patents for each drug in a compendium called *Approved Drug Products with Therapeutic Equivalence Evaluations*, more commonly known as the "Orange Book."  21 U.S.C. §§ 355(c)(2), (j)(7)(A)(i).

An ANDA or section 505(b)(2) applicant must then include in its application a certification regarding all the Orange Book-listed patents.  Several types of certifications exist; relevant here is the "paragraph IV" certification.  If there are any patents listed in the Orange Book for a given brand-name drug, and if the ANDA or section 505(b)(2) applicant wants to market its product before the expiration of any of those patents, a "paragraph IV" certification allows it to represent that, in its view, the patent is invalid or unenforceable or will not be infringed by the proposed drug.  21 U.S.C. § 355(b)(2)(A)(iv), (j)(2)(A)(vii)(IV); 21 C.F.R. § 314.94(a)(12)(i)(A).

Submitting a paragraph IV certification "comes with a risk" because it is a technical act of patent infringement that allows the patent owner to sue immediately—*i.e.*, before the product has been approved and marketed.  *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1305 (D.C. Cir.

5

2010); 35 U.S.C. § 271(e)(2)(A).  Filing suit within 45 days of receiving notice of the paragraph IV certification typically triggers an automatic stay of FDA's ability to approve the 505(b)(2) application or ANDA for up to 30 months.  21 U.S.C. § 355(c)(3)(C).  This stay allows patent disputes to be litigated before approval and market entry of the follow-on product.  *See Eli Lilly & Co. v. Teva Pharms. USA, Inc.*, 557 F.3d 1346, 1348-49 (Fed. Cir. 2009).  If the patent litigation ends sooner than 30 months, so does the stay.  *See* 21 U.S.C. § 355(c)(3)(C)(i)-(ii).

As explained in more detail below, pp. 9-10, *infra*, the automatic 30-month stay is only available for patents submitted to FDA before the original 505(b)(2) application or ANDA was submitted to the agency.  *See* 21 U.S.C. § 355(c)(3).  During the 30-month stay, the patent disputes are litigated, and FDA reviews the follow-on application in parallel.

### C.     FDA's Bundling Rule

For more than three decades, FDA's "Bundling Rule" has provided that an applicant may not add a new indication to a pending application—including a "tentatively approved" application—via an amendment.  Instead, FDA has long maintained that requests to seek approval for new indications, together with several other types of requests, require entirely new applications.

In its 1993 articulation of the rule, FDA explained to applicants "what should be contained in separate marketing applications and what should be combined into one application."  FDA, *Interim Guidance: Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees Under the Prescription Drug User Fee Act of 1992* at 2 (July 12, 1993) ("1993 Bundling Rule", ECF No. 14-5).  FDA stated that certain proposed additions or alternatives were not proper subjects for amendment, but rather could be sought only in a new application.  For example, "[e]very different active ingredient … should be submitted in a separate original application," as should "[p]roducts to be administered using different routes of administration" and "[d]ifferent dosage forms" (subject to narrow exceptions).  *Id.* at 3-4.  By contrast, applicants seeking approval

for "[d]ifferent strengths or concentrations" of a drug were directed to combine their requests into a single application. *Id.* As most relevant here, the 1993 Bundling Rule directed that "[a]fter initial submission, a pending original or supplemental application should not be amended to add a new indication." *Id.* at 6; *see also id.* ("New clinical or *in vitro* data to support a new claim(s) should not be submitted to an already submitted original application during the review of that application."). Instead, "[i]f the original application is not yet approved, a request for approval of other indications or claims" should "be submitted in a separate, original application." *Id.*

FDA has carried forward the Bundling Rule throughout the years with only minor changes, immaterial here. In its current form, issued by FDA in 2004, the agency reiterated that:

> After initial submission, a pending original or supplemental application should not be amended to add a new indication or claim… . If the original application is not yet approved, a request for approval of other new indications or claims should be submitted in a separate, original application.

FDA, Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees at 4-5 (Dec. 2004) (2004 Bundling Rule[2]) (ECF No. 14-6); see also Abbreviated New Drug Applications and 505(b)(2) Applications, 81 Fed. Reg 69,580, 69,616 (Oct. 6, 2016) ("Most requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to the 505(b)(2) application[.]"). FDA has consistently applied this rule since 2004. See, e.g., id. at 69,635 (maintaining that an applicant may not "amend[] or supplement[] a 505(b)(2) application to seek approval of a drug that has been modified to have a different active ingredient, different route of administration, different dosage form, or certain differences in excipients than the drug proposed in the original submission of the 505(b)(2) application"). Indeed, FDA has reiterated the rule as recently as January 2024. *See*

---

[2] This memorandum refers to the 1993 Bundling Rule and 2004 Bundling Rule collectively as "the Bundling Rule," reflecting the fact that there are no material differences between the two versions.

FDA, SOPP 8401: Administrative Processing of Original Biologics License Applications (BLA) and New Drug Applications (NDA) at 12 (2024), https://www.fda.gov/media/85659/download.

FDA has always understood that the Bundling Rule binds both itself and applicants.  For example, before FDA accepts an application (including an amendment) for substantive review, FDA staff must complete the agency's "RPM Filing Review" checklist to ensure that the submission is lawful and consistent with the statute.  As relevant here, that checklist permits FDA to accept only those applications that comply with the Bundling Rule: "Has the user fee bundling policy been appropriately applied? *If no, or you are not sure, consult the User Fee Staff*."  FDA, Approval Package, Other Review(s), Application No. 208603, at PDF p. 4 (May 21, 2021), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/208603Orig1s000OtherR.pdf.

In addition, FDA has repeatedly enforced the Bundling Rule against companies that seek to add new indications by way of an amendment.[3]  The Bundling Rule has also been consistently applied in various additional contexts, including sought-after changes to pending applications that are likely to implicate patent rights, such as changes to the dosage form or route of administration.[4]

_____

[3] *See, e.g.*, FDA, Approval Package, Administrative and Correspondence Documents, Application No. 021822, at PDF pp. 6-7 (May 2006), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2008/021822s000admincorres.pdf (Aptivus Correspondence); FDA, Approval Package, Administrative & Correspondence Documents, Application No. 206682, PDF p. 45 (Jan. 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2015/206628Orig1s000Admincorres.pdf (Dexmedetomidine Correspondence); FDA, Approval Package, Proprietary Name Review(s), Application No. 761223, at PDF p. 3 (May 24, 2021), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2021/761223Orig1s000NameR.pdf (Jemperli Correspondence); *see also* FDA, Approval Package, Proprietary Name Review(s), Application Nos. 761285 & 761331, file p. 3 (Sept. 22, 2023), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2024/761285Orig1s000,761331Orig1s000NameR.pdf (Ustekinumab Correspondence).

[4] *See, e.g.*, FDA, Approval Package, Administrative & Correspondence Documents, NDA 210709, PDF p. 60 (May 2017), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/210709Orig1s000AdminCorres.pdf (Tekturna Correspondence); FDA, Approval Package, Administrative & Correspondence Documents, NDA 209400, PDF pp. 63-64 (Nov. 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/209400Orig1s000AdminCorres.pdf

Unsurprisingly, FDA has unequivocally characterized the Bundling Rule as a "require[ment]." FDA, Proposed Rule, Abbreviated New Drug Applications and 505(b)(2) Applications, 80 Fed. Reg. 6802, 6851 (Feb. 6, 2015) ("Consistent with FDA's 'bundling' policy … , the applicant is *required* to submit a new 505(b)(2) application [in certain circumstances]." (emphasis added)).

### D.    The Medicare Modernization Act

In 2003, Congress enacted the Medicare Modernization Act (MMA), Pub. L. No. 108-173, 117 Stat. 2066.  Among other things, the MMA reformed the process for the automatic stay to ensure it operates for its intended purpose:  to provide an opportunity to litigate significant patent disputes prior to market-altering approvals.  Before passage of the MMA, brand manufacturers sometimes could secure multiple 30-month stays by listing new—but insignificant—patents after the submission of a section 505(b)(2) application or ANDA.  For example, a brand manufacturer might have secured a patent covering minor secondary changes to a drug product (*e.g.*, related to color or packaging) and used it to trigger a new stay, even though the change "really did not indicate a different or improved use for the product."  148 Cong. Rec. S6844 (daily ed. July 16, 2002) (statement of Sen. Collins).  Congress curbed this practice by amending the language of section 505(c) to provide that a 30-month stay only kicks in with respect to patents listed in the Orange Book "before the date on which the [ANDA or section 505(b)(2)] application (excluding an amendment or supplement to the application) was submitted."  21 U.S.C. § 355(c)(3)(C).

In passing the MMA, Congress legislated against the backdrop of—and, indeed, effectively codified—the Bundling Rule.  As discussed above, the Bundling Rule was a fixture of FDA's regulatory regime for more than a decade before the MMA's passage.  *See* pp. 6-8, *supra*.  And

---

(Omeprazole Correspondence); FDA, Approval Package, Administrative & Correspondence Documents, NDA 208780, PDF p. 76 (May 2015), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/208780Orig1s000AdminCorres.pdf (EsbrietCorrespondence).

Congress "d[id] *not* intend [the MMA] to alter current [FDA] practice regarding acceptance of … amendments and supplements to pending and approved [applications]."  H.R. Rep. No. 108-391, at 835 (2003).  Instead, Congress "intend[ed] [the MMA] to reflect the FDA's current practice regarding those changes and variations to both innovator and generic drugs that may be approved under amendments and supplements to previously filed NDAs and ANDAs."  *Id.*  With the Bundling Rule in place, Congress understood that the MMA would not prevent a 30-month stay in the event of a follow-on patent for significant changes reflecting "different or improved use[s] for [a] product," 148 Cong. Rec. at S6844, because the Bundling Rule would bar the addition of such "different or improved" uses by way of an amendment to an existing application.

