# EXHIBIT 1
# Civil Action No. 1:24-cv-484-JDB

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED THERAPEUTICS CORPORATION, .
 .
   Plaintiff, . CA No. 24-0484 (JDB)
 .
  v. .
 .
FOOD AND DRUG ADMINISTRATION, . Washington, D.C.
et al., . Friday, March 29, 2024
 . 2:21 p.m.
   Defendants. .
. . . . . . . . . . . . . . . . ...

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff:   WILLIAM M. JAY, ESQ.
      BRIAN T. BURGESS, ESQ.
      WILLIAM C. JACKSON, ESQ.
      Goodwin Procter LLP
      1900 N Street NW
      Washington, DC 20036

      SHAUN R. SNADER, ESQ.
      United Therapeutics Corporation
      1735 Connecticut Avenue NW
      Second Floor
      Washington, DC 20009

For Defendants:   SAMUEL B. BALLINGRUD, ESQ.
      U.S. Department of Justice
      PO Box 386
      Washington, DC 20044

For Intervenor Defendant: BRYAN M. KILLIAN, ESQ.
      DAVID B. SALMONS, ESQ.
      Morgan, Lewis & Bockius LLP
      1111 Pennsylvania Avenue NW
      Washington, DC 20004

Court Reporter:   BRYAN A. WAYNE, RPR, CRR
      U.S. Courthouse, Room 4704-A
      333 Constitution Avenue NW
      Washington, DC 20001

1                        P R O C E E D I N G S

2           THE DEPUTY CLERK:  Good morning, Your Honor.  We're on

3    the record in civil case 24-484, United Therapeutics Corporation

4    versus Food and Drug Administration et al. and Liquidia

5    Technologies, Incorporated.

6        Starting with plaintiff's counsel, please approach the

7    podium and state your appearance for the record.

8           MR. JAY:  Good morning, Your Honor.  William Jay for

9    Plaintiff United Therapeutics, joined today by William Jackson,

10   Brian Burgess, both of Goodwin Procter, and Shaun Snader from

11   United Therapeutics.

12          THE COURT:  Good morning.

13          MR. BALLINGRUD:  Good morning, Your Honor.  Sam

14   Ballingrud for defendants.  Joining me is agency counsel Danli

15   Song and Scott Kennedy.

16          THE COURT:  Good morning to you.

17          MR. KILLIAN:  Good morning, Judge Bates.  I'm Bryan

18   Killian on behalf of Liquidia, joined by David Salmons.

19          THE COURT:  Good morning, all.  So we're here for,

20   I guess I'll call it a motion for preliminary injunction/TRO.

21   And things are happening even today that may impact things.  I

22   guess what I want to do is just make sure that I'm up to speed.

23   I am aware of Judge Andrews' decision yesterday, and UTC's steps

24   with respect to that decision either yesterday or today.

25       I guess what I want to do is just ask a question of the FDA

1    so I'm sure that I know where we are.  There were three

2    impediments, I think, to the FDA issuing its decision on the

3    application and/or the letter/petition.  One of those related to

4    the litigation that was in the federal circuit.  That impediment

5    is gone as I understand it.

6        The second is the three-year exclusivity period that runs

7    out on Sunday, March 31, I believe.  And then the third was the

8    Rule 60(b) motion before Judge Andrews in the first patent

9    litigation.  And that has now been appealed and a stay sought.

10       My question to the FDA is, is that still an impediment to

11   the FDA issuing its decision on the application and/or the

12   letter?

13       Use the microphone.  I'm going to ask everybody to be

14   careful about using the microphone because we do have a public

15   line that is open and I want to make sure that we're not saying

16   things that others can't be hearing.

17           MR. BALLINGRUD:  Good morning, Your Honor.  Given that

18   there is so much in flux and, as you know, things are constantly

19   in motion, I do not have an agency position on the effect of the

20   recent developments in the last 24, 48 hours to report at this

21   time.  I apologize.

22           THE COURT:  So we don't know whether the FDA feels

23   that it is free to issue a decision on the pending application

24   by Liquidia or the letter -- I'm going to call it a letter until

25   I know a little more clearly what the various positions are on

1    whether it's a citizen petition.  We don't know what the FDA's

2    position is with respect to its freedom to issue a decision?

3            MR. BALLINGRUD:  Yes, Your Honor.  At this time we are

4    considering the full spectrum, but I do not have an agency

5    position to report at this time.

6            THE COURT:  All right.  That's going to hamstring us a

7    little bit perhaps at some points today, but maybe not

8    irreparably.

9        So I guess -- I'm going to hear first from UTC and then

10   I'll hear from the FDA and then from Liquidia.  I think that's

11   the right order of things.  The merits of the matter are

12   relevant in the preliminary injunction context because that's

13   one of the four prongs of the preliminary injunction test, the

14   likelihood of success on the merits.  So I'm not precluding

15   discussion on the merits, but I do think we need to be spending

16   most of the time this morning focused on the reasons that have

17   been raised that are sort of extra-merits reasons for a lack

18   of likelihood of the success, and those are the -- I'll call

19   them the finality and exhaustion type reasons.

20       But UTC, you get to go first and you get to decide what

21   you want to present to me and what's of the most importance.

22   I don't want to hear more than 30 minutes from anybody, but we

23   may go longer than that if I have questions that extend things

24   considerably.  But, Mr. Jay, I think that means you're up first.

25           MR. JAY:  Thank you, Your Honor.  I'm certainly not

1    going to talk at you for more than 30 minutes if you don't have

2    questions.  But I do want to focus first on what is the decision

3    under review because I think that goes to both the way the

4    government has approached standing and also to final agency

5    action.  And then I'm happy to address alternative arguments

6    about preclusion of review.  And then I would like to talk about

7    the merits and irreparable harm at the back end.

8         So to start with, what is the decision under review?

9    The decision under review is to accept the amendment as an

10    amendment, so that when Liquidia submitted that to the agency

11    there was a 60-day period for initial review wherein the agency

12    was required by its rules to decide whether it would file the

13    amendment or reject it, or return it.

14         THE COURT:  So let's assume for a moment that that

15    acceptance is a distinct question from ultimately FDA's

16    substantive review of the application by Liquidia.  What's your

17    best argument for why that email acceptance from an employee at

18    FDA marked the consummation of the agency's decisionmaking

19    process even on that acceptance question?

20         MR. JAY:  Let me just note at the outset that we now

21    have, since this litigation began, the document that is attached

22    to the Katzen declaration filed by the government, which is just

23    the correspondence to Liquidia accepting the amendment.  So

24    although we didn't have that when we brought the action, I think

25    we can now see that it's not just the email; it's the -- the

1    decision to accept the amendment has been documented in that

2    letter as well.

3         So the reason why that's reviewable and why that is the

4    consummation of the agency's decision on the relevant question

5    is that legal consequences flow from the decision to accept the

6    amendment as an amendment -- or the proposed amendment as an

7    amendment.

8         Number one, and most relevant to us, it means that that

9    amendment is grandfathered from creating a 30-month stay with

10   respect to any patents that Liquidia had to certify to --

11        THE COURT:  But it's not final in the sense that when

12   the FDA decides the application, it can do whatever it wishes

13   that would obviate whatever that acceptance -- I'll put

14   "decision" in quotation marks when I say it, whatever that

15   acceptance decision was.

16        MR. JAY:  I think what we've seen from agency practice

17   is that when the agency looks at an amendment and says this

18   isn't proper as an amendment, the same thing as a supplement,

19   in addition to other reasons, because you now owe us a user fee,

20   the agency's practice is to stop review and to say we're not

21   reviewing this until it's characterized correctly and you pay

22   us any applicable user fee.

23        And so the fact that review is ongoing, that shows that

24   the agency took one fork in the road rather than the other, and

25   deemed this to be a proper amendment.

1        THE COURT:  Do you have any case that you can cite

2   that says that ongoing review means that there's a consummated

3   agency decision?  It seems odd, doesn't it, to say that ongoing

4   review means that there's a final agency decision?  It's exactly

5   the opposite.

6        MR. JAY:  The question, Your Honor, is review of what.

7   It is absolutely correct that the agency is reviewing whether it

8   can approve the amendment on the merits as safe and effective,

9   but that's not the question that remains to be decided.  And

10   setting aside for the moment whether the agency could reconsider

11   the view that it took, at a minimum, in that initial 60-day

12   period, the agency made a decision not to return the application

13   but to accept it and to allow it to proceed to substantive

14   review without --

15        THE COURT:  So what are the irreversible consequences

16   of that preliminary or initial decision on acceptance for UTC?

17   What are the irreversible consequences?

18        MR. JAY:  You ask specifically about UTC.  I think

19   there are several consequences for the review of this

20   application.  One is the timing of the review.  In other words,

21   the fact that it's been accepted as an amendment and not as a

22   new new drug application, that affects the timing of the

23   agency's review under the -- the sort of system of PDUFA date

24   targets that the agency provides --

25        THE COURT:  What's the timing impact?

1          MR. JAY:  It takes less time to review an amendment

2    than it does a new new drug application.  So, in other words,

3    you'd get a shorter time frame.

4          THE COURT:  Well, there's a shorter time frame but

5    does it necessarily take FDA less time?

6          MR. JAY:  No, not necessarily.

7          THE COURT:  It's just operating within a shorter time

8    frame.

9          MR. JAY:  That's right.  But when the agency is

10   triaging -- this whole user fee system is set up so the agency

11   can triage what takes the most -- largest number of man-hours,

12   person-hours, and user fees are aimed at compensating the agency

13   for that.  And so if you have an amendment, that is expected not

14   to take the kind of labor -- of laborious review that the

15   original application does, that's relevant to setting the target

16   date for a decision.

17        It's absolutely true that some amendments might take a long

18   time and some new drug applications might take a shorter time.

19   But so -- I'm going to give you four consequences of this

20   decision.  One is that it affects what track the substantive

21   review is put on timing-wise.  And the timing does affect UTC as

22   well as Liquidia and the agency.

23        The second is the 30-month stay.  So unless a decision is

24   made to take the amendment out of this application, it is clear

25   that there will be no 30-month stay with respect to any patent

1    that was listed after the original application --

2            THE COURT:  The agency says it is still looking at

3    that.  Right?

4            MR. JAY:  So I want to be clear about what the agency

5    has said because the agency has said it is a hundred percent

6    clear that if this is a proper amendment then there won't be a

7    30-month stay.  The agency I think described that as a truism or

8    words to that effect in characterizing the email that we began

9    our discussion talking about.  So if this is an amendment, then

10   there will be no 30-month stay based on any patent listed after

11   the original application was filed.

12       So what the agency has said it is considering is whether it

13   was right to accept the amendment as an amendment.  But it has

14   not suggested that it would somehow apply a 30-month stay but

15   allow it to continue being reviewed as an amendment, if you're

16   following the distinction that I'm drawing.  But it's clear that

17   the agency has allowed it to be reviewed as an amendment because

18   it's undergoing substantive review right now, and that's what

19   the letter agreeing to file the amendment does.

20       And then the last consequence is that Liquidia doesn't have

21   to pay a separate user fee because it's an amendment, whereas --

22            THE COURT:  It's not really a consequence to UTC.

23            MR. JAY:  That's correct.  That's correct.  But it

24   is relevant here in looking at what the agency's practice is

25   because one of the examples that we gave was a product called

1   dexmedetomidine, D-E-X --

2           THE COURT:  I'm not going to pronounce a single drug

3   sitting up here.  Believe me.

4       (Laughter.)

5           MR. JAY:  I'm happy to spell it later, but that I

6   think is a good example of the agency saying -- and the other

7   is Tekturna, in which the agency said, if you didn't pay us

8   the user fee, we're not starting our review.  Like, this was

9   submitted as a supplement, it should have been submitted as an

10  NDA, you have not paid a user fee and we are not starting our

11  review until you true up.  And that obviously has relevance for

12  timing as well.  Because the date that sets the PDUFA goal is

13  the date that you pay the user fee, as the agency said in that

14  decision.

15          THE COURT:  So I'll return to what I began to ask but

16  probably didn't complete asking it a moment ago, and that is can

17  you cite me a case, is there any case that you have where a

18  court found final agency action, reviewable agency action, when

19  the agency was affirmatively representing that it was still

20  considering the question -- and I know you have an argument as

21  to what the question is and maybe they're not still, you think,

22  considering this question -- and hadn't reached a final

23  decision, which they certainly haven't with respect to the

24  application, and that the -- well, I'll just stop there.  What

25  case can you cite me to that found a final agency action that

1   was reviewable in that kind of context?

2          MR. JAY:  Let me try a couple of answers to that

3   because I think there are two lines of --

4          THE COURT:  Do they involve citing a case to me?

5          MR. JAY:  They're going to involve citing the same

6   cases that we've cited in our papers.  So if that's not

7   constructive, then I don't have anything new beyond the two

8   lines of cases that we cited in our papers.

9          THE COURT:  Go ahead.

10          MR. JAY:  But the two lines of cases that we

11   cited, one are for the proposition that what matters is is

12   the relevant -- is the decision final in the relevant sense.

