IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED THERAPEUTICS CORP.,

      *Plaintiff,*

    v.

FOOD AND DRUG ADMINISTRATION, *et al.,*

      *Defendants,*

    and

LIQUIDIA TECHNOLOGIES, INC.,

      *Defendant-Intervenor.*

No. 24-cv-484-JDB

LIQUIDIA TECHNOLOGIES, INC.'S
REPLY MEMORANDUM
IN SUPPORT OF ITS MOTION TO DISMISS

# Table of Contents

Introduction ................................................................................................. 1

Argument ...................................................................................................... 2

    I.    UTC has not lost and will not lose statutory rights. ..................... 2

        A.    FDA's initiation of review of the July Amendment did
not deprive UTC of a stay of full approval of Liquidia's
NDA. ........................................................................................ 2

        B.    FDA's initiation of review did not and will not *cause*
UTC to lose statutory rights. .................................................. 4

        C.    The '793 patent does not create standing or finality. ............ 7

        D.    30-month stays are discretionary. ........................................... 9

    II.    Accepting the July Amendment for review was not the consummation
of the FDA's decisionmaking as to any issue. ........................... 11

    III.    UTC's infringement case offers an adequate alternative remedy. ............ 15

    IV.    The July Amendment is procedurally appropriate. .................................. 18

        A.    The Bundling Guidance does not forbid the July
Amendment. ........................................................................... 18

        B.    The July Amendment does not violate the rule against
submitting data for major amendments. ................................ 22

Conclusion .................................................................................................. 23

Certificate of Service ................................................................................. 24

# Table of Authorities

## Cases

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
   271 F.3d 262 (D.C. Cir. 2001) ................................................................. 18

*Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*,
   226 F. Supp. 2d 204 (D.D.C. 2002) ............................................................ 7

*Ass'n of Battery Recyclers, Inc. v. EPA*,
   716 F.3d 667 (D.C. Cir. 2013) ................................................................. 16

*AstraZeneca Pharms. LP v. FDA*,
   850 F. Supp. 2d 230 (D.D.C. 2012) .......................................................... 14

*Avadel CNS Pharms., LLC v. Becerra*,
   638 F. Supp. 3d 23 (D.D.C. 2022) ...................................................... 15, 16

*Banner Health v. Sebelius*,
   797 F. Supp. 2d 97 (D.D.C. 2011) ............................................................ 18

*Bittner v. United States*,
   598 U.S. 85 (2023) ................................................................................. 10

*Cities of Anaheim & Riverside, Calif. v. FERC*,
   692 F.2d 773 (D.C. Cir. 1982) ......................................................... 2, 3, 14

*Clifton Power Corp. v. FERC*,
   294 F.3d 108 (D.C. Cir. 2002) ................................................................. 14

*FDA v. Alliance for Hippocratic Medicine*,
   --- S. Ct. ----, 2024 WL 2964140 (U.S. Jun. 13, 2023).............................. 5, 6

*Fl. Audubon Soc. v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) .................................................................... 5

*Heuer v. Smithsonian Inst.*,
   619 F. Supp. 3d 202 (D.D.C. 2022) ............................................................ 3

*Int'l Telecard Ass'n v. FCC*,
   166 F.3d 387 (D.C. Cir. 1999) ................................................................. 14

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................. 3

*Mun. Light Boards of Reading & Wakefield, Mass. v. Fed. Power Comm'n*,
450 F.2d 1341 (D.C. Cir. 1971)................................................................. 12

*Mylan Inc v. CIR*,
76 F.4th 230 (3d Cir. 2023) ........................................................................ 9

*Papago Tribal Util. Auth. v. FERC*,
628 F.2d 235 (D.C. Cir. 1980) .................................................................. 11

*Plummer v. Safeway, Inc.*,
934 F. Supp. 2d 191 (D.D.C. 2013) .......................................................... 22

*Simon v. Eastern Ky. Welfare Rights Organization*,
426 U.S. 26 (1976) ...................................................................................... 6

*Smith v. Spizzirri*,
144 S. Ct. 1173 (2024) .............................................................................. 10

*United Therapeutics Corp. v. Liquidia Techns., Inc.*,
2024 WL 2805082 (D. Del. May 31, 2024) ...................................... 1, 3, 9

*Warth v. Seldin*,
422 U.S. 490 (1975) ..................................................................................... 2

## Statutes

5 U.S.C. § 704...................................................................................................... 15

21 U.S.C. § 355(c)(3)(C) .................................................................................. *passim*

21 U.S.C. § 355(c)(3)(C)(i)–(iv) ......................................................................... 16

21 U.S.C. § 355(d) ................................................................................................ 19

21 U.S.C. § 355(j)(5)(B)(iii) ................................................................................. 9

35 U.S.C. § 271(e)(4)(A) ...................................................................................... 16

## Other Authorities

21 C.F.R. § 314.60(b)(6)'s .................................................................................. 22

21 C.F.R. § 314.60(f)(1)(i) ................................................................................... 20

21 C.F.R. § 314.101(a)(1) .................................................................................... 12

21 C.F.R. § 314.107(b)(3)(viii)...................................................................................................... 8

MMA Proposed Rule, 80 Fed. Reg. 6802....................................................................................... 20