Consistent with the Bundling Rule, the MMA provides that "[a]n applicant may not amend or supplement an application … to seek approval of a drug that is a different drug than the drug identified in the application as submitted to the Secretary."  21 U.S.C. § 355(b)(4)(A).  Congress further echoed the Bundling Rule by making an exception for "approval of a different strength," as the MMA *permits* an applicant to submit an amendment to a pending NDA to seek approval for a different strength—the type of minor change that is unlikely to implicate the innovator's patent rights.  *See* 21 U.S.C. § 355(b)(4)(B) ("[N]othing in this subsection or subsection (c)(3) prohibits an applicant from amending or supplementing the application to seek approval of a different strength.").  By contrast, the statute contains no exception allowing for the addition of a new indication by amendment—a possibility that would have directly contradicted the Bundling Rule.

### E.    Regulatory Limitations on Major Amendments to New Drug Applications

FDA typically divides amendments to applications into two categories: "minor" and "major."  In the context of resubmissions, FDA has explained that minor resubmissions contain "minor clarifying information" (*e.g.*, "[f]inal printed labeling," "[s]afety updates submitted in the same format … as the original safety submissions," or "[a] minor analysis of data previously

submitted to the application").  FDA, *SOPP 8402: Designation of Amendments as Major* at 2-3 (2023), https://www.fda.gov/media/84431/download.  Major resubmissions, by contrast, include "items that would require presentation to an advisory committee or a re-inspection of facilities" (*e.g.*, data "other than minor assay validation data").  *Id.*

FDA has long limited the types of major amendments an applicant may submit to a pending application.  Under 21 C.F.R. § 314.60(b)(6), an applicant may not submit a major amendment that includes "data to support an indication or claim that was not included in the original NDA."  The applicant may, however, include data "to support a minor modification of an indication or claim that was included in the original NDA."  *Id.* § 314.60(b)(6).  As FDA has explained:

> [I]t is appropriate to allow a major amendment to include data to support a slightly modified indication (e.g., increasing or decreasing the age range, increasing the severity of the disease) *but not a completely new indication*, regardless of whether the data supporting the new indication were submitted at the applicant's initiative or at our request.

Applications for Approval to Market a New Drug; Complete Response Letter; Amendments to Unapproved Applications, 73 Fed. Reg. 39,588, 39,604 (July 10, 2008) (emphasis added).

## II.    **Factual Background**

This case concerns a prescription drug containing treprostinil and its innovative use to treat a form of pulmonary hypertension (PH).  PH is a rare, chronic, and often fatal disease generally characterized by increased pressure in the blood vessels between the heart and lungs.  Compl. ¶ 35. That increased pressure strains the heart and, over time, can result in heart failure and death.  *Id.* The World Health Organization has designated five subcategories of PH, each with a different cause and different expected clinical outcomes.  Treprostinil is one of a number of therapies approved for Group I PH (also known as pulmonary arterial hypertension (PAH)).  In contrast, treprostinil is the only therapy ever approved to treat patients with pulmonary hypertension associated with interstitial lung disease (PH-ILD).  To treat various forms of PH, UTC has

pioneered several inventions, including the methods claimed by U.S. Patent No. 10,716,793 ('793 patent) for use of inhaled treprostinil to treat PH and U.S. Patent No. 11,826,327 ('327 patent) for use of inhaled treprostinil to improve exercise capacity in patients with PH-ILD.  *Id.* ¶ 43.

      **A.**      **UTC Develops Novel Treatments for Rare Diseases.**

UTC develops and commercializes products designed to address the needs of patients with chronic and life-threatening rare conditions.  Compl. ¶ 3.  Indeed, UTC was created to develop treatments for PAH.  United Therapeutics Corp., *United Therapeutics Corporation History*, https://www.unither.com/about-us/history.  UTC's treprostinil-based drug products include: an infusion administered subcutaneously or intravenously (Remodulin®), an extended-release tablet (Orenitram®), a nebulized inhaler (Tyvaso®), and a dry powder inhaler (Tyvaso DPI®).  UTC's efforts to develop innovative treprostinil-based therapies has led to multiple patents, including the '793 patent, which expires in 2027, and the '327 patent, which expires in 2042.  Compl. ¶ 43.

In 2009, FDA approved Tyvaso, the first inhaled treprostinil therapy to treat PAH.  *See* Compl. ¶ 38; *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360, 1363, 1365 (Fed. Cir. 2023).  In 2021, UTC discovered that inhaled treprostinil can improve exercise capacity in patients with PH-ILD based on an extensive clinical trial known as the INCREASE clinical trial.  *Id.* ¶¶ 4, 40-42.  UTC's INCREASE study convinced FDA to approve a treprostinil-based treatment for patients with PH-ILD for the first time.  *Id.* ¶ 42.  This first-and-only approved therapy for PH-ILD follows failures to use other PH drugs to successfully treat PH-ILD.  In 2022, FDA also approved Tyvaso DPI, the first commercialized dry powder inhaler version of treprostinil, to treat both PAH and PH-ILD.  United Therapeutics Corp., *Tyvaso/Tyvaso DPI*, https://www.tyvaso.com (last visited June 3, 2024).

**B.      Liquidia Applies to Market a Treprostinil Product, Leading to Patent Litigation.**

Liquidia is a biopharmaceutical company seeking FDA approval to market Yutrepia™, a dry powder inhaler version of treprostinil.  When filing its original section 505(b)(2) application in 2020, Liquidia relied on the approval of UTC's Tyvaso product to seek approval to market Yutrepia for the treatment of PAH.  Compl. ¶ 44.  Liquidia included paragraph IV certifications for UTC's patents that were then listed in the Orange Book.  *Id.* ¶ 45.

After Liquidia submitted its original section 505(b)(2) application in 2020, UTC promptly filed suit against Liquidia in the District of Delaware, asserting that Liquidia's Yutrepia product would infringe several patents.  Compl. ¶ 49.  After a four-day trial, the District of Delaware concluded that "Liquidia … will induce infringement of claims 1, 4, 6, 7, and 8 of the '793 patent," and awarded the statutory Hatch-Waxman remedy, an order barring FDA from granting final approval of Liquidia's NDA before May 14, 2027.  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-cv-755, D.I. 436 ¶¶ 3-4 (D. Del. Sept. 9, 2022).  Liquidia appealed, and the Federal Circuit affirmed.  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 74 F.4th 1360 (Fed. Cir. 2023), *cert. denied*, No. 23-804, 2024 WL 675262 (Feb. 20, 2024).

During the pendency of the District of Delaware case, Liquidia sought to administratively cancel claims 1-8 of the '793 patent through a process at the U.S. Patent & Trademark Office (Patent Office) called "*inter partes* review."  *See Liquidia Techs., Inc. v. United Therapeutics Corp.*, No. IPR2021-00406, 2022 WL 2820717 (P.T.A.B. July 19, 2022). The PTAB found the claims unpatentable, and UTC appealed to the Federal Circuit, which affirmed.  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, 2023 WL 8794633 (Fed. Cir. Dec. 20, 2023).  UTC filed a petition for panel rehearing and rehearing en banc, which the Federal Circuit denied.  UTC intends to file a petition for a writ of certiorari by the deadline.

Liquidia moved the District of Delaware for relief from the judgment ordering FDA from approving its section 505(b)(2) application until the '793 patent expires.  *See United Therapeutics*, No. 20-cv-755, D.I. 461.  The District of Delaware granted the motion, vacated the portion of its judgment that blocked Liquidia's pending NDA, *United Therapeutics*, No. 20-cv-755, D.I. 479, and amended its final judgment.  *United Therapeutics*, No. 20-cv-755, D.I. 480.  That amended judgment is now on expedited appeal to the Federal Circuit, and will be set for argument in September.  Order, *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 24-1658 (Fed. Cir. May 9, 2024).  The '793 patent will not be cancelled by the Patent Office while appeals are pending, and it remains listed in the Orange Book.  *See* 35 U.S.C. § 318(b).

### C.   Liquidia Submits an Amendment to Add the PH-ILD Indication, and UTC Brings Timely Infringement Litigation.

On July 27, 2023, Liquidia announced that it had submitted an amendment to its pending NDA No. 213005 to add the PH-ILD indication.  *See* Compl. ¶ 50.  In September 2023, within 45 days of receiving notice of Liquidia's paragraph IV certifications, UTC asserted infringement of the '793 patent in a suit against Liquidia in the District of Delaware.  Compl. ¶ 53.[5]  In December 2023, Liquidia amended its section 505(b)(2) application to include a paragraph IV certification for the '327 patent.  Compl. ¶ 57.  Within 45 days of receiving notice of that paragraph IV certification, UTC amended that complaint to assert infringement of the '327 patent.  Compl. ¶ 56.

Although the PH-ILD patent litigation in Delaware remains ongoing, FDA has already determined that this litigation will not trigger a new 30-month stay period because the patents asserted were listed in the Orange Book after Liquidia submitted its *original* 505(b)(2) application.

---

[5] UTC later stipulated to the dismissal of counts of infringement of the '793 patent without prejudice, reserving its right to amend its complaint to reassert the patent if the Patent Trial and Appeal Board's decision to hold the '793 patent unpatentable is ultimately set aside on appeal.

Compl. ¶¶ 55-56; *see* ECF No. 14-3, Cooney Email (describing which patents could result in a stay, and excluding patents listed after Liquidia submitted the original section 505(b)(2) application).  But if Liquidia were required to submit a new application for approval of the PH-ILD indication, as the Bundling Rule directs, a paragraph IV certification to the '327 patent would trigger the statutory 30-month stay.  Compl. ¶ 58.