13   In other words, has the relevant piece of the decision been

14   finally made.  And two, the way I would characterize it in this

15   case, and this is just to push back on your question a little

16   bit, the agency has not said that it is still deciding whether

17   to accept this as an amendment; it has said something a little

18   bit different, which is it says it's still deciding whether this

19   was properly characterized as an amendment.

20      That's a backward-looking rather than a forward-looking

21   decision.  It is akin to the agency deciding to reconsider.

22   Agencies can always decide to reconsider their decisions, but

23   outside the context of a formal process for petitioning for

24   rehearing or something of the like, the fact that the agency

25   might reconsider is not enough to make its initial decision not

1    the con- -- I think I added an extra "not" -- something other

2    than the consummation of its decisionmaking process.

3         And in this case the agency took the fork in the road.  It

4    could either have returned the application or the proposed

5    amendment and said this is not a proper amendment; it's got to

6    be an NDA.  Or it could begin substantive review.  And we know

7    that it began substantive review.

8         So the second line of cases is we, United Therapeutics, are

9    not a party to the agency's review of Liquidia's application, so

10   this is not like a formal dispute between parties in which one

11   party has filed a petition -- it is not the type of case in

12   which one party is seeking reconsideration of an agency decision

13   that it lost.  It is instead a case in which we've asked the

14   agency to reconsider a decision that it has made, but using the

15   same power the agency always has to reconsider its own

16   decisions.  And that power is always there but it does not get

17   in the way of final agency action.

18        THE COURT:  So let's talk for a second about the

19   letter, the December letter.  In your view, is that a citizens'

20   petition?

21        MR. JAY:  It is not, Your Honor.  The basic reason

22   why is that we are not seeking to affect the timing of the

23   approval of the new drug application.  What this is a challenge

24   to is whether the agency properly added the PH-ILD application

25   to that.  But nothing in this litigation challenges Liquidia's

1    ability to get approval of the new drug application that it

2    filed off the bat for pulmonary arterial hypertension, PAH.

3              THE COURT:  So, if it is not, where does that leave

4    you with respect to any obligations under 10.45 and that

5    exhaustion question?

6              MR. JAY:  So we have followed the process that the

7    agency has laid out for us.  In other words, the agency has

8    given us this opportunity to tell it why we think its decision

9    was wrong, and so on, and has asked both parties to agree to

10   the letter exchange rather than have both parties submit letters

11   to the agency without the benefit of being able to respond to

12   each other.  That is, as we understand it, kind of an informal

13   practice of the agency that the agency uses for its own

14   convenience to get better information, but it's not like the

15   kind of formal rehearing that we were discussing with respect to

16   finality.

17             THE COURT:  But in your view that satisfies the

18   exhaustion of administrative remedies requirement?  And in

19   previous cases I've actually decided that that's an exhaustion

20   requirement.  In your view what you've done satisfies that, or

21   you don't have to do anything?

22             MR. JAY:  So I'm going to give a two-part answer.

23   Just to note that I think since the decision Your Honor is

24   talking about is D.C. Circuit's *Sandoz v. FDA*, in which the

25   court noted that there is neither a -- that there is no

1    statutory exhaustion requirement in --

2              THE COURT:  This is a regulatory provision.

3              MR. JAY:  No, that's right.  But given that, that the

4    requirement in that case, issue exhaustion, was not -- there was

5    no -- because there was no statutory requirement of issue

6    exhaustion, the court of appeals regarded it as essentially a

7    discretionary matter.

8        So in this case, where we followed what the agency has

9    laid out as a convenient procedure to give it the full scope

10   of our views about why they shouldn't have accepted this as an

11   amendment, we think that that fully satisfies our exhaustion

12   obligations.  And we obviously had no earlier opportunity

13   because this decision --

14             THE COURT:  But you're not going to call it a citizen

15   petition -- you're not going to call it a citizen petition

16   because if it's a citizen petition, then statutorily you can't

17   proceed before me.

18             MR. JAY:  That's right.  That's right.  But we are not

19   characterizing it as a citizen petition because it does not meet

20   the definition of a citizen petition.  And I'll just note -- not

21   that this is binding on Your Honor -- but that the agency has

22   not suggested in its brief that we should have followed the

23   citizen petition route.  They've just said we have your letter

24   and we're thinking about what to do about it.

25             THE COURT:  All right.

1          MR. JAY:  The other sort of preclusion argument that
2    our friends on the other side have made is the idea that the
3    patent litigation gives us an alternative means that takes away
4    the right of review under the APA.

5          THE COURT:  Facially, that's a pretty convincing
6    argument.  But.

7          MR. JAY:  I think understanding the difference between
8    this case and -- you know, like, *Avadel* I think is the most
9    relevant decision from this district on that.  And that dealt
10   primarily with a counterclaim that's set up in the FDCA for
11   exactly the kind of thing that Avadel and *Jazz* were litigating
12   about in that case.  So the whole dispute in that case was we
13   shouldn't have to certify to this patent because it shouldn't
14   be in the orange book at all.

15       And that is exactly the kind of thing that you can litigate
16   in a counterclaim and -- the delisting counterclaim that's in
17   Section 355.  And in fact, the relief available in that
18   counterclaim looks an awful lot like APA relief; it's just an
19   order directing the brand company to go and pull the patent out
20   of the orange book.

21       So this is not remotely similar to that case because we're
22   not dealing with a statutory right of action that answers the
23   question whether this is a proper amendment.  Nothing in the
24   patent litigation before Judge Andrews will answer the question
25   whether the other side should have submitted this as a new drug

1    application.  We obviously do have the certification that they

2    say that they're --

3            THE COURT:  Does it turn on the legal issue, or does

4    it turn on the relief that you would get?  And isn't the real

5    question whether you'd get satisfactory relief, not what the

6    legal issue is?

7            MR. JAY:  Let me quibble with that a little bit.  I

8    think it would be the same relief.  To say satisfactory relief

9    risks, like, looking at a Venn diagram and saying well, if

10   there's some overlap, then there's no APA review.  First of all,

11   the presumption is generally in favor of APA review.  Congress

12   has -- generally speaks clearly when giving you an alternative

13   means.

14       So if we're not talking about the counterclaim -- which I

15   think everyone agrees is not at issue here -- all we're talking

16   about is the fact that we've sued them for patent infringement.

17   And so the question is, is an injunction saying don't market

18   your product for the specific PH-ILD indication, is that enough

19   to give you full relief?

20       And it's not in this case, for two reasons.  One, because

21   of the way Liquidia decided to tee this up, they -- by kind of

22   hitching their PH-ILD amendment to their original application,

23   a consequence of that is, if we're right that that's not a

24   proper -- that that wasn't properly done, their application

25   can't be approved either, so -- until the amendment is removed

1   from it.  And so that's not relief that we could get in the

2   patent case.

3       And then second, just to zoom out a little bit,

4   essentially, no 30-month stay dispute, and probably quite --

5   almost none of the disputes that this district has resolved

6   between brand companies and generics over the procedural

7   certification and related requirements of Hatch-Waxman would

8   ever be litigated in an APA action if just the fact that you

9   could sue for patent infringement was enough, especially because

10  in Hatch-Waxman there's always the possibility that if you win

11  the case the district judge will say don't approve the

12  application or we'll enjoin the defendant from marketing.

13      So that is relief, it is in some respects satisfactory

14  relief, but it's not the same relief.  In other words, it's not

15  getting at the same flaw.  And in this case it actually would be

16  narrower relief.  And that even assumes that --

17          THE COURT:  I want you to crystallize that a little

18  bit.  I want you to tell me what's the difference between the

19  relief -- what's the actual difference in terms of getting A, B,

20  and C, the relief you would get through the preliminary

21  injunction in the patent case, and what you seek in this court.

22  Where are the actual differences?

23          MR. JAY:  In this case, if the Court holds that we're

24  right on the merits and that the application can't be approved

25  with the PH-ILD amendment attached to it, then the NDA can't be

1    approved.  So Liquidia would then have to take some action,

2    whatever it wants to before the agency to cure that problem.

3         In the patent case -- first of all, there's an open

4    question whether we would even get an injunction.  Injunctions

5    are not automatic.  And if approval has already come because

6    this court doesn't grant relief, for example, because as Your

7    Honor was discussing right at the outset, as we see it, there

8    will be no remaining obstacle to the FDA at least granting

9    approval unless this court grants relief.

10        If that happens, then the patent district court can no

11   longer grant an order saying don't approve the NDA.  All it can

12   do is either award money damages after a jury trial that would

13   be limited to -- like what percentage -- I shouldn't say

14   percentage.  It would be limited to damages for infringement

15   of the method patent, which is limited to the method relating

16   to PH-ILD.  It's in the patent that we sued on.

17            THE COURT:  The '327 patent?

18            MR. JAY:  The '327 patent.  That's right.  And we

19   have sought a preliminary injunction in that case.  We might be

20   able to get it, we might be able to get a permanent injunction.

21   But again, it would only be an injunction relating to marketing

22   the product for something that infringes the '327 patent.  And

23   that's both narrower and different than what's at issue here.

24        Now, to be clear, we're not saying that Liquidia can't get

25   approval of their PAH NDA at all in this case, but they can't

1    get approval of it while they've got the PH-ILD indication along

2    for the ride.  And I think that's the primary difference that we

3    point to on the preclusion of remedies point.

4        I think that covers the main things I wanted to say about

5    ripeness, final agency action, standing.  Standing and injury

6    we'll get to, and irreparable injury, in a moment.  Unless the

7    Court has other questions about that, I would like to touch just

8    briefly on the merits.

9            THE COURT:  You may.

10           MR. JAY:  Thank you.  So as we see it, it's pretty

11   straightforward that the bundling rule says that an NDA should

12   not be amended to add a new indication or claim.  And in this

13   case the agency has allowed the NDA to be amended to add a new

14   indication.  And the other side -- the agency obviously has not

15   responded on the merits at all.

16       What the Liquidia argument consists of is the argument

17   that in -- as I understand it, in 2015 the agency undertook

18   this rulemaking, and that that has allowed kind of wholesale

19   amendment like this.  We just don't think that you can read

20   either the regulation or the rulemaking history or the statute

21   from 2003 that that rule is implementing to give that kind of

22   authorization to change the bundling rule, essentially to make

23   the bundling rule no longer --

24           THE COURT:  Do you disagree that the FDA regulations

25   now contemplate amendments that would add new indications in

1    some circumstances?

2          MR. JAY:  So there is that subsection (f), which

3    is the certification subsection of that regulation, refers to

4    requiring a certification if there's an amendment that adds

5    an indication or condition of use or -- indication or other

6    condition of use.  As we see that, we think that corresponds to

7    the narrow situation that the agency itself has set out in the

8    rulemaking documents, which I think is at 6849 of the proposed

9    rule, which is the situation where you have like a prescription

10   to over-the-counter switch.  And that can be done on an

11   indication by indication basis.

12         So, in other words, you can change one indication from

13   prescription to over-the-counter while leaving another

14   prescription.  But the agency itself has said it regards that as

15   a narrow pathway and that in general Congress did not want to

16   change the agency's policy toward amendments or supplements.

17         Congress itself said the same thing in the relevant

18   committee report accompanying the MMA.  And so the rulemaking

19   history we think is completely devoid of evidence that there was

20   this kind of dramatic change to the bundling -- the policy of

21   not letting people circumvent the certification requirements by

22   bundling their new indication into an amendment.  There's no

23   indication in the text of the reg or -- and subsection (e) is

24   also relevant.  It lists a handful of things that are a

25   different drug and it lists one thing that is permissible in an

amendment because it's not a different drug, and that's changing
the strength.  But it doesn't provide permission to add a new
indication.  And I think the other side --

THE COURT:  The one thing is a different strength?

MR. JAY:  Right.  It says here are a handful of things
that amount to changing the drug, and you can't change the drug
in an amendment.  It says notwithstanding the foregoing, or
words to that effect, changing the strength is not asking for a
different drug and so therefore you can change the strength in
an amendment.  That corresponds to text actually in the statute
itself, I believe.

But what it doesn't do is give permission to add new
indications.  And that I think is what the other side would need
in order to get around the bundling rule, because at a minimum I
think we've shown that the agency has treated the bundling rule
as something applicants must comply with, and it has sent
applicants letters that say your submission is not in compliance
with the document we've shorthanded as "the bundling rule," and
you must comply with it.

So at a minimum, the obligation to treat like cases alike
is the problem here.  And to tie this actually back to our
threshold discussion about whether this is justiciable, even if
the agency hasn't made a final decision, I think we've raised
serious questions about what the agency could say about why it
is treating Liquidia differently.  And if the agency follows its

1    usual practice of releasing a decision in response to our

2    letters, and an approval decision on the same day, like, the

3    Court won't have a chance to review that reasoning because it

4    will already be too late.

5         Now, the Court has already put in place its three business

6    days notification requirement and the FDA has not provided

7    notice of that, but --

8         THE COURT:  They haven't even decided whether they are

9    free yet to issue a decision.