# Glossary

| | |
|---|---|
| ANDA | abbreviated new drug application |
| Bundling Guidance | FDA, *Guidance for Industry: Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing Prescription Drug User Fees* (Dec. 2004), attached as Burgess Decl Ex. 4 (ECF 14-6) |
| "Compl. ¶ #" | citation of UTC's complaint in this action (ECF 1) |
| FDA | the Defendant Food and Drug Administration |
| FDCA | Federal Food, Drug, & Cosmetic Act, 21 U.S.C. § 301 *et seq.* |
| the July Amendment | Liquidia's amendment to its 505(b)(2) NDA seeking FDA approval to market YUTREPIA for PH-ILD |
| "Killian Decl. Ex #" | citation of Liquidia's declaration exhibits filed in support of its opposition to UTC's motion for a preliminary injunction (ECF 24-2–3) |
| "Liquidia MTD #" | citation Liquidia's memorandum in support of its motion to dismiss (ECF 38-1) |
| "Liquidia PI Opp. #" | citation of Liquidia's memorandum in opposition to UTC's motion for a preliminary injunction in this action (ECF 24) |
| MMA Proposed Rule | Abbreviated New Drug Applications and 505(b)(2) Applications, 80 Fed. Reg. 6802 (Feb. 6, 2015) |
| NDA | new drug application |
| PAH | pulmonary arterial hypertension |
| PH-ILD | pulmonary hypertension associated with interstitial lung disease |
| "PI Reply #" | citation of UTC's reply memorandum in support of its motion for a preliminary injunction in this action (ECF 31) |
| UTC | the Plaintiff United Therapeutics Corp. |
| "UTC Opp. #" | UTC's opposition to the motions to dismiss (ECF 39) |

# Introduction

Facing the end of a lucrative monopoly and the beginning of competition that will give doctors and patients a choice for treating PAH and PH-ILD, UTC has pulled out all the stops to slow down FDA's approval of Liquidia's 505(b)(2) NDA. First, UTC sought preliminary injunctions from both this Court and the Delaware District Court. Following this Court's denial of UTC's motion in March, the Delaware District Court denied UTC's parallel motion in May. *United Therapeutics Corp. v. Liquidia Techns., Inc.*, 2024 WL 2805082, (D. Del. May 31, 2024). Owing to "difficult questions regarding the validity of the '327 patent," *id.* at *7, the Delaware District Court found that UTC failed to prove likelihood of success on its infringement claim. The court also found that the irreparable injuries UTC claimed—price erosion, lost market share, etc.—were "speculative" and, if they ever arose, could be recompensed by damages. *See id.* at *10–*13. And because UTC's TYVASO "does not meet the current market need," the court found that enjoining Liquidia from launching YUTREPIA during the infringement action would be contrary to the public interest. *Id.* at *15.

Despite failing to secure preliminary relief based on the '327 patent directly, UTC presses this Court to let UTC use the APA to get that relief indirectly. Specifically, UTC asks this Court to halt FDA's review of Liquidia's July Amendment, force FDA to compel Liquidia to file a brand-new 505(b)(2) NDA, and then force FDA to stay final approval of this hypothetical NDA for 30 months to allow the Delaware District Court to adjudicate UTC's infringement claims based on the '327 patent.

1

The Court should put an end to this unprecedented case. FDA has not violated UTC's statutory rights, for it is undisputed that the July Amendment did not trigger a 30-month stay under Section 505(c)(3)(C). Unless Liquidia filed a brand-new 505(b)(2) NDA, FDA could not possibly stay approval, and there is no legal basis for FDA or the Court to compel Liquidia to file one.

In addition, FDA's Bundling Guidance does not create the rights and duties that UTC aims to vindicate and enforce. The Court should not retain this case as a place-holder for a different one that UTC might file if FDA approves Liquidia's application. Rather, just like everyone else, UTC must wait for a final decision. For these reasons and others described below, this case should be dismissed.

## Argument

## I.    UTC has not lost and will not lose statutory rights.

## A.    FDA's initiation of review of the July Amendment did not deprive UTC of a stay of full approval of Liquidia's NDA.

Nonparties ordinarily have no legally protected interest in an agency's initiation of review of an amendment to someone else's application for a permit, and the APA, therefore, ordinarily affords nonparties no cause of action to challenge it apart from a final decision awarding a permit. *See Cities of Anaheim & Riverside, Calif. v. FERC*, 692 F.2d 773, 777–780 (D.C. Cir. 1982). There is a limited exception to this rule. "Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute." *Warth v. Seldin*, 422 U.S. 490, 514 (1975).

2

Whether UTC's case may proceed—whether UTC has standing and whether the action it challenges is truly final—depends on whether it fits within this limited exception.[1] Realizing this, UTC contends that Section 505(c)(3)(C), which empowers FDA to stay full approval of a 505(b)(2) NDA upon *completion* of review, gives UTC a legally protected interest in FDA's *initiation* of review. *See* UTC Opp. 16–22, 32–33. When a plaintiff's theory of standing and finality rests ineluctably upon an alleged violation of a statutory right, the first question the Court must answer is the legal question whether that statutory right exists. *See, e.g., Heuer v. Smithsonian Inst.*, 619 F. Supp. 3d 202, 211 (D.D.C. 2022) (dismissing because, as a matter of law, the statute did not create the right that allegedly transformed a non-injury-causing event into an injury-causing event). Here, Section 505(c)(3)(C) does not create the statutory right that UTC claims.

Section 505(c)(3)(C) empowers FDA to stay full approval of a 505(b)(2) NDA for 30 months in one, conditional situation—when the NDA implicates a patent that was listed in FDA's Orange Book before the NDA's original submission and the patentholder has diligently pursued infringement litigation. *See* 21 U.S.C. § 355(c)(3)(C).