> **D.      Liquidia Tells the Market It Is Prepared To Launch Immediately.**

Liquidia has already announced that it is prepared to launch Yutrepia immediately upon receiving final approval from FDA.  It plans to launch "for both the PAH and PH-ILD indications as soon as possible."  Press Release, Liquidia Submits Amendment to Add PH-ILD Indication to Tentatively Approved NDA for YUTREPIA™ (treprostinil) Inhalation Powder (July 27, 2023), https://www.liquidia.com/node/10556/pdf; ECF No. 14-7, J.P. Morgan Healthcare Conference Tr. at 6 (JPM Tr.); Compl. ¶¶ 55-57.  Liquidia has specifically relied on FDA's decision to bypass the Bundling Rule to assure the market that it can launch its product for the PH-ILD indication without being subjected to a stay.  *See* ECF No. 14-7, JPM Tr. at 6 ("[T]he 327 patent … we know it won't cause a regulatory stay.  So it won't trigger a regulatory stay because it was not Orange Book listed at the time of our original NDA application."); *id.* at 9 (similar).

## LEGAL STANDARD

"At the motion-to-dismiss stage, plaintiffs must plead facts that, taken as true, render it plausible that the Court has subject-matter jurisdiction.  The Court must take all facts alleged in the complaint as true and make all reasonable inferences in plaintiffs' favor."  *Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 27 (D.D.C. 2018) (Bates, J.).  This Court may "consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  *Id.* "To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id.* (quotation marks

omitted).  This Court "must accept as true all facts stated in the complaint and make all reasonable

inferences in [a] plaintiff['s] favor."  *Id.*

  In considering Defendants' motion, this Court may take judicial notice of public documents

available on FDA's website, *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 47 n.1 (D.D.C.

2017), and it may also consider documents incorporated by reference in the Complaint, *Gustave-

Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).  The Court does not resolve merits

disputes over whether agency action is arbitrary and capricious or otherwise contrary to regulations

and agency policy on a motion to dismiss, as such claims require production of the administrative

record.  *See e.g.*, *Swed. Am. Hosp. v. Sebelius*, 691 F. Supp. 2d 80, 89 (D.D.C. 2010).

## ARGUMENT

I.   **The Court has jurisdiction over this action.**

  A.   **UTC has Article III standing to challenge FDA's acceptance of Liquidia's amendment.**

  A plaintiff has Article III standing if (1) the plaintiff seeks relief for an actual or imminent

injury-in-fact, (2) the injury is fairly traceable to the defendant's conduct, and (3) a favorable

judgment would provide relief from the injury.  *See Jibril v. Mayorkas*, 20 F.4th 804, 813-14 (D.C.

Cir. 2021).  "The ripeness doctrine generally deals with when a federal court can or should decide

a case, and has both constitutional and prudential facets."  *Perry Cap. LLC v. Mnuchin*, 864 F.3d

591, 632 (D.C. Cir. 2017) (quotation marks omitted).  Constitutional ripeness overlaps with the

standing inquiry, in that it requires "an injury in fact be certainly impending."  *Nat'l Treasury

Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996).

  As explained below, FDA's decision to accept Liquidia's amendment adding a PH-ILD

indication to its pending 505(b)(2) application caused the deprivation of a statutory right (the loss

of a 30-month stay) and threatens imminent economic injury.  Both injuries give UTC standing to

pursue its claims now.

> **1.      FDA's acceptance of Liquidia's amendment caused a ripe injury-in-fact by depriving UTC of a 30-month stay.**

The Hatch-Waxman Act provides for a careful balance between the interests of innovative pharmaceutical companies and those that follow in their footsteps. *Bristol-Myers Squibb Co. v. Royce Labs., Inc.*, 69 F.3d 1130, 1132 (Fed. Cir. 1995). When a company like Liquidia uses the innovator's data for a pioneer drug to support its own application, the resulting application must certify that the company's product will not infringe any valid patents that the innovator has listed. If the innovator files suit based on the listed patents, that "typically brings a 30-month stay of … competition." *Teva Pharms.*, 595 F.3d at 1315 n.4; 21 U.S.C. § 355(c)(3)(C). The statutorily guaranteed stay provides an important "mechanism designed to guard against infringement of patents relating to pioneer drugs." *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676-77 (1990).

FDA deprived UTC of the statutorily prescribed 30-month stay by accepting Liquidia's amendment—going so far as to confirm that Liquidia's amendment would allow it to bypass the 30-month stay. This is plainly an injury-in-fact: the loss of a "statutory entitlement" which cannot be "recaptured" once it is "lost." *Apotex, Inc. v. FDA*, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006) (Bates, J.), *aff'd and remanded*, 449 F.3d 1249 (D.C. Cir. 2006); *see also Heuer v. Smithsonian Inst.*, 619 F. Supp. 3d 202, 208 (D.D.C. 2022) ("Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue … .").  So long as FDA treats Liquidia's amendment as accepted, that restricts UTC from invoking the 30-month stay with respect to the new indication for PH-ILD, as the Hatch-Waxman Act expressly states that an action concerning "an amendment or supplement to the application" does not trigger the 30-month stay. 21 U.S.C. § 355(c)(3)(C). Liquidia itself recognized this point before the outset of litigation, explaining that because it had proceeded to add the PH-ILD indication by amendment, it was not

subject to the 30-month stay that would otherwise apply.  *See* p. 15, *supra*.

UTC is alleging not just that the agency has committed a "bare procedural violation," as FDA claims (at 16), but that the agency's decision has deprived UTC of an important statutory right—one that protects brand manufacturers *and* spares the court system the burden of emergency patent litigation and damages trials.  *See Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 41 (D.D.C. 2000) (30-month stay is "for the benefit of the brand-name drug manufacturers"). Likewise, FDA's attempt (at 16) to label UTC's injury as "'abstract' rather than 'real'" is absurd. As a direct result of FDA's decision to accept Liquidia's amendment and thereby nullify the 30-month stay, UTC devoted significant resources to seeking a preliminary injunction in the patent litigation between UTC and Liquidia under the demanding standard for emergency relief, which would have been unnecessary if FDA had followed the Bundling Rule.  *See* pp. 36-37, *infra*.

**2.   Given FDA's imminent approval of Liquidia's application, UTC faces a substantial risk of competitive harm because of FDA's acceptance of Liquidia's PH-ILD amendment.**

UTC also faces an imminent threat of future harm—the irreversible erosion of UTC's market position.  *See Jibril*, 20 F.4th at 814 ("[A]n alleged future injury may suffice to establish standing if … there is a substantial risk it will occur." (quotation marks omitted)); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021) ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial.").  Here, there is a "substantial risk" that Liquidia's NDA for its PH-ILD product will be approved as amended.  As this Court recognized, because of FDA's acceptance of Liquidia's amendment, "Liquidia would get onto the market immediately," Burgess MTD Decl. Ex. 1, 47:3-4, if FDA were to approve Liquidia's 505(b)(2) application *as amended*.  Liquidia's introduction of its PH-ILD product into the market prematurely would cause UTC to suffer harm in the form of price erosion, lost market share, and

loss of goodwill.  *See generally* Selck Decl.; Compl. ¶ 72.  Such "competitive harm" provides ample basis for Article III standing.  *Sandoz Inc. v. Becerra*, 2022 WL 2904262, at *4 (D.D.C. July 22, 2022).[6]

FDA contends (at 16-17) that the risk of future harm to UTC is speculative, as "approval is an uncertain contingency" given the "rigorous scientific review" that FDA must first complete. FDA MTD Mem. 16-17 (citing *Pfizer Inc. v. Shalala*, 182 F.3d 975 (D.C. Cir. 1999)).[7]  That may be true where there is no "signal or any other indication about the status of FDA's review."  *Teva Pharms. USA, Inc. v. Azar*, 369 F. Supp. 3d 183, 203 (D.D.C. 2019).  But here, FDA has tentatively approved Liquidia's original application for PAH.  And although UTC believes that tentative approval was granted in error (for reasons not before the Court), FDA has given no indication it will revisit its decision, nor has FDA agreed there is "any possible deficiency or uncertainty" in Liquidia's original application or arising from Liquidia's amendment that "could thwart final approval."  *Teva Pharms.*, 595 F.3d at 1309-10.

### 3. Defendants' counterfactual about the '327 patent does not defeat UTC's standing.

FDA and Liquidia contend that UTC has suffered no injury because the patent it is currently

---

[6] The district court in the patent litigation between UTC and Liquidia held that UTC did not establish it would suffer irreparable harm from Liquidia marketing Yutrepia for the PH-ILD indication.  *See United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 23-cv-975, ECF No. 96 at 19.  UTC disagrees with that holding, but it is not significant here in any event because the burden to show irreparable harm for emergency relief is substantially higher than the burden to establish Article III injury to avoid a motion to dismiss.  *See, e.g.*, *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) ("A prospective injury that is sufficient to establish standing, however, does not necessarily satisfy the more demanding burden of demonstrating irreparable injury.").

[7] In *Pfizer*, the D.C. Circuit noted that FDA's action in accepting an ANDA had "cause[d] Pfizer no hardship at present or in the near future," *because Pfizer was protected by the 30-month stay*: "nothing untoward can happen to Pfizer until at least December 1999, when the 30-month [stay] … expires."  *Id.* at 980.  UTC was entitled to the same benefit here, and it faces economic harm by being deprived of it.

litigating, the '327 patent, had not yet been listed in the Orange Book at the time Liquidia filed its amendment.  According to Defendants, UTC's injury is too speculative to confer standing because it assumes "Liquidia would have then filed a second new drug application—and would not have done so until after the '327 patent was listed" in the Orange Book.  FDA MTD Mem. 17; Liquidia MTD Mem. 14 (similar).  But Defendants overstate UTC's burden to establish Article III standing.