10        MR. JAY:  That's right.  But that, obviously, is the

11   concern about imminent injury.  Article III allows us to come to

12   court and we have standing to seek relief from injury that is

13   imminent and impending.  And even if this becomes ripe only once

14   the agency releases a decision in response to our letters, if

15   they release the approval decision at the same time, then

16   Liquidia's going to be shipping product on that same day.

17        THE COURT:  The Court is in an unusual and unenviable

18   position.  If I agree with you with respect to the, I'll call

19   them finality-type arguments, then I still have to look at the

20   question of likelihood of success on the merits.

21        MR. JAY:  Yes.

22        THE COURT:  But I'm not hearing from the FDA with

23   respect to those merits and your likelihood of success on those

24   merits.  And basically the merits involve regulatory

25   interpretations, somewhat novel that the FDA hasn't spoken on

1    before, and you're asking the Court to take a shot at it first.

2              MR. JAY:  So --

3              THE COURT:  I'm not blaming you for that, because

4    that's the way this has transpired, and indeed, a lot of the

5    problems in this area of new drug applications is a little bit

6    difficult for the courts.

7              MR. JAY:  Right.  I mean, I think that's just a

8    consequence of a posture in which -- let's set aside whether I'm

9    correctly characterizing what the agency has done in this case.

10   But in a case where an agency reaches a decision first and gives

11   reasoning later, that is the unenviable situation in which a

12   court will find itself in trying to review that decision.

13        We think that is what has happened here, that the agency

14   has taken that one fork in the road, and whether or not it then

15   papers the record with a longer, more reasoned decision, we are

16   here now because it's taken that fork in the road and there were

17   legal consequences that attach to it.

18        Of course the Court would benefit from seeing an agency's

19   interpretation.  And if it were open to us to wait and read the

20   decision without knowing that the agency's going to then render

21   an approval decision at the same time if the decision actually

22   is to grant approval, then we wouldn't be here.  But the reason

23   we are here is that we know that the agency's practice is to do

24   those two things at the same time.  And that does frustrate

25   judicial review, but I think that's a consequence of the agency

1    not being willing to stage its decisionmaking so that the court

2    can read the reasoning without the urgency attached to the

3    approval decision coming at the same time.

4           THE COURT:  So let's talk about consequences again but

5    in the context of irreparable harm, part of the preliminary

6    injunction standard.  The agency hasn't done anything yet.  The

7    agency is constrained, at least by my order with respect to

8    three days' notice that it's going to do something, not the

9    substance of what it's going to do, and it may be constrained on

10   a continuing basis by the status of the litigation before Judge

11   Andrews and the Third Circuit.

12          Until the agency does something, what's the harm that UTC

13   is experiencing?  There's no harm in terms of the marketplace,

14   because Liquidia can't do anything until its application is

15   approved.  So until then, there's no marketplace harm.  What's

16   the irreparable harm that I should be taking into account in

17   deciding whether to take the extraordinary step of entering a

18   preliminary injunction in favor of UTC, between now and whenever

19   the decision is rendered publicly by the FDA?

20          MR. JAY:  A couple of things.  One is the patent

21   litigation, that if we were protected by the 30-month stay we

22   wouldn't have to be litigating a preliminary injunction before

23   Judge Andrews on the '327 patent.  So that's one harm that's --

24          THE COURT:  That's not usually the kind of harm that

25   leads to preliminary injunctions, the litigation expense.

1          MR. JAY:  I'm not referring just to the litigation

2     expense, although it is not insignificant, Your Honor.  But what

3     I'm actually referring to is the fact that Congress has set out

4     this framework so that companies don't have to go and do that

5     type of expedited litigation with discovery and patent merits

6     and irreparable harm and all of that in a patent case.  That's

7     what the 30-month stay is for, to protect judges like Judge

8     Andrews from having to do the expedited work.  Instead, 30

9     months is about the length a patent case is supposed to take,

10    and if it's over sooner, then the patent --

11         THE COURT:  You don't have to do anything in the

12    patent case over the next couple of weeks.  Let's say that we're

13    dealing with a time frame of -- let's say that we're only

14    dealing with a time frame of a couple of weeks that is not

15    dictated by litigation in the patent case.  It's instead

16    dictated by FDA not yet issuing its decision.

17         MR. JAY:  So there is some market impact based on

18    sort of, like, the market's expectations.  And this is discussed

19    somewhat in --

20         THE COURT:  That already exists, doesn't it?

21    That's not irreparable harm that's going to occur.

22         MR. JAY:  I agree that it's hard to disaggregate

23    kind of the expectations that existed before this case and

24    disaggregate expectations from the ILD indication specifically

25    versus the approval of the PAH.  That's fair.  I didn't want

to say that there is no market impact because of the way Your
Honor asked the question.

But I think it's fair to say that if you ask me to set
aside the patent litigation, and taking the point I just made
about the potential anticipatory market impact, taking that off
the table, that if the agency were going to give its decision
and then render -- I'm sorry -- give its reasoning on the
amendment issue that we've challenged here and then render an
approval decision sometime later, I would agree that with those
two categories off the table, we wouldn't have anything else and
the Court could kind of decide the merits at its leisure.

But the problem is with the possibility of a simultaneous
decision.  So, in other words, if the Court is able to review it
in less than, you know, the space of a business day, then --

THE COURT:  That's been the time frame that's been set
up in other cases.

MR. JAY:  Indeed.

THE COURT:  Including by me.

MR. JAY:  Indeed.  And that's definitely better than
nothing, but what we can't -- the harm that we can't walk away
from is the harm that would come instantly upon an approval
decision, and if it's too late to get judicial review at that
point, then the harm that we're facing right now is the threat
that we're going to lose the ability to get effective judicial
review.

1      That's a roundabout answer to your question, but the basic

2   answer is the threat of a loss of the opportunity to get

3   judicial review before Liquidia starts shipping product into the

4   market.  And I think everyone agrees that that would, A, change

5   the market, B, do so irreparably.

6      And the questions the government and Liquidia have raised

7   are more about whether that's the kind of harm that counts for

8   these purposes, but there's no doubt that that is a bell that

9   can't be unrung.  And we've cited some cases about why this type

10  of economic harm does in fact count in a litigation against the

11  government, NTE being the best --

12            THE COURT:  We're far beyond your 30 minutes.  I think

13  I should hear from others.

14      MR. JAY:  Thank you, Your Honor.

15      NTE was the D.C. Circuit case I was citing.  And I think

16  that's all.

17      Thank you, Your Honor.

18            THE COURT:  All right.  Thank you, Mr. Jay.  You'll

19  have a chance to respond.

20      All right.  Let's hear from the FDA, Mr. Ballingrud.  It's

21  finality or nothing here, right?

22            MR. BALLINGRUD:  We think slightly differently, Your

23  Honor.  Thank you.  May it please the Court.  Plaintiff lacks

24  standing.  Plaintiff challenges nonfinal agency action and is

25  already robustly pursuing its functionally identical remedy in

1    the District of Delaware.  Accordingly, plaintiff's motion

2    should be denied, and a three business day notice requirement

3    previously imposed by the Court should be dissolved as well.

4        I'd like to begin, Your Honor, by being very precise and

5    very clear on an important point that came up in the previous

6    questioning, and that underlies much of the current briefing.

7    FDA is currently undergoing a very robust, very much ongoing

8    review both of Liquidia's amendment and of the application

9    itself.  It may yet decide these issues in either direction.

10       At this point in time the agency does not know whether UTC

11   has the better argument on the merits, it does not know whether

12   Liquidia does.

13       THE COURT:  Well, that may be a little bit of an

14   overstatement.  Maybe FDA has sort of thought it through and

15   come to a conclusion, but it's not prepared to make that

16   conclusion, and indeed it may be constrained in its ability to

17   publicly make that conclusion.  I can't believe the FDA hasn't

18   given a lot of thought to this.

19       MR. BALLINGRUD:  No.  Certainly not, Your Honor.

20   It is a robust and ongoing review, but I want to --

21       THE COURT:  Point taken.  Point taken.

22       MR. BALLINGRUD:  In response to your question, I think

23   this bears mention.  UTC's argument is not that the amendment

24   violates some black-letter statute or regulation, that they can

25   point to this and say, look, you should have done it instantly;

1    this wouldn't have taken a lot of time.  UTC's argument

2    implicates decades of agency practice.  They have five, six,

3    seven different analogous cases, supposedly analogous cases,

4    that they argue came to a different result.  The argument they

5    make is that the bundling guidance is binding, or at least

6    raises a *Fox* issue about the previous position of the agency.

7        So the agency is -- that's no small task to consider.

8    Because not only the agency has to consider the arguments raised

9    by the parties in the letter briefs, the cases cited, to

10   determine if those cases are in fact on all fours in the

11   relevant particulars, it also has to determine whether there are

12   twice the number of counter examples.  That's the nature of the

13   challenge UTC has raised here.

14       And so I want to begin by making this point here, that the

15   agency does not know whether it is on the correct side of the

16   "v" in this case.

17            THE COURT:  No, and I'll accept that.  I'll accept

18   that.

19            MR. BALLINGRUD:  It doesn't even know if this is

20   the correct court.  Ultimately, some decisions are reviewable

21   directly in the circuit.  So the reason the scope of argument

22   offered in the agency's brief reflects that, reflects the

23   underlying fundamental nonfinality of the agency action for

24   which there are absolutely no foregone conclusions about how

25   this matter will be resolved.

1          THE COURT:  Should that complexity of the issues and

2     the need to have an agency resolution impact my decision on

3     whether I should be jumping in and effectively giving judicial

4     viewpoints on those issues?  Because I would have to in terms

5     of an assessment of the likelihood of success on the merits,

6     according to you.  Now, they may think the issue is narrower,

7     but nonetheless it's an issue that would require me to assess

8     their likelihood of success.

9          MR. BALLINGRUD:  What I think you're referring to,

10     Your Honor, are the practical difficulties of addressing

11     nonfinal agency action and effectively compelling a certain

12     resolution or issuing an advisory opinion about how the agency

13     should ultimately resolve this issue.  One would assume that the

14     court's order would force the issue rather than be advisory in

15     that sense.

16          But the awkwardness to which you were referring to is a

17     function of an indictment of UTC's premature challenge.  It

18     is not a reflection of the fact that the Court simply has an

19     unenviable choice it can't get out of.

20          But I think, Your Honor, there's a more preliminary failure

21     as well that I want to touch on that really illustrates perhaps

22     the unsuitability of this case before you.  That is that UTC

23     lacks standing.  UTC does not have an injury in fact that is

24     fairly traceable to any action taken by FDA, for the simple

25     reason that they did not get their patent in time.

1          THE COURT:  That they did not what?

2          MR. BALLINGRUD:  Get their patent in time.  Allow me,

3     Your Honor -- there are many moving pieces and a long history of

4     litigation between these parties, but I think only three dates

5     really matter.

6          First, Liquidia filed its new drug application in January

7     of 2020.

8          Second, Liquidia tendered its amendment in July of last

9     year.

10          Third, the '327 patent, the patent that underlies the

11     district court in Delaware's patent litigation that I understand

12     to be the gravamen of the plaintiff's current harm, that was

13     issued in November of last year, November 28.

14          So the relation back that an amendment affords to Liquidia

15     is simply irrelevant.  What does it matter relative to a

16     November 2023 patent that Liquidia's PH-ILD amendment gets a

17     July 2023 date or a January 2020 date?  The timeline simply

18     doesn't work.

19          Congress made a judgment that not every patent qualifies

20     for the 30-month stay.  Hatch-Waxman Act is a very specific

21     sequencing of events in how one invokes and claims a 30-month

22     stay.  It's certainly not remarkable to have patent litigation

23     without the benefit of the 30-month stay.  So that's precisely

24     what is happening here.  A note patent was issued in November

25     2023.  Patent litigation.  Simple as that.

1          THE COURT:  Is that question which you've just

2     outlined something that is before the FDA in the context of

3     its consideration of either the application by Liquidia or the

4     letter with its position filed by UTC?  Is that sequencing

5     something that is relevant to the FDA's determination on those

6     two matters?

7          MR. BALLINGRUD:  Your Honor, on the merits as to

8     relevance I would hate to prejudge what the agency thinks is

9     irrelevant.  What I can say is that Article II agencies do not

10    have Article III constraints on standing in the questions they

11    address.  So then the agency's review is full spectrum; there's

12    nothing foreclosed from it because there's been no action at

13    all.  So that would be -- without getting in front of the

14    agency, I would simply note that in response to your question.

15         THE COURT:  So when the agency, FDA, makes a decision

16    on Liquidia's pending application, and let's assume

17    contemporaneously makes a decision on the legal issues raised

18    in the letter from UTC, can UTC get judicial review?

19         MR. BALLINGRUD:  When the agency comes to a final

20    agency action, whichever party is aggrieved, UTC or otherwise,

21    would be able to seek judicial review.  It would be able to say

22    that the agency was in error in some basis in approving the

23    application --

24         THE COURT:  So there will be standing then because of

25    the injury suffered by UTC, but there's not standing now.  It's

1    basically a prematurity in terms of the injury argument.