---

1      Economic losses, *see* UTC Opp. 18–19, do not establish UTC's standing or finality vis-à-vis FDA's initiation of review because they are future injuries that will be caused, if ever, by FDA's approval of Liquidia's NDA. *See Cities of Anaheim & Riverside*, 692 F.2d at 779 ("Nor is prospective monetary loss, while it may be injurious, in itself an irreparable harm sufficient to require review of the orders at this time."). As the Delaware District Court found, the economic losses UTC claims are "speculative," *United Therapeutics*, 2024 WL 2805082, at *10–*11. UTC is wrong to suggest that that finding deserves no respect here. *See* UTC Opp. 19 n. 6. In both cases, UTC alleges the same economic harms, and Article III, same as equity, does not tolerate speculative injuries. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Those statutory conditions and the strict sequencing requirement they create are in-disputable and undisputed. UTC admits that Section 505(c)(3)(C) authorizes stays only "for patents submitted to FDA before the original 505(b)(2) application," UTC Opp. 6, and UTC admits that amendments and supplements to 505(b)(2) NDAs do not themselves "trigger the 30-month stay," *id.* at 17.

To allege a violation of Section 505(c)(3)(C), then, UTC would need to allege that FDA fully approved Liquidia's 505(b)(2) NDA in less than 30 months, despite ongoing infringement litigation concerning a patent that UTC listed before Liquidia submit-ted the NDA. UTC does not allege that. FDA has *not* approved Liquidia's NDA, and UTC's ongoing infringement litigation relates to a patent, the '327 patent, which was *not* listed until November 2023, years after Liquidia submitted its NDA and months after Liquidia submitted the July Amendment. *See* Liquidia MTD 12–13. UTC has not plausibly alleged an actual or imminent violation of Section 505(c)(3)(C), so UTC has not plausibly alleged its standing or finality.

## B.   FDA's initiation of review did not and will not *cause* UTC to lose statutory rights.

Because Section 505(c)(3)(C) is plainly inapplicable, UTC mostly abandons its original theory that FDA's mere "acceptance of Liquidia's amendment" *itself* "denied UTC the protection of a statutorily mandated 30-month stay." UTC Opp. 32. *Accord* Compl. ¶¶ 11, 74, 80, 82 (alleging the acceptance "deprived" UTC of rights). Now, UTC more vaguely theorizes that FDA's initiation of review "*caused* the deprivation of a statutory right" or "*caused* a ripe injury-in-fact." UTC Opp. 16, 17 (emphases added). UTC's shift is more than rhetorical. It is a tacit acknowledgment that UTC

hopes to link FDA's initiation of review with the loss of a statutory right via a chain of causation.

That's a tall order. Plaintiffs who stake their standing and finality on a chain of causation frequently fail. *See, e.g.*, *FDA v. Alliance for Hippocratic Medicine*, --- S. Ct. ----, 2024 WL 2964140, at *9 (U.S. Jun. 13, 2023) (rejecting "several complicated causation theories to connect FDA's actions to the plaintiffs' alleged injuries in fact"). "The greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true." *See Fl. Audubon Soc. v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996).

Here, it is not obvious how FDA's initiation of review can *cause* a violation of Section 505(c)(3)(C) when, as everyone agrees, initiation of review did not *itself* violate Section 505(c)(3)(C). No matter what FDA does next—whether FDA approves the NDA, unbundles the July Amendment, or rejects it outright—Section 505(c)(3)(C) will not be violated. *See* Liquidia MTD 14–16. Therefore, FDA's mere initiation of review of the July Amendment in September 2023 cannot possibly cause a violation of Section 505(c)(3)(C) later on.

UTC downplays the possible outcomes of FDA's review as irrelevant "counterfactuals" and "speculative and hypothetical possibilities." *See* UTC Opp. 21–22.[2] UTC

---

2      UTC falsely accuses Liquidia of having "no support" for contending that the July Amendment, if deemed procedurally improper, still "can be used to preserve a filing date for a full-fledged application." UTC Opp. 21. An FDA policy manual explains: If FDA "determines at the time of application receipt or during the course of the review of a submission that the application needs to be separated into more than one application," the application will be rejected as Unacceptable for Filing if "the appropriate fees are not received by FDA within 5 calendar days." Killian Decl. Ex. 2

(footnote continued on next page)

misunderstands their relevance. The point is not that Liquidia can avoid a 30-month stay even "if FDA's acceptance decision is vacated" by the Court. *Id.* at 22. The point is that FDA's acceptance decision, at the time it happened, did not set in motion a series of events—a chain of causation—that could even possibly result in denying UTC a 30-month stay.

Because "causation and redressability[] are often flip sides of the same coin," *Alliance for Hippocratic Medicine*, 2024 WL 2964140, at *6 (cleaned up), if UTC's theory of injury and causation were sound—if merely initiating review of the July Amendment violated or caused a violation of Section 505(c)(3)(C)—the only relief UTC would need is an order requiring FDA to unbundle the July Amendment. But it is clear that relief would not redress the injury UTC alleges, a denial of a 30-month stay, because a brand-new 505(b)(2) NDA is necessary to trigger a stay. *See* 21 U.S.C. § 355(c)(3)(C). The injury UTC alleges, then, is not "likely to be redressed by a favorable decision." *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 38 (1976).