Article III requires only that UTC show "a genuine nexus between [its] injury and [FDA's] alleged illegal conduct," which would be redressable by judicial relief.  *Ipsen Biopharmaceuticals, Inc. v. Becerra*, 678 F. Supp. 3d 20, 31 (D.D.C. 2023).  Those requirements are met here.  At all relevant times, the loss of UTC's statutory right to a 30-month stay was "concrete" and "actual." *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1067 (D.C. Cir. 2019).  When Liquidia submitted its amendment, it submitted a paragraph IV certification to the '793 patent, and UTC filed suit within 45 days.  Compl. ¶¶ 51-53.  It is undisputed that, if Liquidia had instead been required to file a new original application, its paragraph IV certification to the '793 patent would have triggered a 30-month stay.  *Id.* ¶ 74.  But because the '793 patent was first listed in the Orange Book after Liquidia submitted its original NDA, allowing Liquidia to add its indication by amendment allowed it to bypass the stay.  *Id.*

Defendants note that the UTC later voluntarily dismissed its infringement claim based on the '793 patent (although the patent is still listed in the Orange Book).  *See* FDA MTD Mem. 5; Liquidia MTD Mem. 8.  But as they also acknowledge, UTC only did so *after* it had filed suit based on the newly listed '327 patent, to which Liquidia also submitted a paragraph IV certification.  If FDA enforced the Bundling Rule now by requiring Liquidia to seek approval of the PH-ILD indication through a new application, then Liquidia's paragraph IV certification to the '327 patent would trigger a 30-month stay.  Compl. ¶ 58.  By instead allowing Liquidia to receive

substantive review of its amendment, in defiance of the Bundling Rule, FDA has deprived UTC of a valuable statutory right and exposed it to the risk of imminent, unlawful competition.

Resisting that conclusion, Defendants focus on the timing related to the '327 patent and argue that FDA's acceptance of the amendment could not have deprived UTC of a statutory stay right "related to" *that* patent.  Liquidia MTD Mem. 13; *see also* FDA MTD Mem. 17 (discussing the '327 patent certification and ignoring the '793 patent).   But at the time FDA accepted Liquidia's amendment, the agency's disregard of the Bundling Rule deprived it of an automatic stay.   Defendants implicitly assume this stay would have dissolved when UTC voluntarily dismissed its claim related to the '793 patent but ignore that UTC only took this action after it had also asserted the '327 patent, which separately would provide the basis for a stay if the Bundling Rule were properly enforced.   Defendants' argument relies on FDA's noncompliance with the Bundling Rule because a lawful application of that Rule would require Liquidia to submit a new application to seek approval for PH-ILD while its original application is pending, which would indisputably occur after the '327 patent was Orange Book-listed.  It also improperly assumes that a mere amendment can be used to preserve a filing date for a full-fledged application—a position that Liquidia advances without support (at 14) but which FDA conspicuously has not embraced.

Thus, contrary to Defendants' assertions, they and not UTC are the ones engaged in "speculation."  FDA MTD Mem. 17.  Defendants advance various counterfactuals of how Liquidia might have responded to enforcement of the Bundling Rule, variously suggesting that Liquidia might have (1) submitted a full-fledged 505(b)(2) application prior to the '327 patent's issuance (FDA MTD Mem. 17), (2) acted to "preserve the July submission date" for a 505(b)(2) application filed after the patent's issuance (Liquidia MTD Mem. 14), or (3) successfully avoided a 30-month stay by proceeding only with its application for PAH and following up with the supplement process

post-approval (FDA MTD Mem. 17; Liquidia MTD Mem. 15-16).  But UTC "does not have to negate these kind of speculative and hypothetical possibilities" or engage with Defendants' construction of a "counterfactual world" in order to establish standing.  *Ipsen*, 678 F. Supp. 3d at 31-32 (brackets and quotation marks omitted).  The hypothetical possibility that, if FDA's acceptance decision is vacated, Liquidia might find some other way to avoid a 30-month stay without submitting an amendment cannot undermine standing.  *See Braeburn Inc. v. FDA*, 389 F. Supp. 3d 1, 16 (D.D.C. 2019) ("Indivior's argument is that a hypothesized future event that might injure Braeburn in the same way as the challenged agency decision leaves Braeburn without standing. … Braeburn's access to judicial relief does not require that it disprove any speculated alternative source of injury that Indivior conjures ….").  UTC is injured because FDA accepted Liquidia's amendment for substantive review, allowing Liquidia to avoid a 30-month stay.  All that matters is that if UTC is right about the merits, then in the real world—not a counterfactual one—FDA was required to reject Liquidia's PH-ILD indication in the form Liquidia submitted it. It did not do so—it allowed Liquidia to use an unlawful amendment to avoid the 30-month stay that would apply to a new application, whether filed then or now.

## B.     FDA conflates APA statutory arguments with the test for jurisdiction.

In seeking dismissal of UTC's claims, FDA argues at length (at 9-15) that the Court lacks subject-matter jurisdiction on the theory that UTC has not identified a final agency action for review.  That argument is wrong for the reasons explained below.  *See* pp. 27-33, *infra*.  But as a threshold matter, FDA's attempt to conflate APA review requirements with Article III jurisdiction is a category error.  "[T]he 'final agency action' requirement is not jurisdictional, but rather a limitation on an APA cause of action." *Cohen v. United States*, 650 F.3d 717, 722 (D.C. Cir. 2011) (en banc); *S. Poverty L. Ctr. v. Dep't of Homeland Sec.*, 605 F. Supp. 3d 157, 170 (D.D.C. 2002) (explaining that whether the plaintiff has "alleged a final agency action within the meaning of the

APA" "has nothing to do with subject matter jurisdiction").

The difference is more than academic.  Jurisdiction must be established at the outset of a case, but finality issues addressed under Rule 12(b)(6) are subject to amendment.  *See Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 317 F. Supp. 3d 504, 514 (D.D.C. 2018). Moreover, courts evaluate finality of agency action by reference to the administrative record, *see, e.g.*, *Bhd. of Locomotive Eng'rs & Trainmen v. FDA*, 972 F.3d 83, 111 (D.C. Cir. 2020) (looking to the administrative record to determine whether there is "a reviewable final agency action"); *Augustus v. McHugh*, No. 02-2545, 2011 WL 13377119, at *1 (D.D.C. Nov. 16, 2011) (adopting report and recommendation ordering disclosure of "a full administrative record," and explaining that the administrative record would show whether a letter decision "may have been an interlocutory rather than a final agency decision"), whereas Article III standing may (and sometimes must) be supported by evidence outside the administrative record, *see Am. Libr. Ass'n v. FCC*, 401 F.3d 489, 493-94 (D.C. Cir. 2005).  Here, FDA has yet to produce an administrative record, leaving an inadequate basis to assess the agency's argument on a motion to dismiss.  As that argument is not relevant to the Court's jurisdiction, it can properly be deferred.

## C.  UTC's December 2023 letter to FDA does not deprive this Court of jurisdiction.

FDA contends (at 13-14) that UTC's challenge is "incurably premature" because UTC submitted a letter to FDA before filing this suit urging the agency to promptly correct its decision accepting Liquidia's amendment.  FDA analogizes UTC's December 2023 letter to a rehearing petition and, because FDA has not corrected its error, suggests that "rehearing" is still pending. But the analogy is inapt, and FDA's jurisdictional objection accordingly fails.[8]

---

[8] Liquidia does not make this argument expressly but relies on case law involving this same issue when it contends that UTC's challenge is "incurably" non-final.  *See* Liquidia MTD Mem. 19-20.

"A request for administrative reconsideration renders an agency's otherwise final action non-final with respect to the requesting party." *Clifton Power Corp. v. FERC*, 294 F.3d 108, 110 (D.C. Cir. 2002).  But a reconsideration request has this effect only when it is made in accordance with a procedure "specifically provided by the agency … since in that situation the petition [for reconsideration] tolls the period for judicial review of the original order." *ICC v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 279 (1987); *United Transp. Union v. ICC*, 871 F.2d 1114, 1117 (D.C. Cir. 1989) (effect of rehearing petition on finality of agency action "guided specifically by … *Brotherhood of Locomotive Engineers*").  Put differently, a request for rehearing renders an agency decision nonfinal only where the agency must "act[] upon" the request. *Outland v. C.A.B.*, 284 F.2d 224, 227-28 (D.C. Cir. 1960).  By contrast, informal reconsideration requests made outside of a prescribed adjudicatory framework—which an agency has no obligation to "act upon" and which are not prerequisite to administrative exhaustion—do not render an agency action nonfinal:  "The mere possibility that an agency might reconsider [a decision] in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

Here, UTC did not submit its letter under any procedure compelling an FDA response. Rather, UTC invoked the agency's general discretion in "urging FDA to rescind that unlawful action."  Compl. ¶ 76.  This is the kind of "informal discussion" that cannot disturb finality. *Sackett*, 566 U.S. at 127.  Moreover, FDA is not bound to "act upon" UTC's December 2023 letter, as the agency's counsel acknowledged during the preliminary injunction proceedings.  *See* Burgess MTD Decl. Ex. 1 52:19-25 ("I don't understand there to be any specific legal requirement to address in explicit black letter terms that issue.").  None of this is surprising.  UTC was not a party to FDA's decision accepting Liquidia's application, and precedent makes clear that requests from

a nonparty are akin to requests for *new* agency decisions, which do not have the same effect as a motion for reconsideration from the losing party to an *existing* decision. *See 32 Cnty. Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002).

FDA cites no authority for invoking the rehearing rule in this context, as the cases it relies upon all involved a formal petition process requiring agency action. *See* FDA MTD Mem. 13. For example, in *King v. Leavitt*, 475 F. Supp. 2d 67 (D.D.C. 2007), this Court concluded that a petition for a "stay of action" for FDA's response to a citizen petition was "in substance a petition for reconsideration." *Id.* at 70-72. Regardless of the .characterization, the petition process was "specifically provided by the agency," *Locomotive Eng'rs*, 482 U.S. at 279, providing a formal vehicle for FDA to "act upon." *See* 21 C.F.R. §§ 10.33, 10.35.[9] UTC, by contrast, did not rely on a formal, agency-presented framework in submitting its December 2023 letter.