2         MR. BALLINGRUD:  No, Your Honor.  I apologize if I

3    misspoke there.  The fact that the '327 patent postdates the

4    relevant conduct here means that whatever -- there would never

5    be a 30-month stay fairly traceable to any action by FDA.  It's

6    not prematurity, it's the fact that the timeline betrays the

7    fact that the '327 patent is simply of the type that Congress

8    designated to not qualify for the stay.

9         I don't want to opine on future hypotheticals about

10   standing and whatnot, but I don't think prematurity is the right

11   lens for this.  The sequence of events simply indicates that UTC

12   has not suffered an injury in fact.

13        THE COURT:  But it will suffer an injury in fact when

14   the FDA makes a decision if the FDA decides in favor of Liquidia

15   rather than UTC, just to simplify it in terms of the parties.

16        MR. BALLINGRUD:  I would be hard-pressed to see how

17   these same arguments would not be made in that circumstance,

18   Your Honor.

19        THE COURT:  So you think UTC couldn't challenge the

20   FDA's forthcoming decision when it makes it on Liquidia's

21   application and, if we call it a petition, on UTC's petition?

22        MR. BALLINGRUD:  Your Honor, the '327 patent simply

23   postdates the conduct that's at issue here.  And so I don't see

24   the arguments fundamentally changing based upon their temporal

25   presentation or their specific relation to a specific agency

 1    action.

 2                THE COURT:  All right.  Go ahead.

 3                MR. BALLINGRUD:  So it is simply false, Your Honor, to

 4    say that FDA's action, which UTC places in and about September

 5    of last year -- although tellingly we do not have a date for

 6    when the agency supposedly acted -- had any reason to impact the

 7    November issuance of the patent.  The agency made that decision

 8    two months before that patent even existed.

 9        So UTC simply lacks a timely issued patent that would form

10    the basis of the 30-month stay triggered off the patent

11    litigation filed September 5 before Judge Andrews in Delaware.

12        So this case -- last note on standing.  I do want to

13    emphasize, though, that this case is unlike *Ipsen*

14    *Biopharmaceuticals* or *Braeburn* cited by UTC.  Those cases -- I

15    read those cases to generally stand for the notion that if

16    somebody has an injury in fact, it's not particularly relevant

17    as an Article III matter that in an alternate universe they

18    might not have suffered that, or they might have suffered the

19    same harm without the same relation to agency action.

20        That's not what we have here.  What we have here is the

21    current world in which we exist, there is no injury in fact

22    traceable to FDA.  It's UTC who requires contingency upon

23    contingency and alternate universes to make the timeline finally

24    overlap itself.  So this is really not a *Braeburn* or an *Ipsen*

25    type question.  Those cases are simply inapposite to this

1    analysis.

2         I do want to address, though, the final agency action issue

3    that Your Honor touched on before.  As I mentioned, there's an

4    ongoing robust review by the agency of these very questions.

5    And in that, the agency is building the record that would, on

6    suit by the aggrieved party if and when appropriate, form the

7    record for that kind -- for meaningful judicial review.  The

8    agency's position would be known.  There would be an actual

9    factual agency action and decision that would be at issue.  But

10   here there's not.  And what's really --

11        THE COURT:  To review that decision, do I need an

12   administrative record that goes beyond that decision?

13        MR. BALLINGRUD:  I apologize, Your Honor.  I don't

14   quite track your question.

15        THE COURT:  Once the agency renders a decision on

16   let's just say both of the matters, the application and the

17   letter -- and jumping past the standing issue, UTC is seeking

18   relief from me with respect to those decisions, review of those

19   decisions.  In order to review them, do I need an administrative

20   record beyond the decision that FDA renders alone?  Do I need

21   more in terms of an administrative record?

22        MR. BALLINGRUD:  I'm not certain, Your Honor.  What

23   I'm --

24        THE COURT:  Usually in APA cases there's an

25   administrative record.  So what I'm asking is, is that going to

1    be necessary here, or am I going to be able to rule just based

2    on the decision that FDA renders?

3            MR. BALLINGRUD:  I do not believe that the Court now,

4    today, requires the administrative record to resolve, to find no

5    final agency action, to find no standing.

6            THE COURT:  I agree with you.  That's not my question.

7    My question is, when there is an FDA decision and if UTC is in

8    court before me for review of that, do I need an administrative

9    record in order to accomplish that review?

10           MR. BALLINGRUD:  Generally, yes, I would say.

11           THE COURT:  And specifically in this case?

12           MR. BALLINGRUD:  Well, specifically in any case.  We

13   need the benefit of an administrative record that would reflect

14   the resolution and the agency's position on the specific

15   arguments raised, because again, this is not a question of --

16   this is not a *Chevron* type question, this is not a Seminole Lock

17   type question, but the agency's view on a discrete, specific

18   legal issue.

19       This is fairly deep in the weeds about agency practice.

20   And the agency's relationship with its precedent and how it

21   interprets the relevant factors when discussing whether the past

22   examples cited are in fact on all fours in all relevant

23   particulars, what would be those relevant particulars.

24           THE COURT:  Okay.  I don't want to get hung up on that

25   administrative record question.  It just occurred to me as you

1   mentioned administrative record.  But go forward with your

2   position with respect to these finality issues.

3           MR. BALLINGRUD:  Yes, Your Honor.  I think one of the

4   most telling questions about finality is how much we are

5   grasping in the dark.  UTC cannot point to a decisional document

6   or a decisional date that purports to resolve these questions at

7   all.  And that suffuses their reply in the briefing in this

8   case.  Page 4 of their reply they talk about what the agency

9   could and would have done.  Page 7, they read past the actual

10  language cited to summarize, in so many words, what the agency

11  actually did.

12          But the Cooney email from September 14, the acknowledgement

13  letter from September 22, purport to resolve none of these

14  questions.  The bite in final agency action comes from its

15  finality:  Has the agency given its last word and definitively

16  resolved an issue.  I read the Cooney email, I can't find the

17  first word, much less a definitive agency position on these

18  issues.

19          So UTC faults the agency for looking too broadly at the

20  application itself.  But looking more narrowly does not help

21  them either, because nothing in the Cooney email necessarily

22  implies a resolution of any of these matters, nothing in the

23  acknowledgement letter expressly resolves any of these issues.

24  It speaks more than I could say, Your Honor, that we are simply

25  guessing at what the agency did, when it did it, and what its

1    position is.

2         THE COURT:  So a couple questions.  Some of these

3    arguments on finality disappear once FDA does render a decision

4    on the application and the UTC letter.  What doesn't disappear

5    in terms of these justiciability arguments?

6         MR. BALLINGRUD:  In terms of the broader

7    justiciability arguments that we've raised --

8         THE COURT:  Standing you've now explained you don't

9    think disappears.  You think that still is a problem for UTC.

10         MR. BALLINGRUD:  Yes.  Correct.

11         THE COURT:  What else remains a problem?

12         MR. BALLINGRUD:  I don't want to prejudge the agency's

13    view on how the case might present itself in the future.  Things

14    like the adequate remedy analysis, Your Honor, I think are much

15    more contextual.  And as I noted at the outset, the ultimate

16    resolution of these matters can be reviewed in any number of

17    courts, can be reviewed at any appellate or trial court level.

18    I would be very hesitant to say anything on that.

19         THE COURT:  Well, the other adequate remedy argument,

20    that still would exist, wouldn't it?

21         MR. BALLINGRUD:  Broadly --

22         THE COURT:  Because that's a challenge to whether

23    there's an APA cause of action.

24         MR. BALLINGRUD:  Yes, Your Honor.  But I think -- and

25    I'm going to be very careful on this issue not to speak in

1    hypotheticals or about positions the agency had not had an

2    opportunity to take.  What I will say very broadly is that the

3    adequate remedy analysis is highly contextual.  It does go to

4    the existence of a remedy under Section 704.

5        But as Your Honor got into with the questioning with UTC's

6    counsel, it's highly contextual on the relationship between the

7    specific relief available in the APA court vis-à-vis the

8    adequate remedy court we'll call it.  But the -- not to skip

9    around too much, but I do want to note simply that by the time

10   that happens, the patent litigation may well be over.

11       The timeline in this, we have no position on the timeline,

12   how long anything would take, but one thing to not lose sight of

13   is the fact that the 30-month stay is an augment, is an

14   ancillary tool to allow the patent litigation to occur.  It is

15   not a period of exclusivity in that regard.  It is simply a tool

16   that sets investor expectations *ex ante* before people make

17   application decisions.

18       THE COURT:  So what about -- well, does the FDA

19   believe that the UTC letter in December was in effect a citizen

20   petition?

21       MR. BALLINGRUD:  Your Honor, I do not have a specific

22   position on that.  We have not taken a position characterizing

23   the letter as a CP in our response, and I'm afraid I can't say

24   anything more than that.

25       THE COURT:  That leaves me a little bit up in the air,

1    doesn't it?

2            MR. BALLINGRUD:  Just another indictment of UTC's

3    premature challenge, Your Honor.

4            THE COURT:  I don't know that that turns on the

5    prematurity of UTC's challenge.  That's just a question of

6    whether the FDA is treating their letter, which I don't think

7    you're saying was a premature challenge of some kind; it was

8    something that the FDA welcomed, wasn't it?

9            MR. BALLINGRUD:  I wouldn't -- welcomed, certainly,

10   Your Honor.  I don't know what to read behind that.  But my

11   point being that eventually the agency will reach a final

12   decision and the agency's characterization of these actions will

13   be known and determinable, and the relationship to exhaustion

14   requirements will be able to be defined in a concrete way.

15           THE COURT:  Let me make sure of this:  Is the FDA

16   arguing either that the letter of December 2023 -- is the FDA

17   arguing that there's a failure to exhaust under the regulations

18   of the FDA, 10.45 I believe it is?

19           MR. BALLINGRUD:  We are not making that argument at

20   this time, Your Honor.

21           THE COURT:  Is the FDA arguing that the statute,

22   21 U.S.C. 355, precludes UTC from coming into court with these

23   issues because those issues are pending in a letter, maybe a

24   petition, before the agency?

25           MR. BALLINGRUD:  We have not made that argument at

1    this time, Your Honor, either.

2            THE COURT:  All right.  That means, effectively, that

3    you're not arguing that it's a citizen petition.

4            MR. BALLINGRUD:  Correct, Your Honor.  At this time

5    that is not an argument we've made.

6            THE COURT:  All right.  All right.  Fair enough.

7        So even if I technically lack jurisdiction on these

8    justiciability issues, why shouldn't the Court take the kind of

9    approach that Judge Moss, for example, took in *AstraZeneca* and

10   utilize the All Writs Act to maintain jurisdiction pending a

11   final decision by FDA?

12           MR. BALLINGRUD:  Your Honor, I don't have a specific

13   agency position on the All Writs Act and how it may apply in

14   this case or not.  I don't understand that to be an argument

15   that UTC has made, but acknowledging that --

16           THE COURT:  The Court has to independently look at its

17   jurisdiction.

18           MR. BALLINGRUD:  Yes, Your Honor.  Acknowledging that

19   and speaking purely hypothetically, my understanding of the All

20   Writs Act is that it is -- in that sense is the sort of

21   defensive protection of the court's ultimate jurisdiction.  Much

22   like in the *Track* case in the D.C. Circuit, the court exercised

23   jurisdiction as a way to ensure its ultimate power of review.  I

24   don't see that as necessary here.  The court will be able to

25   review -- if this is in fact the correct court, this court will

1   be able to review the final agency action.

2          THE COURT:  I guess the more important way to put this

3   is is the FDA arguing that the Court should dismiss this case at

4   this time for a lack of jurisdiction, or are you only arguing

5   that the serious issues with respect to justiciability,

6   including standing, mean that the Court should not enter the

7   relief that is currently requested in terms of preliminary

8   injunction and temporary restraining order?

9          MR. BALLINGRUD:  Your Honor, at this time it would be

10  our position that the motion, the TRO, PI aspect of it should be

11  denied in full, and that the 72-hour notice requirement should

12  be dissolved.

13         THE COURT:  Why should I dissolve the 72-hour

14  requirement?

15         MR. BALLINGRUD:  It would be an order issued without

16  jurisdiction, Your Honor, and it would be unnecessary given that

17  plaintiffs are not entitled to a preliminary injunction and it

18  is a restraint on agency action.

19         THE COURT:  But it's not much of a restraint on agency

20  action.  We can talk about that a little bit more, but it's a

21  means to enable judicial review fairly for the FDA, for UTC, and

22  Liquidia, and the Court, in a prompt fashion.  That's really

23  what it is.  It doesn't give much relief, if any, to UTC; it

24  just gives relief to everybody involved in the litigation by

25  enabling the parties to deal fully and fairly -- or I won't say

1   fully, but more fully and fairly.