UTC understands this and so seeks much more than just an order requiring FDA to unbundle the July Amendment. UTC also asks the Court to compel FDA to compel Liquidia to submit a brand-new 505(b)(2) NDA, then stay full approval of that brand-new NDA for 30 months. *See* Compl. p. 33; *see also* Liquidia MTD 11. That request for relief does not save UTC's case. For one thing, UTC does not cite an arguable basis

---

(ECF 24-3) at 4. If the applicant pays within five days, the application is not as Unacceptable for Filing, and the filing date is preserved. If, however, the applicant fails to pay within five days, the application is rejected, and if the applicant later on "satisfies its user fee obligation … the date that the user fee obligation is met is the date that starts the review clock." *Id.* at 5.

for ordering Liquidia to submit a brand-new NDA. *Compare Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*, 226 F. Supp. 2d 204, 207–209 (D.D.C. 2002) (holding that FDA lacks authority to require manufacturers to submit applications). More importantly, by asking the Court to mandate the submission of a brand-new NDA that would, in turn, trigger a 30-month stay, UTC is asking the Court to use its equitable powers to generate the injuries that UTC wants the Court to redress. That is bootstrapping, and it flips the Article III case-or-controversy requirement upside down. Federal courts cannot create the controversies they are asked to resolve.

## C.   The '793 patent does not create standing or finality.

UTC tries redirecting the Court's focus off the '327 patent (the sole remaining subject of UTC's infringement case) to the '793 patent (the sole original subject of UTC's infringement case). *See* UTC Opp. 20. That effort fails as matter of law. Because UTC did not list the '793 patent in the Orange Book before Liquidia originally submitted its 505(b)(2) NDA, Compl. ¶¶ 56–57, the July Amendment could not and did not trigger a 30-month stay based on that patent. UTC does not disagree, and that should end the discussion.

Yet UTC forges ahead, speculating that, *if* FDA had rejected the July Amendment in September 2023, *if* Liquidia had immediately responded by filing a brand-new 505(b)(2) NDA concerning PH-ILD (instead of waiting for full approval to file a supplement), *if* Liquidia also sent UTC new paragraph IV notices, and *if* UTC timely sued Liquidia after receiving those notices, that hypothetical chain of events "would

have triggered a 30-month stay" based on the '793 patent. UTC Opp. 20. That's a lot of "ifs," and UTC alleges no factual bases for them.

That said, *even if* the Court accepted UTC's speculation, the Court must still dismiss UTC's case, for any stay of full approval based on the '793 patent would have ended on January 22, 2024, when UTC voluntarily dismissed its claims alleging infringement of that patent. Section 505(c)(3)(C) keys a stay to the patentholder's pursuit of infringement litigation, so a 30-month stay ends when the underlying infringement case ends without a finding of infringement. *See* 21 C.F.R. § 314.107(b)(3)(viii). Thus, the statutory violation that UTC imagines—a deprivation of a 30-month stay of full approval based on the '793 patent between September 2023 and January 2024—was resolved *before* UTC filed this suit in February 2024.

UTC conjectures that a 30-month stay might not have "dissolved" on January 22, 2024 because the '327 patent "separately would provide a basis for a stay." UTC Opp. 21. That conjecture only takes UTC back to the position it wants to avoid: FDA cannot stay full approval of a 505(b)(2) NDA, or an amendment or a supplement to a 505(b)(2) NDA, based on a patent listed after the NDA was originally submitted. *See* 21 U.S.C. § 355(c)(3)(C). The '327 patent, which was issued, listed, and added to UTC's infringement case *in November 2023*, cannot explain how FDA's initiation of review of the July Amendment *in September 2023* caused UTC injury and violated UTC's rights *in September 2023*.

Because FDA could not stay full approval of Liquidia's amended 505(b)(2) NDA based on either the '793 or the '327 patent, UTC's assertion that it was forced to seek

preliminary relief in the Delaware District Court, because it did not receive a 30-month stay, is untenable. *See* UTC Opp. 18. UTC was not forced to do anything. The FDCA does not require infringement suits or preliminary-injunction motions; a "substantial percentage" of patentholders, in fact, choose not to litigate when they receive paragraph IV notices. *Mylan Inc v. CIR*, 76 F.4th 230, 243 (3d Cir. 2023).

UTC's factual allegations also disprove its assertion. When UTC filed its infringement suit in September 2023, it knew Liquidia had submitted an amendment and that FDA, therefore, could not stay full approval of Liquidia's amended 505(b)(2) NDA based on the '793 patent. UTC did not seek preliminary relief in the Delaware District Court until *five months later* and, even then, relied exclusively on a patent that did not exist in September 2023, the '327 patent. *See United Therapeutics*, 2024 WL 2805082, at *1–*4. FDA's initiation of review of the July Amendment did not cause UTC to incur the costs of seeking preliminary relief in the Delaware District Court.

## D.   30-month stays are discretionary.

By drafting Section 505(c)(3)(C) to say that full approval of a 505(b)(2) NDA "*may* be made effective upon the expiration of the thirty-month period," 21 U.S.C. § 355(c)(3)(C) (emphasis added), Congress gave FDA discretion over whether to issue a 30-month stay for a 505(b)(2) NDA. *See* Liquidia MTD 14 n. 3; *see also* Liquidia PI Opp. 21–22. UTC's short response to the statutory text—that Section 505(c)(3)(C) "cannot use the word 'shall,'" UTC Opp. 33—is the same response UTC gave earlier, *see* PI Reply 10. That response is still wrong because it still ignores 21 U.S.C. § 355(j)(5)(B)(iii), the 30-month stay provision for ANDAs. Section 505(j)(5)(B)(iii) is

drafted nearly identically to Section 505(c)(3)(C) *except that* Congress substituted the mandatory verb "shall" for the discretionary verb "may." That Congress varied these two critical verbs in parallel subparagraphs of the same statute confirms that Congress intended a difference. *See Bittner v. United States*, 598 U.S. 85, 94 (2023); *see also Smith v. Spizzirri*, 144 S. Ct. 1173, 1177 (2024) (holding that "the use of 'shall' … create[s] a mandatory obligation" that leaves "no place for the exercise of discretion") (quotation mark omitted). Stays are mandatory for ANDAs but not for 505(b)(2) NDAs. UTC offers no other plausible explanation for the difference in wording.