## II.    Defendants' non-jurisdictional objections provide no basis to avoid APA review.

In addition to challenging the Court's jurisdiction, FDA and Liquidia also contend that UTC's suit is premature as a matter of prudential ripeness and the APA's final agency action requirement. They then argue alternatively that review is foreclosed under the APA because UTC supposedly can seek relief from FDA's unlawful agency action via patent litigation against Liquidia. None of these arguments is sound.

Prudential objections to judicial review are narrowly confined, given a federal court's "virtually unflagging" "obligation to hear and decide cases within its jurisdiction." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quotation marks omitted) (questioning

---

[9] The same is true of the petition for clarification addressed in *Union Pacific Railroad Co. v. STB*, No. 23-1125, 2023 WL 4982772, at *1 (D.C. Cir. Aug. 3, 2023), which was filed pursuant to a catchall regulation for seeking relief from the Board, 49 C.F.R. § 1117.1; *see also* 49 C.F.R. § 1115.3 (prescribing process for seeking reconsideration of STB actions).

prudential ripeness doctrine as being "in some tension" with this obligation). A court applying prudential ripeness principles "decide[s] whether to defer resolving a case … by 'evaluat[ing] (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration.'" *Perry Capital*, 864 F.3d at 632. Courts in this circuit treat the APA's "final agency action" requirement as "a prerequisite to ripeness." *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1208 (D.C. Cir. 2021); *see* 5 U.S.C. § 704 (stating that "[a]gency action made reviewable by statute" and "final agency action" are "subject to judicial review").

Defendants insist that FDA's acceptance decision is neither an agency action nor "sufficiently final," and thus does not constitute "final agency action." As discussed, *see* p. 23, *supra*, those arguments would be better assessed on cross-motions for summary judgment, after production of the administrative record makes clear what agency processes have reached finality. To the extent the issue is considered now on the pleadings, UTC has adequately alleged that FDA's decision to accept Liquidia's amendment marks its consummation of a decision that has legal consequences under the Hatch-Waxman Act. UTC also easily satisfies the second ripeness prong of hardship, given the immediate loss of UTC's statutory right and the imminent threat of economic harm that will flow from that loss. And UTC can only obtain effective relief against FDA's unlawful agency action in this APA suit.

A. **FDA's acceptance of Liquidia's amendment is "final agency action."**

"Agency action" is capaciously defined by the APA to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). An agency action is "final," in turn, if "it satisfies two conditions: 'First, the action must mark the consummation of the agency's decisionmaking process…. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Rhea Lana, Inc. v. Dep't of Lab.*, 824 F.3d 1023, 1027 (D.C. Cir. 2016)

26

(quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  Both conditions are satisfied here.

FDA's decision to accept Liquidia's amendment represents the culmination of FDA's consideration of whether to allow the addition of a new indication by way of an amendment.  The decision imposes legal consequences distinct from FDA's decision on whether to ultimately approve Liquidia's 505(b)(2) application.

### 1.    FDA's acceptance decision is "agency action."

FDA begins (at 10) with the surprising assertion that its acceptance of Liquidia's amendment for substantive review is not an "agency action" at all, on the theory that an acceptance does not fall under any of the terms set forth in the definition of "agency action," 5 U.S.C. § 551(13).  FDA's failure to grapple with the text of the APA reveals the weakness of its argument: its acceptance is plainly an "order" under the APA, as it is "the whole or part of a final disposition." *Id.* § 551(6).  Indeed, FDA regulations expressly require the agency to make a "threshold" decision whether to accept an application for substantive review, with the agency obliged to set forth its determination "in writing."  21 C.F.R. § 314.101(a).  This written, threshold determination then sets the course for whether FDA will engage in substantive review of the application—setting a review clock for an approval decision—or will require the applicant to start from scratch.  It is nonsensical that a "threshold" decision specifically required by FDA's own regulations does not qualify as an agency action.

Nor is there any basis for FDA to argue that the only "final disposition" is the final decision on whether to approve Liquidia's NDA as amended.  First, what makes an agency decision an "order" is that it has "some determinate consequences for the party to the proceeding," *Int'l Tel. & Tel. Corp. v. Local 134, Int'l Bhd. of Elec. Workers*, 419 U.S. 428, 443 (1975). As explained further below, p. 34-35, *supra*, FDA's acceptance has "determinate consequences" for Liquidia, FDA, and UTC:  it allows FDA to move forward with substantive review, deprives UTC of an

automatic- 30-month stay, and thus saves Liquidia the trouble of having to defend against a patent infringement suit before it can launch its product, if approved.  Second, the term "order" also embraces those "*components* of that which is itself the final disposition required."  *Int'l Tel.*, 419 U.S. at 443 (emphasis added).  So even as "*part* of a final disposition," 5 U.S.C. § 551(6), FDA's acceptance is an "order."

> **2.      FDA's decision to accept Liquidia's amended section 505(b)(2) application reflects its consummated decision to allow new indications by amendment, rather than by new applications.**

"The consummation prong of the finality inquiry requires [this Court] to determine whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue."  *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020).  "[A] final agency action need not be the last administrative action contemplated by the statutory scheme."  *Nat'l Treasury Emps. Union v. FLRA*, 745 F.3d 1219, 1222 (D.C. Cir. 2014).  Rather, the decision is final if it "mark[s] the consummation of the agency's decisionmaking process" *on the relevant question*. *Id.* (quotation marks omitted).  Indeed, an agency decision "can be final even if it is" part of "a larger decision-making process." *Young v. Dep't of Lab.*, 2020 WL 1557170, at *12 (D.D.C. Apr. 1, 2020).

FDA's decision to accept Liquidia's amended 505(b)(2) application, and the resulting refusal to apply the automatic stay, marked the consummation of the agency's decisionmaking on the relevant question in this case:  whether it was appropriate for Liquidia to seek approval by way of an amendment, rather than by filing a new NDA.  And by telling Liquidia that it was only obligated to notify UTC of its paragraph IV certification as to the patents listed in Liquidia's original application, FDA cemented its "definitive" position that UTC is not entitled to a 30-month stay with respect to Liquidia's PH-ILD submission—a position that had a "direct and immediate … effect on the day-to-day business" of UTC.  *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232 239

(1980) (quotation marks omitted); *see also Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 437 (D.C. Cir. 1986) (concluding EPA's denial of a pre-cancellation hearing was "final agency action" given a letter from EPA stating the Agency "position that Ciba-Geigy ha[d] no statutory right to a cancellation hearing").

Both FDA (at 9) and Liquidia (at 17) contend that FDA's acceptance of Liquidia's amended 505(b)(2) application is not "final agency action" under the APA because the agency has not yet approved Liquidia's NDA, and FDA's acceptance of Liquidia's amendment is part of that process.  In doing so, FDA and Liquidia improperly conflate (1) FDA's determination of whether Liquidia's NDA should be approved, a process that is still ongoing, with (2) FDA's determination that Liquidia could add an indication to its existing 505(b)(2) application by amendment, rather than via a new application.  It is FDA's "definitive position" on that second "issue that inflicts an actual concrete injury"—the deprivation of UTC's 30-month stay.  *Darby v. Cisneros*, 509 U.S. 137, 144 (1993).  *How* an agency processes an application for a benefit can have legal consequences independent of whether the agency ultimately decides to confer that benefit—when it does, the agency's actions as to its process may, as here, separately constitute "final agency action."  *Cf. Jafarzadeh*, 321 F. Supp. 3d at 41 (Bates, J.) (concluding that agency memo implementing "an administrative application handling protocol" was a final agency action because it affected how an application would be processed, despite the government's arguments that the memo "does not change the statutory requirements for any immigration benefit … and does not mandate the outcome in any individual case").

None of the cases cited by FDA or Liquidia suggests otherwise.  *Pfizer* concerned an attempt to block approval of an ANDA before FDA had an opportunity to decide the application's merits.  182 F.3d at 978.  The two cases that Liquidia cites (at 18-19) concern license applications

that, unlike an NDA and the resulting paragraph IV certification, had no standalone legal effect.[10]

FDA's attempt (at 11-12) to compare UTC's action to cases challenging an FDA complete response letter falls especially flat.  A "complete response letter" is a rejection letter informing the applicant that its NDA or ANDA requires changes before it can be approved.  *Nostrum Pharms., LLC v. FDA*, 35 F.4th 820, 825 (D.C. Cir. 2022); *Lannett Co. v. FDA*, 300 F. Supp. 3d 34, 43-44 (D.D.C. 2017).  In other words, a complete response letter is necessarily tentative, as it invites its recipient to "provide additional information before the agency makes a final decision on the [NDA or ANDA]," giving the applicant "an opportunity to convince the agency to change its mind." *Nostrum*, 35 F.4th at 825-26 (quotation marks omitted).