2           MR. BALLINGRUD:  Your Honor, I don't think --

3           THE COURT:  And indeed, the FDA agreed to at least the

4   two-day notice requirement.

5           MR. BALLINGRUD:  Your Honor, if we're speaking purely

6   on the practical aspects and benefits of it, then I don't see

7   those anymore, to be honest, because the motion is fully

8   briefed.  It is difficult to imagine anything as a matter of law

9   changing in a two-day, three-day period in between --

10          THE COURT:  Whoa.  I don't even have an agency

11  decision to review.  That three-day notice requirement is to

12  enable the Court, and the parties, to fairly litigate and decide

13  the merits of the agency's decision.  I don't even have the

14  agency decision.  I have no briefing from anybody on the

15  agency's decision.  Why do you say nothing's going to change?

16          MR. BALLINGRUD:  Well, because, Your Honor, three days

17  would be unlikely to be -- resolve those kind of issues.  This

18  case is not premature; it's radically premature.  Three days to

19  brief and actually do the full briefing on this case, I don't

20  see the practical benefit.

21          THE COURT:  Well, let me explain something to you.

22  I will feel a lot more comfortable rendering a decision even on

23  the day -- meaning that third day -- if I've known that there

24  was going to be a decision, and if I place some further

25  requirements in terms of access to the decision and even

briefing by the parties on the decision.  And there have been lots of situations in my life, as a judge and otherwise, where I've required or had to deal with briefing in a 24-hour period.

Why do you say there won't be anything that will aid the disposition of that question of review of the FDA's decision? We'll know what the rationale was for the decision and we'll have each party's position on it.

MR. BALLINGRUD:  Yes, Your Honor.  And if I have mistaken how Your Honor anticipated that proceeding in that three days, then I apologize.  I can think of little to respond to.  Yes, the matter would become more ripe after an agency decision.  I agree.

THE COURT:  All right.  Go ahead.

MR. BALLINGRUD:  Your Honor, without an agency decision on which to base its challenge, UTC primarily argues from past agency practice.  Primarily says that because in the past the agency reached a negative conclusion in some number of days that have already passed, then here the agency must have found the opposite because it's taken longer.

But that's not the stuff of final agency action.  The fact that the agency in some selected prior cases had a quicker trigger finger than it does today does not manufacture final agency action from inaction.  This is not an unreasonable delay case.

UTC attempts to -- in vain, I would say -- to find final

agency action by implying it from the absence of any -- by the
absence of evidence.  The absence of evidence is not evidence of
absence, as it were.  So I don't understand the relevance of
those cases here.  Prior cases can raise *Fox* issues or disparate
treatment issues, would be relevant in any number of ways, but
they're not going to conjure a final agency action from here.

I do want to give a brief note ancillary to the final
agency action piece about incurable prematurity.  And I don't
understand the argument FDA raises in its opposition brief to be
rebutted in substance.

UTC's argument in reply seems to be targeted at finality.
It primarily rests on the *Sackett* decision.  But the *Sackett*
decision is not about incurable prematurity at all.  It's really
just about finality qua finality in the Clean Water Act case.
I don't think that has anything to say for the Court to guide
its decision here on the incurable prematurity argument we made
in our brief.

The other cases are similarly inapposite.  *32 County* and
*Columbia Falls* are solely about forward-looking, rule-based
relief, and that's not really what's at issue here.  This came
up in UTC's opening argument when they said that the agency has
made it clear that it won't revisit it, its relief would only be
prospective, and the agency has made some sort of -- has passed
some sort of gatekeeping to make a decision.  That's simply
entirely false.

1    UTC slices much more thinly than I can discern a difference

2    by attempting to argue there's some limit on backwards-looking

3    relief or some limit on the agency's action to give relief to

4    the parties here.  The agency has complete freedom of action in

5    how it's resolving these issues, and I don't understand UTC's

6    attempt to slice more narrowly than that.

7         I do want to -- last piece I want to touch on is the

8    adequate remedy piece.  And I want to begin by emphasizing that

9    if there's a reason that UTC prefers an injunction from this

10   court over an injunction from the district court in Delaware, it

11   has not given one.  UTC's claimed irreparable injury is from the

12   30-month stay, but really it's about market competition.  It's

13   about how quickly the other drug is introduced onto the market.

14   That irreparable harm will be as avoided by this court's order

15   as it would be by the court's order in Delaware.

16        So if UTC loses here, they go back to Delaware, and they

17   can get functionally the same relief.  That argument is being

18   briefed.  I understand the hearing is in the middle of next

19   month.  And so I don't understand anything from UTC's papers to

20   explain any difference they perceive in those two remedies.

21             THE COURT:  So if the FDA felt free to and issued a

22   decision 10 days from now, that the FDA would say is effective

23   immediately, the adequate remedy would be that they would have

24   to change their preliminary injunction request to a TRO request

25   and get immediate relief from that Delaware court?

1        MR. BALLINGRUD:  Your Honor, I don't know that that

2   would really be necessary.

3        THE COURT:  Well, Liquidia would get onto the market

4   immediately, wouldn't they?

5        MR. BALLINGRUD:  Your Honor, I don't want to

6   presuppose either what the agency will do nor the immediate

7   impact on how quickly products get to market.  I'm not prepared

8   to make any hypotheticals in that regard.  What I will say is

9   that it's difficult to imagine a scenario in which the district

10  court in Delaware's not acting fast enough, or in which the

11  parties can't plausibly go to the court and say we're scheduled

12  for a hearing on the 15th, let's do it on the 12th.

13       THE COURT:  That's pretty complex to get the relief

14  from the district court, and I understand there's some extensive

15  discovery that's going on?

16       MR. BALLINGRUD:  I assume that to be true, Your Honor.

17  I do not know that to be true.

18       THE COURT:  Is that relevant to my consideration of

19  whether that's an adequate remedy, how difficult it is or how

20  complicated it is to obtain that relief?

21       MR. BALLINGRUD:  No, Your Honor.  Largely no, Your

22  Honor.  I think you're getting at the *Gonzalez* case in that, but

23  I'll set that to the side for the moment.  The question that the

24  circuit asks is the same genre of relief.  What I understand

25  UTC's argument to be and what I understand the general question

you've asked me here is much more about the practical realities of what happens when you ask different questions.

That's an argument against the doctrine itself less than an application in this case.  It is necessarily true that when you target a different agency action or, under a case like *Delaware County* or *Gonzalez*, you target a private entity, the case will differ in many respects.

I mean, a private suit is not going to have sovereign immunity, it's not going to have state action, it's not going to have an administrative record, it's not going to have Touhy regulations.  It's going to differ in virtually every particular that could really matter between the parties.  And yet the circuit doesn't view that as a drop-dead sort of distinction. In cases like *Gonzalez* and *Delaware County* they look more broadly, is this the same genre of relief.

And not only does the district court in Delaware possess the ability to provide a functionally identical injunction, but the Hatch-Waxman Act makes that litigation the centerpiece.  The entire purpose of the 30-month stay is not to avoid irreparable injury as such, it's to allow the Delaware litigation to play out.  So playing out is the entire purpose of the stay.  So adequate remedy almost doesn't even capture it, because it is the remedy that Congress provided.

So to touch on *Gonzalez*, Your Honor, as well, because it does seem to me UTC's headline argument in their brief, headline

case is about *Gonzalez*.  But *Gonzalez* is readily

distinguishable.  As Your Honor knows, the *Gonzalez* case found

itself bound by the *Cort v. Rusk* decision, and functionally

dictated the outcome in that case as I understand that case.

So already, there's no Supreme Court case here that dictates the

outcome in the same manner as *Cort*.

The issue in *Gonzalez* is about citizenship.  That's a very

binary question:  You are a citizen or you are not a citizen.

There's no other question you can ask that would provide

anything like the same relief.  Here that's simply not the

issue.  UTC claims irreparable injury and it claims regular

injury as well.  That is the dividing line between those two.

And what measures provide a measure of recovery is something

that the Delaware court under federal circuit precedent, the

national uniform standard of patent law, can and will do.

That's just fundamentally not a question posed by *Gonzalez*.

And functionally as well, I think what Your Honor was

getting to before is that *Gonzalez* is just a case that had a

very particular statutory structure under 8 U.S.C. 1502, where

if there was no APA review, there were multiple branches on

the road upon which one might trip.

Gonzalez had to go to a consular office and apply for a

certificate, and then come to a port of entry and apply for a

different -- file a different application, and only then come

back and file functionally the same type of APA declaratory

1  judgment action.  And that's a very, very different scenario

2  than what UTC has here.

3       And the last thing I would want to highlight, Your Honor,

4  are practical difficulties about this court providing relief.

5  On the one hand, if this court grants the injunction, the

6  district court in Delaware's injunction would, without prejudging

7  it, be moot if not much more difficult to functionally administer

8  because Liquidia would not be able to market its drug if there

9  was never any approval if this court restrained the *ex ante* act

10 of approval.

11      But the Hatch-Waxman Act specifically contemplated that

12 court administering the stay.  Section 505(c)(3)(C) provides

13 that court the authority to terminate the stay early based upon

14 the litigation conduct of the parties.  It's supposed to be a

15 tool the court can use to ensure that the parties litigate

16 fairly and quickly and in good faith.

17      And so if one party comes to the *Markman* hearing and

18 doesn't know left from right, the court can say, as courts have

19 in the past, I'm sorry, your stay is going to be gone, this case

20 is clearly not substantial.  That's not a power that court in

21 Delaware would have anymore.  Because this court's injunction

22 would not be amenable to the same type of reactive changes based

23 upon that litigation conduct.

24      And lastly, Your Honor --

25           THE COURT:  At least the second "lastly," but go

1   ahead.

2          MR. BALLINGRUD:  If this -- just playing it out,

3   if this court ends up resolving the matter on the merits and

4   vacating the injunction, I don't take it for granted that

5   Liquidia would have to file a new application.  There are any

6   number of practical potential off-ramps like supplementation as

7   the papers note.

8          But gaming it out as UTC wants, where Liquidia would end

9   up filing its new drug application at the end of this year,

10  beginning of next year, and some number of times.  UTC asks for

11  a 30-month stay triggered then.  So that's functionally a

12  45-month stay.  That's not what they claim they lost in

13  September.  And that's a very different thing.  It's much

14  better, frankly.

15         THE COURT:  Are you able to give me a glimpse of the

16  FDA's position on whether it intends to resolve the application

17  and the legal issues posed by UTC in its letter at the same

18  time?

19         MR. BALLINGRUD:  I'm afraid, Your Honor, I do not have

20  anything I can share on that.

21         THE COURT:  Is there some reason that they might not

22  want to do that?

23         MR. BALLINGRUD:  I do not know of any, Your Honor.  I

24  don't know of anything that would compel a particular course in

25  that manner offhand but I simply don't have any...

1          THE COURT:  Would it make sense to resolve one without

2     resolving the other?

3          MR. BALLINGRUD:  It depends a little bit on how the

4     matter is resolved.  Because this is a question of agency

5     practice, one can imagine that, you know, if it's totally

6     insubstantial, UTC's example's what curated in a different

7     manner, it might be appropriate to file it and do a final

8     decision on the application.  If the matter is deeply

9     substantial and there's a lot to parse through, maybe the agency

10    would prefer a different path.  I don't particularly know the

11    answer to that or care to speculate, but I mean --

12         THE COURT:  Do you know whether the FDA even considers

13    itself bound to resolve the letter?  If it's not viewed as a

14    petition -- and I know you've said that you have no position on

15    whether it's a petition or not -- but if it's not viewed as a

16    petition, does the FDA have any obligation to resolve it?

17    Except to the extent that resolving the application will to some

18    extent perhaps address the issues in the letter.

19         MR. BALLINGRUD:  Well, that's to some degree, Your

20    Honor, based upon what I just talked about, because it may be

21    possible that it it's so insubstantial the agency chooses a

22    particular path.  I don't understand there to be any -- I want

23    to be careful here because the agency has not -- I don't

24    understand there to be any specific legal requirement to address

25    in explicit black letter terms that issue.  I also do not think

1    that makes a difference.

2            THE COURT:  All right.  Thank you, Mr. Ballingrud.

3            MR. BALLINGRUD:  Thank you, Your Honor.

4            THE COURT:  I'll hear from Mr. Killian now.

5            MR. KILLIAN:  Good afternoon, Judge Bates.

6            THE COURT:  Good afternoon.

7            MR. KILLIAN:  I'd like to address a couple points.

8            THE COURT:  Pick and choose what you're going to

9    address, because I think you've heard from both the other

10   parties and we can be a little more focused here.

11           MR. KILLIAN:  I will.  I think my points are going to

12   fall into two buckets:  the *Bennett* factors, and I'm going to

13   talk a little bit about the merits of the amendment as well.

14       You asked very early on in the argument, you asked Mr. Jay

15   a question about whether the acceptance, the acknowledgement in

16   September represents the consummation of the agency's

17   decisionmaking on this point.  And I just want to direct the

18   Court to one of the attachments to my declaration.  It's

19   Attachment 3.  It's called the Manual of Policies and

20   Procedures, 6050.1.  And on page 4 of that FDA notes, and I'll

21   just -- I'll quote:  "If FDA determines at the time of

22   application receipt or during the course of review of a

23   submission that the application needs to be separated into

24   more than one application" -- this is the unbundling idea --

25   "then the agency will communicate that to the parties."