UTC's theory for why Section 355(c)(3)(C) "cannot use the word 'shall'" fails on its own terms. UTC theorizes that the verb "shall" would compel FDA to approve a 505(b)(2) NDA after 30 months even if "there might be reasons not to approve the application" at that time. UTC Opp. 33. But Section 355(c)(3)(C) does not say that "FDA may approve a 505(b)(2) NDA after 30 months," same as Section 355(j)(5)(B)(iii) does not say that "FDA shall approve an ANDA after 30 months." Neither subsection addresses the time when FDA approves an application. Both subsections address only the time when FDA's approval "may" or "shall" "be made effective." FDA can approve (or disapprove) 505(b)(2) NDAs and ANDAs whenever appropriate. For ANDAs, FDA shall not make its approval effective until the date that is 30 months after the ANDA was submitted. But for 505(b)(2) NDAs, FDA has discretion to make approval effective either immediately or on the date that is 30 months after the NDA was submitted.

10

## II.  Accepting the July Amendment for review was not the consummation of the FDA's decisionmaking as to any issue.

"Acceptance of a filing" is "undeniably interlocutory" because it "decides nothing concerning the merits of the case … ." *Papago Tribal Util. Auth. v. FERC*, 628 F.2d 235, 240 (D.C. Cir. 1980). UTC nonetheless contends that, by beginning review of the July Amendment, FDA rendered a final decision as to the question UTC wants this Court to adjudicate—whether FDA's rules and guidance allow a 505(b)(2) applicant to amend its tentatively approved NDA to add an indication to its drug's label after the manufacturer of the reference drug has added the same indication to the reference drug's label. *See* UTC Opp. 28–32. UTC argues that, simply by accepting the July Amendment for review rather than rejecting it upon submission, FDA irrevocably determined that "it was appropriate for Liquidia to seek approval by way of amendment." *Id.* at 28. *Accord id.* at 29 (claiming FDA's initiation of review of the July Amendment definitively determined "that Liquidia could add an indication to its existing 505(b)(2) application by amendment").

UTC's argument is divorced from reality. FDA's rules and guidance explain that FDA evaluates procedural issues generally, and bundling issues specifically, on a rolling basis. *See* Liquidia MTD 18; *see also* Killian Decl. Ex. 2 (ECF 24-3) at 4 (explaining that FDA considers the question whether a particular "application needs to be separated into more than one application" *both* "at the time of application receipt" *and* "during the course of the review of a submission"). FDA's approach is no different than how district courts may dismiss complaints on the pleadings, at summary judgment, or after trial. Just as a court that lets a plaintiff amend its complaint to add a

11

new claim can later grant the defendant's motion for summary judgment on that claim, FDA's "threshold determination that the NDA is sufficiently complete to permit a substantive review," 21 C.F.R. § 314.101(a)(1), does not preclude FDA from later deciding, after it has dug into the merits of an amendment, that the amendment should be unbundled. *Accord Mun. Light Boards of Reading & Wakefield, Mass. v. Fed. Power Comm'n*, 450 F.2d 1341, 1348 (D.C. Cir. 1971) ("The filing rules at issue here are designed to give the FPC a 'first cut' at the material in the filing. … We cannot say that the FPC was unreasonable in finding the filing sufficiently complete for it to be able to decide whether or not to investigate and suspend the increased rate.").

UTC doubles down, arguing that FDA's acceptance of the July Amendment conclusively determined not only that the amendment was procedurally appropriate, but also that FDA will not stay full approval of Liquidia's amended NDA. *See* UTC Opp. 31–32. FDA's written acknowledgment of receipt of the July Amendment says nothing about a stay, and FDA's initiation of substantive review of the July Amendment implies no such thing.[3] UTC is misattributing to FDA what Section 505(c)(3)(C)

---

3      To support the inference that UTC draws from FDA's acceptance of the July Amendment, UTC claims that a checklist FDA employees use when reviewing submissions for filing indicates that acceptance of an amendment is a considered agency decision and is therefore final agency action. *See* UTC Opp. 8. UTC reads too much into the checklist. Filing review generally and review of bundling issues specifically are high-level exercises; the checklist is a clerical tool employees use for consistency. Some items on the checklist, like whether the applicant claims exclusivity, have nothing to do with whether something may be filed. *See* FDA, Approval Package, Other Review(s), App. No. 208603, at PDF p. 5 (May 21, 2021). *If* employees identify a bundling concern during filing review, the checklist instructs them to consult with FDA staff about what to do. *See id.* p. 4. Acceptance of an amendment, then, could mean
(footnote continued on next page)

itself compels—that there can be no 30-month stay of full approval of Liquidia's amended NDA because UTC did not list the '793 patent or '327 patent before Liquidia submitted the 505(b)(2) NDA that the July Amendment amended.