There is nothing similarly tentative here in FDA's acceptance decision.  Although FDA argues that it has not passed upon whether Liquidia's submission is a "proper" amendment at all, that argument is belied by regulation and past practice.  The agency does not just file any NDA that a party submits; it conducts an initial review within 60 days to "*determine* whether the NDA may be filed."  21 C.F.R. § 314.101(a)(1) (emphasis added).  "The filing of an NDA means that FDA has made a threshold determination that the NDA is sufficiently complete to permit a substantive review."  *Id.*  Moreover, in correspondence regarding Liquidia's July 2023 submission, FDA expressly "note[d] that the 45-day period" within which UTC may bring suit to trigger the 30-month stay "*does* apply with respect to the paragraph IV certification for" patents that UTC listed in the Orange Book before the submission date of Liquidia's original NDA.  ECF No. 14-3,

---

[10] *See Cities of Anaheim & Riverside v. FERC*, 692 F.2d 773, 777-78 (D.C. Cir. 1982) (concluding that a challenge about FERC's failure to "grant[] a preference to … municipalities" and its purported deprivation of rights in evaluating competing applications was unripe, as the Commission had not yet "ultimately determine[d] if and to whom a license … should be awarded"); *Bethesda-Chevy Chase Broads., Inc. v. FCC*, 385 F.2d 967, 968 (D.C. Cir. 1967) (per curiam) (agency invitation to amend application "does not impose an obligation, *deny a right*, or fix a legal obligation" (emphasis added)).

at 1 (Cooney Email); Compl. ¶ 51.  Thus, FDA made clear that the 30-month stay *does not* apply to any patents that UTC added to the Orange Book after Liquidia submitted its original NDA.  *See* FDA MTD Mem. 5 (FDA indicated to Liquidia in September 2023 that "the 45-day period during which a patent-infringement suit could trigger a 30-month stay applied to certain patents – namely, those that had been submitted for listing before the date on which the application was originally submitted").  If the agency was going to reject the amendment as facially improper, it could and would have done so then.  Indeed, that is exactly what the agency has done in the past: when an applicant has sought to add a new indication to a pending application by way of an amendment, FDA has promptly rejected the request.  *See, e.g.*, FDA, Administrative and Correspondence Documents, Application No. 021822, at PDF pp. 5-6 (May 2006), https://www.accessdata.fda. gov/drugsatfda_docs/nda/2008/021822s000admincorres.pdf   (Aptivus   Correspondence).   If acceptance was a simple error, FDA could have readily corrected that error in the over five months since it has been brought to FDA's attention.  Here, FDA chose to accept Liquidia's amendment, allowing Liquidia to skirt the 30-month stay, and it has not renounced that decision.

In ruling on UTC's preliminary injunction motion, this Court reasoned that UTC was not likely to succeed in establishing final agency action on acceptance because "the agency has consistently represented that it is still actively considering the questions at the heart of UTC's complaint in this case."  Burgess MTD Decl. Ex. 1, 72:20-22.  But UTC respectfully submits that the relevant question for finality is what the *agency itself* has stated—not the *post hoc* litigation positions of Department of Justice counsel.  The case on which the Court relied, *id.* 73:8-9, supports this distinction.  *See Nasdaq Stock Mkt. LLC v. SEC*, 1 F.4th 34, 38 (D.C. Cir. 2021) (noting that the SEC provided indications about the "tentative" nature of its decisionmaking in its orders).  There is nothing on the face of FDA's acceptance decision that suggests it is subject to

further review: the letter states that FDA "consider[s]" Liquidia's submission "complete," and it set a review date based on that acceptance.  ECF No. 26-2 at 1.  The agency later made clear that the 30-month stay does not apply to any patents that UTC listed in the Orange Book after Liquidia submitted its original NDA—a position that necessarily implies an acceptance decision for the amendment had already been made.  *See* ECF No. 25 at 16 (FDA conceding this point).  In any event, to the extent there is ambiguity, it further supports deciding this issue after production of an administrative record.

### 3. Legal consequences flow from FDA's decision to accept Liquidia's amendment.

FDA's acceptance decision also satisfies the second element of finality, because it is an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett*, 520 U.S. at 177-78 (quotation marks omitted).  Neither FDA nor Liquidia disputes that submitting a new indication by amendment allows the filer to avoid the 30-month stay:  the text of the statute makes that "legal consequence" clear.  21 U.S.C. § 355(c)(3)(C).  And FDA's acceptance of Liquidia's amendment gave rise to legal consequences:  it (1) relieved Liquidia of the obligation to pay a user fee, no matter the ultimate result of the agency's review, (2) obligated the agency to conduct a substantive review of the submission, and, critically here, (3) denied UTC the protection of a statutorily mandated 30-month stay.  FDA argues (at 12) that denial of the 30-month stay "does not flow from anything FDA has done, but from the interplay between 21 U.S.C. § 355(c)(3)(C) and the fact that Liquidia has submitted an amendment, not a second new drug application."  But FDA was not bound to follow Liquidia's self-interested characterization of its submission.  It could have—as it often does—rejected the improper amendment.  *See* pp. 7-8, *supra*; pp. 43-44, *infra*.  Its failure to do so here is the source of UTC's injuries.

Both FDA (at 12-13) and Liquidia (at 15-16) contend that UTC's injury does not flow from

FDA's decision to accept Liquidia's amendment because Liquidia may submit its PH-ILD indication for review in some other way that does not result in a 30-month stay. This argument repackages Defendants' flawed standing argument, *see* pp. 16-22, *supra*, and it fails for similar reasons. An action may have legal consequences without dictating a "certain" outcome. *See Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 958 (D.C. Cir. 2019) (concluding that CMS letters constituted final agency action where the letters "increase[d] [the challenger's] risk of incurring penalties in a future enforcement proceeding …, a less certain consequence"). As matters stand, FDA's acceptance of Liquidia's amendment has allowed it to seek approval of its PH-ILD amendment without triggering a 30-month stay; if FDA applied the Bundling Rule and refused the amendment, then Liquidia either would need to file a new original application for the new indication (triggering a stay) or delay seeking approval for the PH-ILD indication until after its first application is approved. FDA's acceptance decision thus unquestionably had legal consequences, regardless of how Liquidia might choose to respond to an order rescinding acceptance of its amendment.

Finally, Liquidia (but not FDA) also suggests (at 14 n.3) that FDA has discretion to approve an application despite the 30-month stay. It is unsurprising that the agency does not join that argument because it is obviously wrong and divorced from settled practice under the Hatch-Waxman Act. Liquidia's argument rests on an obvious misreading of "may." In saying that an application "may be made effective upon the expiration of the thirty-month period," the statute specifies that an application *may not* be made effective before that period is up. It uses "may" to mean permission (the sense of *No, you may not*) rather than to mean a hypothetical possibility (in the sense of *I think it may rain*). The statute does not and cannot use the word "shall," as Liquidia suggests, because there might be reasons not to approve the application even after the stay expires.

**B.      UTC faces hardship if this Court does not consider its claims.**

The "hardship" prong of the ripeness inquiry considers whether "the impact of the administrative action could be said to be felt immediately by those subject to it in conducting their day-to-day affairs."  *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 92 (D.C. Cir. 1986).  The hardship analysis may rely "in part upon an acceptance of the [challenger's] view of the merits" where "[t]he issue of harm and the issue on the merits are intertwined."  *Id.* at 94.

FDA's acceptance of Liquidia's amendment is the reason that UTC faces a loss of its statutory right to a 30-month stay and the risk of an immediate approval that would upend the market, causing UTC to face immediate and permanent erosion of its market position and a loss of goodwill.  *See* pp. 18-19, *supra*.  UTC cannot secure effective review of the challenged acceptance decision post-approval:  once Liquidia has entered the market, the bell cannot be un-rung.  *See Apotex*, 2006 WL 1030151, at *17 ("Once the statutory entitlement has been lost, it cannot be recaptured."); *see also Sidak v. ITC*, 678 F. Supp. 3d 1, 13 (D.D.C. 2023) ("A plaintiff meets the [hardship] standard if postponing review 'foreclose[s] [his] right ever to get meaningful judicial review." (quoting *Pfizer*, 182 F.3d at 979)).  That hardship compels immediate resolution of the purely legal questions presented in UTC's APA claims.

At a minimum, given the substantial hardship that UTC faces from an approval that could now come at any point, this Court should retain jurisdiction over this case and hold it in abeyance. Even when an action is prudentially unripe for review (and this case is not), courts have discretion to hold the matter in abeyance where an agency "will eventually" reach a final, reviewable decision.  *Cantu v. United States*, 2011 WL 13385444, at *3 (D.D.C. Dec. 21, 2011); *see also Wheaton Coll. v. Sebelius*, 703 F.3d 551, 553 (D.C. Cir. 2012) (holding claims unripe given pending agency action that might obviate the need for review, but "hold[ing] these cases in abeyance, subject to regular status reports to be filed by the government with this court every 60

days from the date of this order"); *CTIA-The Wireless Ass'n v. FCC*, 530 F.3d 984, 989 (D.C. Cir. 2008) (holding case in abeyance despite nonfinal nature of agency rule due to OMB review, but recognizing that petitioners may have had no choice but to file, given that "parties still must petition for judicial review … within 60 days to preserve their rights, even though the case may be nonjusticiable due to pending OMB review").  Moreover, given the hardship and injury imposed by the imminent launch of Yutrepia with an indication for PH-ILD, the Court should also maintain the three-day advance notice currently in place, so as to "enabl[e] the parties to deal … more fully and fairly" with a final approval decision.  Burgess MTD Decl. Ex. 1, 42:23-43:1.

> **C.**     **Patent litigation is not an adequate remedy for UTC to challenge FDA's disregard of its own rules, resulting in the deprivation of a statutory right.**

Defendants' attempt to evade review of FDA's final regulatory action by reference to the separate patent litigation between UTC and Liquidia likewise falls short. This action is UTC's only avenue for challenging FDA's unlawful decision accepting Liquidia's amendment and for restoring UTC's lost statutory right to a 30-month stay.

Section 704 of the APA authorizes judicial review of final agency action "for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  This provision "reflects Congress' judgment that the general grant of review in the APA ought not 'duplicate existing procedures for review of agency action' or 'provide additional judicial remedies in situations where Congress has provided special and adequate review procedures.'" *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW*"), 846 F.3d 1235, 1244 (D.C. Cir. 2017) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)).  But this "exception … to avoid … duplication should not be construed to defeat the [APA's] central purpose of providing a broad spectrum of judicial review of agency action."  *Bowen*, 487 U.S. at 903-04.  Thus, before precluding APA review, courts demand "clear and convincing evidence of legislative intent to create a special, alternative

remedy." *CREW*, 846 F.3d at 1244 (quotation marks omitted).