1   And so what this document represents is that sometimes the

2   agency does make a determination about unbundling immediately,

3   but they often do not.  It's whenever during the course of

4   review of the substance of the amendment that the agency

5   identifies a bundling problem, then it makes that determination.

6   So I think that Manual of Policies and Procedures helps to

7   show that the initial acceptance of the document, of the

8   amendment, was not the consummation of the agency's

9   decisionmaking on that point.

10  Now, the other *Bennett* factor of course is whether the

11  determination affects substantial rights, whether there's a

12  legal injury of some kind along with the consummation.  And both

13  of these factors are independent.  The D.C. Circuit has told us

14  that they can't be bootstrapped, you can't sort of turn the

15  practical implications of a loss of a right into the

16  consummation of the agency's determination.  Both these need to

17  exist.

18  And UTC's theory for why its rights have been affected here

19  relates entirely to the 30-month stay that we've been talking

20  about and around throughout most of the day today.  The text of

21  the statutory provision that gives rise to the 30-month stay is

22  355(c)(3)(C).  And this provides that FDA may stay approval of a

23  (b)(2) NDA, and that's the only type of NDA that's at issue in

24  (c)(3)(C) are these (b)(2) NDAs, and only for patents that are

25  listed in the orange book before the NDA is filed.  Newly listed

1  patents, patents that come after the original NDA simply never

2  trigger a 30-month stay.

3      And I think Mr. Ballingrud got to this point in some

4  capacity but I want to reiterate that the patent that UTC relies

5  on in this case, the patent that is the only patent at issue

6  with Judge Andrews in the second infringement case pending in

7  the district of Delaware is the '327 patent that was issued in

8  November of 2023.

9      Yet everything that UTC complains about in its complaint,

10 everything it complains about in the preliminary injunction

11 motion happened months beforehand.  Happened in July when

12 Liquidia submitted the amendment, happened in September when

13 the email acknowledgement came and then a week later when the

14 acceptance was formally done by the agency.

15     That simple chronology shows that UTC's rights were not

16 affected, not in July and not in September.  It had no right to

17 a stay because it didn't even have the patent that supposedly

18 gives rise to this 30-month stay.  It would have been impossible

19 for the agency to make any determination about a 30-month stay

20 based on a patent that was not even issued by the PTO until

21 three months after the amendment was accepted.  It's

22 chronologically impossible for that injury to have occurred at

23 that time.

24     So plainly what UTC is trying to accomplish in this case

25 is to find some post-November 2023 way to get that amendment

1   unwound so that Liquidia would be in the position of having to

2   file a brand-new NDA now, because it's that filing of a

3   brand-new NDA, after patents have already been listed, that

4   gives rise to the right to a 30-month stay.

5       And a point that I think has not come out sufficiently in

6   the arguments yet today is that Liquidia is not going to and

7   does not have to as a matter of law file a new NDA even if the

8   amendment is ultimately rejected by FDA in this case.  And

9   that's because Liquidia has the right to supplement its NDA

10  after it's been approved.  There are two ways to modify an NDA:

11  amendments, which are changes made before FDA approval, and then

12  supplements, which are changes made after NDA approval.

13      And I think it's undisputed in this case that Liquidia has

14  the right to supplement even if FDA rejects this amendment.  And

15  I'll point the Court to three things.  First, the bundling

16  guidance, which UTC rests its entire case on, says explicitly on

17  page 5 that new indications can be added by supplement.  Second,

18  in its brief on page 13, FDA noted that Liquidia can supplement.

19      And I'd also point out that UTC itself supplemented.  That

20  is how the UTC got the PH-ILD indication added to its own NDA.

21  It supplemented after approval.  So by its own conduct, UTC has

22  to acknowledge that Liquidia could do the same thing, could

23  supplement after approval.

24      And the reason this is critical is back to the text of

25  section (c)(3)(C).  It says not only newly listed patents don't

1    give rise to 30-month stays, but Congress wrote the

2    parenthetical and said "excluding amendments and supplements."

3    So amendments after the original filing, of course, don't

4    trigger 30-month stays based on newly listed patents, and so do

5    supplements.  Supplements also don't trigger 30-month stays.

6         So everyone agrees that Liquidia could supplement it if we

7    got to that point, but we don't see how UTC's rights were

8    affected before its patent ever existed, and how its rights will

9    ever be affected in the future because we're going to take the

10   supplement route if it gets to that point.

11        See, what UTC is trying to accomplish I think in this

12   action is to turn (c)(3)(C), this 30-month stay provision, into

13   a statutory period of exclusivity.  But as Mr. Ballingrud

14   discussed with the court, that's not what (c)(3)(C) is about.

15   It is simply a provision that provides a streamlined preliminary

16   injunction for a narrow subset of patents that give rise to

17   litigation in connection with these NDAs.  And it's only those

18   patents that predate the filing of the original (b)(2) NDA.

19        And I think this is what Judge Mehta recognized in the

20   *Avadel* decision.  *Avadel* is more than a case about

21   counterclaims.  Mr. Jay tries to distinguish the decision

22   because that case was -- actually the immediate question in the

23   APA context and in the infringement litigation had to do with

24   the propriety of listing a particular patent, and in connection

25   with that, Judge Mehta recognized that Congress gave the

applicant in that case a right of action via counterclaim on the underlying infringement action.  But that's not where he stopped his analysis.

At page 33, he says, "Even if an aggrieved NDA applicant were not to file a counterclaim, Congress plainly contemplated that the affirmative patent infringement action filed pursuant to Section 355(c)(3)(C) would itself resolve any dispute between the patent holder and the NDA applicant and lead to the establishment of the effective date of approval for the NDA."

And that's really what this is about.  There are a number of different criteria, and Your Honor has discussed them early on in the case today, that need to fall in line before an applicant like Liquidia is allowed to market.  You need to have FDA approval, which has a number of things as well.

But the patent court could also just stop that.  This is all fundamentally about the ability to get a product onto the market.  And the patent court is going to be the one that controls that.  It has the ultimate -- well, let me come at it this way.  It has the immediate authority to control the length of the stay.  The statute says that explicitly.  It also has the authority to tell the FDA that you cannot approve the application until a certain date.  And it has the ultimate authority to decide whether the patents all by themselves prohibit the applicant from marketing its product until the expiration of the patent.  There's a number of different ways

1    that the timing of the launch of a drug are fundamentally and

2    ultimately within the control of the patent court.  And Congress

3    built that into the text of the statute.  Which is why we think

4    that the infringement action is in fact an adequate alternative

5    for questions about timing, for questions about the timing of

6    the FDA approval.

7        And we also think that UTC cannot fairly disagree with

8    that, given that one week before asking this court for a

9    preliminary injunction, they asked the district of Delaware for

10   a preliminary injunction.

11       THE COURT:  That's an argument that isn't simply a

12   finality argument.  It's a no cause of action argument.

13       MR. KILLIAN:  That's right.  That's right.  But it all

14   relates to their misinterpretation of the same statute,

15   (c)(3)(C).  It sort of gives rise to the lack of a substantial

16   right and shows why, if there is any interest here, it's one

17   that needs to be resolved by the patent court.  Yes, that's

18   correct.  This argument cuts through both finality and through

19   the lack of a cause of action.

20       What I wanted to point to, I guess, is the -- I cited the

21   final or the penultimate paragraph in the *Avadel* case -- I guess

22   it's penultimate.  It's on page 35, where Judge Mehta makes an

23   observation, and I won't read it into the record, but notes that

24   there are potentially more complicated decisions, more

25   complicated questions that could come up in connection with

1    these timing things.

2        But what Judge Mehta found persuasive and important was

3    that the applicant in *Avadel* had availed itself of the remedy.

4    And because the applicant had availed itself of the counterclaim

5    remedy, there really was no question that the APA was going to

6    be duplicative in that case.

7        And I think the same logic applies here.  UTC has availed

8    itself of the infringement remedy, it has filed a preliminary

9    injunction which if granted would stop Liquidia from marketing

10   for the PH-ILD, or from launching for the PH-ILD indication,

11   which is the ultimate result of what UTC is trying to get here

12   by simply restraining the FDA from giving Liquidia authority to

13   then go and launch its product.

14       So for those reasons, we think there's no injury, no cause

15   of action, there's no statutory right to a 30-month stay.  And

16   that sort of cuts through a lot of the case and why there's no

17   likelihood of success on the merits.

18       The second point I wanted to address was in fact the

19   propriety of the amendment.  In UTC's case, the whole complaint,

20   in fact, and the PI is premised on the idea that the bundling

21   guidance, originally issued in '91, slightly modified in 2004,

22   has a categorical prohibition on amending NDAs to add

23   indications.  Our view, and I know the agency has not taken a

24   position on this yet, but our view and the reason why we did

25   what we did is that's not what the guidance says and it's

1    contrary to on-point regulations.

2         Now, in question and answer earlier today I think Mr. Jay

3    acknowledged that the 314.60(f) regulation clearly states that a

4    (b)(2) NDA can be amended, quote, "to add a new indication."

5    And I'd say not only does it say that, but the substance of the

6    regulation I think gives some support to what this is about,

7    because the 314.60(f) reg anticipates that these amendments can

8    have patent implications.

9         The whole point of .60(f) is to require the applicant, when

10   it submits the amendment, to include patent certifications along

11   with the amendment.  So we're not dealing with trivial

12   amendments here.  We're dealing with amendments that have real

13   patent ramifications, and the regulation anticipates that it

14   will happen, and it tells a party like Liquidia how you are

15   supposed to proceed if your amendment has patent implications.

16        The existence of that regulation completely undermines the

17   idea that there is a categorical prohibition in the bundling

18   guidance.  The two are incompatible.  Either the guidance

19   doesn't mean what UTC has claimed, and its whole case, this

20   whole idea of a clear regulatory right in the guidance goes

21   away, or there's a conflict between the two, in which case the

22   regulation would win for any number of reasons.  The notice and

23   comment reg trumps guidance, that's one.  The later in time

24   rule.  The regs from 2016 would trump an earlier in time rule.

25   And the specific would govern the general in that case.

1          The specific here is the reg.  The reg deals specifically

2     with (b)(2) NDAs, and it specifically allows amendments for new

3     indications.  The guidance is the general.  The guidance deals

4     with all manner of NDAs, not just (b)(2)s, and it provides some

5     advice on what you should do, and says if you violate these

6     recommendations you may have to pay additional fees.  These

7     really are not comparable --

8          THE COURT:  But even if not clearly mandatory and

9     binding, if the guidance had been interpreted and followed a

10    certain way by FDA over the years without exception, what would

11    FDA have to do in order to change that?

12         MR. KILLIAN:  I think the notice and comment reg

13    published in 2016 would be more than enough.  That is a formal

14    agency rulemaking --

15         THE COURT:  If that effectuated a change.

16         MR. KILLIAN:  Correct.  Well, if it effectuated a

17    change at least as to the particular type of amendment that

18    we're dealing with in this case.  We're not saying that FDA has

19    thrown out the entire bundling guidance and that the document is

20    not worth the paper it's written on.  It's just that in this

21    particular way, for (b)(2)s, it's now appropriate -- we think it

22    always was but it's now clearly appropriate for an indication to

23    be added by amendment.  And that's with the regulation.

24         So I think, Your Honor, there may be two answers.  One

25    would be a notice and comment rule would be more than adequate

1    to mark the change of the agency's past practice, its pre-2016

2    practice.  And then even if not, the agency in its decision

3    document in the administrative record has the ability, under

4    *Encino Motorcars* and other cases and the like, to recognize a

5    change in practice and to give a reason for why the agency is

6    making that change.

7        The guidance is just that.  And if the new policy of the

8    agency is to deviate from what it had been doing in the past,

9    as long as it gives a nonarbitrary and capricious explanation

10   for that, the agency has the flexibility to make those

11   determinations.

12       So I think either of those paths would be sufficient for

13   the agency to break with the guidance if in fact the guidance

14   ever forbade amendments like the kind that Liquidia filed here.

15           THE COURT:  Do you have a position on whether UTC has

16   filed a citizen petition?

17           MR. KILLIAN:  Yeah.  Our position, it is not a citizen

18   petition.  I think Mr. Jay said that this morning as well.  It

19   lacks the mandatory requirements of a signed verification and

20   signed certification.

21       They filed a letter.  They're allowed to submit letters.

22   Anyone is allowed to exercise their First Amendment right and

23   send a letter to the government.  But by not doing a citizen

24   petition, they've given up their ability to ask FDA to delay

25   the application.  Under 355(q)(1), the statute says very clearly

1    that you could only delay in citizen petitions if there is a

2    public health emergency, which clearly there isn't in this case.