UTC proposes two last-ditch reasons for why FDA's initiation of review is final agency action. *See* UTC Opp. 32. As to the first, UTC is wrong that FDA's acceptance of the July Amendment "relieved Liquidia of the obligation to pay a user fee." *Id.* Liquidia paid a user fee for its original submission, and, during review of the July Amendment, if FDA decides to unbundle it, FDA may demand another user fee (and if Liquidia pays within 5 days, the amendment's July 2023 filing date will be preserved). *See* p. 5 n. 2, *supra.*  As to the second, to say that FDA's acceptance of the July Amendment "obligated the agency to conduct a substantive review" is to say that any agency action that does not terminate a proceeding is final in that it commits the agency to continue. By that logic, any and every agency decision would be final agency action, which clearly is not correct.

UTC's complaint will not suddenly ripen if and when FDA takes final agency action on Liquidia's 505(b)(2) NDA. UTC's complaint is incurably premature and must be dismissed because the exclusive subject of the complaint, FDA's acceptance of the July Amendment and initiation of review, is inherently nonfinal agency action. *See* Liquidia MTD 19–20. Resisting that conclusion, UTC argues that case law dismissing petitions for review and APA complaints as incurably premature applies only when

---

that the employee handling the filing review identified no *obvious* bundling problem—which is one reason why FDA's guidance documents explain that bundling issues are reviewed continuously after filing. *See* p. 5 n. 2, *supra.*

an administrative petition for reconsideration is pending. *See* UTC Opp. 23 & n. 8. A petition for reconsideration, however, is simply one common example of a reason why courts dismiss APA complaints as incurably premature. Challenges to agency actions that are nonfinal for other reasons also are subject to dismissal as incurably premature. *See, e.g., Int'l Telecard Ass'n v. FCC*, 166 F.3d 387, 288 (D.C. Cir. 1999) (dismissing a challenge to a decision by bureau staff that had not been adopted by the full commission); *Cities of Anaheim & Riverside*, 692 F.2d at 780 (dismissing as premature a challenge to FERC's acceptance of an amendment to a permit application). FDA's mere initiation of review will *never* injure UTC, so UTC's challenge to that agency action will *never* ripen, not even with a final decision on the July Amendment.

UTC's complaint is incurably premature also because "a favorable decision from the agency might yet obviate the need for review by the court." *Clifton Power Corp. v. FERC*, 294 F.3d 108, 111–112 (D.C. Cir. 2002). FDA's final decision on Liquidia's NDA might injure UTC, or it might not. Like Liquidia, UTC must wait and see. Therefore, the Court should reject UTC's plea (UTC Opp. 34–35) to hold this case in abeyance until FDA's final decision, as other judges dealing with premature challenges to FDA action have done. *See AstraZeneca Pharms. LP v. FDA*, 850 F. Supp. 2d 230, 250 (D.D.C. 2012) (declining to hold a brand manufacturer's premature case against FDA "in abeyance for an indefinite period to wait and see whether this premature action ever ripens" because the court was "not in a position to prophesy whether the FDA will ultimately decide to give final approval to a competing generic, when that hypothetical decision might happen, or what relationship the agency's proffered

14

rationale for that hypothetical decision would have to the specific claim raised by AstraZeneca in this action"). Like Liquidia, UTC can file a complaint challenging FDA's final decision if warranted.

## III.   UTC's infringement case offers an adequate alternative remedy.

UTC's pending infringement case displaces the APA claims UTC asks this Court to adjudicate. *See* Liquidia MTD 20–23. UTC's objections miss the forest for the trees. *See* UTC Opp. 35–38.

It's true but irrelevant that the questions UTC presents in the two cases are not identical—that this Court won't address patent infringement, and the Delaware District Court won't address FDA's Bundling Guidance. *See id.* at 36. An APA claim is available only when the plaintiff has "no other adequate remedy in a court." 5 U.S.C. § 704. The key word in the statute is "remedy." Whether a non-APA claim displaces an APA claim depends, not on the questions presented, but on the remedies available—whether they are of "the same genre" and would "put the plaintiff in the position in which they seek to be placed." *Avadel CNS Pharms., LLC v. Becerra*, 638 F. Supp. 3d 23, 33–34 (D.D.C. 2022) (citing *Garcia v. Vilsack*, 563 F.3d 519, 522, 525 (D.C. Cir. 2009)). Infringement remedies and APA remedies are of the same genre because both are equitable, and they could put UTC in the position in which it seeks to be placed—extending its monopoly by delaying Liquidia's entry into the market.

In agreeing that infringement litigation displaces APA claims over 30-month stays, Judge Mehta in *Avadel* relied on the statutory links between infringement litigation and 30-month stays as strong evidence of Congress' intent. Section

505(c)(3)(C)'s clauses and subclauses give the district court hearing the infringement case authority to control the length of any stay FDA imposes, *see* 21 U.S.C. § 355(c)(3)(C)(i)–(iv), and patent laws give that district court authority to set "the effective date of any approval of the drug" at issue in the infringement case, 35 U.S.C. § 271(e)(4)(A). APA claims over 30-month stays are unnecessary because "Congress plainly contemplated that the affirmative patent infringement action filed pursuant to Section 355(c)(3)(C) would itself resolve any dispute between the patentholder and the NDA applicant and lead to the establishment of the effective date of approval for the NDA." *Avadel*, 638 F. Supp. 3d at 33. UTC offers no response to Judge Mehta's textual analysis except to call it "unnecessary dictum." UTC Opp. 38. But a considered holding is not dictum merely because it is an alternative holding. *See Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 673 (D.C. Cir. 2013) (citing *United States v. Title Ins. & Trust Co.*, 265 U.S. 472, 486 (1924)).