As this Court has noted, several principles guide review of adequacy under that "clear and convincing" standard. *Gonzalez Boisson v. Pompeo*, 459 F. Supp. 3d 7, 13 (D.D.C. 2020) (Bates, J.). First, "although an alternative remedy 'need not provide relief identical to relief under the APA,'" it "must nevertheless be of the 'same genre'; 'doubtful and limited relief' will not suffice." *Id.* (quoting *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009)). Second, "an alternative is not adequate where it requires a person to undergo an arduous, expensive, and long process." *Id.* (quotation marks omitted). Third, "the alternative remedy must actually result in a determination of the underlying legal question, rather than a peripheral issue." *Id.*

Under this framework, UTC's ability to pursue a patent-infringement claim against Liquidia and to seek emergency relief in that case does not divest this Court of authority to review UTC's APA claim against FDA. In this case, UTC challenges the legality of FDA's decision to accept Liquidia's amendment in violation of the agency's own rules, policies, and precedents, Compl. ¶¶ 77-95—not whether Liquidia's product would infringe any UTC patents. As a result, the patent-infringement case will not "actually result in a determination of the underlying legal question" presented in this lawsuit. *Gonzalez Boisson*, 459 F. Supp. 3d at 13.

Moreover, Defendants' contention that UTC's ability to file a motion for preliminary injunction in the patent case is an adequate substitute for UTC's loss of a statutory right to a 30-month stay reframes the problem as the solution. Congress established the automatic 30-month stay *to avoid* forcing patent owners to pursue emergency relief to protect their patent rights before a market-altering launch of a potential infringing product. Because patent litigation is typically fact- and discovery-intensive, early preliminary injunction motions are highly burdensome for both the parties and the court. In a preliminary injunction proceeding, a patent holder like UTC

shoulders the burden of showing that it not only is likely to succeed on the merits—a standard that requires it to show there is not even a "substantial question" of patent validity, *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009)—but also satisfies the other equitable factors.  The Delaware district court's decision in the patent litigation underscores the point.  There, the court found that UTC "will likely prove infringement" on several asserted claims, and that Liquidia had not shown "a substantial question of validity with respect to anticipation." *United Therapeutics Corp.*, No. 23-cv-975, ECF No. 96, at 5-6, 11-12.  But the court nonetheless denied preliminary injunctive relief based on its assessment of the equitable factors and its conclusion that the parties had "presente[d] difficult questions" regarding patent validity based on obviousness, with "each side" presenting "plausible arguments."  *See id.* at 5-6, 12, 14-29.

By contrast, this suit seeks to restore the *automatic* stay to which UTC is entitled, which would prevent FDA approval of Liquidia's amended NDA without imposing any evidentiary burden on UTC or necessitating emergency proceedings.  Treating a preliminary injunction motion as an adequate substitute for APA relief restoring the 30-month stay thus gets matters backwards.  Defendants' approach would also make the loss of a valuable statutory right resulting from unlawful FDA action effectively unreviewable, since a preliminary injunction in a patent suit could always be touted as a substitute remedy.

Contrary to Defendants' assertions, *Avadel CNS Pharmaceuticals, LLC v. Becerra*, 638 F. Supp. 3d 23 (D.D.C. 2022), does not support their effort to insulate FDA's decision from APA review.  In *Avadel*, FDA required a 505(b)(2) applicant to provide a patent certification to an Orange Book-listed patent.  *Id.* at 28, 31-35.  The applicant sued under the APA, alleging no such certification was required, but the district court held that the applicant had an adequate alternative remedy in the patent litigation resulting from its certification.  *Id.*  The court emphasized that

Congress had created "an independent cause of action and an alternative review procedure" for applicants disputing patent certifications: they can file a "counterclaim" in the patent lawsuit "to challenge the patentholder's Orange Book listing," which, if successful, would remove any obligation to certify. *Id.* at 32, 34; *see* 21 U.S.C. § 355(c)(3)(D)(ii). No such cause of action or review procedure exists here for UTC to challenge FDA's decision accepting Liquidia's amendment. Liquidia notes (at 22-23) that the *Avadel* court suggested that even absent the counterclaim right, an affirmative patent suit also would have provided an adequate alternative to an APA action. *See Avadel*, 638 F. Supp. 3d at 33. That dictum was unnecessary to the court's holding, and the reasoning does not apply here in any event. *Avadel*'s putative APA claim arguing that its drug product did not implicate a use claimed by a listed patent "was of the very sort that a patent infringement suit triggered by a Paragraph IV certification is intended to resolve." *Norwich Pharms., Inc. v. Becerra*, 2023 WL 7174558, at *13 (D.D.C. Nov. 1, 2023) (distinguishing *Avadel* on this ground). Not so here, where UTC's legal challenge is directed at FDA's disregard of its own rules limiting amendments, rather than any issue bearing directly on UTC's and Liquidia's patent dispute.

Liquidia does not dispute (at 23) that "the immediate question UTC poses … cannot be answered in its patent case." Nevertheless, it contends that so long as both this action and a patent-infringement suit can address the same "ultimate question[]" as to "the timing of FDA's ultimate approval," UTC's patent-infringement suit provides an "adequate alternative remedy." But a patent suit cannot restore the loss of UTC's statutory right to a 30-month stay—because that specific "injury" cannot be "remedied in another action," the APA's "adequate remedy" bar does not apply. *Coker v. Sullivan*, 902 F.2d 84, 90 n.5 (D.C. Cir. 1990).

## III.   UTC has adequately pleaded its APA claims.

Although FDA restricts its motion to threshold justiciability objections, Liquidia ventures

further, asking the Court to resolve the merits of UTC's claims on the pleadings without the benefit of an administrative record.  That is improper.

It is "black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more or less information than did the agency when it made its decision.'"  *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) (quoting *Walter O. Broswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)).  "To review less than the full administrative record might allow a party to withhold evidence unfavorable to its case, and so the APA requires review of 'the whole record.'"  *Walter O. Boswell*, 749 F.2d at 792 (quoting 5 U.S.C. § 706).  For that reason, the rules of this Court require agencies to file relevant portions of the administrative record before, or contemporaneously with, the filing of "any dispositive motion" in an APA action.  LCvR 7(n)(1).  FDA has not done so here, even as its counsel represented during the preliminary injunction hearing that the Court would "need the benefit of an administrative record that would reflect the resolution and the agency's position" before the Court could decide "the specific arguments raised" by UTC's claims for relief.  Burgess MTD Decl. Ex. 1, 36:12-18.

The Court should accordingly decline to address Liquidia's premature merits arguments. In any event, as set forth below, UTC plausibly alleges APA violations.

**A.  The Complaint properly pleads that FDA violated its Bundling Rule by accepting Liquidia's amendment to add a new indication, instead of requiring a separate 505(b)(2) application.**

UTC has plausibly alleged that FDA's decision to accept Liquidia's amendment to add a PH-ILD indication is barred by the Bundling Rule.  Under that Rule, "[a]fter initial submission, a pending original or supplemental application should not be amended to add a new indication." 2004 Bundling Rule at 5.  Rather, "a request for approval of other new indications … should be submitted in a separate, original application."  *Id.*

Liquidia's amendment is contrary to the plain language of the Bundling Rule because it

did not file a "separate, original application" for the indication.  In passing, Liquidia suggests (at 28) that the Bundling Rule does not speak to the situation at issue here, where a sponsor's original application is still pending but has been tentatively approved.  Nothing in the Bundling Rule supports that distinction, as there is no reference whatsoever to a distinction between tentative and final approval.  The Bundling Rule differentiates between only approved and unapproved NDAs, and a tentatively approved NDA is not an approved NDA.  *See* 21 C.F.R. 314.3(b) ("A drug product that is granted tentative approval is not an approved drug and will not be approved until FDA issues an approval letter after any necessary additional review of the NDA or ANDA.").  Indeed, FDA applied the Bundling Rule in the case of Aptivus Oral Solution, despite a tentative approval.  *See* p. 31, *supra*, p. 44, *infra* (discussing Aptivus precedent).  Liquidia is thus left to argue (at 26-30, 33-34) that the Bundling Rule is non-binding or, perhaps, was once binding but has since been superseded.  Both arguments fail.

### 1.    The Bundling Rule is binding.

FDA treats the Bundling Rule as binding.  In 2016, FDA noted that "[c]onsistent with FDA's 'bundling' policy in effect at the time of enactment of the MMA, an applicant may not seek approval for these types of changes to a drug through an amendment or supplement to the 505(b)(2) application; the applicant is *required* to submit a new 505(b)(2) application."  80 Fed. Reg. at 6,851 (emphasis added).  FDA plainly understood, and intended for the public to understand, that the Bundling Rule imposed binding "require[ments]" on applicants.  *Id.*  Indeed, FDA has amended a regulatory definition to ensure "consisten[cy] with [its] user fee 'bundling' policy." 73 Fed. Reg. 39,588, 39,593 (July 10, 2008).  Similarly, FDA's RPM Filing Worksheet requires confirmation that the applicant has complied with the Bundling "Policy."  FDA, Approval Package, Other Review(s), Application No. 108603, at PDF p. 4 (May 21, 2021), https://www.accessdata.fda.gov/ drugsatfda_docs/nda/2017/208603Orig1s000OtherR.pdf.

FDA's actions match its words in treating the Bundling Rule as binding.[11]  As explained, pp. 7-8, *supra*, FDA has rejected amendments seeking to add new indications, including 505(b)(2) applications, because those amendments did not comply with the Bundling Rule.  Liquidia attempts to distinguish FDA's multi-decade practice of rejecting amendments, but notably, does not cite any FDA precedent *consistent* with FDA's decision to *depart* from the Bundling Rule.