3    And they've given up the ability to get an answer from FDA

4    within the 150 days, which then gives rise to a final agency

5    action, which then gives rise to an administrative record and

6    potentially judicial review.

7         So they submitted a letter but they did not use a citizen

8    petition and thus lack recourse to the court, ultimately,

9    whatever happens on that letter.

10        And so I think the final point I'll make, Your Honor, is

11   that Mr. Jay and UTC have now recognized that this regulation

12   does allow for some manner of amendments, and they argue that

13   the Court or the FDA should interpret the amendment regulation,

14   314.60(f), narrowly, and that our amendment falls outside

15   whatever the sort of narrow scope is that UTC proffers.

16        That's a huge concession because it just undermines the

17   entirety of the case, that this is an easy, black and white

18   answer.  The bundling guidance says you can't amend, they

19   amended, game over.  Because it focuses the question more on

20   the nature of the amendment.  But even if it is a narrow

21   exception, the type of amendment that we're dealing with here

22   is a narrow amendment.  And that's because Liquidia changed its

23   NDA in the exact same way that UTC did, just added the indication

24   for PH-ILD.  And that's the whole point of these (b)(2) NDAs.

25             THE COURT:  And they did that through what?

1          MR. KILLIAN:  Through a supplement.  Through a

2     supplement.  But supplements are the post-approval changes;

3     amendments are the pre-approval changes.  Amendment was the

4     only option we -- well, it was the option that was available to

5     us at the time and so we took it.  We could not supplement I

6     think is what I'm trying to say, because the application hadn't

7     been approved at that point.

8          But the whole point of these hybrid NDAs, (b)(2)s, which

9     don't get litigated that often.  It's usually the court is

10    dealing with ANDAs, mere copycats, generics, but that (b)(2)s

11    combine an innovative addition from the drug sponsor with the

12    FDA's prior findings of safety and effectiveness.

13         Here the innovative addition that Liquidia has for its

14    product Yutrepia was proposed in the original (b)(2) NDA back in

15    2020.  None of that has changed.  The amendment that was

16    submitted in July of last year was simply to add an indication

17    on the label, that this is also prescribable for the PH-ILD

18    indication.

19         And in that sense, the innovative aspect of the Yutrepia

20    application is not being proposed to be changed at all.  It is

21    simply trying to rely on FDA's recent prior finding that this

22    underlying product is safe and effective for treating PH-ILD.

23    So this kind of amendment doesn't trigger the different drug

24    rules.  We're not changing the drug; we're changing the label.

25         This kind of amendment doesn't trigger the rules on

1    submitting significant new data or new analyses of old studies

2    or new studies, because we're not.  We're just relying on the

3    prior findings of safety and efficacy.  It's relatively

4    straightforward as amendments go and does not impose additional

5    work on the agency.

6         So it's for those reasons that we think ultimately the

7    agency should accept it, but why UTC is not likely to succeed on

8    the merits of its case challenging that amendment.

9         I've taken up enough of the Court's time.  Do you have any

10   particular questions.  Otherwise we'd just ask that you deny --

11            THE COURT:  No, I think I'm ready to hear from Mr. Jay

12   to wrap this up.

13            MR. KILLIAN:  Okay.  Thank you.

14            THE COURT:  Thank you.

15            MR. JAY:  Thank you, Your Honor.  I will just wrap up

16   with a couple of points, kind of one on each category of the

17   main issues.  The government's main argument about standing

18   boiled down to the assertion that UTC did not get their patent

19   in time.  And I just want to take a minute to explain just

20   briefly why the relief that we would get here would redress our

21   injury.

22        If we prevail, then Liquidia would not be able to get its

23   NDA approved with the ILD indication attached.  What Liquidia

24   then does after that is up to Liquidia.  And you heard

25   Mr. Killian say that what they would do is go back to the FDA

1    and submit -- once they have approval for the PAH indication,

2    and submit a supplement.  And that would get reviewed -- that

3    would get reviewed and in due course maybe they would get

4    approval.  But that's up to them.

5         During that time, we would have the relief that the Court

6    has given us, which is relief from the unlawful decision by the

7    agency to allow Liquidia to hook the PH-ILD indication onto its

8    existing NDA.  That is a redress of the injury that we're

9    facing.

10        And what the government seems to be building into its

11   argument is the assumption that the agency would allow Liquidia

12   to backdate its application as a new NDA filed at a time when

13   the '793 patent was still on the books and being actively

14   litigated.

15        Actually, we had a "do not approve" order based on the '793

16   patent, but before the '327 patent.  But that doesn't matter.

17   Mr. Killian just told you that's not actually what they would

18   do.  And even if Mr. Killian had said we would pursue a

19   backdated NDA, that's a separate course of action that might or

20   might not be lawful.  What matters for whether we have standing

21   in this court is whether we have an injury that an order from

22   this court declaring the agency's action unlawful would redress.

23   And we do.

24        On the point that Your Honor brought out in the colloquy

25   with the government about whether you need the administrative

1    record, and I think that really highlights some of the danger

2    that we face here, that if the agency comes in with a decision,

3    and the Court has everyone into the courtroom on that day and

4    says, let's look at the merits of this agency decision, if the

5    agency says, the Court cannot look at the merits of this

6    decision because we don't have the administrative record yet, so

7    you have to allow Liquidia to market for 60 days or so while our

8    paralegals assemble the administrative record, you can see why

9    that is a threat to the Court's ability to render effective

10   judicial review.

11       And what I think Judge Collyer did in a similar situation

12   in the *CollaGenex* case was to grant a preliminary injunction in

13   advance of the administrative record being filed, based on the

14   traditional balancing of the factors including the likelihood of

15   success.

16       And I would just point out, *CollaGenex* is also relevant to

17   the question you asked me in the top part of the argument, in

18   addition to the *NTEU* and *Teva* cases we cited in our papers,

19   because that was a case in which the government sort of dangled

20   the possibility that it might be reconsidering its decision but

21   then said at the last minute at the hearing that actually it's

22   very unlikely that we're going to change our mind.

23       Citizen petition, I agree with much of what Mr. Killian

24   said.  The government is not treating this as a citizen

25   petition.  We don't treat it as a citizen petition.  We're not

1    getting the benefit of the 150 days.  The only part I don't

2    agree with and which the agency apparently doesn't agree with

3    either is the part at the end where he said and thus you lack

4    recourse to the courts, and there is nothing in the citizen

5    petition statute that says that, nor has the government taken

6    that position either.

7        It is not a citizen petition because we're not seeking to

8    affect the timing of the approval of the NDA that they filed for

9    PAH.  That's the reason.

10       Last point is just about what the patent court does and

11   does not do and whether inaction for patent infringement

12   satisfies the requirement that -- as the court said in *Gonzalez*,

13   that the other action is going to determine the same underlying

14   legal question?  It's not.

15       A patent court can affect the timing of FDA approval, but

16   it does so only once it litigates the patent merits.  And a

17   preliminary injunction in a patent court definitely doesn't turn

18   on the same question that's before Your Honor about the

19   propriety of what's happening before the FDA.

20       So take, for example, if Judge Andrews in a couple of weeks

21   were to deny our preliminary injunction based on, for example,

22   the public interest factor of the four-part PI standard, nobody

23   would say that he's answered the question that's before this

24   court, but we would not be able to get relief at that point.

25   The reliefs may overlap in the sense that an injunction would

prevent Liquidia from marketing, but it's not determining the same legal question, and I think that's why it's not of the same genre, to use the D.C. Circuit's word.

THE COURT:  Well, the genre was as to the relief, not the genre as to the legal issue.

MR. JAY:  No, that's right.  But even an injunction saying -- even if we could get an injunction in the patent case, which is not to be taken for granted, but even that would just be an injunction that says don't induce infringement of this method claim specific to the PH-ILD indication.  It would not have anything to do with FDA approval.  FDA approval, under Hatch-Waxman, the patent court only regulates the timing of FDA approval based on kind of a final decision on the patent merits, which obviously is not a question before this court.

Unless the Court has any further questions, you've been very generous with your time.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Jay.  Any final point that either the FDA or Liquidia needs to make in response to Mr. Jay's points?

MR. BALLINGRUD:  I don't believe so, Your Honor.

MR. KILLIAN:  Likewise.

THE COURT:  All right.  I think what we'll do, I need to give some in the courtroom a break, and what I'm thinking is maybe taking a 15-minute break and I'll come back and I will render a decision on the request for a preliminary

1    injunction/TRO that is currently before me.

2           Then if we need to have any further discussion, we can have

3    it at that point.  But I'll come back and render a decision on

4    that pending motion.  So 15-minute break.

5           (Recess from 12:54 p.m. to 1:23 p.m.)

6           THE COURT:  All right.  Now, before me at this time is

7    the motion by UTC for a preliminary injunction or a temporary

8    restraining order enjoining the FDA from approving Liquidia's

9    505(b)(2) application for Yutrepia for the PH-ILD indication

10   until such time as the Court is able to adjudicate UTC's case on

11   the merits.

12          I'm going to deny that motion at this time, based on the

13   record before me.  A preliminary injunction is an extraordinary

14   remedy that may only be awarded upon a clear showing that the

15   plaintiff is entitled to such relief.  Many cases say that,

16   including *Guedes v. Bureau of Alcohol, Tobacco, Firearms and*

17   *Explosives*, 920 F.3d 1, jump cite 10 (D.C. Cir. 2019).

18          The moving party, and that is UTC, must establish four

19   things:  That it is likely to succeed on the merits, that it is

20   likely to suffer irreparable harm in the absence of preliminary

21   relief, that the balance of equity tips in its favor, and that

22   an injunction is in the public interest.

23          Likelihood of success on the merits is a foundational

24   requirement for obtaining preliminary injunctive relief under

25   those cases, including *Guedes*, and a plaintiff who is unlikely

1   to clear threshold hurdles to judicial review is ipso facto

2   unlikely to succeed on the merits, and those threshold hurdles

3   can include justiciability hurdles.  See, for example,

4   *Electronic Privacy Information Center v. Department of Commerce*,

5   928 F.3d 95, 104 (D.C. Cir. 2019).

6       So here, UTC has a significant finality problem.  UTC only

7   has a cause of action under the APA if there has been final

8   agency action.  To be final, agency action must generally meet

9   two requirements.  First, it must mark the consummation of the

10  agency's decisionmaking process rather than being of a merely

11  tentative or interlocutory nature; and second, it must be one by

12  which rights or obligations have been determined or from which

13  legal consequences will flow.

14      That's the *Bennett v. Spear* test, more recently set out in

15  *Army Corps of Engineers v. Hawkes*, 578 U.S. 590, jump cite 597,

16  2016.

17      The first requirement, which is what I will focus on, is

18  not met here.  FDA has neither issued a decision on Liquidia's

19  pending application, nor a decision on the issues raised in

20  UTC's December 2023 letter.  Indeed, the agency has consistently

21  represented that it is still actively considering the questions

22  at the heart of UTC's complaint in this case.

23      UTC maintains that the agency's September 2023

24  communications constituted a sufficiently definitive statement

25  of the agency's position and that the agency is unlikely to

1     change its mind.  I am not persuaded.

2         UTC hasn't directed the Court to any case law finding

3     finality in analogous circumstances with a relatively informal

4     initial decision -- and I'll put "decision" in quotation

5     marks -- and where the agency is affirmatively representing that

6     it has not reached final decision on relevant issues.  FDA's

7     representation here that it hasn't reached a final decision is

8     entitled to some weight.  See NASDAQ Stock Market LLC v. SEC, 1

9     F.4th 34, jump cite 38 (D.C. Cir. 2021).

10        And to accept UTC's argument would put the Court in the

11    position of opining on a nuanced regulatory question that FDA is

12    grappling with, as represented by counsel, on a continuing

13    basis.  And that would be before the relevant agency has weighed

14    in on the question.

15        I note that there are other threshold questions, including

16    standing, and whether the patent litigation affords UTC an

17    adequate remedy.  I'm not going to reach those questions at this

18    moment, but FDA and Liquidia are of course free to renew or

19    continue their arguments on those points in the future.

20        So I conclude that as the case stands before me today, UTC

21    has not demonstrated final agency action and therefore is

22    unlikely to succeed on the merits of its current claim for a

23    preliminary injunction or a temporary restraining order.  I will

24    thus deny UTC's motion.  Because UTC has such a low likelihood

25    of success based on that preliminary jurisdictional problem, the

1   Court will not address the remaining preliminary injunction

2   factors.  That's in accordance with D.C. Circuit law again, for

3   example, *Greater New Orleans Fair Housing Action Center v. HUD*,

4   639 F.3d 1078, jump cite 1088 (D.C. Cir. 2011).

5        I will note, however, that the discussion here today has

6   revealed that there are limitations to the irreparable injury

7   claim that UTC can make under the current circumstances for a

8   period of time that is not determined yet but is likely to be,

9   as we will ascertain in a moment, a fairly short, if any,

10   period.

11       So these and other threshold hurdles can fall away once FDA

12   renders a decision on Liquidia's application and the UTC letter.