Arguing that "Congress established the automatic 30-month stay *to avoid* forcing patent owners to pursue emergency relief to protect their patent rights before a market-altering launch of a potential infringing product," UTC Opp. 36, UTC contends that APA relief is necessary to effectuate Section 505(c)(3)(C)'s purpose. UTC's contention is a non sequitur. That Congress may have enacted Section 505(c)(3)(C) to minimize litigation burdens in discrete circumstances[4] does not answer the question

---

4    UTC exaggerates the statute's purpose. Because 30-month stays are discretionary, *see* pp. 9–10, *supra*; because they are available only when Section 505(c)(3)(C)'s strict sequencing requirements are met, *see* Liquidia MTD 9, 12–13; and because the statutory parenthetical states that amendments do not trigger stays,

(footnote continued on next page)

of where a patentholder must go for judicial relief when litigation burdens have become inevitable. The question is not whether "fil[ing] a motion for preliminary injunction in the patent case is an adequate substitute for UTC's loss of a statutory right to a 30-month stay." UTC Opp. 36. The question is whether, if FDA does not stay full approval for 30 months, the remedies available to a patentholder in a patent proceeding are an adequate substitute for the remedies available in an APA proceeding.

UTC's attack on the adequacy of its patent remedies rests on a false comparison. It may be easier and cheaper to win a 30-month stay from FDA than to win a preliminary injunction from an infringement court. *See id.* at 37. But Section 704 asks whether a non-APA remedy "requires a person to undergo an arduous, expensive, and long process" *as compared with an APA remedy. Id.* at 36 (quoting *Gonzalez Boisson v. Pompeo*, 459 F. Supp. 3d 7, 13 (D.D.C 2020) (Bates, J.)).

When a dispute over a 30-month stay spills into court, obtaining relief from a patent court is not so arduous that it renders patent remedies an inadequate alternative to APA remedies. UTC insists otherwise, pointing to its failure to obtain preliminary relief in the Delaware District Court. *See* UTC Opp. 37. But UTC also failed to obtain preliminary relief in this Court, and besides, Section 704 tasks the Court with comparing the full suite of remedies available in both cases, not just the preliminary remedies. While litigating the merits of an infringement claim can be more fact-intensive than litigating the merits of an APA claim, that comes with the potential

---

*see* 21 U.S.C. § 355(c)(3)(C), the manifest purpose of Section 505(c)(3)(C) is much more limited than UTC imagines.

for the patent court to award superior relief—a delay of full approval that lasts until the patents expire, as well as damages if the competitor launches "at risk" before the infringement litigation concludes.

## IV.   The July Amendment is procedurally appropriate.

## A.   The Bundling Guidance does not forbid the July Amendment.

Assuming for argument's sake that UTC has cleared the threshold hurdles, the Court still must dismiss because UTC has not stated a valid APA claim. UTC urges the Court to delay evaluating the merits of its APA claim until FDA produces an administrative record. *See* UTC Opp. 39. While an administrative record is almost always necessary for a court to evaluate a claim of arbitrary-and-capricious agency action, a record is not always necessary to evaluate whether agency action is permitted or forbidden by "the relevant statute," "its legislative history," and "materials published in the Federal Register." *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 112 (D.D.C. 2011). Purely legal objections can be reviewed on the face of the laws and regulations at issue *See, e.g.*, *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266 (D.C. Cir. 2001). This is one of those cases: the Court does not need an administrative record to review UTC's contention that FDA's Bundling Guidance forbids all amendments that add indications to an NDA.

18

The Court need not interpret the Bundling Guidance to resolve the case. For, even if the Guidance were binding[5] and even if it means what UTC claims—that is, even if the Guidance at one time categorically forbade all new-indication amendments—later, more authoritative laws and rules undisputedly allow some new-indication amendments. The FDCA enshrines the right to amend and, though it forbids some amendments, does not forbid new-indication amendments. Two of FDA's regulations, in turn, explicitly and specifically authorize amending 505(b)(2) NDAs to add indications. *See generally* Liquidia MTD 25–26.

UTC contends that the FDCA's prohibition on different-drug amendments effectively prohibits new-indication amendments because "a new indication requires a new safety and efficacy conclusion." UTC Opp. 43. This is a non sequitur. FDA must make a finding of safety and effectiveness to approve every change to an NDA, including changes that obviously do not render the drug a "different drug" (*e.g.*, changing the dosing, using a new manufacturing process, and even seemingly minor labeling changes). *See* 21 U.S.C. § 355(d). So, the fact FDA must make a finding of safety and effectiveness to approve a new-indication change does not imply that the drug has changed. *Some* new-indication amendments change a drug; *some* don't. Thus, as FDA said when it rejected the position UTC espouses, to treat all amendments proposing labeling changes as different-drug amendments "would have resulted in an

---

5    One sentence from a Federal Register notice referring to the Guidance generally as a "require[ment]," UTC Opp. 40, does not overcome that the Guidance was not enacted via notice-and-comment rulemaking, that regulations declare that FDA's guidance documents are nonbinding, and that the Guidance itself states that it is nonbinding. *See* Liquidia MTD 27.

unwarranted departure from FDA's previous practice for handling such changes." MMA Proposed Rule, 80 Fed. Reg. 6802, 6851.