The Bundling Rule is binding notwithstanding the title "Guidance for Industry."  The presence of the word "guidance" does not preclude a finding that an FDA document provides a binding rule. Courts have looked through FDA's "boilerplate" recitation of the words "guidance" and "non-binding" to FDA's actual practices in assessing whether a particular "guidance" document constitutes a binding rule.  *E.g.*, *Philip Morris USA Inc. v. FDA*, 202 F. Supp. 3d 31, 46 (D.D.C. 2016) (FDA "guidance" binding rule (citing *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000))); *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 468 (D. Md. 2019) (similar); *accord Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 95 (D.C. Cir. 1997). Instead, any document—"guidance" or otherwise—that FDA *treats* as a rule *is* a rule.  *Pediatrics*, 379 F. Supp. 3d at 468; *Philip Morris USA*, 202 F. Supp. 3d at 46.  As explained, FDA's treatment of the Bundling Rule satisfies this standard.

---

[11] FDA, Approval Package, Administrative & Correspondence Documents, Application No. 021822, PDF pp. 5-6 (May 2006), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2008/ 021822s000admincorres.pdf (Aptivus Correspondence); FDA, Approval Package, Administrative & Correspondence Documents, Application No. 206628, PDF p. 45 (Jan. 2015), https://www. accessdata.fda.gov/drugsatfda_docs/nda/2015/206628Orig1s000Admincorres.pdf (Dexmedetomidine Correspondence); FDA, Approval Package, Proprietary Name Review(s), Application No. 761223, PDF p. 3 (May 24, 2021), https://www.accessdata.fda.gov/drugsatfda _docs/nda/2021/761223Orig1s000NameR.pdf (Jemperli Correspondence); *see also* FDA, Approval Package, Proprietary Name Review(s), Application Nos. 761285 & 761331, PDF p. 3 (Sept. 22, 2023), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2024/761285Orig1s000, 761331Orig1s000NameR.pdf (Ustekinumab Correspondence).

## 2.     FDA expressly preserved the Bundling Rule in later rulemaking.

Implicitly recognizing that FDA's acceptance decision cannot be squared with the Bundling Rule, Liquidia insists that it has been abrogated with respect to indications.  Liquidia points (at 30-31) to 21 C.F.R. § 314.60(f)(1)(i), a provision adopted in 2016 as part of FDA's MMA implementing regulations, which requires a new paragraph IV certification "if approval is sought … [t]o add a new indication or other condition of use."  But contrary to Liquidia's assertion, the regulation does not provide a blanket endorsement of adding new indications by amendment. Rather, as the preamble to the regulation states: "Most requests for approval of a different indication or condition of use by a 505(b)(2) applicant should not be made as an amendment to the 505(b)(2) application."  81 Fed. Reg. at 69,616; *see also Union of Concerned Scientists v. Dep't of Energy*, 998 F.3d 926, 929-30 (D.C. Cir. 2021) (preamble provides "evidence of [the agency's] contemporaneous understanding of its rule" (citation, modifications, and internal quotation marks omitted)).  And as Liquidia acknowledges (at 30), the preamble identifies only one exception to this rule covering "a drug product for which the indication has changed from prescription status to [over-the-counter] use."  80 Fed. Reg. at 6,849.  That exception has no relevance here.[12]  There is thus no basis to read 21 C.F.R. § 314.60(f)(1)(i) as abrogating the Bundling Rule, especially since FDA made clear that its MMA regulations were designed to honor "Congress's expressed intent" in the MMA "to preserve rather than disrupt FDA processes regarding submission of amendments

---

[12] The MMA was intended to work with the Bundling Rule to prevent multiple 30-month stays for *insignificant* modifications to an application (i.e., making a drug available over-the-counter), which can be implemented via amendment, while permitting additional stays for *significant* modifications (i.e., a new and inventive use for the drug), which cannot be introduced via amendment. *See* pp. 9-10, *supra*. This balance was struck to prevent abuse of the 30-month-stay while ensuring protection for legitimate follow-on innovation, like the new indication at issue here. *Id.* Thus, the FDA's limited exception for modifying over-the-counter status does not run afoul of the Bundling Rule, which provides the general rule for major changes in indication.

and supplements to 505(b)(2) applications and ANDAs." 80 Fed. Reg. at 6,851; *see* H.R. Rep.

No. 108-391, at 835 (2003).

Liquidia also argues (at 5, 31-33) that, although Hatch-Waxman and FDA's implementing

regulations do not permit making any changes by amendment that would lead to a "different drug,"

*e.g.*, 21 U.S.C. § 355(b)(4)(B), FDA permits changes to *labeling* by amendment, and that adding

a new indication is a labeling change. It reasons that, because new indications are "absent from

the list" of amendments that are expressly defined to be a change to a "different drug," 21 C.F.R.

§ 314.60(e), new indications may be added by amendment as a labeling change. But adding a new

indication is not a mere "labeling change" because by definition a new indication requires a new

safety and efficacy conclusion. Indeed, the co-author of the relevant compromise language

explained that it aimed at allowing "minor changes" by amendment without a 30-month stay, *as*

*opposed to* "a different or improved use for the product." 148 Cong. Rec. at S6844. Nothing in

§ 314.60(e) changes FDA policy to *authorize* the addition of a new indication via an amendment;

the only express authorization is for amendments to change the strength, which mirrors the

preexisting exception in the Bundling Rule. *See* ECF No. 14-2 at 4. Once again, reading the MMA

and its implementing regulations to contemplate such a change runs directly contrary to the

expressed intent of Congress and FDA to preserve existing practices.

**B.      UTC has adequately alleged a claim of differential treatment.**

Administrative agencies must "treat like cases alike," *Westar Energy, Inc. v. FERC*, 473

F.3d 1239, 1241 (D.C. Cir. 2007), a point that Liquidia acknowledges (at 33). Liquidia does not

deny FDA's history of rejecting amendments offering new indications but nevertheless argues (at

33-34) that the past cases on which UTC relies are not comparable on the facts. Liquidia's

arguments cannot support dismissal: without the administrative record, it is impossible to tell

whether FDA raised the same distinctions that Liquidia attempts to raise here. "It is … a

foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action." *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 600 (D.C. Cir. 2023) (quotation marks omitted).  Liquidia cannot raise distinctions that FDA itself did not make.

In any event, Liquidia's attempts to justify FDA's differential treatment fall flat.  As the Complaint alleges (¶ 64), FDA has "consistently and repeatedly enforced the Bundling Rule against companies seeking to add new indications to pending applications."  Two of the amendments that FDA previously rejected under the Bundling Rule (amendments for NDAs 021822 (Aptivus) and 206628 (Dexmedetomidine)) are materially identical to Liquidia's:  they sought changes to indication by way of an amendment of a 505(b)(2) application.  Liquidia identifies no distinctions between its amendment and the amendments rejected for those NDAs. Liquidia contends (at 34) that these amendments do not serve as proper comparators because they "precede[d] the 2016 rulemaking."  But as explained above, the 2016 rulemaking did not alter the Bundling Rule.  FDA's failure to treat Liquidia's amendment like the materially identical amendments it rejected for NDAs 021822 and 206628 makes its (apparently unexplained) decision to accept Liquidia's amendment arbitrary and capricious.

### C.    UTC has adequately alleged that FDA acted contrary to its regulations governing "major" amendments by accepting Liquidia's PH-ILD amendment.

"A major amendment [to an existing application] may not include data to support an indication or claim that was not included in the original NDA, supplement, or resubmission, but it may include data to support a minor modification of an indication or claim that was included in the original NDA, supplement, or resubmission." 21 C.F.R. § 314.60(b)(6).  UTC has alleged that FDA classified Liquidia's PH-ILD amendment as a "major amendment," and that the amendment sought to add a "completely new indication for an entirely different disease (PH-ILD)."  Compl.

¶ 70.  UTC has also alleged that, despite Liquidia's representations that its amendment "contains no data," the amendment "necessarily contains 'a substantial amount of new data not previously submitted to … the Agency' to support Liquidia's *completely new* PH-ILD indication because it relies on the INCREASE phase 3 clinical study that UTC conducted to secure approval of UTC's PH-ILD supplement."  Compl. ¶ 71.  This runs afoul of § 314.60(b)(6)'s core prohibition.

Liquidia contends (at 36) that § 314.60(b)(6) does not apply when "a 505(b)(2) applicant seeks approval only for the same indications for which the listed drug has been approved."  This argument has no basis in § 314.60(b)(6)'s text.  It is also inconsistent with the purpose of the regulation.  Even where an amendment seeks to add an indication that has been approved for the reference drug, the submission of new data in an amendment to a 505(b)(2) application is effectively the same as relying on new findings of safety and effectiveness that had not been made at the time the original 505(b)(2) application was submitted.  Both scenarios implicate the same fundamental concern that FDA contemplated when implementing the MMA:  that the underlying clinical data necessary to support the safety and effectiveness of an indication or claim sought via amendment must have been provided to FDA at the time of the original NDA.  Otherwise, the applicant is "developing the product on the review clock," which "is contrary to the spirit and intent of the [Hatch-Waxman] Act."  ECF No. 14-6, at 5.  UTC has therefore plausibly alleged that FDA's acceptance of Liquidia's amendment violated § 314.60(b)(6).

## CONCLUSION

Defendants' motions to dismiss should be denied.

June 4, 2024

Shaun R. Snader (D.C. Bar No. 492231)
UNITED THERAPEUTICS CORPORATION
1735 Connecticut Ave. NW, 2nd Floor
Washington, DC 20009
(202) 304-1701

Douglas Carsten (admitted *pro hac vice*)
Art Dykhuis (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Road, Suite 250
Irvine, CA 92615
(949) 851-0633

Adam W. Burrowbridge
  (D.C. Bar No. 1001783)
Paul Hughes (D.C. Bar No. 997235)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001
(202) 756-8797

Respectfully submitted.

 /s/ *Brian T. Burgess*
William C. Jackson (D.C. Bar. No. 475200)
William M. Jay (D.C. Bar No. 480185)
Brian T. Burgess (D.C. Bar No. 1020915)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

Gerard J. Cedrone (D.D.C. Bar No. MA0019)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA  02210
(617) 570-1000

*Counsel for United Therapeutics Corporation*