13   And I understand that the fallback position by UTC here is that

14   the Court should establish a process for expedited consideration

15   pending further events.

16       So let's talk about that a little bit.  We've already

17   gotten no answer to the question of whether FDA anticipates

18   rendering a decision on the UTC letter contemporaneously with

19   any decision on Liquidia's application.

20       I recognize that FDA's view of its statutory obligations is

21   based on concerns related to public disclosure.  But in previous

22   cases, including cases before me, certainly cases before judges

23   of this court, those judges have ordered FDA to first disclose

24   its decision in a sealed hearing, to allow for some degree of

25   review of that decision, assuming that review is available.  I'm

1    not foreclosing or precluding FDA's arguments on standing or

2    other issues.  But judges have set up a process to enable such

3    review.

4         The Court has already ordered FDA to provide both the Court

5    and the parties with at least three business days' advance

6    notice prior to the issuance of any decision on Liquidia's

7    application.  But that's advance notice only as to the timing of

8    the decision.  I understand FDA thinks that should be dissolved,

9    but that's basically on its standing argument, and I'm not

10   reaching standing at this point.

11        So my view, and we discussed this a little bit in the

12   hearing, is that the Court and the parties will be better off if

13   they have some indication, not just of the timing of that

14   decision, but of the substance of the decision.  And I wonder --

15   and FDA can address this, but I wonder whether there's some

16   fundamental difference between prerelease disclosure of the

17   substance of the decision in a sealed hearing, which has been

18   done in many cases, and whether that's any different from such

19   disclosure in sealed briefing.

20        The Court is able to have matters proceed confidentially if

21   necessary.  If FDA's concerns continue to be about market

22   impact, I think the Court can enter an order that strictly

23   limits any short-term disclosure of the information, for

24   example, only to counsel in the case, not further within the

25   parties to the case.

1    So here's what I'm thinking and what I want your reactions

2    to, as I attempt, like other judges have attempted, to find some

3    balance between the interests involved here, the FDA's

4    institutional interest and its statutory obligations, the market

5    impact, and any considerations for any of the parties with

6    respect to the ability to litigate any judicial review of a

7    decision that FDA presumably will render at some point.

8    We've got this three business days' notice.  Let's call

9    that decision day, the public decision day, day X.  So the

10   notice that there will be a decision would occur on X minus 3.

11   I wonder whether X minus 2 -- in other words, two business days

12   out of public release of the FDA decision -- FDA can't provide

13   to the Court and the parties -- limited perhaps to counsel --

14   its decision or at least a summary of the decision and the basis

15   therefor.  And then the next day, one day before that public

16   disclosure, the parties could provide supplemental briefing to

17   the Court, perhaps limited to 10 pages, just to be realistic

18   here about what we can accomplish and what I can accomplish in

19   terms of reviewing briefing.  And then on the day of public

20   issuance we would have a hearing.

21   And that would enable a judicial decision contemporaneously

22   with or shortly thereafter public disclosure of the FDA

23   decision.  And all this briefing, and hearing, if necessary,

24   could be under seal.

25   So that's what I'm thinking about and I want your reactions

1    to.  And I'll -- anyone who wants to seize the lectern, seize

2    the lectern.  It may be that we should hear from FDA first, but

3    I'm not dictating that.

4         MR. BALLINGRUD:  Thank you, Your Honor.  We would need

5    at the very least a few minutes to confer internally to evaluate

6    this new scheme.  I can't guarantee that we can come to a

7    definitive answer in 10 minutes.  But at the very least, I am

8    not prepared to take a position until we've had a moment to

9    confer in private.

10        THE COURT:  So do you want to discuss it?  Is that

11   what you'd like to do --

12        MR. BALLINGRUD:  Yes, Your Honor.

13        THE COURT:  -- and have me remain here or come back in

14   a couple minutes?

15        MR. BALLINGRUD:  Whichever is your preference, Your

16   Honor.  I can't represent anything now and I can't also

17   guarantee that we can do so in 10 minutes, but we can certainly

18   try.

19        THE COURT:  I understand.  I'm perfectly happy to give

20   you that time, and I'll give counsel for Liquidia and UTC that

21   time as well.  Is there anything that anyone wants to say before

22   I give you that time?

23        MR. BALLINGRUD:  Nothing for me.

24        THE COURT:  Liquidia wants to say something.

25        MR. KILLIAN:  Just a brief clarification, Your Honor.

1    And I think from our perspective, it would be important that the

2    procedure envisioned would still be limited to the issues in the

3    complaint, and that we're not sort of envisioning kind of a

4    fishing expedition with T minus 1 day before the public

5    decision.

6          THE COURT:  Well, that's an interesting point.  To the

7    extent that the decision by the FDA and its rationale, you view

8    that as going beyond the complaint?

9          MR. KILLIAN:  Absolutely.  It will consider the merits

10   of the entirety of the application and the as amended by the

11   July amendment.  So the safety and efficacy of the drug, the

12   label, all that -- sort of the things that would normally be

13   reviewed after the fact would potentially be available

14   beforehand.

15       And so this case as it's come to the court so far has been

16   purely about this right to a 30-month stay.  And so I think that

17   clarification that I'm asking for is that in the process Your

18   Honor's envisioning, it still be just limited to this question

19   about the 30-month stay and the amendment and not range into

20   something broader.

21         THE COURT:  Why don't you all think about that as an

22   issue with respect to this scheduling.  And I'll think about it

23   as well.  Anything you want to say?

24         MR. BALLINGRUD:  Yes, Your Honor.  I apologize.  One

25   last clarification.  Maybe this was implicit.  Did Your Honor

1    anticipate the briefing solely being framed as on UTC's request

2    for relief?  Because, as noted, a decision could be anything.

3    And so it's plausible it could be in a different posture

4    entirely with a different aggrieved party.  I don't know what

5    the Court's conception of the briefing schedule --

6              THE COURT:  Well, I'm having a little problem based on

7    what you're saying coming up with the precise conception.  FDA

8    could do any number of things with respect to the matter before

9    it.  You know, it could bundle, unbundle, require this, require

10   that.  Are you saying or asking whether whatever FDA does would

11   not be subject to review?  It might be in a context of a

12   preliminary injunction/TRO, that they'd be seeking it, but is

13   that in your view something that goes beyond the proper

14   parameters of the complaint and the matters before the Court?

15             MR. BALLINGRUD:  Well, Your Honor, to be clear, my

16   point, I think it's -- I understand what you're getting at.  My

17   point is solely that UTC is not necessarily an aggrieved party

18   based on what the agency does given the panoply of options --

19             THE COURT:  They may not be.  You're absolutely right.

20   It may be Liquidia.

21             MR. BALLINGRUD:  So this briefing schedule would

22   contemplate relief sought by Liquidia, but there's no -- that's

23   my only question.  Would that avenue be available.

24             THE COURT:  I think you're right in your concern

25   there.  I don't think it would contemplate relief sought by

1    Liquidia.  It would only contemplate relief sought by UTC.

2              MR. BALLINGRUD:  That makes sense.

3              THE COURT:  Because that's all that's before me.

4              MR. BALLINGRUD:  Thank you, Your Honor.

5              THE COURT:  All right.  So I'll see you in a few

6    minutes.  If it turns out that you need 12 minutes instead of

7    10, just let Ms. Duncan know.

8         (Recess from 1:40 p.m. to 1:58 p.m.)

9              THE COURT:  All right.  I'm sure we can't achieve

10   perfection.  What I'm trying to do is come up with something

11   that will make this work a little bit better in terms of

12   whatever scope of review -- and I think you've raised some

13   important questions with respect to what that scope is, but

14   that's up to each of you to decide based on whatever FDA decides

15   and what the issues are in your view.

16        I do think UTC is limited by its complaint to what is

17   currently before me, and that also limits what's before me from

18   Liquidia's perspective, depending on what FDA does.

19        Well, what do you think about some kind of process along

20   the lines of what I suggested?  Let's turn to you first on

21   behalf of the FDA, Mr. Ballingrud.

22             MR. BALLINGRUD:  Thank you, Your Honor.

23        Your Honor, unfortunately, this question implicates several

24   different layers of agency concern, and in a 10-minute period I

25   apologize we were not able to come to a definitive position.

1  Spring break, people are out on trips, I understand one

2  decisionmaker is simply not reachable this week.

3      We might suggest as an alternative a status conference next

4  week where we could revisit the issue, provided that we had at

5  the very least a whole business day and Monday.  Middle of the

6  week for a status conference would allow us to have a position.

7  We will of course obey any previously entered orders that are in

8  effect and any orders the Court enters in the interim.

9          THE COURT:  The only representation I would ask for

10  from you on behalf of FDA, is that if we do set a status call,

11  let's say for Tuesday is what you're suggesting?

12          MR. BALLINGRUD:  Tuesday, yeah, as long as we have a

13  full business day I think would allow us to make the

14  necessary --

15          THE COURT:  All right.  I think I'd be looking for a

16  representation from you on behalf of FDA that, for example, the

17  three-day notice is not going to be given this afternoon or on

18  Monday morning.

19          MR. BALLINGRUD:  I would be deeply shocked --

20          THE COURT:  Because if you do that, then this has gone

21  by the board.

22          MR. BALLINGRUD:  I think there's not a significant

23  chance of that, Your Honor.

24          THE COURT:  All right.  I'll accept the "not

25  significant chance" representation.  So what do the other

1  parties think about delaying this discussion of a process for a

2  little bit to enable FDA to sink its teeth into it in a more

3  deliberate fashion with more of the players involved?  Mr. Jay?

4          MR. JAY:  That's fine with us based on the

5  representations of counsel and the three-day order remaining in

6  place.

7          THE COURT:  And Mr. Killian?

8          MR. KILLIAN:  That's also fine with us, Your Honor.

9  Can I just add one or two small points?

10          THE COURT:  Sure.

11          MR. KILLIAN:  For consideration, maybe for everyone

12  and for the Court ahead of that?  One is that it could be a long

13  time; we don't actually know when FDA's going to issue its

14  decision here.

15          THE COURT:  You're absolutely right.  It could be a

16  month.

17          MR. KILLIAN:  Exactly.  So I think one of the things

18  we'd at least like the Court to keep in mind on this is we have

19  a deadline to file motions to dismiss soon.  I think it's our

20  perspective we should file motions to dismiss, the Court can

21  have them and make a determination on what it should do, and

22  that these are not necessarily mutually exclusive paths to

23  resolution of the case, that the motion to dismiss path can

24  proceed while this path is available if FDA makes the

25  determination along that time period.

1          THE COURT:  Okay.  So are you asking -- is that said

2     just to educate me or remind me, or are you asking me to do

3     something?

4          MR. KILLIAN:  I think it's a question, slash, we just

5     want to make sure we still have our -- that this is not

6     precluding -- the whole case is being put on ice, but rather

7     that we'll still continue to have the ability to file a motion

8     to dismiss in the ordinary course.

9          THE COURT:  Certainly as of this moment, I haven't put

10    any stay into effect or anything else so you're free to litigate

11    as you choose.

12         MR. KILLIAN:  Thank you.

13         THE COURT:  Anything else from anybody else?

14        All right.  Let's look at the calendar.  Ms. Duncan is

15    doing so, but I will do so as well.  No, I won't.  My phone will

16    have to enter a passcode so I'll rely on you.

17        Next week, how does Tuesday look -- that would be April 2.

18    I have a couple matters, I think.

19         THE DEPUTY CLERK:  Yes, Your Honor.  At 10 a.m. and

20    4:30.

21         THE COURT:  So there's room between then.  What's the

22    matter at 10 a.m.?

23         THE DEPUTY CLERK:  A swearing-in.

24         THE COURT:  Oh, it's not even a court matter.

25         THE DEPUTY CLERK:  Oh, no.  No court matters.

1          THE COURT:  Okay, good.  Do you want late morning or

2     you want early afternoon?  Early afternoon gives you more time?

3          MR. BALLINGRUD:  Early afternoon is fine.

4          THE COURT:  All right.  So two o'clock?  Status call,

5     two o'clock.

6          MR. JAY:  Will that be in person, Your Honor?

7          THE COURT:  If you all would want to do it remotely, I

8     can do it remotely.  I'm happy to do it in person as well.  I'll

9     be here, so it's easy for me.

10         MR. JAY:  We are all local.  All of UTC counsel are

11    local.

12         THE COURT:  Okay.  So I'll be happy to see you.  So

13    we'll do it in person.  Two o'clock on Tuesday, April 2.  And I

14    appreciate the quality of the arguments, both on paper and made

15    here today.  I appreciate your flexibility and your ongoing

16    consideration of what makes sense in terms of dealing with these

17    issues as they morph and evolve, which is not an unusual

18    situation for this type of case, but it certainly is a situation

19    that is not always easy to manage, from your perspective or from

20    mine.

21         But thank you all.  We'll see you on Tuesday at 2 p.m.

22    Good day.

23         (Proceedings adjourned at 2:04 p.m.)

24

25

```
*  *   *   *   *   *
```

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Bryan A. Wayne
Bryan A. Wayne