UTC next contends that 21 C.F.R. § 314.60(f)(1)(i), one of the two regulations that refer to new-indication amendments of 505(b)(2) NDAs, "has no relevance here" because the July Amendment did not change YUTREPIA's status from prescription to over the counter, the lone new-indication amendment mentioned in the regulation's preamble. *See* UTC Opp. 42. UTC's effort to use the regulation's preamble to limit the regulation's text is wrong,[6] but even if UTC were correct, UTC misses the point. No matter how many different types of new-indication amendments the regulation envisions, the fact that the regulation envisions *even one* new-indication amendment explodes the major premise of UTC's case—that *all* new-indication amendments are categorically forbidden under the Bundling Guidance.

Not that UTC's major premise is sound; the July Amendment *can* "be squared with" the Bundling Guidance. *Id.* at 42. The "plain language" of the Guidance, *id.* at 39, does not *forbid* anything—it's advisory, by its own terms and by law, *see* Liquidia MTD 26–30—let alone forbid a 505(b)(2) applicant from amending a tentatively

---

6    UTC argues that the regulation's preamble implicitly limits the regulation's broad text because the preamble expresses support for and "effectively codified" the Bundling Guidance (UTC Opp. 9) and because the only new-indication amendment FDA mentioned in the preamble is one that changes a drug's status from prescription to over the counter (*id.* at 42). That FDA abstractly supports its bundling policies does not clarify the meaning of a regulation that explicitly authorizes new-indication amendments. The preamble's full text, moreover, identifies status-change amendments as just one "example," not the only example, of the types of new-indication amendments that 505(b)(2) applicants may submit in accordance with the regulation. *See* Liquidia MTD 30 (quoting the preambles to the proposed and final rules).

approved NDA to add an indication that the reference drug's sponsor added to its own NDA. UTC claims that "[n]othing" in the Guidance "supports … a distinction between" amendments submitted before and after tentative approval. UTC Opp. 40. On the contrary, the Guidance explains that it generally advises against new-indication amendments when they will prevent the agency from fulfilling its statutory, nondiscretionary duty to complete review of an NDA within 180 days. *See* Liquidia MTD 28. An amendment to a tentatively approved NDA, however, cannot cause the agency to miss its review deadline because, by definition, the agency meets the deadline when tentatively approving the NDA.

Resisting the import of the Bundling Guidance's discussion of review deadlines and goal dates, UTC argues that FDA has applied the Bundling Guidance consistent with UTC's interpretation because FDA once rejected an amendment "of Aptivus Oral Solution, despite a tentative approval." UTC Opp. 40. The Aptivus case did not have a tentative approval. On the contrary, FDA had identified substantive deficiencies and did not approve the application: on June 22, 2005, the applicant received a notification that is application was approvable *but for* the "absence of adequate bioequivalence data or relative bioavailability data" as compared *its own* capsule formulation of the product. *See* FDA, Other Actions Letter(s), App. No. 021822 at PDF p. 2 (June 2005), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2008/021822s000other-actionltrs.pdf.[7]

---

[7]    Aptivus and the other examples UTC alleges (UTC Opp. 43–44) are also distinguishable in the ways Liquidia already described (Liquidia MTD 33–34).

B.     The July Amendment does not violate the rule against
       submitting data for major amendments.

UTC's last objection to the July Amendment, that it violates 21 C.F.R.
§ 314.60(b)(6)'s prohibition on major amendments that include data, is factually and
legally unfounded. On the facts, UTC acknowledges Liquidia's public representation
that the July Amendment "contains no data," yet UTC insists that Liquidia was lying.
UTC Opp. 45. Such a conclusory allegation of misrepresentation cannot be credited.
*See, e.g.*, *Plummer v. Safeway, Inc.*, 934 F. Supp. 2d 191, 197–198 (D.D.C. 2013).

UTC tries to buttress its allegation with a legal argument that the July Amend-
ment "necessarily" included data insofar as it relied on UTC's clinical studies. *See*
UTC Opp. 45. A paragraph later, however, UTC admits that Liquidia could not actu-
ally rely on UTC's clinical studies—Section 505(b)(2) forbids it, *see* Liquidia MTD 37–
38—and so contends that Liquidia's reliance on FDA's finding that Tyvaso is safe
and effective for PH-ILD is "effectively the same" thing as relying on UTC's clinical
studies. UTC Opp. 45. But here, formality matters. 505(b)(2) applicants are allowed
to rely on FDA's prior findings. UTC's cursory assertion that relying on others' clinical
studies and relying on FDA's findings are "effectively the same" is itself effectively an
attack on Section 505(b)(2) and the expedited process Congress designed for FDA to
review and approve drugs, like Yutrepia, that are in part novel and in part the same
as already-approved, reference drugs.

22

## Conclusion

The Court should dismiss UTC's complaint with prejudice.


Dated: June 25, 2024                    Respectfully submitted,

                                        /s/ Bryan Killian
                                        Bryan Killian (DC Bar No. 989803)
                                        David B. Salmons (DC Bar No. 476299)
                                        MORGAN, LEWIS & BOCKIUS LLP
                                        1111 Pennsylvania Avenue, NW
                                        Washington, DC 20004
                                        T: (202) 373-6191
                                        F: (202) 739-3001
                                        bryan.killian@morganlewis.com
                                        david.salmons@morganlewis.com

23

## Certificate of Service

I hereby certify that on June 25, 2024, I caused a true and correct copy of the foregoing to be served by CM/ECF on all counsel of record.

/s/ Bryan Killian

24